**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Bostwick Laboratories, Inc., *et al.*,[1] | Case No. 17-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF TAMMY HUNT IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1764, Tammy Hunt declares as follows under penalty of perjury:

1.      I am the Chief Financial Officer of Bostwick Laboratories, Inc., a Delaware corporation ("BLI") and Bostwick Laboratories Holdings, Inc., a Delaware corporation ("BLHI"), the above-referenced debtors and debtors-in-possession (collectively, the "Debtors") in these proceedings.  I am familiar with the Debtors' day-to-day operations, business, financial affairs and books and records.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, the "Bankruptcy Code").  The Debtors are continuing to operate their business and manage their property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      I submit this affidavit (the "Affidavit") concurrently with each of the Debtors' chapter 11 petitions (i) to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and (ii) in support of

---

[1]      The Debtors are the following entities (last four digits of EIN in parentheses): (i) Bostwick Laboratories, Inc., a Delaware corporation (3169); and (ii) Bostwick Laboratories Holdings, Inc., a Delaware corporation (1042). The mailing address for the Debtors is 100 Charles Lindbergh Blvd., Uniondale, NY 11553.

the petitions and various motions and applications (collectively, the "First Day Pleadings")[2] of the Debtors filed contemporaneously herewith.  A copy of the resolutions of the Boards of Directors, or such other resolutions or authorizations as are appropriate, authorizing the filing of each of the Debtor's petitions is annexed to each Debtor's respective petition.  Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Affidavit.  I am authorized to submit this Affidavit on behalf of the Debtors.

4.      This Affidavit is divided into two parts.  Part I describes the Debtors' business, capital structure, the circumstances that led to the filing of these chapter 11 cases and the goals of these chapter 11 cases.  Part II sets forth relevant facts in support of each of the First Day Pleadings.

## PART I

## BACKGROUND

A.      **Debtors' Organization and Structure**

5.      BLI was founded in 1999 and is headquartered in Uniondale, New York.  BLI is a wholly owned subsidiary of BLHI.  BLHI has no business operations of its own.  BLHI is a wholly owned subsidiary of Bostwick Laboratories Group Holdings, LP, a Delaware partnership ("Bostwick Holdings") and a non-debtor in these chapter 11 cases.

---

[2]      Terms not defined herein shall have the meanings ascribed to them in the applicable First Day Pleadings.

#43002631 v6

B.     **Description of the Debtors' Business**

6.      BLI is an independent, full-service anatomic pathology laboratory and specialty provider of diagnostic testing services for urologists and gynecologists in the United States of America (the "United States").  BLI is also a reference laboratory offering a suite of anatomic pathology and molecular testing services to independent physicians nationally.

7.      BLI provides laboratory services to the approximately $1.3 billion urology market, with over 15 years of experience in the field of diagnostic and prognostic testing for the approximately 7,500 non-hospital based urologists practicing in the United States.  BLI also has testing capabilities to serve other select subspecialty markets outside of urology, including women's health / OBGYN, gastroenterology, nephrology, and dermatology.

8.      BLI's commercial infrastructure and centralized laboratory facility allows service to customers in all fifty (50) states.  Its commercial infrastructure includes billing, client services, field technicians, and information technology.

9.      BLI is integrated within physician practices through a full suite of practice solution capabilities.  BLI also employs directly a team of specialized pathologists.

C.     **Sources of Revenue**

10.      BLI is in-network with key large national commercial health insurance plans, as well as Medicare and over twenty-five (25) state Medicaid programs.  The vast majority of BLI's business is considered to be "in-network" and driven by those key commercial and government contracts.  BLI receives approximately half of its revenue from commercial payors.

11.      BLI maintains a diverse range of customers, both in geographic range and type of practice.  The majority of BLI's large accounts have longstanding relationships and view BLI as a key relationship to their practice.

