**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Bostwick Laboratories, Inc., *et al.*,[1] | Case No. 17-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' COMBINED MOTION FOR ENTRY OF (I) AN ORDER**
**(A) AUTHORIZING AND APPROVING BIDDING PROCEDURES, BREAK-UP FEE**
**AND EXPENSE REIMBURSEMENT, (B) AUTHORIZING AND APPROVING THE**
**DEBTORS' PERFORMANCE OF PRE-CLOSING OBLIGATIONS UNDER THE**
**STALKING HORSE ASSET PURCHASE AGREEMENT, (C) APPROVING NOTICE**
**PROCEDURES, (D) SCHEDULING A SALE HEARING AND (E) APPROVING**
**PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES AND DETERMINING CURE AMOUNTS;**
**AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF**
**SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF**
**ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES,**
**(B) APPROVING THE ASSET PURCHASE AGREEMENT AND (C) AUTHORIZING**
**THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS**
**<u>AND UNEXPIRED LEASES</u>**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") submit this motion (the "<u>Motion</u>") for entry of the Bidding Procedures Order and Sale Order (as each term is defined herein) with respect to the sale (the "<u>Sale</u>") of substantially all of the Debtors' assets.  In support hereof, the Debtors respectfully submit the following:

**<u>Jurisdiction</u>**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): (i) Bostwick Laboratories, Inc., a Delaware corporation (3169); and (ii) Bostwick Laboratories Holdings, Inc., a Delaware corporation (1042).  The mailing address for the Debtors is 100 Charles Lindbergh Blvd., Uniondale, NY 11553.

2.      The Debtors confirm their consent pursuant to Rule 9013-1(f) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 6004, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules.

### Background

4.      On March 15, 2017 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases.

5.      The Debtors operate an independent, full-service anatomic pathology laboratory and are a specialty provider of diagnostic testing services for urologists and gynecologists in the U.S.  The Debtors operate a reference laboratory offering a comprehensive suite of anatomic pathology and molecular testing services to independent physicians nationally.

6.      The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      No trustee, examiner, creditors' committee, or other official committee has been appointed in these chapter 11 cases.

61280309_3

8.     Additional information regarding the Debtors and these cases, including the Debtors' business, organizational structure, financial condition, the reasons for and objectives of these cases, and the Sale process is set forth in the *Declaration of Tammy Hunt in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and incorporated herein by reference.

9.     The Debtors began to explore a sale process as a result of continuing negative cash flow from its business. Specifically, in August of 2016, the Debtors retained Leerink Partners LLC ("Leerink"), an investment banking firm with extensive experience in the health care industry, to assist and advise on the process of identifying a buyer for the Debtors' business. Beginning in late August, 2016 and early September, 2016 Leerink began a marketing process aimed at identifying potential strategic buyers. At the outset, Leerink contacted approximately thirty potential buyers, eighteen of which signed confidentiality agreements.  In the early stages of the sale process, the field was narrowed to a handful of prospects because of the length of time requested by many prospects to conduct due diligence.

10.     In their continued efforts to seek to maximize value through the sale of the business, the Debtors began to explore interest in a potential sale of their assets under section 363 of the Bankruptcy Code.  The Debtors determined that, given their liquidity needs, existing secured debt facilities, and continued operational losses, a successful section 363 sale process would require debtor-in-possession financing, and the only likely providers of such financing would be a potential buyer of the Debtors' business.  Only two potential bidders expressed an interest in providing such financing.

11.     The Debtors, through a special transactions committee of the Debtors' board of directors, ultimately determined that the offer from Poplar Healthcare, PLLC (the "<u>Stalking</u>

Horse Bidder") was superior in several respects, including the Stalking Horse Bidder's willingness to provide the Debtors with the necessary debtor-in-possession financing to fund the Debtors' chapter 11 case, the Stalking Horse Bidder's proposed price for the Debtors' assets, and the Stalking Horse Bidder's ability to move quickly to document a binding asset purchase agreement.

12.    After completing negotiations, the Debtors and the Stalking Horse Bidder entered into that certain Stalking Horse Asset Purchase Agreement, a copy of which is attached hereto as **Exhibit B** (the "Stalking Horse APA").  As reflected in the summary of the proposed transaction set forth below, the Stalking Horse Bidder was prepared to extend its commitment to the transaction in the context of a bankruptcy process only in consideration of the Break-Up Fee and Expense Reimbursement described below.  In light of the Debtors' continuing operational losses, the Stalking Horse APA contemplates an expedited auction sale process and provides certain bid protections to the Staking Horse Bidder.

## Relief Requested

13.    By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") and, at the conclusion of the Sale Hearing (as defined herein), an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order") with respect to the sale of the Purchased Assets.