D.    **Leased Properties and Employees**

12.    The company's headquarters is located in a leased building in Uniondale, New York and houses of all the laboratory operations.  The 77,800 square foot facility contains extensive state of the art testing platforms and has been constructed to streamline operations and increase efficiency.  BLHI is a guarantor of the Uniondale, New York lease.  Additionally, BLI leases support facilities in Virginia and Florida.

13.    BLI has approximately 193 employees, with approximately 125 employees located at the laboratory facility in Uniondale, New York.  The employees perform a variety of critical functions relating to the business, including billing and registration, sales and marketing, and laboratory operations.

E.    **Capital Structure**

14.    On September 17, 2012, BLI executed an agreement for a revolving loan facility (as amended, the "First Lien Revolver") with General Electric Capital Corporation ("GE Capital").  Subsequent to that date, BLI executed several amendments, primarily related to covenant calculations, under which Healthcare Financial Solutions, LLC (the "Agent") became successor to GE Capital.  The Agent is a wholly owned affiliate of Capital One, N.A.  The First Lien Revolver is for an amount up to $12,500,000, matures on September 17, 2017, and the interest is based on LIBOR plus 3.5% (3.733% at December 31, 2015).  The balance outstanding on the First Lien Revolver as of the Petition Date is approximately $1,823,000.  The First Lien Revolver is secured by a first lien on substantially all of the assets of BLI.  BLI's obligations under the First Lien Revolver are guaranteed by BLHI.  The First Lien Revolver will be satisfied in full from the debtor-in-possession financing in these chapter 11 cases.

15.    BLI is indebted in the approximate amount of $950,000 in notes (the "Second Lien Notes") issued under a Note Purchase Agreement, dated February 21, 2017 (the "NPA") to

-4-

certain "Purchasers" as defined in the NPA.  The Second Lien Notes are secured by all of BLI's assets but are subordinated to the First Lien Revolver under a subordination agreement with the Agent (as amended, the "Subordination Agreement").

16.    BLI is indebted in the approximate of $40,000,000 in aggregate principal amount of notes (the "Unsecured Notes", and together with the Second Lien Notes, the "Notes") issued under a series of note purchase agreements dating from 2013 through 2016.  Like the Second Lien Notes, the Unsecured Notes are subject to the Subordination Agreement.

17.    In August 2014, BLI entered into a settlement agreement with the Department of Justice (the "DOJ"), under which BLI agreed to pay the DOJ $7,000,000.  The agreement resulted in a $3,200,000 unsecured installment note, payable in seventeen quarterly installments, beginning June 2016 with interest at 2.25%.  The note matures in June 2020.  As of the Petition Date, the amount owed to the DOJ is $2,702,020.80.

## F.    Background and Events Leading to Chapter 11

18.    BLI was founded in 1999.  Although BLI initially experienced growth, there were unexpected and severe cuts to the Medicare physician fee schedule in 2013, with reimbursement for certain Current Procedural Terminology ("CPT") codes being reduced as much as 52%.[3] These cuts were a major factor in BLI realizing a revenue reduction of almost 20% from 2012 to 2013.

19.    Facing those reductions in revenue, BLI focused on cost reductions and streamlining operations to achieve cost efficiencies and to reduce overhead.  Four testing locations were closed, and laboratory testing was consolidated into the remaining testing facility

---

[3]    CPT is a code set that is published and maintained by the American Medical Association.  The CPT codes are used to describe tests, surgeries, evaluations, and any other medical procedure performed by a healthcare provider on a patient.

in Uniondale, New York.  BLI liquidated assets to lower overhead and generate cash to fund operations.  BLI sold a non-anatomic pathology clinical testing segment of the business in 2014. The Debtors also divested themselves of ownership of the Uniondale facility through a sale-leaseback agreement.

20.    BLI also engaged in negotiations with its supply chain and vendors to further reduce costs.  BLI reduced its employee count from approximately 600 at the start of 2013 to fewer than 200 remaining today.  While all of these efforts minimized expenses and produced liquidity, the efforts to streamline operations ultimately left the company with far fewer assets and less revenue.