14.    The Debtors seek entry of the Bidding Procedures Order:

   a.    authorizing and approving the bidding procedures for competitive bidding in connection with the Sale, substantially in the form attached hereto as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures");

   b.    approving the form and manner of notice of the Sale by auction, the Sale Hearing and related matters, substantially in the form attached hereto as Exhibit 2 to the Bidding Procedures Order (the "Auction and Sale Notice");

   c. approving the Break-Up Fee and Expense Reimbursement for the Stalking Horse Bidder;

   d. establishing procedures for the assumption and assignment of executory contracts and unexpired leases to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder selected at the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code (as defined in the Stalking Horse APA, collectively, the "Assumed Leasehold Interests and Assumed Contracts"), including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and approving the form and manner of notice of the proposed assumption and assignment of the Assumed Leasehold Interests and Assumed Contracts in the form attached hereto as Exhibit 3 to the Bidding Procedures Order (the "Assumption and Assignment Notice"); and

   e. establishing the following dates and deadlines, subject to modification:

      i. Qualified Bid Determination Deadline: April 24, 2017 at 12:00 p.m. (Prevailing Eastern Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Qualified Bid Determination Deadline").

      ii. Auction: April 26, 2017 at 10:00 a.m. (Prevailing Eastern Time), as the date and time the auction, if one is needed (the "Auction"), which will be held at the office of Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899-1709

      iii. Sale Objection Deadline: April 21, 2017 at 4:00 p.m. (Prevailing Eastern Time), as the deadline to object to the Sale.

      iv. Sale Hearing: [April 28], 2017 at [_____] (Prevailing Eastern Time), as the date and time of the hearing to approve the Sale which will be held before Honorable [_____], United States Bankruptcy Judge in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [___] Floor, Wilmington, Delaware 19801 ) (the "Sale Hearing").

15.    The Debtors also seek entry of the Sale Order following the conclusion of the Sale Hearing:

   a. approving the Stalking Horse APA (or such other agreement as agreed to with respect to the Sale with the successful bidder at the Auction);

   b. approving the sale of the Purchased Assets free and clear of all liens, claims, interests and encumbrances (collectively, "Encumbrances") but subject to Permitted Encumbrances (as defined in the Stalking Horse APA) to the Stalking Horse Bidder or such other party that is the successful bidder at the Auction;

-5-

c. authorizing the assumption and assignment of the Assumed Leasehold Interests and Assumed Contracts in connection with the Sale; and

d. granting certain related relief as described herein.

**Summary of Proposed Sale**

16. The principal terms of the Stalking Horse APA are summarized in the following chart:

| SUMMARY DESCRIPTION | |
|---|---|
| Parties | Seller: Bostwick Laboratories, Inc.<br><br>Stalking Horse Bidder: Poplar Healthcare, PLLC |
| Property | All of the following (collectively, the "Purchased Assets"):<br><br>a. Except as limited by Section 2.1(c)(ii) of the Stalking Horse APA with respect to Government Receivables[2], all accounts, accounts receivable, notes, contract or other rights to payments of the Debtor of whatever kind or nature, including all current or deferred rights to payment for goods or services rendered on or prior to the Closing Date and all claims (excluding claims arising under Chapter 5 of the Bankruptcy Code), rights, interests and proceeds related thereto (collectively, "Accounts Receivable");<br><br>b. all supply inventories of the Debtor used in the conduct of the Business, including all testing supplies and reagents (collectively, "Inventory");<br><br>c. all laboratory and other equipment owned by the Debtor;<br><br>d. all of the Debtor's right, title and interest in and to the real property leases described in Schedule 2.1(b)(iv) of the Stalking Horse APA and the leasehold improvements situated on such leased real property which is the subject of each such lease (the "Assumed Leasehold Interests");<br><br>e. to the extent authorized by the Bankruptcy Court, all of the Debtor's right, title and interest in, to or under the Contracts of the Debtor described in Schedule 2.1(b)(v) of the Stalking Horse APA (such purchased Contracts, the "Assumed Contracts");<br><br>f. all of the Debtor's right, title and interest in and to the following intellectual property used in the conduct of the Business: trade names, trademarks, trademark registrations (including "Bostwick Laboratories", "Bostwick Scientific", "Dermatocor", "Gastrocor", "Gynecor", "Hematocor", "Nephrocor", "Renaissance", and "QC Sciences"), trademark applications, service marks, |

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

service mark registrations, service mark applications; copyrights, copyright registrations, copyright applications; patent rights (including issued patents, applications, divisions, continuations and continuations-in-part, reissues, patents of addition, utility models and inventors' certificates); domain names; licenses with respect to any of the foregoing; IP Confidential Information; customer and vendor lists; patient lists in respect of the Assumed Contracts; and the goodwill associated with any of the foregoing (collectively, the "<u>Intellectual Property</u>");

g. the LIS System;

h. any patient records in respect of the Purchased Assets or the conduct of the Business, including those maintained on the LIS System, which the Stalking Horse Bidder agrees to maintain in accordance with applicable law;

i. any test results generated in respect of the Business, which the Debtor is required to maintain in accordance with applicable law; and

j. all slides and blocks of the Debtor in respect of the Business (the "<u>Slides</u>"), which the Debtor is required to maintain in accordance with applicable law.