21.    Although BLI engaged in vigorous efforts to become profitable, the reduced expenses could not keep up with and counteract the continued reduced reimbursement and lowering revenue.  BLI's revenues are approximately one-third of what the company generated in 2012.  Despite the lowered revenue, BLI has significant "fixed" costs in relation to real estate leases, insurance, system costs and necessary administrative functions.  Moreover, the cost to employ BLI's highly specialized experienced pathologists is significant.  Based on the hands-on, manual nature of laboratory testing, BLI did not engage in any further reductions to its laboratory staff.  BLI believed that any further reduction efforts would have affected negatively its ability to sell itself as a going concern.

## G.    Pre-Petition Marketing of the Debtors' Assets

22.    As a result of continuing negative cash flow from its business, in August of 2016, the Debtors retained Leerink Partners LLC ("Leerink"), an investment banking firm with extensive experience in the health care industry, to assist and advise on the process of identifying a buyer for the Debtors' business.  Beginning in late August, 2016 and early September, 2016 Leerink began a marketing process aimed at identifying potential strategic

-6-

buyers.  At the outset, Leerink contacted approximately thirty potential buyers, eighteen of which signed confidentiality agreements.  In the early stages of the sale process, the field was narrowed to a handful of prospects because of the length of time requested by many prospects to conduct due diligence.

23.     In their continued efforts to seek to maximize value through the sale of the business, the Debtors began to explore interest in a potential sale of their assets under section 363 of the Bankruptcy Code.  The Debtors determined that, given their liquidity needs, existing secured debt facilities, and continued operational losses, a successful section 363 sale process would require debtor-in-possession financing, and the only likely providers of such financing would be a potential buyer of the Debtors' business.  Only two potential bidders expressed an interest in providing such financing.

24.     The Debtors, through a special transactions committee of the Debtors' board of directors, ultimately determined that Poplar Healthcare, PLLC (the "Stalking Horse Bidder") was best situated to enter into an asset purchase agreement and to provide debtor-in-possession financing.  The Debtors concluded that the Stalking Horse Bidder's bid was superior because of the Stalking Horse Bidder's willingness to provide the Debtors with the necessary debtor-in-possession financing to fund the debtors' chapter 11 cases, and the Stalking Horse Bidder's ability to move quickly to document a binding asset purchase agreement and debtor-in-possession financing.  Beginning on approximately March 1, 2017, the Debtors and their professionals negotiated an asset purchase agreement (the "Stalking Horse APA") and a debtor-in-possession credit facility (the "DIP Credit Agreement") with the Stalking Horse Bidder.  The Stalking Horse APA was signed on March 13, 2017, and the DIP Credit Agreement was finalized shortly thereafter.

25.    The Stalking Horse APA provides for the following consideration:

| Sale Consideration | $5,405,000, less any then-outstanding amounts due under a proposed debtor-in-possession facility to be provided by the Stalking Horse Bidder (the "DIP Facility"). As additional consideration for the purchase of the Purchased Assets, the Stalking Horse Bidder will agree to perform, and in due course pay and discharge, the following obligations and liabilities of the Debtor: |
|---|---|
| | a. Up to $1,250,000 in principal amount of Second Lien Notes, after giving effect to the modification of the Second Lien Notes pursuant to the Second Lien Notes Amendment substantially in the form of Exhibit D to the Stalking Horse APA providing for (X) amortization over a period of 18 months at an interest rate of 8% and (Y) the right for the Stalking Horse Bidder to prepay the Second Lien Notes at any time without penalty; |
| | b. the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees; |
| | c. cure costs under Bankruptcy Code Section 365 for all Assumed Contracts and Assumed Leasehold Interests; and |
| | d. Assumed Taxes. |

## H.    Goals of Chapter 11 Cases

26.    The Debtors seek the sale of all of their assets through the Stalking Horse APA, subject to a competitive sale process under Bankruptcy Code section 363.  The Debtors believe that the consummation of such a sale on terms favorable to the Debtors, their creditors and other stakeholders will provide the best opportunity possible for maximizing value under the circumstances.