The Purchased Assets do not include all other assets and property of the Debtor, including the following (collectively, the "<u>Retained Assets</u>"):

a. all bank accounts of the Debtor and all cash and cash equivalents of the Debtor;

b. all Government Receivables (but not the Stalking Horse Bidder right to amounts collected with respect to the Government Receivables pursuant to Section 2.7 of the Stalking Horse APA);

c. all deposits and advances, prepaid expenses and other prepaid items of the Debtor, which includes any prepaid Taxes and deposits under any Assumed Leasehold Interests;

d. the Debtor's corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents;

e. all of the Debtor's right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character, including under warranties, guarantees and indemnitees and actions under Chapter 5 of the Bankruptcy Code;

f. all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith;

g. (i) all attorney-client privilege and attorney work-product protection of the Debtor or associated with the Business as a result of legal counsel representing the Debtor or the Business; (ii) all documents of the Debtor or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by the Debtor in connection with the transactions contemplated by this Agreement;

h. the Debtor's national provider identifier number and Provider Transaction Access

| | |
|---|---|
| | Number (PTAN) (i.e., Medicare number) and all related provider Contracts; |
| | i.  all Contracts of the Debtor, other than the Assumed Contracts; |
| | j.  all rights to any refund or credit of Taxes including any right to refunds set forth on <u>Schedule 2.1(c)(x)</u>; |
| | k.  all rights in laboratory equipment leased by the Debtor; |
| | l.  all of the Debtor's billing records, other than the LIS System; and |
| | m. the Debtor's rights under the Stalking Horse APA and the transactions contemplated thereby |
| Sale Consideration | $5,405,000, less any then-outstanding amounts due under a proposed debtor-in-possession facility to be provided by the Stalking Horse Bidder (the "<u>DIP Facility</u>"). As additional consideration for the purchase of the Purchased Assets, the Stalking Horse Bidder will agree to perform, and in due course pay and discharge, the following obligations and liabilities of the Debtor: |
| | a.  Up to $1,250,000 in principal amount of Second Lien Notes, after giving effect to the modification of the Second Lien Notes pursuant to the Second Lien Notes Amendment substantially in the form of Exhibit D to the Stalking Horse APA providing for (X) amortization over a period of 18 months at an interest rate of 8% and (Y) the right for the Stalking Horse Bidder to prepay the Second Lien Notes at any time without penalty; |
| | b.  the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees; |
| | c.  cure costs under Bankruptcy Code Section 365 for all Assumed Contracts and Assumed Leasehold Interests; and |
| | d.  Assumed Taxes. |
| Closing Date | No later than May 15, 2016 |
| Break-Up Fee | $199,650 |
| Expense Reimbursement | Reasonable and documented out of pocket expenses up to a cap of $150,000 |

As described above, under the terms of the Stalking Horse APA, if the Stalking Horse Bidder is not designated as the successful bidder for the purchase of the Purchased Assets, the Stalking Horse Bidder would be entitled to a fee of $199,650 (the "<u>Break-Up Fee</u>"), along with reimbursement of reasonable expenses, up to a cap of $150,000 (the "<u>Expense Reimbursement</u>").

The Debtors make the following additional disclosures in in conformity with Local Rule 6004(b)(iv):

| Local Rule | Disclosure |
|---|---|
| Agreements with Management. Local Rule 6004(b)(iv)(B) | To the Debtors' knowledge, the Stalking Horse Bidder has not discussed or entered into any agreements with the Debtors' management or key employees regarding compensation or future employment. Pursuant to Section 7.2 of the Stalking Horse APA, upon entry of the Bid Procedures Order, the Stalking Horse Bidder, upon providing notice to the Debtors, is authorized to communicate with certain categories of the Debtors' employees (which categories do not include senior management) for the purpose of negotiating and extending to such employees as it determines, offers of employment contingent on Stalking Horse Bidder being the successful purchaser of the Purchased Assets; provided, that this right shall terminate if Stalking Horse Bidder is not the winning bidder at the Auction |
| Public Sale / Competitive Bidding. Local Rule 6004(b)(iv)(D) | As discussed herein, an auction is contemplated in respect of the Sale. The Debtors have not agreed to refrain from soliciting competing offers for the Purchased Assets or to otherwise limit shopping of the Purchased Assets |
| Closing and Other Deadlines. Local Rule 6004(b)(iv)(E) | Article IX of the Stalking Horse APA sets forth the conditions to closing of the Sale: <br> n. Seller shall not have terminated this Agreement pursuant to Section 11.1 of the Stalking Horse APA. <br><br> o. The Bankruptcy Court shall have entered (i) the Bid Procedures Order and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date. <br><br> p. Each of the representations and warranties of Seller contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Seller will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing. <br><br> q. No proceeding by any Governmental Authority shall be pending on the Closing Date which seeks to enjoin the consummation of this Agreement or any transactions contemplated hereby. <br><br> r. There shall have been no material adverse change in the |