## PART II

27.    The Debtors have filed the First Day Pleadings and related orders (the "Proposed Orders") seeking various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Pleadings include:

a.    Debtors' Motion For Entry of An Order Directing Joint Administration Of The Debtors' Chapter 11 Cases  (the "Joint Administration Motion");

-8-

b.      Application for an Order Appointing Donlin, Recano & Company, Inc., Nunc Pro Tunc as of the Petition Date, As Claims And Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c) (the "DRC Retention Application");

c.      Debtors' Motion for Entry of Interim and Final Orders Authorizing Continued Use of the Debtors' Cash Management System (the "Cash Management Motion");

d.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Taxes  (the "Taxes Motion");

e.      Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations (the "Employee Wages Motion");

f.      Debtors' Motion for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to the Debtors' Utility Providers (the "Utility Motion");

g.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Insurance Policies and Pay Related Obligations (the "Insurance Motion");

h.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Obligations to Customers and Continue Prepetition Customer Practices in the Ordinary Course of Business (the "Customer Programs Motion");

i.      Debtors' Motion For Order Authorizing Payment Of Prepetition Claims Of Certain Critical Vendors (the "Critical Vendors Motion");

j.      Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) And 507 Of The Bankruptcy Code (I) Authorizing Debtors To (A) Obtain Post-Petition Secured Financing From

Poplar Healthcare, PLLC; (B) Utilize Cash Collateral; And (II) Scheduling A Final Hearing (the "<u>DIP Financing Motion</u>"); and

       k.     Debtors' Motion for Order Expediting Consideration of, and Shortening the Notice Period Applicable to, the Bid Procedures and Bid Protections Component of the Debtors' Sale Motion (the "<u>Expedited Bidding Procedures Motion</u>").

28.    In summary, I believe that the relief requested in these First Day Pleadings is in the best interests of the Debtors, their estates, their creditors, and all parties-in-interest, and should be granted in all respects.

29.    I believe that the relief requested in the First Day Pleadings is necessary to provide the Debtors an opportunity for successful chapter 11 cases to the benefit of all of the Debtors' stakeholders.

30.    Many of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored the relief they seek through the First Day Pleadings to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

31.    I have reviewed each of the First Day Pleadings, Proposed Orders and exhibits thereto. In my opinion, approval of the relief sought in each of the First Day Pleadings (i) is vital

to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption and disruption to their business or loss of productivity or value and (ii) is critical to ensuring that the Debtors are able to successfully maximize value for the benefit of their estates.

32.     **Joint Administration Motion**.  By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these chapter 11 cases and the consolidation thereof for procedural purposes only.  Many of the motions, applications, hearings, and orders that will arise in these chapter 11 cases will affect both of the Debtors jointly.  Joint administration of these chapter 11 cases will ease the administrative burden on this Court and all parties in interest.  Joint administration of these chapter 11 cases will not prejudice creditors or other parties in interest because joint administration is purely procedural and will not impact the parties' substantive rights.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

33.     **Donlin, Recano & Company, Inc. Retention as Noticing Agent.**  By the DRC Retention Application, the Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. ("DRC") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  The Debtors' selection of DRC to act as the claims and noticing agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

#43002631 v6

34.     DRC is one of the country's leading chapter 11 administrators and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  Their professionals have acted as the official claims and noticing agent in many large bankruptcy cases in this District and in other districts nationwide.  DRC is well qualified to provide experienced claims and noticing services in connection with these chapter 11 cases.

35.     In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the DRC Retention Application should be approved.

36.     **Cash Management Motion.**  By this Motion, the Debtors seek entry of an order authorizing the Debtors to continue to operate their existing cash management system (the "Cash Management System").  The Cash Management System is designed to efficiently collect, transfer, and disburse funds for the Debtors.

37.     By the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to: (a) continue to operate their Cash Management System; and (b) honor certain prepetition obligations related thereto.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Cash Management Motion on a final basis.