| | condition or affecting the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or to the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order. |
|---|---|
| Good Faith Deposit. Local Rule 6004(b)(iv)(F) | The Stalking Horse Bidder has deposited $540,500 with Pepper Hamilton LLP ("Pepper Hamilton"), proposed counsel to the Debtors. Pepper Hamilton is holding the deposit in escrow in a segregated, non-interest-bearing account, which will be released to the Debtors on the closing date of the Sale. Pepper Hamilton will release the deposit to the Stalking Horse Bidder if the Stalking Horse APA is terminated pursuant to Sections 11.1(a)-(d) thereof. If an Auction is held and the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, to select the bidder who makes the Back-Up Bid (as defined below) (the "Back-Up Bidder"), if any, as the new bidder who makes the Successful Bid (as defined below) (the "Successful Bidder"), and shall proceed to consummate the Successful Bid of the new Successful Bidder. In such case, the defaulting Successful Bidder's Good Faith Deposit (as defined below) shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder |
| Interim Arrangements with Proposed Buyer. Local Rule 6004(b)(iv)(G) | The Debtors have entered into a DIP Facility with the Stalking Horse Bidder, which is the subject of a separate motion filed contemporaneously |
| Record Retention. Local Rule 6004(b)(iv)(J) | The Debtors will retain all corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents |
| Requested Findings as to Successor Liability. Local Rule 6004(b)(iv)(L) | The Debtors seek entry of the Sale Order, which provides that the Stalking Horse Bidder or such other party that is the successful bidder at the Auction (the "Purchaser") is not a successor to the Debtors or its estate by reason of any theory of law or equity, whether with respect to any liens and claims against the Debtors, the Purchased Assets or otherwise, and the Purchaser shall not be subject to successor liabilities for products sold prior to the closing. See Order ¶ 7 |
| Sale Free and Clear of Unexpired Leases. Local Rule 6004(b)(iv)(M) | The Debtors seek entry of the Sale Order, which provides that the sale of the Purchased Assets will be made free and clear of Encumbrances (subject to Permitted Encumbrances). The Sale Order also provides that the Debtors are authorized to assume and assign each of the Assumed Leasehold Interests and Assumed Contracts to Purchaser in accordance with the Stalking Horse APA and the Sale Order free and clear of all interests pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and to execute and |

| | deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Leasehold Interests and Assumed Contracts to Purchaser |
|---|---|
| Credit Bid. Local Rule 6004(b)(iv)(N) | Should the DIP Facility be approved, the Stalking Horse Bidder will be entitled to credit bid toward the Purchase Price the amount sufficient to pay in full the outstanding obligations under the DIP Facility. See Stalking Horse APA § 2.2(a) |
| Relief from Bankruptcy Rule 6004(h). Local Rule 6004(b)(iv)(O) | The Debtors seek entry of the Sale Order, which provides that such order will not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d) |

## Bidding Procedures

17.     The Bidding Procedures are intended to permit a fair and efficient competitive sale process to confirm that the bid of the Stalking Horse Bidder is indeed the best offer, or promptly identify the alternative bid that is higher or otherwise better.  In conformity with Local Rule 6004-1(c), below is a summary of certain provisions of the Bidding Procedures:

18.     <u>Bid Requirements</u>. Any counteroffer or bid for any of the Purchased Assets (a "Qualified Bid") shall comply with the following requirement:

    a.  Any Qualified Bid shall provide for a purchase price with a minimum cash or cash equivalent component payable at closing equal to the sum of (i) the Purchase Price, $5,405,000.00 plus (ii) $500,000 (the "Initial Overbid Requirement").

    b.  Any Qualified Bid shall further comply with all of the following requirements; <u>provided</u>, that the Debtors may, in their discretion exercise in good faith and without further order of the Bankruptcy Court, waive any such requirements:

    c.  Any Qualified Bid shall:

        i.  be in writing and be served (both electronic copy and hard copy) on counsel to the Debtors, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899-1709, Attn: David B. Stratton, strattod@pepperlaw.com <u>so as to be received</u> on or before 12:00 noon (Prevailing Eastern Time) on April 24, 2017; and

        ii.  be accompanied by (1) a deposit in the amount of ten percent of the initial bid, delivered to an escrow agent (the identity of which is to be determined by the Debtors), by certified or cashier's check or wire transfer, so as to be received on or before April 25, 2017, the last Business Day prior to the first scheduled date of the Auction (the "Good Faith Deposit"); (2) an executed asset purchase agreement (the "Counteroffer Asset Purchase

Agreement") and executed copies of all other transaction documents necessary to effect the proposed transaction (including all schedules) and a copy of the Stalking Horse APA marked to show all changes requested by the bidder (including those related to purchase price); (3) an executed confidentiality agreement; (4) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and pay the purchase price at the Closing; (5) if any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, then such party shall provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with the bid; (6) confirm that the offer shall remain open and irrevocable as provided below; (7) fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid, and the complete terms of any such participation; and (8) not be conditioned on obtaining financing or the outcome of any due diligence.

d.  The entity submitting a Qualified Bid shall enter into joint escrow instructions with the Debtors regarding the deposit delivered in connection with such Qualified Bid.

e.  The terms and conditions of the Qualified Bid must be, in aggregate, not materially more burdensome to the Debtors than provisions contained in the Stalking Horse APA.

f.  Any entity submitting a Qualified Bid shall demonstrate to the Debtors' satisfaction, in the Debtors' sole discretion exercised in good faith, that such entity is able to consummate the transaction on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement.

g.  The Debtors reserve the right to extend the Qualified Bid Determination Deadline.

h.  The Debtors reserve their right to contact bidders before or after the Qualified Bid Determination Deadline to discuss or clarify the terms of their bid and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or otherwise evaluate the bid.

i.  If a bid submitted on or prior to the Qualified Bid Determination Deadline fails to meet all the requirements of a Qualified Bid, the Debtors are entitled to work with the bidder in an effort to cure any defects in the bid and to cause such bid to become a Qualified Bid prior to the commencement of the Auction. In addition, the Debtors may waive one or more of the requirements specified above and deem such bid to be a Qualified Bid prior to the commencement of or during the Auction; provided, however, that the Debtors may not waive the Initial Overbid Requirement.  The Debtors may aggregate separate bids from unaffiliated bidders to create one Qualified Bid, provided, however, that all such bidders shall remain