38.     The continuation of the Debtors' Cash Management System is essential to the Debtors' business and any disruption in the Debtors' use of the Cash Management System would

significantly disrupt the Debtors' operations.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

39.    **Taxes Motion.**    By the Taxes Motion, the Debtors seek the authority to pay property, sales and use taxes and commercial activities taxes (collectively, the "Taxes") to the respective taxing authorities (collectively, the "Authorities") and (ii) authorizing and directing financial institutions to receive, process, honor and pay all related electronic payment requests for payment of the related Taxes, whether issued or presented prior to or after the Petition Date. The Debtors are not seeking authority to pay any pre-petition tax owed to the state of New York based upon the metropolitan commuter transportation mobility tax ("MCTMT").    By the interim Proposed Order, the Debtors are requesting that they be authorized, but not directed, to remit or pay to the Authorities the Taxes that accrued prior to the Petition Date and that will become payable in the ordinary course of business, at such time when the Taxes are payable, in an aggregate interim amount not to exceed $13,000.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Tax Motion on a final basis.

40.    In the ordinary course of business, the Debtors incur property, sales and use taxes and commercial activities taxes, as more fully described in the Taxes Motion.  The Debtors' failure to pay prepetition Taxes may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, or seeking to lift the automatic stay, all of which would greatly disrupt the Debtors' operations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

41.    **Employee Wages Motion.**    By the Employee Wages Motion, the Debtors seek the authority to: (i) pay and/or perform, as applicable, prepetition obligations to current

employees including accrued prepetition wages, salaries, commissions, incentives and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (ii) maintain and continue to honor its practices, programs, and policies for their employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Debtors' various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (iii) reimburse employees for prepetition expenses incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (iv) continue to pay and/or contest in good faith all amounts related to workers' compensation claims that arose prepetition (the "Workers' Compensation Obligations"); (v) pay all related prepetition withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations and (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of any prepetition Employee Obligations.  No employee shall be paid more than the priority amounts set forth in Section 507(a)(4) and (a)(5) of the Bankruptcy Code ($12,850.00).  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Employee Wages Motion on a final basis.

42.      I believe that it is in the best interest of the estates for this Court to authorize the Debtors to make such payments and honor obligations owed to, or for the benefit of, the

#43002631 v6

Employees so as to enable the Debtors to maintain morale, retain its remaining Employees during this critical time, and minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due or honored as expected.  At this critical stage of these chapter 11 cases, the Debtors simply cannot risk the substantial disruption that would accompany any decline in workforce morale resulting from the Debtors' failure to pay the Employee Obligations in the ordinary course of its businesses, which could jeopardize the Debtors' efforts to preserve and maximize the value of their assets in these cases for the benefit of their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wages Motion should be approved.

43.    **Utility Motion.**  By the Utility Motion, the Debtors seek authority to deposit $45,000 into a newly created, segregated, interest bearing account (the "Adequate Assurance Deposit") to satisfy their obligations to provide adequate assurance under Bankruptcy Code section 366 to the utility companies (the "Utility Companies") that provide utility services to the Debtors, including, but not limited to, telephone, internet, gas, electric, waste removal, and water (collectively, the "Utility Services").  The Debtors further request that the Court set procedures to be followed by any Utility Company seeking additional assurance.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Utility Motion on a final basis.

44.    Uninterrupted service from the Utility Companies is essential to maintaining the Debtors' ongoing operations and to preserving value for all interested stakeholders.  For the Debtors to preserve the value of their estates, their operations must continue to operate without interruption.  Any temporary or permanent discontinuation of utility services could irreparably

disrupt the Debtors' business operations and, as a result, diminish recoveries to the Debtors' stakeholders.

45.     I believe that approval of the Utility Motion is essential to preserve the value of the Debtors' assets and that the proposed adequate assurance should alleviate, if not eliminate, any concern of non-payment on the part of Utility Companies.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utility Motion should be approved.