-12-

subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

j.  Each bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such bidder's financial wherewithal to consummate and perform obligations in connection with the sale. Failure by the bidder to comply with requests for additional information may be a basis for the Debtors to determine that a bidder is not a Qualified Bidder and that a bid made by a bidder or a Qualified Bidder is not a Qualified Bid. A bidder that submits a Qualified Bid shall be a "<u>Qualified Bidder</u>."

k.  The Debtors shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than one (1) Business Day prior to the first scheduled date of the Auction.

l.  After the Qualified Bid Determination Deadline, the Debtors shall determine which Qualified Bid or combination of Qualified Bids represents the baseline bid for purposes of the Auction (the "<u>Starting Qualified Bid</u>"). Prior to the commencement of the Auction, the Debtors shall distribute copies of all Qualified Bids to each Qualified Bidder, and shall indicate therein which Qualified Bid has been selected by the Debtors as the Starting Qualified Bid.

19.  <u>The Auction</u>. If more than one Qualified Bid by a Qualified Bidder is received by the Qualified Bid Determination Deadline (or if a non-qualified bid received by the Qualified Bid Determination Deadline is qualified prior to the commencement of the Auction), other than the bid of the Stalking Horse Bidder, the Auction will be conducted by the Debtors at the offices of their counsel, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, Wilmington, DE 19899-1709, on April 26, 2017, at 10:00 a.m. (Prevailing Eastern Time), or at such other date and time as determined by the Debtors in their sole discretion. The Debtors will send notice by electronic mail to (a) counsel to the Debtors, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899, Attn: David B. Stratton; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the any official committee of unsecured creditors appointed in the Chapter 11 Case; and (d)

counsel to the Stalking Horse Bidder (collectively, the "Notice Parties") and counsel to any entity that has submitted a Qualified Bid if the date, time, or place of the Auction changes.

20.     Auction Procedures. The Auction will be conducted openly and shall be transcribed, audiotaped or videotaped. Only Qualified Bidders who have submitted a Qualified Bid for some or all of the assets and their authorized representatives will be eligible to participate at the Auction and to increase their bids. The Debtors and their professionals will direct and preside over the Auction. At the Auction, the Debtors may announce additional procedural or bidding rules for the Auction so long as the rules are not inconsistent with the Bidding Procedures. The Debtors shall maintain a transcript of all bids made and announced at the Auction.

21.     Each bidder participating at the Auction will certify on record at the commencement of the Auction that it has not and will not engage in any collusion with respect to the bidding or the Sale; provided, however, in order to obtain the highest and/or otherwise best bid, the Debtors may engage in discussions with one or more Qualified Bidders if the Debtors determine that the combination of all or a portion of bids received from such Qualified Bidders would yield the highest and/or otherwise best offer at the Auction.

22.     The Break-Up Fee and Expense Reimbursement will be credited to the Stalking Horse Bidder's bids at the Auction.

23.     Each subsequent bid at the Auction must comply with the requirements for a Qualified Bid set forth in the Bidding Procedures and be at least $50,000.00 greater than the preceding bid (such bid, an "Overbid") or such greater amount as designated by the Debtors.

24.     During the course of the Auction, the Debtors shall inform each participant which Qualified Bid(s) reflects, in the Debtors' view, the highest or otherwise best offer or combination

of offers. At the conclusion of the Auction, the Debtors, in the exercise of their business judgment, will select (i) the highest or otherwise best bid for the Purchased Assets (the "Successful Bid") and the Successful Bidder, and (ii) at the Debtors' discretion, the next highest or otherwise best bid after the Successful Bid (the "Back-Up Bid") and the bidder who makes the Back-Up Bidder.

25.     The Auction will close when the Debtors announce that the Auction has concluded and a Successful Bid and, at the Debtors' discretion, a Back-Up Bid, have been selected. Notwithstanding anything herein to the contrary, the Debtors are authorized, but not required, to select a Back-Up Bidder and Back-Up Bid. The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until the earlier of (x) consummation of the Successful Bid with the Successful Bidder and (y) 20 days after the Sale Hearing. If the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, to select the Back-Up Bidder, if any, as the new Successful Bidder, and shall proceed to consummate the Successful Bid of the new Successful Bidder. In such case, the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.

26.     If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction, (ii) definitive documentation has been executed in respect thereof and (iii) the Court has approved the sale to the Successful Bidder. Such acceptance by the Debtors is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

27.    <u>Return of Good Faith Deposits</u>. All Good Faith Deposits will be held by the Debtors.  Good Faith Deposits of bidders other than the Successful Bidder and the Back-Up Bidder, if any, will be returned to the unsuccessful bidders within three (3) Business Days after selection of the Successful Bidder and Back-Up Bidder, if any, in accordance with these Bidding Procedures. The Successful Bidder's Good Faith Deposit will be applied to the Purchase Price of the Successful Bid at closing.