46.     **Insurance Motion.**  By the Insurance Motion, the Debtors seek authority to (a) continue existing insurance coverage entered into prepetition and satisfy prepetition payment obligations related thereto in an aggregate amount not to exceed $25,000; (b) satisfy postpetition obligations related to the Insurance Policies, including any amounts owed to the Insurance Broker and (c) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business.

47.     In the ordinary course of business, the Debtors maintain certain insurance policies (collectively, the "Insurance Policies") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers").  These policies provide coverage for, among other things, the Debtors' general liability, professional liability, automobile, workers' compensation, umbrella, excess, crime, property, cyber and director and officer liability.

48.     Continuation of the Insurance Policies and entry into new insurance is essential to the preservation of the value of the Debtors' business and operations.  Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

#43002631 v6

Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

49.    **Customer Programs Motion.**    In the ordinary course of business, the Debtors bill insurance companies of customers that receive services from their clinical laboratory and also individual customers.  In certain instances, after a customer pays the Debtors for a service, the customer's insurance company remits payment for the same underlying service to the Debtors.  The Debtors are periodically informed by the individual customers of the double payment and a refund request is made by the customer for the overpayment/duplicate billing. The Debtors then remit refunds to the individual customers (the "Individual Refunds") in the ordinary course of business.

50.    Additionally, a substantial portion of the Debtors' business involves individuals for whom services are paid for through government programs such as Medicare or by other third parties such as insurance companies (collectively, the "Third Party Payors").  In the ordinary course of their business, the Debtors routinely bill the Third Party Payors for services rendered to individuals who are covered by the Third Party Payors' programs.  In rendering payment on such bills, the Third Party Payors occasionally reimburse for services that are more appropriately payable by another payor, or for various reasons are paid in error.  In the ordinary course of business and pursuant to the applicable programs, the Debtors remit those funds to the Third Party Payors or those overpayments are subsequently withheld from later payments by the Third Party Payors to the Debtors (collectively, the "Third Party Refunds").  Through this process, the Debtors are appropriately compensated for the services performed and the Third Party Payors are refunded overpayments.

-17-

51.    By the Customer Programs Motion, the Debtors seek authority to honor and perform their prepetition Individual and Third Party Refund obligations and to continue to issue Refunds and permit Third Party Refunds postpetition in the ordinary course.

52.    The Debtors' relationships with their customers and the Third Party Payors are the backbone of their business. The Debtors' ability to honor and perform their prepetition Individual and Third Party Refund obligations and to continue to issue Refunds and permit Third Party Refunds postpetition in the ordinary course is critical to the Debtors' goodwill and business. I believe that the relief requested in the Customer Programs Motion is necessary to preserve the Debtors' critical customer relationships and goodwill, thereby maximizing the value of the Debtors' business and assets for the benefit of the estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

53.    **Critical Vendors Motion.** By this Critical Vendors Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay the claims of certain critical vendors (the "Critical Vendor Claims") in an amount not to exceed $200,000 (the "Estimated Amount").

54.    The Debtors rely upon certain vendors, suppliers, and service providers that are critical to its ongoing operations (the "Critical Vendors") in its highly specialized, highly regulated, and highly competitive industry. In determining the Critical Vendors, the Debtors reviewed, among other things, (i) which vendors provide delivery services essential to the transport of samples to and from the Debtors for testing, without which the Debtors could not perform their lab testing services, (ii) which vendors are sole-source or limited-source suppliers or service providers, without which the Debtors could not continue to operate; (ii) which vendors would be prohibitively expensive to replace; and (iii) which vendors are simply at risk of ceasing

the provision of truly essential services or supplies.  The Debtors then estimated the amount they believe may be required to pay for prepetition obligations to ensure the continued supply of critical goods and services, the aggregate of which formed the basis for the  Estimated Amount.

55.    While the Debtors hope to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the Critical Vendors, they recognize that their fiduciary duties bind them to consider and plan for those Critical Vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Critical Vendors are essential to the Debtors' business, and the lack of each of their particular services, even for a short duration, will likely cause harm to the Debtor's valuable business relationships, revenue, and goodwill.  Specifically, any disruption in the ability to receive samples and deliver test results would almost assuredly cause the collapse of the Debtors' entire business operations and would directly affect the continuity of patient care which could result in serious harm to patients including even death.  This harm and disruption would far outweigh the cost of payment of the Critical Vendor Claims.