28.    If no Qualified Bids other than the bid of the Stalking Horse Bidder are received by the Qualified Bid Determination Deadline, or if a non-qualified bid received by the Qualified Bid Determination Deadline is not qualified prior to the commencement of the Auction, then the Auction will not be held, the Stalking Horse APA shall be designated as the Successful Bid, and the Debtors shall seek approval of the sale of the Assets to the Stalking Horse Bidder in accordance with the Stalking Horse APA at the Sale Hearing

**Form and Manner of Auction and Sale Notice**

29.    The Debtors propose that within three (3) Business Days of entry of the Bidding Procedures Order, the Debtors will serve the Auction and Sale Notice by email or first class mail upon the following parties: (i) the Office of the United States Trustee for the District of Delaware, (ii) the Internal Revenue Service, (iii) the United States Attorney for the District of Delaware, (iv) counsel to any committee of unsecured creditors appointed in the Chapter 11 Case, (v) the U.S. Securities and Exchange Commission, (vi) any party known or reasonably believed to have asserted any lien, claim, encumbrance or other interest in the Purchased Assets, (vii) all non-Debtor parties to the Assumed Leasehold Interests and Assumed Contracts and any parties who are known to claim interests therein; (viii) all applicable federal, state, and local taxing authorities; (ix) the Debtors' twenty largest unsecured creditors; (x) the Debtors'

insurance providers; (xi) all known parties that have expressed interest to the Debtors, within the six (6) months prior to the Petition Date and/or since the Petition Date, in purchasing some or all of the Debtors' assets; and (xii) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002.  Further, the Debtors propose that, on or before three (3) Business Days after entry of this Order, the Debtors will (i) serve by email or first class mail the Auction and Sale Notice on all creditors appearing on the Debtors' creditor matrix (to the extent not already served pursuant to paragraph above); and (ii) subject to applicable submission deadlines and cost considerations, publish the Auction and Sale Notice once in one or more publications as the Debtors deem appropriate, including but not limited to *The Wall Street Journal* (national edition).

30.    The Debtors submit that the Auction and Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including (a) the date, time and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Sale Objection Deadline and the date, time and place of the Sale Hearing; and (d) instructions for promptly obtaining a copy of the Stalking Horse APA. The Debtors propose that no other or further notice of the Sale shall be required. Accordingly, the Debtors request that the form and manner of the Auction and Sale Notice be approved.

**Proposed Assumption and Assignment Procedures for
the Assumed Leasehold Interests and Assumed Contracts**

31.    As part of the Sale, the Debtors seek to offer the Purchaser the opportunity for the Debtors to assume and assign the Purchaser the Assumed Leasehold Interests and Assumed Contracts.  By no later than three (3) Business Days following the entry of the Bidding Procedures Order, the Debtors shall file with the Bankruptcy Court and serve via first class mail the Cure Notice on all non-Debtor counterparties to all Assumed Leasehold Interests and

Assumed Contracts and their respective known counsel, and provide a copy of same to the Stalking Horse Bidder. The Cure Notice shall inform each recipient that its respective Assumed Lease or Contract may be designated by the Stalking Horse Bidder as either assumed or excluded and the timing and procedures relating to such designation, and, to the extent applicable, (i) the name of the counterparty to the Assumed Lease or Contract (ii) the Debtors' good faith estimates of the cure amounts required in connection with such Assumed Lease or Contract, (iii) the identity of the Stalking Horse Bidder and (iv) the deadline by which any such Assumed Lease or Contract counterparty may file an objection to the proposed assumption and assignment and/or cure amount, and the procedures relating thereto; provided, however, that service of a Cure Notice does not constitute an admission that such Assumed Lease or Contract is an executory contract or unexpired lease.

32.    Upon request by a counterparty under any Assumed Lease or Contract, the Debtors shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Assumed Leasehold Interests and Assumed Contracts provided by the Stalking Horse Bidder, including the legal name of the proposed assignee, the proposed use of any leased premises, the proposed assignee's financial ability to perform under the Assumed Lease or Contract and a contact person with the proposed assignee that counterparties may contact if they wish to obtain further information regarding the Stalking Horse Bidder.

33.    The Cure Notice provides that any entity other than the Stalking Horse Bidder may be selected as the Successful Bidder at the Auction, and that any non-Debtor counterparty to any Assumed Leasehold Interest or Assumed Contract wishing to know the identities of all Qualified Bidders (and therefore the potential Successful Bidder), and the actual Successful Bidder, prior to the Sale Hearing, may provide such non-Debtor counterparty's email address or

-18-

fax number to Debtors' counsel prior to the Qualified Bid Determination Deadline. All such parties who provide an email address or fax number as provided above (i) will be emailed by Debtors' counsel the identities of all Qualified Bidders the day after the Qualified Bid Determination Deadline; and (ii) if they wish, may request prior to the Auction copies from Debtors' counsel of the adequate assurance information submitted to the Debtors by any Qualified Bidder (which information shall be provided subject to such non-Debtor counterparty's entry into a confidentiality agreement acceptable to such Qualified Bidder). All such non-Debtor counterparties who provide an email address or fax number to Debtors' counsel in accordance with the foregoing will be notified of the Successful Bidder by email or fax (as applicable) from Debtors' counsel immediately (and by no later than two (2) hours) after the Auction concludes.

34.      Objections, if any, to the proposed assumption and assignment of any Assumed Lease or Contract, or to the cure amount proposed with respect thereto must: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any orders of the Bankruptcy Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof and (iv) be filed with the Bankruptcy Court and served so as to be actually received by the Notice Parties before the Sale Objection Deadline.