56.    I believe that it is in the best interest of the Debtors, their estates, creditors, and other parties in interest, for the Debtors to have the ability to pay some or all of the Critical Vendor Claims.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved.

57.    **DIP Financing Motion.**   By the DIP Financing Motion, the Debtors seek authority to enter into that certain Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") between Bostwick Laboratories, as borrower, and Poplar Healthcare PLLC, as lender (in such capacity, the "DIP Lender").  Pursuant to the DIP Credit Agreement, the DIP

Lender will provide a senior secured priming debtor-in-possession credit facility (the "<u>DIP Facility</u>") up to an aggregate amount of $5,116,000.00.

58.     Pursuant to the DIP Financing Motion, the Debtors will be authorized to obtain an Initial Credit Advance of up to $3,323,000 on an interim basis.  The Initial Credit Advance represents the amounts being advanced to pay off the First Lien Revolver in the approximate amount of $1,823,000 and a $1,500,000 advance to the Debtors to defray operating expenses.

59.     BLI is in need of an immediate infusion of liquidity.  BLI has limited cash on hand with which to maintain the Debtors' businesses through the sale process or to otherwise fund the administrative costs of these chapter 11 cases.  Without the financing to be provided by the DIP Facility, BLI would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders.

60.     Based upon my understanding of the Debtors' liquidity needs, the current state of debt markets and recent inquiries to other potential sources of debtor-in-possession financing, I do not believe that alternative sources of financing are readily available to the Debtors.  The DIP Credit Agreement is the result of arm's-length and good faith negotiations between the Debtors and the DIP Lender. I believe that the terms and conditions of the DIP Credit Agreement are fair and reasonable and necessary to preserve and maximize the value of assets in these case for the benefit of the estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Financing Motion should be approved.

61.     **Expedited Bidding Procedures Motion.**  By the Expedited Bidding Procedures Motion, the Debtors seek entry of an order scheduling a hearing on the Bid Procedures for April 5, 2017, with objections to be filed on April 3, 2017 at 12:00 pm (ET).  I believe that an expedited sale is necessary to preserve and maintain the value of the estates during the limited

time that the Debtors will have financing under the DIP Credit Agreement.  Absent the proposed

sale process, due to the Debtors' continuing operational losses and the absence of other sources

for debtor-in-possession financing, the Debtors would be forced to shut down their operations in

the near term.  This would cause the Debtors to lose its going concern value, incur significant

operational costs to wind down testing operations in a manner ensuring patient safety, and

potentially incur substantial additional liabilities under various applicable regulatory laws for

healthcare laboratory businesses.  An expedited sale process is also warranted because of the

Debtors' concerns that competitors may attempt to interfere with the Debtors' relationships with

their healthcare providers or poach their employees, both of which would be detrimental effect

on the Debtors' ability to maximize value for their creditors and all parties in interest.  Moreover,

the Stalking Horse APA and DIP Credit Agreement both contemplate an expedited sale process.

Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Bidding

Procedures Motion should be approved.

## CONCLUSION

62.    The Debtors' ultimate goal in these chapter 11 cases is the maximization of estate

value through a sale of substantially all of their assets.  In the near term, however, to minimize

any loss of value on its business during these chapter 11 cases, the Debtors' immediate objective

is to maintain a business-as-usual atmosphere during the early stages of these chapter 11 cases,

with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the

Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving

these objectives will be substantially enhanced.

63.    I hereby certify that the foregoing statements are true and correct to the best of my

knowledge, information and belief, and respectfully request that all of the relief requested in the

First Day Pleadings be granted, together with such other and further relief as is justified.

#43002631 v6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief

Executed On: March 15, 2017

Name:  Tammy Hunt
Title:    Chief Financial Officer