35.      Promptly following the Debtors' selection of the Successful Bidder and the Back-Up Bidder, if any, at the conclusion of the Auction, the Debtors shall announce the Successful Bidder and the Back-Up Bidder, if any, and shall file with the Bankruptcy Court a notice of the Successful Bidder and the Back-Up Bidder, if any.  If and only if the Stalking Horse Bidder is not the Successful Bidder for the Debtors' assets, counterparties to the Assumed Leasehold

Interests and Assumed Contracts shall have until April 27, 2017 at 4:00 p.m. to object to the assumption and assignment of an Assumed Lease or Contract solely on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code. For the avoidance of doubt, if the Stalking Horse Bidder is the Successful Bidder, all adequate assurance objections must be filed by the Sale Objection Deadline.

36.    Any objection to the proposed assumption and assignment or related cure of an Assumed Lease or Contract in connection with the proposed sale that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Bankruptcy Court) provided that any such objection may be adjourned, in full or in part, by the Debtors to a later date by listing such adjournment in a notice of agenda or other notice filed on the docket of the Chapter 11 Case and served on the affected counterparty.

37.    The Debtors request that any party failing to object to the proposed transactions be (i) be deemed to have consented to the assumption, assignment and/or transfer of such of the Assumed Lease or Contract to Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any; (ii) be forever barred from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtors, their estates or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such Assumed Lease or Contract and (b) asserting that the Stalking Horse Bidder or other Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994 (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v.

Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). The Debtors further request that each party be deemed to consent to the assumption and assignment of its executory contract and /or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

**Basis for Relief**

**I.   The Bid Procedures Are Appropriate and in the Best Interests of the Debtors and their Estates and Creditors**

38.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that a sale of the Purchased Assets governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Debtors' estates, which is the paramount goal in any proposed sale of property of the estate. See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the . . . [Debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); In re Blue Coal Corp., 59 B.R. 157, 162 (Bankr. M.D. Pa. 1986) (same); see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand") (internal citation omitted). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and . . .

maximize the value of the debtor's assets"). The Debtors submit that the foregoing procedures are fair, transparent, and will derive the highest and best bid for the Purchased Assets.

## II.    The Break-Up Fee and Expense Reimbursement Should Be Approved

39.    The Debtors seek authority to offer customary bid protections to the Stalking Horse Bidder, including a Break-Up Fee and Expense Reimbursement, as part of the Bidding Procedures. The Stalking Horse Bidder has requested the enticement of a Break-Up Fee and Expense Reimbursement if the Stalking Horse Bidder loses at auction or otherwise to another bidder. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by locking in a price "floor" before exposing an asset to auction. Stalking horse bidders virtually always require breakup fees, expense reimbursements, and other forms of bid protections as an inducement for holding their offer open while it is exposed to overbids in an auction process. The use of bid protections, including Break-Up fees and expense reimbursements, has become an established practice in chapter 11 cases.

40.    In the Third Circuit, termination or break-up fees are permissible where they provide a post-petition benefit to the bankruptcy estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999). The Third Circuit in O'Brien provided that the potential benefits to the estate of a termination fee include a fee that (i) "promote[s] [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" and (ii) encourages potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id. at 537.

Bankruptcy courts have approved bidding incentives, similar to the Break-Up Fee and Expense Reimbursement, in other cases in this district. See, e.g., In re DA Liquidating Corp., Case No. 16-12051 (LSS) (Bankr. D. Del. October 1, 2016); In re Filip Techs., Inc., Case No. 16-12192 (KG) (Bankr. D. Del. November 9, 2016).

41.     The Debtors believe, based on their reasoned business judgment, that the presence of the Break-Up Fee and Expense Reimbursement would enhance its ability to maximize value without chilling bidding. The presence of a Break-Up Fee and Expense Reimbursement would first and foremost point to the existence of a contractually-committed bidder at a price believed to be fair and reasonable while providing the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer which, absent such a bid floor, might not have otherwise been realized. The Break-Up Fee and Expense Reimbursement will therefore maximize value to the Debtors' estates from the Sale of the Purchased Assets.

### III.    The Form and Manner of the Auction and Sale Notice Should be Approved

42.     As described above, the Debtors also seek approval of the form of the Auction and Sale Notice. The Auction and Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in this Motion once they are set by the Court.

43.     The Debtors propose that such a timeline is warranted and necessary given the exigent circumstances and the Debtors' need to sell the Purchased Assets in a timely fashion. Moreover, the Debtors propose that such a timeline is appropriate and will have little impact on the Debtors' ability to market the sale of the Purchased Assets.

**IV.      The Sale of the Purchased Assets Is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

44.      Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, a debtor may use, sell or lease property of the estate outside of the ordinary course of business. A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. See, e.g., In re Martin, 91 F.3d 989 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephen Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983). Courts typically consider the following factors in determining whether a proposed sale meets this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. In re Decora Indus., Inc., 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

45.      When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted). A sound business purpose for use of property outside the ordinary course of business exists where the sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063. In fact, the paramount goal in any proposed sale of property of the estate is to maximize

-24-

the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d at 564-65 (stating

that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy

law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest

overall benefit possible for the estate.") *(quoting* Cello Bag Co. v. Champion Int'l Corp. (In re

Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

46.     If a "debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v Johns-Manville

Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Indeed, when a

valid business justification exists, there is a strong presumption that the debtor's management

and directors "acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (internal

citations omitted).

47.     The Debtors submit that the proposed Sale satisfies section 363's requirements, to

the extent applicable. Absent the proposed sale process, due to the Debtors' continuing

operational losses and the absence of other sources for debtor-in-possession financing, the

Debtors would be forced to shut down their operations in the near term. This would cause the

Debtors to lose its going concern value, incur significant operational costs to wind down testing

operations in a manner ensuring patient safety, and incur substantial additional liabilities under

various applicable regulatory laws for healthcare laboratory businesses. A prompt Auction and

Sale will preserve the Debtors' current value as best as possible for the benefit of the Debtors'

estate and avoid these substantial wind-down costs. The Sale is therefore in the best interest of the Debtors' estate and a valid exercise of the Debtors' business judgment.

48.     The Stalking Horse APA provides for a sale of the Purchased Assets and contemplates this Court's approval of the sale process. This Court's approval is therefore necessary for either a sale of the Purchased Assets.

49.     Bankruptcy Code section 105(a) also supplies ample authority for the relief requested. Section 105(a) empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This equitable power is granted to effect the policies and goals of chapter 11 reorganization, which are to rehabilitate the debtor, In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989), and to "create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987); see also In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr. S.D. Ohio 1998) (rejecting a bright line rule prohibiting payment of prepetition debts because it "may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code"). Accordingly, the Debtors respectfully submit that the relief requested herein should be granted in all respects and is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**V.      The Sale of the Purchased Assets Free and Clear of Claims and Interests Is Authorized by Section 363(f) of the Bankruptcy Code**

50.     The Debtors request approval to sell the Purchased Assets free and clear of any and Encumbrances (subject to Permitted Encumbrances) in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f)

61280309_3

"free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

    a.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.   such entity consents;

    c.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.   such interest is in bona fide dispute; or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met). The Bankruptcy Court has the power to approve the sale of a debtor's assets free and clear of any claims against the debtor pursuant to section 363(f) of the Bankruptcy Code. In re TWA Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code).

    51.    To facilitate the Sale, the Debtors seek to sell Purchased Assets free and clear of all Encumbrances (subject to Permitted Encumbrances). The Debtors believe that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code. The Debtors also believe that the service of the Auction and Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Sale and therefor provides additional justification for approval of the sale free and clear of all Encumbrances (subject to Permitted Encumbrances) as set forth in the Sale Order.

**VI.    The Stalking Horse Bidder is a Good Faith Purchaser**

52.    The Debtors request that the Purchaser receive the protections set forth in section

363(m) of the Bankruptcy Code and that it has not violated section 363(n) of the Bankruptcy

Code. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit

has addressed the meaning of the term as

> speak[ing] to the integrity of his conduct in the course of the sale
> proceedings. Typically, the misconduct that would destroy a purchaser's
> good faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take grossly
> unfair advantage of other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986).

53.    The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse

APA without collusion, in good faith and from arm's-length bargaining positions. In this regard,

each of the Stalking Horse Bidder and the Debtors have engaged separate counsel to represent it

in its negotiation of the Stalking Horse APA. To the Debtors' knowledge, no party has engaged

in any conduct that would cause or permit the Stalking Horse APA to be set aside under section

363(n) of the Bankruptcy Code. The Debtors submit that any alternative sale agreement that it

enters into with such other party that is the successful bidder at the Auction will also have been

negotiated at arm's-length and in good faith.

VII.    **Approval of the Assumption and Assignment of the Assumed Leasehold Interests and Assumed Contracts Should Be Authorized**

54.    Section 365(a) of the Bankruptcy Code provides in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). Courts consider whether the Debtors' reasonable business judgment supports assumption or rejection. See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2005) (finding that Debtors' decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

56.    After a debtor assumes an executory contract or unexpired lease, the debtor may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); see also In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); see also Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (purpose of section 365(f) is to assist the trustee in realizing full value of the debtor's assets). Section 365(f)(2)(B) of the Bankruptcy Code requires

that adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2)(B). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "materially and economically" significant. In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007). Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance where prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

57.    The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Leasehold Interests and Assumed Contracts to the Purchaser. The Debtors further request that the Sale Order provide that the Assumed Leasehold Interests and Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provisions in the Assumed Contracts, including those described in Bankruptcy Code sections 365(b)(2), (f)(1) and (f)(3), that prohibit such assignment.

58.    To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Purchaser to perform under the

Assumed Contracts. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Purchaser to provide adequate assurance of future performance under the Assumed Contracts, as required under Bankruptcy Code section 365(b)(1)(C).

59.     Further, as set forth above, the Debtors will give notice to all parties to the Assumed Leasehold Interests and Assumed Contracts. This notice will include the amounts the Debtors believe is necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code. Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

## Waiver of Bankruptcy Rules 6004(h) and 6006(d)

60.     The Debtors requests that, upon entry of the Sale Order, the Court waive the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). Waiver of the 14 day period will maximize the value of the Purchased Assets and help to ensure the preservation of jobs held by the Debtors' employee and an orderly transition of the Purchased Assets to the Purchaser.

## Notice

61.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Stalking Horse Bidder; and (c) parties required by Bankruptcy Rule 2002(a).

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully requests that the Court enter the Bidding Procedures Order and the Sale Order, granting the relief requested in the Motion and such other and further relief for the Debtors as may be just or proper.

Dated: March 15, 2017
Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP


/s/ David B. Stratton
David B. Stratton (DE No. 960)
Evelyn J. Meltzer (DE No. 4581)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390


*Proposed Counsel for the Debtors*

61280309_3