**Exhibit B**

**Stalking Horse APA**

**Execution Version**

# STALKING HORSE ASSET PURCHASE AGREEMENT

**dated March 13, 2017**

**by and between**

**POPLAR HEALTHCARE, PLLC**

**and**

**BOSTWICK LABORATORIES, INC.**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................................... 1

1.1    Previously Defined Terms ........................................................................... 1
1.2    Definitions ................................................................................................... 1
1.3    Additional Defined Terms .......................................................................... 6
1.4    Interpretation .............................................................................................. 7

**ARTICLE II PURCHASE AND SALE, PURCHASE PRICE** ................................ 7

2.1    Purchase and Sale ....................................................................................... 7
2.2    Purchase Price; Deposit ............................................................................ 11
2.3    Payments at Closing .................................................................................. 11
2.4    Assumed Liabilities and Retained Liabilities ........................................... 11
2.5    Transfer Taxes ........................................................................................... 12
2.6    Allocation .................................................................................................. 12
2.7    Government Receivables; Post-Termination Wind Down ........................ 12

**ARTICLE III CLOSING AND CLOSING DATE DELIVERIES** ........................ 13

3.1    Closing ...................................................................................................... 13
3.2    Closing Deliveries by Seller ..................................................................... 13
3.3    Closing Deliveries by Purchaser ............................................................... 13
3.4    Cooperation ............................................................................................... 14

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** .......... 14

4.1    Due Incorporation ..................................................................................... 14
4.2    Noncontravention ...................................................................................... 15
4.3    Brokers ...................................................................................................... 15
4.4    Title to Purchased Assets .......................................................................... 15
4.5    Condition of Assets ................................................................................... 15
4.6    NO OTHER REPRESENTATIONS .......................................................... 15

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** ................. 16

5.1    Organization; Authorization ..................................................................... 16
5.2    Noncontravention ...................................................................................... 16
5.3    No Brokers ................................................................................................ 16
5.4    Financing Ability ...................................................................................... 16

**ARTICLE VI** ......................................................................................................... 16

6.1    Competing Bid ........................................................................................... 16
6.2    Cooperation in Bankruptcy Court Matters ............................................... 17
6.3    Sale Order .................................................................................................. 17
6.4    Back-up Bidder .......................................................................................... 18
6.5    Break-up Fee and Expense Reimbursement .............................................. 18

**ARTICLE VII EMPLOYEE MATTERS**.................................................................. 19

7.1    Employees to be Hired by Purchaser ...................................................... 19
7.2    Authorization to Communicate with Certain Employees............................. 19

**ARTICLE VIII COVENANTS** ............................................................................. 20

A.    Pre-Closing Covenants. ....................................................................... 20
8.1    Access to Governmental Authorities and Payors ..................................... 20
8.2    Maintenance of Business ...................................................................... 20
8.3    Seller Pre-Closing Covenants................................................................ 20
8.4    Cooperation to Transfer Memphis Facility .............................................. 20
8.5    Commercially Reasonable Efforts to Close ............................................. 21
8.6    Exclusivity......................................................................................... 21
B.    Certain other Covenants and Agreements. .............................................. 21
8.7    Access to Uniondale Facility................................................................ 21
8.8    Use of Name ...................................................................................... 21
8.9    Tax Matters ........................................................................................ 21

**ARTICLE IX CONDITIONS TO CLOSING APPLICABLE TO PURCHASER** .............. 22

9.1    No Termination .................................................................................. 23
9.2    Bankruptcy Court Approval .................................................................. 23
9.3    Bring-Down of Seller Warranties, Representations and Covenants ........................... 23
9.4    Pending Actions ................................................................................. 23

**ARTICLE X CONDITIONS TO CLOSING APPLICABLE TO SELLER** ........................ 23

10.1    No Termination .................................................................................. 23
10.2    Bankruptcy Court Approval .................................................................. 23
10.3    Bring-Down of Purchaser Warranties, Representations and Covenants..................... 23
10.4    Pending Actions ................................................................................. 24
10.5    All Necessary Documents .................................................................... 24

**ARTICLE XI TERMINATION** ........................................................................... 24

11.1    Termination ....................................................................................... 24
11.2    Breakup Fee....................................................................................... 25
11.3    Purchaser Deposit................................................................................ 25

**ARTICLE XII MISCELLANEOUS** ...................................................................... 26

12.1    Costs and Expenses ............................................................................ 26
12.2    Bankruptcy Court Approval .................................................................. 26
12.3    Entire Agreement ............................................................................... 26
12.4    Counterparts ...................................................................................... 26
12.5    Assignment, Successors and Assigns...................................................... 26
12.6    Survival ............................................................................................ 27
12.7    Severability........................................................................................ 27
12.8    Headings............................................................................................ 27
12.9    Risk of Loss....................................................................................... 27

| 12.10 | **GOVERNING LAW** | 27 |
| 12.11 | Press Releases and Public Announcements | 28 |
| 12.12 | U.S. Dollars | 28 |
| 12.13 | Notices | 28 |
| 12.14 | WAIVER OF JURY TRIAL | 29 |
| 12.15 | Waiver | 30 |
| 12.16 | No Third-Party Beneficiary | 30 |
| 12.17 | SELLER DISCLAIMER | 30 |
| 12.18 | PURCHASER DISCLAIMER | 31 |
| 12.19 | Disclosures | 31 |
| 12.20 | Specific Performance | 31 |

<u>Exhibits</u>

Exhibit A – Form of Bid Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of DIP Credit Agreement
Exhibit D – Form of Second Lien Notes Amendment

<u>Schedule Index</u>

Schedule 2.1(b)(iv) -   Assumed Leasehold Interests
Schedule 2.1(b)(v) -    Assumed Contracts
Schedule 4.3 -          Brokers
Schedule 7.1(a) -       Employees List

This Asset Purchase Agreement is made and entered into as of March 13, 2017 (this "<u>Agreement</u>") by and between Poplar Healthcare, PLLC, a Tennessee professional limited liability company ("<u>Purchaser</u>"), and Bostwick Laboratories, Inc., a Delaware corporation (the "<u>Seller</u>").

<u>RECITALS</u>:

A.    Seller is engaged in the business of providing anatomic pathology laboratory services to physicians and other healthcare providers (the "<u>Business</u>").

B.    Seller desires to sell certain of its assets and properties and transfer certain specified liabilities related to the Business, and Purchaser desires to acquire certain of Seller's assets and properties and assume certain specified liabilities related to the Business from Seller, on the terms and subject to the conditions set forth herein.

C.    Seller intends to commence a bankruptcy case (the "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>") on or after March 14, 2017 in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

D.    In connection with the Chapter 11 Case and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, Seller shall sell, transfer and assign to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and Purchaser shall assume from Seller the Second Lien Notes and the other Assumed Liabilities (each as defined herein), all as more specifically set forth herein and in the Sale Order; and

E.    The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Chapter 11 Case.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**<br>**<u>DEFINITIONS</u>**

1.1    <u>Previously Defined Terms</u>. Each term defined in the first paragraph and Recitals shall have the meaning set forth above whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

1.2    <u>Definitions</u>. Whenever used herein, the following terms shall have the meanings set forth below unless otherwise expressly provided or unless the context clearly requires otherwise:

"<u>Accounts Receivable</u>" - As defined in clause (i) of the definition of Purchased Assets.

"<u>Affiliate</u>" means (a) with respect to an individual, (i) the members of the immediate family (including parents, siblings and children) of the individual, (ii) the individual's spouse and (iii) any Business Entity that directly or indirectly, through one or more intermediaries is Controlled by, or is under common Control with, any of the foregoing individuals, or (b) with respect to any Person other than an individual, any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such Person. The term "<u>Control</u>" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Assumed Tax</u>" means any Liability for real property, personal property and similar ad valorem Taxes with respect to the Purchased Assets that are due and payable by Purchaser on or after the Closing Date and which are attributable to a Pre-Closing Tax Period.

"<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"<u>Bid Procedures Motion</u>" means the motion filed by Seller seeking entry of the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, substantially in the form attached hereto as <u>Exhibit A</u>, establishing bidding procedures for the solicitation of higher or otherwise better bids for the Purchased Assets.

"<u>Business Day</u>" means any day other than a Saturday or Sunday or other day on which banks in Wilmington, Delaware are authorized or required by Law to be closed.

"<u>Business Entity</u>" means any Person other than an individual or a Governmental Authority.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Commercial Payor</u>" means, each Payor that is not a Governmental Authority.

"<u>Confidentiality Agreement</u>" means that certain Nondisclosure Agreement, dated August 31, 2016, by and between Seller and Purchaser.

"<u>Contracts</u>" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, arrangement or undertaking, written or oral, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

- 2 -

"DIP Facility" means a debtor-in-possession financing facility under which the Purchaser will provide financing of up to $5,116,000.00 to the Seller pursuant to a credit agreement substantially in the form attached hereto as Exhibit C.

"Encumbrances" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"Environmental Laws" means any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"Excluded Tax" means any Liability of Seller for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract or other agreement): (i) income Taxes of Seller; and (ii) Taxes that relate to the Purchased Assets, the Business, or any Transferred Employee for any Pre-Closing Tax Period that are not Assumed Taxes.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"Government Receivables" means, collectively, all amounts received by Seller after the Closing pursuant to accounts receivable due from any Governmental Authority payor or governmental third-party payors for services performed by any of Seller's employees, agents or contractors prior to Closing in connection with the operation of the Business, including, but not limited to, the United States Centers for Medicare and Medicaid Services.

"IP Confidential Information" means all of the following U.S., state and foreign intellectual property of any Person related to the Business: (a) inventions, discoveries, processes, designs, techniques, developments, technology and related improvements, whether or not patented or patentable; (b) proprietary computer programs and software (including source code, object code and executable code form), confidential and proprietary data, proprietary databases, and related documentation thereof, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof; (c) mask works; and (d) confidential or proprietary information (including trade secrets, know-how, drawings, specifications, designs,

- 3 -

technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes). For the avoidance of doubt, "IP Confidential Information" excludes any data or information which is in the public domain.

"IRS" means the Internal Revenue Service.

"Law" means any law, statute, code, regulation, ordinance, rule or Order enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"LIS System" means the Laboratory Information System maintained by Seller, which logs specimens and maintains patient and other records regarding Seller's business.

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Materials of Environmental Concern" means any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, chemicals, petroleum or petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws; provided, that neither the Slides nor any medical specimens contained or incorporated therein shall be deemed or construed to be Materials of Environmental Concern.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement with, a Governmental Authority.

"Ordinary Course" means the ordinary course of business of Seller, taking into account that Seller will be operating its business under chapter 11 of the Bankruptcy Code as a debtor-in-possession.

"Payors" means any third party payors who pay or reimburse the cost of health services provided by Seller in connection with the Business such as Medicare, Medicaid,

- 4 -

CHAMPUS/TRICARE, Blue Cross and/or Blue Shield, State government insurers, private insurers or any other Person.

"Permitted Encumbrances" means (a) Encumbrances for Taxes not yet due and payable or being contested in good faith; (b) landlord and lessor Encumbrances existing under the terms and conditions of leases of real and personal property; (c) mechanic's, materialmen's, landlord's and similar Encumbrances incurred in the Ordinary Course; (d) Encumbrances arising in the Ordinary Course under worker's compensation, unemployment insurance, social security, retirement and similar legislation; (e) Encumbrances on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course; (f) any recorded easement, covenant, zoning or other restriction on the Leased Real Property; and (g) any lien, claim or encumbrance of which Seller, as a debtor under the Bankruptcy Code, could not sell its property free and clear pursuant to section 363(f) of the Bankruptcy Code.

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) that ends on or prior to the Closing Date.

"Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures Order. This Agreement shall constitute a Qualified Bid.

"Qualified Bid Determination Deadline" shall have the meaning ascribed to it in the Bid Procedures Order.

"Sale Motion" means the motion filed by Seller seeking approval of this Agreement and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, and substantially in the form attached hereto as Exhibit B, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby.

"Second Lien Notes" means the second lien secured notes issued by the Seller pursuant to that certain Note Purchase Agreement, dated February 21, 2017, between Bostwick Laboratories Group Holdings, L.P., Seller, certain "Purchasers" identified therein, and Bostwick Laboratories Group Holdings GP, LLC.

"Second Lien Notes Amendment" means an amendment of the Second Lien Notes substantially in the form attached as Exhibit D.

"Second Lien Noteholders" means the holders of the Second Lien Notes.

"Successful Bidder" means any party or parties who acquires all, substantially all, or a portion of the Purchased Assets (in a single transaction or a series of transactions) by reason of having submitted the successful bid at the Auction in a manner consistent with and authorized by the Bid Procedures Order.

"Tax Return" means any report, return (including estimated) or other information required (including any attachments or schedules required to be attached to such report, return, or other information) to be filed, with a Governmental Authority in connection with any Taxes (and any amendment thereto).

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental (including Section 59A of the Code), capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"Transaction" means the sale and purchase of the Purchased Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Purchased Assets.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109, or any similar applicable state or local laws.

1.3    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| Agreement | Preamble |
|---|---|
| Aggregate Purchase Price | 2.2 |
| Assumed Contracts | 2.1(b)(v) |
| Assumed Leasehold Interests | 2.1(b)(iv) |
| Assumed Liabilities | 2.7(a) |
| Auction | 6.4 |
| Bankruptcy Code | Preamble |
| Bill of Sale and Assignment Agreement | 3.2(a) |
| Business | Recitals |
| Business Employees | 7.1(a) |
| Closing | 3.1(a) |
| Competing Bid | 6.1 |
| Closing Date | 3.1(a) |
| Credit Bid | 2.2(a) |
| Effective Time | 3.1 |
| Intellectual Property | 2.1(b) |

| | |
|---|---|
| Inventory | 2.1(b) |
| Permits | 4.16 |
| Pre-Closing Period | 8.2 |
| Purchased Assets | 2.1(b) |
| Purchase Price Allocation Schedule | 2.6 |
| Purchaser | Preamble |
| Real Property Leases | 4.6(b) |
| Required Closing Payment | 2.3 |
| Retained Assets | 2.1(c) |
| Seller | Preamble |
| Slides | 2.1(b) |
| Specified Categories | Schedule 7.1(a) |
| Transfer Taxes | 2.7 |
| Transferred Employees | 7.1(a) |

1.4    <u>Interpretation</u>. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement, (d) all references in this Agreement to Articles, Sections and Exhibits shall mean and refer to Articles, Sections and Exhibits of this Agreement, (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (g) the term "including" shall be deemed to mean "including, without limitation" and "including, but not limited to" and (i) all references to "day" or "days" in this Agreement shall refer to calendar day(s), unless such reference is specifically to "Business Days."

## ARTICLE II
## PURCHASE AND SALE, PURCHASE PRICE

2.1    <u>Purchase and Sale</u>.

(a)    <u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement, the Bid Procedures Order, and the Sale Order, at the Closing on the Closing Date, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall acquire from Seller, the Purchased Assets, free and clear of any Encumbrances pursuant to Bankruptcy Code Section 363(f), other than Permitted Encumbrances, and Purchaser shall assume from Seller the Assumed Liabilities. Notwithstanding anything herein to the contrary, the Excluded Liabilities shall not be assumed by Purchaser and the Retained Assets will be retained by Seller and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

(b)    <u>Purchased Assets</u>. For purposes of this Agreement, "<u>Purchased Assets</u>" means all assets, rights and properties of Seller identified below (other than the Retained Assets), whether or not carried and reflected on the books of Seller, wherever located:

- 7 -

(i)      Except as limited by Section 2.1(c)(ii) with respect to Government Receivables, all accounts, accounts receivable, notes, contract or other rights to payments of Seller of whatever kind or nature, including all current or deferred rights to payment for goods or services rendered on or prior to the Closing Date and all claims (excluding claims arising under Chapter 5 of the Bankruptcy Code), rights, interests and proceeds related thereto (collectively, "Accounts Receivable");

(ii)      all supply inventories of Seller used in the conduct of the Business, including all testing supplies and reagents (collectively, "Inventory");

(iii)      all laboratory and other equipment owned by Seller;

(iv)      all of Seller's right, title and interest in and to the real property leases described in Schedule 2.1(b)(iv) (which Schedule 2.1(b)(iv) Purchaser may amend at any time in Purchaser's discretion prior to one (1) business day following entry of the Bid Procedures Order) and the leasehold improvements situated on such leased real property which is the subject of each such lease (collectively, the "Assumed Leasehold Interests");

(v)      to the extent authorized by the Bankruptcy Court, all of Seller's right, title and interest in, to or under the Contracts of Seller described in Schedule 2.1(b)(v) (which Schedule 2.1(b)(v) Purchaser may amend at any time in Purchaser's discretion prior to one (1) business day following entry of the Bid Procedures Order) (such purchased Contracts the "Assumed Contracts");

(vi)      all of Seller's right, title and interest in and to the following intellectual property used in the conduct of the Business: trade names, trademarks, trademark registrations (including "Bostwick Laboratories", "Bostwick Scientific", "Dermatocor", "Gastrocor", "Gynecor", "Hematocor", "Nephrocor", "Renaissance", and "QC Sciences"), trademark applications, service marks, service mark registrations, service mark applications; copyrights, copyright registrations, copyright applications; patent rights (including issued patents, applications, divisions, continuations and continuations-in-part, reissues, patents of addition, utility models and inventors' certificates); domain names; licenses with respect to any of the foregoing; IP Confidential Information; customer and vendor lists; patient lists in respect of the Assumed Contracts; and the goodwill associated with any of the foregoing (collectively, the "Intellectual Property");

(vii)      the LIS System;

(viii)      any patient records in respect of the Purchased Assets or the conduct of the Business, including those maintained on the LIS System, which Purchaser agrees to maintain in accordance with applicable law;

(ix)      any test results generated in respect of the Business, which Seller is required to maintain in accordance with applicable law;

- 8 -

(x)      all slides and blocks of Seller in respect of the Business (the "Slides"), which Seller is required to maintain in accordance with applicable law.

(c)      Retained Assets. For purposes of this Agreement, "Retained Assets" means all assets and property of Seller, other than the Purchased Assets, including the following:

(i)      All bank accounts of Seller and all cash and cash equivalents of Seller;

(ii)      all Government Receivables (but not Purchaser's right to amounts collected with respect to the Government Receivables pursuant to Section 2.7);

(iii)      all deposits and advances, prepaid expenses and other prepaid items of Seller, which includes any prepaid Taxes and deposits under any Assumed Leasehold Interests;

(iv)      Seller's corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents;

(v)      all of Seller's right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character, including under warranties, guarantees and indemnitees and actions under Chapter 5 of the Bankruptcy Code;

(vi)      all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith;

(vii)      (i) all attorney-client privilege and attorney work-product protection of Seller or associated with the Business as a result of legal counsel representing Seller or the Business; (ii) all documents of Seller or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by Seller in connection with the transactions contemplated by this Agreement;

(viii)      Seller's national provider identifier number and Provider Transaction Access Number (PTAN) (i.e., Medicare number) and all related provider Contracts;

(ix)      all Contracts of Seller, other than the Assumed Contracts;

(x)      all rights to any refund or credit of Taxes of Seller;

(xi)      all rights in laboratory equipment leased by Seller;

(xii)      all of Seller's billing records, other than the LIS System; and

(xiii)    Seller's rights under this Agreement and the transactions contemplated hereby.

(d)    <u>Excluded Liabilities</u>. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Purchased Assets shall be or become liable for or subject to, any liabilities or obligations of Seller or the Business, including the following liabilities and obligations (collectively, "<u>Excluded Liabilities</u>"), which shall be and remain liabilities of Seller:

(i)    liabilities accrued on any financial statements of Seller;

(ii)    liabilities or obligations associated with any Retained Assets;

(iii)    liabilities or obligations associated with any and all indebtedness of Seller for borrowed money to the extent the liability therefor is not one of the Assumed Liabilities;

(iv)    liabilities or obligations arising under any Contracts that are not Assumed Contracts;

(v)    liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Seller that occurred, or arise from events that occurred, prior to the Closing Date;

(vi)    liabilities retained by Seller pursuant to <u>Section 7.1(b)</u> and all other liabilities or obligations prior to the Closing to current, former or prospective employees (including any Business Employees who do not become Transferred Employees) of Seller and other individual service providers or their respective dependents or beneficiaries, other than liabilities or obligations with respect to any Transferred Employees on or after the Closing;

(vii)    liabilities of Seller to the Internal Revenue Service or any other Governmental Authority including those relating to Seller's employees to the extent such liabilities are not Assumed Taxes;

(viii)    penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Seller of any Legal Requirement and/or Environmental Law prior to the Closing Date;

(ix)    compliance with or any payment under the terms of the Settlement Agreement among the United States of America and Seller and others dated August 28, 2014;

(x)    liabilities of Seller to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law; and

(xi)    liabilities or obligations under the WARN Act, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction.

2.2    Purchase Price; Deposit.

(a)    The aggregate purchase price payable by Purchaser for the Purchased Assets shall be equal to: (a) Five Million Four Hundred and Five Thousand Dollars ($5,405,000.00), which shall be paid in the form of (i) a credit bid in an amount sufficient to pay in full the outstanding obligations under the DIP Facility (the "Credit Bid") and (ii) cash, and (b) the assumption by Purchaser at the Closing of the Assumed Liabilities (collectively, the "Aggregate Purchase Price").

(b)    Within three (3) Business Days after entry into this Agreement, Purchaser shall deposit Five Hundred Thousand Five Hundred Dollars ($540,500.00) (the "Buyer Deposit") with Pepper Hamilton LLP ("Pepper") by wire transfer of immediately available funds. Pepper shall hold the Buyer Deposit in escrow in a segregated, non-interest-bearing account (the "Escrow Account"). An amount equal to the Buyer Deposit (the "Closing Release Amount") shall become payable, and shall be paid, to Seller from the Escrow Account at the Closing. At the Closing, Purchaser and Seller shall instruct Pepper to deliver so much of the Closing Release Amount to Seller as is necessary for payment of the Aggregate Purchase Price by wire transfer of immediately available funds into an account designated by Seller, pursuant to the terms of this Agreement. If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Purchaser or Seller in accordance with the terms set forth in Section 11.3.

2.3    Payments at Closing. At the Closing, an amount equal to $5,405,000.00 ("Required Closing Payment"), less the Credit Bid and the Closing Release Amount, shall be paid by Purchaser to Seller by delivery to Seller by bank wire transfer (in immediately available funds) to an account or account designated Seller, which account or accounts will be designated by Seller to Purchaser in writing at least three (3) Business Days prior to the date of the required payment. To the extent that total of the Credit Bid and the Closing Release Amount exceeds the Required Closing Payment, the excess of the Buyer Deposit shall be refunded to Purchaser.

2.4    Assumed Liabilities and Retained Liabilities.

(a)    As additional consideration for the purchase of the Purchased Assets, Purchaser shall, at the Closing, pursuant to the Sale Order, agree to perform, and in due course pay and discharge, only the following obligations and liabilities of Seller relating to the Business (collectively, the "Assumed Liabilities"):

(i)    $950,000 in principal amount of Second Lien Notes plus accrued interest through the date of the Closing, after giving effect to the modification of the Second Lien Notes pursuant to the Second Lien Notes Amendment substantially in the form of Exhibit D providing for (X) amortization over a period of 18 months at an interest rate of 8% and (Y) the right for Purchaser to prepay the Second Lien Notes at any time without penalty;

(ii)     the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees;

(iii)     cure costs under Bankruptcy Code Section 365 for all Assumed Contracts and Assumed Leasehold Interests; and

(iv)     Assumed Taxes.

(b)     Purchaser shall only be responsible for the Assumed Liabilities and shall not assume or pay any, and Seller shall continue to be responsible for each, liability of Seller whether or not relating to the Business including, but not limited to the Excluded Liabilities set forth in Section 2.1(d) (collectively, the "Retained Liabilities").

2.5     Transfer Taxes. Any and all transfer, sales, use, purchase, value added, excise, real property, personal property, intangible stamp, registration or similar Taxes or fees imposed on, or resulting from, the transfer of any Purchased Assets (collectively "Transfer Taxes"), regardless of when payable, shall be paid by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, fees and charges, and, if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.

2.6     Allocation. Within sixty (60) days of the Closing, Purchaser shall provide to Seller, for Seller's review, comment and consent, a schedule allocating the Aggregate Purchase Price (taking into account any Assumed Liabilities that are Liabilities for Tax purposes) among the Purchased Assets (the "Purchase Price Allocation Schedule"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code. The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Aggregate Purchase Price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation Schedule, as adjusted pursuant to the prior sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

2.7     Government Receivables; Post-Termination Wind Down. The Parties acknowledge that, notwithstanding anything to the contrary herein, Purchaser is not acquiring, and the Purchased Assets do not include, the Government Receivables; provided, however, that Purchaser is purchasing the Purchased Assets, and the Purchased Assets include all amounts collected with respect to the Government Receivables. Seller hereby appoints Purchaser (at Purchaser's sole cost and expense) to act as Seller's collection agent with respect to the Government Receivables. In connection therewith, on or before the Closing Date, Seller shall establish a new, or maintain an existing, depository bank account at a financial institution mutually acceptable to Seller and Purchaser. After the Closing, Seller shall receive in such bank account cash, checks, drafts or other similar items of payment received with respect to the Government Receivables, and Seller shall cause such amounts to be swept into an account controlled by Purchaser. To the extent any Accounts Receivable of a Commercial Payor are not assignable to Purchaser pursuant to any Assumed Contract, any amounts collected related to such

- 12 -

receivables shall be collected and transferred to Purchaser through a separate bank account controlled by Seller in the manner provided in this Section 2.7.

## ARTICLE III
## CLOSING AND CLOSING DATE DELIVERIES

3.1     Closing. The term "Closing" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser in exchange for the consideration delivered to Seller pursuant to this Agreement. The Closing shall take place at the offices of Pepper Hamilton LLP, 1313 North Market Street, Suite 5100, Wilmington, DE 19899, or at such other place as is mutually agreed to in writing by Seller and Purchaser, at 10:00 am local time not later than five (5) Business Days following the date on which all of the conditions set forth in Articles IX and X are satisfied (other than conditions the fulfillment of which is to occur at the Closing). The date upon which the Closing actually takes place is referred to as the "Closing Date". The Closing shall be deemed effective as of 12:01 a.m. (Eastern Time) on the Closing Date (the "Effective Time").

3.2     Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a Bill of Sale and Assignment Agreement (the "Bill of Sale and Assignment Agreement"), executed by Seller; and all such other bills of sale, lease assignments, trademark assignments, copyright assignments, patent assignments, employee work product assignments, and contract assignments (and any other appropriate title transfer documentation) and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser may deem necessary or desirable;

(b)     a certificate executed by an executive officer of Seller certifying as to the matters set forth in Section 9.3;

(c)     a certified copy of the Sale Order;

(d)     a certificate, duly completed and executed by Seller pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(e)     a duly completed and executed IRS Form W-9 establishing that Seller is exempt from U.S. back-up withholding; and

(f)     all documents furnished by Purchaser that are necessary to amend Seller's name to not include "Bostwick," or any derivative thereof or any other similar name, which shall be executed by Seller and in a form that Purchaser may file in the State of Delaware and in each other state in which Seller is qualified to transact business.

3.3     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)     the payments to be delivered by Purchaser pursuant to Section 2.3;

- 13 -

(b)      a certificate of the Secretary or an Assistant Secretary of Purchaser certifying as to: (i) the certificate of formation of Purchaser; and (ii) the resolutions of the board of managers of Purchaser authorizing and approving the execution, delivery and performance by Purchaser of this Agreement and any agreements, instruments, certificates or other documents executed by Purchaser pursuant to this Agreement;

(c)      a certificate executed by an authorized officer of Purchaser certifying as to the matters set forth in <u>Section 10.3</u>;

(d)      the Bill of Sale and Assignment Agreement as executed by Purchaser;

(e)      the Second Lien Notes Amendment and related documentation;

(f)      a payoff letter reflecting the cancellation of the DIP Facility as a portion of the Aggregate Purchase Price; and

(g)      a certificate, duly completed and executed by Purchaser pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code; <u>provided</u>, <u>however</u>, that if Purchaser is a disregarded entity (as described in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations), such certification shall be provided by the Purchaser's owner.

3.4      <u>Cooperation</u>. Seller and Purchaser shall, on request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents and/or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as of the Closing as follows:

4.1      <u>Due Incorporation</u>. Seller is (i) duly organized, validly existing and in good standing under the Laws of the State of Delaware and (ii) duly qualified to do business and in good standing in each jurisdiction where such qualification is required. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Seller and, if applicable, have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and, subject to entry of the Sale Order, is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Seller has the full power and authority necessary to own, lease, operate and use the Purchased Assets.

61183747_11

4.2     Noncontravention. Subject to entry of the Sale Order, neither the execution, delivery and performance by Seller of this Agreement nor the consummation of the transactions contemplated hereby will, after the giving of notice, or the lapse of time, or otherwise result in a breach or violation of, or default under, Seller's organizational documents.

4.3     Brokers. Except as set forth in Schedule 4.3, neither this Agreement nor the sale of the Purchased Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of, or representing Seller or any of its Affiliates as broker, finder, investment banker, financial advisor or in any similar capacity.

4.4     Title to Purchased Assets.

(a)     Seller has good and marketable title to, or, in the case of property held under a lease or other contractual obligation, a valid leasehold interest in, all of the Purchased Assets, whether real or personal property and whether tangible or intangible, other than Permitted Encumbrances.

(b)     Subject to entry of the Sale Order, Purchaser will be vested with title to the Purchased Assets, free and clear of all liens and Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5     Condition of Assets. The Purchased Assets are being sold by Seller in AS-IS condition. Neither Seller nor any other Person makes any other express or implied representation or warranty on behalf of Seller, including, without limitation, any representation or warranty as to the condition of the Purchased Assets.

4.6     NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLER DOES NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS, AND SELLER DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLER, ANY AFFILIATE OF SELLER OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY

DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1   <u>Organization; Authorization</u>. Purchaser is (a) duly organized, validly existing and in good standing under the laws of the State of Delaware and (b) duly qualified to do business and in good standing in each jurisdiction where such qualification is required. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by such party and is a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2   <u>Noncontravention</u>. Neither the execution, delivery and performance by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby will result in a breach or violation of, or default under, Purchaser's organizational documents.

5.3   <u>No Brokers</u>. Purchaser has no Liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller could be liable.

5.4   <u>Financing Ability</u>. Purchaser has the financial ability to pay the Aggregate Purchase Price as of the date hereof and the Closing and to otherwise perform Purchaser's obligations under this Agreement and provide the DIP Facility. Accordingly, there are no financing conditions to the payment of the Aggregate Purchase Price.

## ARTICLE VI
## BANKRUPTCY MATTERS

6.1   <u>Competing Bid</u>.

(a)   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of any assets of the Seller to a purchaser or purchasers other than Purchaser (whether consummated pursuant to a sale, consensual foreclosure, liquidation, credit bid or chapter 11 plan, a "<u>Competing Bid</u>").

(b)   Nothing contained herein shall be construed to prohibit Seller and its representatives or Affiliates from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bid.

6.2     Cooperation in Bankruptcy Court Matters.

(a)     Seller shall pursue diligently the entry of the Bid Procedures Order and the Sale Order. Seller shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bid Procedures Order.

(b)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bid Procedures Order. In the event the entry of the Bid Procedures Order shall be appealed, Seller and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

6.3     Sale Order.

(a)     The Sale Order shall contain, without limitation, the following provisions:

(i)     finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that Seller and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Seller under the Assumed Leasehold Interests and Assumed Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)     authorizing Seller to transfer to Purchaser all of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)     authorizing Seller to assume and sell and assign the Assumed Leasehold Interests and Assumed Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code;

(iv)     finding that Purchaser is a not a successor to Seller or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Seller, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing, all as set forth in more detail in the form of Sale Order attached hereto as Exhibit C; and

(v)     Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Assumed Leasehold Interests and Assumed Contracts.

(b)     Subject to any Competing Bid, (i) Seller agrees that it will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order, (ii) Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller and are reasonably necessary or appropriate to assist Seller in obtaining entry

- 17 -

of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Aggregate Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code; and (iii) if the entry of the Sale Order shall be appealed or collaterally attacked, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; provided, that Purchaser shall reimburse to Seller the costs and expenses (including professional fees and expenses) of Seller in any such appeal. After consultation with the Purchaser, in Seller's sole discretion, Seller may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement. Seller shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Bankruptcy Case reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; provided, however, Seller's obligations in connection with any such efforts shall terminate upon the Closing.

6.4     Back-up Bidder. Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Bid Procedures Order (the "Auction"), if and only if Purchaser submits the next highest or otherwise best bid at the Auction, as contemplated by the Bid Procedures Order and the winning bidder fails to consummate the transaction, Purchaser shall promptly consummate the transactions upon the terms and conditions as set forth herein, including the Aggregate Purchase Price, as the same may modified by Purchaser at the Auction.

6.5     Break-up Fee and Expense Reimbursement.

(a)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser a break-up fee (the "Break-Up Fee") in an amount equal to the sum of: (i) $199,650 plus (ii) the reasonable and documented out of pocket amounts actually expended or incurred by or on behalf of Purchaser, payable to third parties, in connection with Purchaser's due diligence review and the preparation, negotiation, execution and delivery of this Agreement (including attorneys' fees) and its representation in the Chapter 11 Case through the later of (A) the consummation of any such Alternative Transaction and (B) the payment of the Break-Up Fee in full, up to a maximum of $150,000, in accordance with the terms hereof, the Bid Procedures Order, and only upon the Bankruptcy Court having approved the Break-Up Fee. The Break-Up Fee shall be deemed to be an allowed expense in the Chapter 11 Case of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

(b)     Seller shall seek, pursuant to the Bid Procedures Order, Bankruptcy Court approval of the Break-Up Fee. For the avoidance of doubt, the Break-Up Fee provided for hereunder shall only be paid to the Purchaser if this Agreement is approved pursuant to the Bid Procedures Order and the Bankruptcy Court approves the Break-Up Fee.

- 18 -

(c)     Seller acknowledges and agrees that the entry into this Agreement provides value to the Seller's chapter 11 estate by, among other things, inducing other parties to submit higher or better offers for the Purchased Assets. Seller and Purchaser agree that the Break-Up Fee is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated in this Agreement.

## ARTICLE VII
## EMPLOYEE MATTERS

7.1     Employees to be Hired by Purchaser.

(a)     Prior to the Closing. Purchaser will offer to employ, effective as of the Closing Date, the employees of Seller as of immediately prior to the Closing Date in respect of the Business as listed on Schedule 7.1(a) (which Purchaser shall deliver to Seller no later than one (1) Business Day prior to the Qualified Bid Determination Deadline) (the "Business Employees") as determined in the sole discretion of Purchaser. All Business Employees who are offered and accept employment with Purchaser and commence such employment immediately after the Closing shall be referred to as the "Transferred Employees". Seller shall terminate the employment of all Transferred Employees effective as of the Closing. Schedule 7.1(a) shall be filed under seal.

(b)     Seller shall be solely responsible, and Purchaser shall have no obligations whatsoever, for any salary, wages, bonuses, accrued vacations or paid time off, or other similar amounts payable to any current or former employee, independent contractor, consultant of Seller, or any of their eligible dependents, for any period relating to service with Seller. For the avoidance of doubt and notwithstanding anything to the contrary in this Section 7.1, Purchaser shall be responsible only for any Assumed Liabilities under Section 2.4(a)(i)-(iv).

(c)     Nothing in this Agreement shall be deemed or construed to limit or condition the delivery by the Seller of any notices required by, or the taking of any other action the Seller deems necessary or desirable to comply with, the WARN Act, which the Seller may take at such time and in such manner as the Seller deems appropriate in its sole discretion. Purchaser shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, within ninety (90) days after the Closing Date, take any action that would obligate Seller to have provided notice to any Business Employees prior to or on the Closing Date under the WARN Act.

(d)     The provisions of this Section 7.1 shall inure solely to the benefit of the parties to this Agreement, and nothing herein, express or implied, is intended to confer upon any other Person (including any Business or Transferred Employee) any rights or remedies of any nature (including any third-party beneficiary rights under this Agreement) whatsoever.

7.2     Authorization to Communicate with Certain Employees. Upon entry of the Bid Procedures Order, Purchaser, upon providing notice to Seller, is authorized to communicate with the employees of Seller consisting of members of the pathology staff, laboratory operations,

"Field Tech Reps", members of the sales, marketing, and customer service team for the purpose of negotiating and extending to such employees as it determines, offers of employment contingent on Purchaser being the successful purchaser of the Purchased Assets; <u>provided</u>, that this right shall terminate if Purchaser is not the winning bidder at the Auction.

**ARTICLE VIII**
**<u>COVENANTS</u>**

A.   <u>Pre-Closing Covenants</u>.

8.1   <u>Access to Governmental Authorities and Payors</u>. Upon the entry of the Bid Procedures Order, Seller shall permit Purchaser to communicate with Governmental Authorities involved in the regulation of Seller's Business regarding the pending transactions contemplated by this Agreement; <u>provided</u>, that this right shall terminate if Purchaser is not the winning bidder at the Auction. At such time as Purchaser becomes the winning bidder, Purchaser shall be permitted to communicate directly with Seller's Payors regarding the transactions contemplated in this Agreement.

8.2   <u>Maintenance of Business</u>.  For the period commencing on the date hereof and expiring on the earlier of the termination of this Agreement in accordance with <u>Article XI</u> and the Closing (the "<u>Pre-Closing Period</u>"), Seller shall, subject to the compliance by the Purchaser with its covenants hereunder and to applicable requirements of Law, conduct and carry on the Business in the Ordinary Course other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order.

8.3   <u>Seller Pre-Closing Covenants</u>. Without limiting the generality of <u>Section 8.2(a)</u>, during the Pre-Closing Period, Seller shall not, without the prior written consent of Purchaser:

(a)   purchase, sell, lease, mortgage, pledge or otherwise acquire or dispose of any material Purchased Assets, except for inventory, parts and supplies purchased, sold or otherwise disposed of in the Ordinary Course;

(b)   waive, release or cancel in any material respect any claims against third parties or material debts owing to it, or any rights which have any material value, in each case, with respect to any Purchased Assets, other than in the Ordinary Course or related solely to Excluded Liabilities;

(c)   change, amend, terminate or otherwise modify in any material respect, any material Assumed Contract to which Seller is a party, other than in the Ordinary Course; and

(d)   agree to do any of the items prohibited by this <u>Section 8.3</u>.

8.4   <u>Cooperation to Transfer Memphis Facility</u>. Upon entry of the Sale Order, Seller shall, at Purchaser's cost, use reasonable efforts to cooperate with Purchaser in the transition of work to Purchaser's Memphis facility.

8.5    <u>Commercially Reasonable Efforts to Close</u>.

(a)    Subject to the terms and conditions hereof, each party hereto covenants and agrees to use all commercially reasonable efforts to consummate the transactions contemplated hereby within sixty (60) days of the date of this Agreement and will fully cooperate with the other parties hereto for such purpose.

(b)    Seller agrees to immediately notify Purchaser of any event, fact or circumstance of which Seller becomes aware that could reasonably be expected to result in the failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Purchaser a reasonable opportunity to satisfy such condition.

(c)    Purchaser agrees to immediately notify Seller of any event, fact or circumstance of which Purchaser becomes aware that could reasonably be expected to result in the failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Seller a reasonable opportunity to satisfy such condition.

8.6    <u>Exclusivity</u>.

(a)    During the period from the date hereof to the commencement of Seller's chapter 11 case, Seller shall, and shall cause its Affiliates and its and their respective stockholders, members, partners, directors, officers, employees, representatives and agents (collectively, "<u>Representatives</u>") to, cease immediately and cause to be terminated any and all activities, discussions or negotiations with any person, entity or group conducted heretofore with respect to, or that may reasonably be expected to lead to, an Alternative Transaction, and Seller shall not, and shall cause its Representatives to not, directly or indirectly, solicit, initiate or encourage, or take any other action that facilitates any offer, inquiry or proposal concerning any Alternative Transaction.

(b)    Subject to the terms and conditions of the Bid Procedures Order, Purchaser shall have the right to bid against any Alternative Transaction Bids at the Auction.

B.    <u>Certain other Covenants and Agreements</u>.

8.7    <u>Access to Uniondale Facility</u>. Seller will use commercially reasonable efforts, at Purchaser's cost, to provide Purchaser with access to Seller's facility in Uniondale, New York, for 30 days following the Closing.

8.8    <u>Use of Name</u>. After the Closing, Seller may not, directly or indirectly, use the name "Bostwick," "Bostwick Laboratories" or any derivative thereof or any similar name to identify itself. Seller shall be responsible for all filing fees required to be paid in connection with filing Seller's change of name amendments in the State of Delaware and in each other state in which it is qualified to transact business.

8.9    <u>Tax Matters</u>.

(a)    All refunds for Taxes for any Excluded Tax, Transfer Taxes, or that are attributable to the carry forward of a Tax attribute from a Pre-Closing Period shall be for the sole

benefit of Seller and to the extent that Purchaser receives a refund that is for the benefit of Seller, Purchaser shall promptly advise Seller of the receipt of the refund and within two (2) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Seller. All refunds for Taxes relating to the Business, the Purchased Assets or Transferred Employees for a Post-Closing Tax Period or that are Assumed Taxes shall be for the sole benefit of Purchaser and to the extent that Seller receives a refund for a Tax that is for the benefit of Purchaser, Seller shall promptly advise Seller of the receipt of the refund and within two (2) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Purchaser.

(b)      If any Tax (or Tax refund) relates to a period that begins before and ends after the Closing Date, the parties shall use the following conventions for determining the portion of such Tax (or Tax refund) that relate to a Pre-Closing Tax Period and the portion that relates to a Post-Closing Tax Period: (A) in the case of property Taxes and other similar Taxes imposed on a periodic basis, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined by multiplying the Taxes (or Tax refund) for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period, and the remaining amount of such Taxes (or Tax refunds) shall be attributable to the Post-Closing Tax Period; and (B) in the case of all other Taxes, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined as if a separate return was filed for the period ending as of the end of the day on the Closing Date using a "closing of the books methodology," and the remaining amount of the Taxes (or Tax refunds) for such period shall be attributable to the Post-Closing Tax Period.

(c)      Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such reasonably requested information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return or other filings or otherwise in connection with Tax matters, in each case relating to the Purchased Assets or the Business.

8.10      Transfer of Slides. Seller shall, at Seller's expense, use commercially reasonable efforts to catalogue the Slides in accordance with cataloguing instructions provided by Purchaser, with such catalogue to be completed by the Closing. Following the Closing, Seller shall, at Seller's expense, use commercially reasonable efforts to transfer the Slides to Purchaser's Memphis, Tennessee location. Seller shall remain solely responsible for the Slides until delivered to Purchaser's Memphis, Tennessee location.

## ARTICLE IX
## CONDITIONS TO CLOSING APPLICABLE TO PURCHASER

The obligations of Purchaser hereunder (including the obligation of Purchaser to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Purchaser):

9.1     No Termination. Seller shall not have terminated this Agreement pursuant to Section 11.1.

9.2     Bankruptcy Court Approval. The Bankruptcy Court shall have entered (i) the Bid Procedures Order and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

9.3     Bring-Down of Seller Warranties, Representations and Covenants. Each of the representations and warranties of Seller contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Seller will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing.

9.4     Pending Actions.  No proceeding by any Governmental Authority shall be pending on the Closing Date which seeks to enjoin the consummation of this Agreement or any transactions contemplated hereby.

9.5     Condition of Assets. There shall have been no material adverse change in the condition or affecting the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or to the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order.

**ARTICLE X**
**CONDITIONS TO CLOSING APPLICABLE TO SELLER**

The obligations of Seller hereunder (including the obligation of Seller to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Seller):

10.1     No Termination. Purchaser shall not have terminated this Agreement pursuant to Section 11.1.

10.2     Bankruptcy Court Approval. The Bankruptcy Court shall have entered (i) the Bid Procedures Order and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

10.3     Bring-Down of Purchaser Warranties, Representations and Covenants. Each of the representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Purchaser will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing.

10.4     <u>Pending Actions</u>.  No proceeding by any Governmental Authority shall be pending on the Closing Date which seeks to enjoin the consummation of this Agreement or any transaction contemplated hereby.

10.5     <u>All Necessary Documents</u>. All proceedings to be taken in connection with the consummation of the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Seller, and Seller shall have received copies of such documents as it may reasonably request in connection therewith, including those documents to be delivered pursuant to <u>Section 3.3</u>.

**ARTICLE XI**
**<u>TERMINATION</u>**

11.1     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)     by mutual consent of Purchaser and Seller;

(b)     by Seller, if:

(i)     the Closing of the transactions contemplated by this Agreement shall not have occurred on or before May 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; <u>provided</u> that Seller is not in material breach of or default under this Agreement;

(ii)     any representation or warranty made herein for the benefit of Seller is untrue in any material respect, or Purchaser shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(c)     by Purchaser, if:

(i)     the Closing of the transactions contemplated by this Agreement shall not have occurred on or before May 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; <u>provided</u> that Purchaser is not in material breach of or default under this Agreement;

(ii)     any representation or warranty made herein for the benefit of Purchaser is untrue in any material respect, or Seller shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(iii)     if Seller fails to file, on or prior to March 16, 2017, the Sale Motion and the Bid Procedures Motion; <u>provided</u>, <u>however</u>, that if Seller makes such filing after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this <u>Section 11.1(c)(i)</u>;

(iv)     if Bankruptcy Court does not enter the Bid Procedures Order on or prior to April 5, 2017; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court enters such order

after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this <u>Section 11.1(c)(iv)</u>;

(v)    if Seller fails to conduct the Auction in accordance with the Bid Procedures Order within seven (7) Business Days of the Qualified Bid Determination Deadline; <u>provided</u>, <u>however</u>, that if such auction concludes after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this <u>Section 11.1(c)(v)</u>;

(vi)    if the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after the conclusion of the Auction; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this <u>Section 11.1(c)(vi)</u>;

(vii)    if, after the entry of the Bid Procedures Order, the Auction is cancelled by Seller and the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after such cancellation; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this <u>Section 11.1(c)(vii)</u>; or

(viii)    if, upon there being no Competing Bids resulting in cancellation of the Auction, or in the alternative, if Purchaser is declared the winning bidder at the Auction such that Purchaser will be the successful purchaser of the Purchased Assets upon entry of the Sale Order, and less than 66% of those employees of Seller in the Specified Categories who are provided with offers of employment by Purchaser pursuant to <u>Section 7.2</u> (with compensation substantially similar to, or better than, such employees' compensation from Seller and on other terms consistent with Purchaser's current employment practices for similarly situated employees) accept such offers of employment; <u>provided</u>, <u>however</u>, that Purchaser must exercise its right to terminate this Agreement under this <u>Section 11.1(c)(viii)</u> within 5 calendar days of the entry of the Sale Order.

(d)    automatically if, in accordance with the Bid Procedures Order, an alternative bidder is selected by Seller at the conclusion of the Auction as having the highest or otherwise best bid, and such alternative bidder transaction closes.

11.2    <u>Breakup Fee</u>. In the event that this Agreement is terminated pursuant to <u>Section 11.1(c)(vii)</u> or <u>Section 11.1(d)</u>, Seller shall immediately become obligated to pay Purchaser the Break-Up Fee, in accordance with the terms of this Agreement and the Bid Procedures Order.   In the event that this Agreement is terminated pursuant to any other provision of <u>Section 11.1</u>, Purchaser shall not be entitled to the Break-Up Fee.

11.3    <u>Purchaser Deposit</u>. In the event that Purchaser terminates this Agreement pursuant to <u>Section 11.1(a)</u>, <u>Section 11.1(c)</u>, or <u>Section 11.1(d)</u>, Purchaser shall be entitled to disbursement of the Purchaser Deposit (including, for the avoidance of doubt, all interest and

other earnings accrued and earned thereon, if any) from the Escrow Account. In the event of a termination of this Agreement pursuant to any provision of <u>Section 11.1(b)</u>, Seller shall be entitled to disbursement of the Purchaser Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Escrow Account. In the event that this Agreement is terminated pursuant to <u>Section 11.1</u> and Seller or Purchaser is entitled to receive the Purchaser Deposit, then Seller or Purchaser may deliver to the Escrow Holder, at any time following the effective date of any such termination, a letter instructing the Escrow Holder to pay Seller or Purchaser, as applicable, the Purchaser Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Holder shall be subject to the terms of the Escrow Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1    <u>Costs and Expenses</u>. Subject to Seller's obligations under <u>Section 6.5</u>, Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). Seller will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein).

12.2    <u>Bankruptcy Court Approval</u>. The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

12.3    <u>Entire Agreement</u>. The Schedules and Exhibits referenced in this Agreement are incorporated into this Agreement and collectively with the Confidentiality Agreement and this Agreement contain the entire agreement between the parties hereto with respect to the transactions contemplated hereunder, and supersede all negotiations, representations, warranties, commitments, offers, contracts and writings prior to the date hereof. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

12.4    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimiles or other electronic copies of signatures will be deemed to be originals.

12.5    <u>Assignment, Successors and Assigns</u>. The respective rights and obligations of the parties hereto shall not be assignable without the prior written consent of the other parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

61183747_11

12.6    Survival. The representations and warranties of Seller contained in this Agreement (whether or not contained in Article IV) shall not survive, and shall terminate at, the Closing, and Seller shall have no liability after the Closing for any breach of any representation or warranty. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each surviving covenant or agreement shall survive the Closing for the period contemplated by its terms. For the avoidance of doubt, Seller shall have no obligations under this Agreement after the earlier of (i) the date that is three months from the date of this Agreement and (ii) the effective date of any plan confirmed in the Chapter 11 Case.

12.7    Severability. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof.

12.8    Headings. The captions of the various Articles and Sections of this Agreement have been inserted only for convenience of reference and shall not be deemed to modify, explain, enlarge or restrict any of the provisions of this Agreement.

12.9    Risk of Loss. Risk of loss, damage or destruction to the Purchased Assets shall be upon Seller until the Closing, and shall thereafter be upon Purchaser.

12.10    **GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND PURCHASER AND SELLER EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION; PROVIDED, HOWEVER, THAT IF THE CHAPTER 11 CASE SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH**

- 27 -

**COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 12.13</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 12.13</u>.**

12.11   <u>Press Releases and Public Announcements</u>. No public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the Transaction without the prior written consent of Purchaser and Seller; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 12.11</u> will not prohibit (a) any disclosure required by any applicable Laws (in which case the disclosing party will provide the other parties with the opportunity to review in advance any such disclosure) or an Order of the Bankruptcy Court (b) any disclosure made in connection with the enforcement of any right or remedy relating to the Transaction and (c) any disclosure by Purchaser or Seller to report and disclose the status of this Agreement and the transactions contemplated hereunder to their respective Affiliates and/or their respective members or limited partners. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate.  If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing Party required to make such announcement or disclosure shall give the other Party prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the Parties. The Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bid Procedures Order and/or the Sale Order and shall make any applicable disclosures regarding this Agreement in the Sale Motion and that Seller may provide copies of this Agreement (including any draft versions of this Agreement) to the statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

12.12   <u>U.S. Dollars</u>. All amounts expressed in this Agreement and all payments required by this Agreement are in United States dollars.

12.13   <u>Notices</u>.

(a)      All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by facsimile or sent by reputable overnight delivery service and properly addressed as follows:

- 28 -

To Purchaser:

>Poplar Healthcare, PLLC
>3495 Hacks Cross Road
>Memphis, TN 38125
>Fax: (901) 271-2684
>Attention: James P. Sweeney

with a **copy** to (which shall not constitute notice):

>Baker Donelson
>2000 First Tennessee Building
>165 Madison Avenue
>Memphis, TN 38103
>Fax: 901-577-0845
>Attention: E. Franklin Childress, Jr.

To Seller Prior to the Closing:

>Bostwick Laboratories, Inc.
>100 Charles Lindbergh Boulevard
>Uniondale, NY 11553
>Fax: (516) 512-5300
>Attention: James Carroll, Chief Restructuring Officer

with a **copy** to (which shall not constitute notice):

>Pepper Hamilton LLP
>Hercules Plaza
>1313 North Market Street, Suite 5100
>Wilmington, DE 19899
>Fax: 302-656-8865
>Attention: David B. Stratton, David M. Fournier, and Evelyn J. Meltzer

(b)      Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)      All notices and other communications required or permitted under this Agreement which are addressed as provided in this <u>Section 12.13</u> if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of transmission proof of transmission.

12.14   <u>WAIVER OF JURY TRIAL</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER

- 29 -

AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.15   Waiver. Any party hereto may waive compliance by or extend the time of performance of any obligation or act for any other party with respect to any provision of this agreement. No waiver of any provision or extension shall be construed as a waiver of any other provision or an extension of time for the performance of any other obligation or act hereunder. Any waiver or extension must be in writing.

12.16   No Third-Party Beneficiary. This Agreement is being entered into solely for the benefit of the parties hereto, and the parties do not intend that any employee or any other person shall be a third-party beneficiary of the covenants by either Seller or Purchaser contained in this Agreement.

12.17   SELLER DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES) ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO PURCHASER IN CONNECTION WITH THIS AGREEMENT, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, SELLER HAS NOT MADE AND IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF SELLER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF SELLER ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER REPRESENTS, WARRANTS, COVENANTS AND AGREES, THAT SELLER IS NOT MAKING ANY REPRESENTATION OR WARRANTY, OTHER THAN THOSE EXPRESSLY MADE BY SELLER AS SET FORTH IN ARTICLE IV (AS MODIFIED BY

THE SCHEDULES), AND THAT PURCHASER SHALL ACQUIRE THE PURCHASED ASSETS AND ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY SELLER AS SET FORTH IN ARTICLE IV(AS MODIFIED BY THE SCHEDULES).

12.18  PURCHASER DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN ARTICLE V ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLER IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, PURCHASER HAS NOT MADE OR IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF PURCHASER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V HEREOF, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF PURCHASER ARE HEREBY EXPRESSLY DISCLAIMED. SELLER REPRESENTS, WARRANTS, COVENANTS AND AGREES, ON BEHALF OF IT AND ITS AFFILIATES, THAT PURCHASER IS NOT MAKING ANY REPRESENTATION OR WARRANTY OTHER THAN THOSE EXPRESSLY MADE BY PURCHASER AS SET FORTH IN ARTICLE V, AND THAT SELLER SHALL ACQUIRE THE EQUITY CONSIDERATION WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY PURCHASER AS SET FORTH IN ARTICLE V.

12.19  Disclosures. No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.

12.20  Specific Performance. Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties hereto will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this

61183747_11

Agreement and the terms hereof in any Action instituted in any court specified in <u>Section 12.10</u> in addition to any other remedy to which he, she or it may be entitled, at law or in equity.

[signature page follows]

- 32 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

POPLAR HEALTHCARE, PLLC

By: _____
  Name: James P. Sweeney
  Title: CEO


**SELLER:**

BOSTWICK LABORATORIES, INC.


By: _____
  Name: _____
  Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

POPLAR HEALTHCARE, PLLC


By:_____
  Name: _____
   Title:


**SELLER:**

BOSTWICK LABORATORIES, INC.

By:_____
  Name: James P. Carroll
   Title: Chief Restructuring Officer

## Exhibit A

**Form of Bid Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
Bostwick Laboratories, Inc.,[1]          :        Case No. 17-_____ ( )
                                         :
                    Debtor.              :        Related Docket No.:____
------------------------------------------------------x

**ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES, BREAKUP FEE AND EXPENSE REIMBURSEMENT, (II) AUTHORIZING AND APPROVING THE DEBTOR'S PERFORMANCE OF PRE-CLOSING OBLIGATIONS UNDER THE STALKING HORSE ASSET PURCHASE AGREEMENT, (III) APPROVING NOTICE PROCEDURES, (IV) SCHEDULING A SALE HEARING AND (V) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND DETERMINING CURE AMOUNTS**

Upon the motion (the "Motion") of the above-captioned debtor (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), for entry of an order (this "Bidding Procedures Order"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing and approving (a) certain proposed bidding procedures (as attached hereto as **Exhibit 1**, the "Bidding Procedures")[2] governing the submission of competing proposals to purchase the Purchased Assets pursuant to section 363 of the Bankruptcy Code and (b) the Breakup Fee and Expense Reimbursement to the extent payable pursuant to and on the terms set forth in the Asset Purchase Agreement (as appended to the Bidding Procedures as **Exhibit A** and, together with all exhibits thereto and as may be further

---

[1]        The last four digits of the taxpayer identification number of the Debtor are ([ ]).

[2]        Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Stalking Horse APA, as applicable.

amended, modified or supplemented from time to time in accordance with the terms thereof, the

"Stalking Horse APA"), dated as of March [ ], 2017, by and among the Debtor and Poplar

Healthcare Management, LLC (the "Stalking Horse Bidder"), (ii) authorizing and approving the

Debtor's performance of certain pre-closing obligations under the Stalking Horse APA, pursuant

to which the Debtor has agreed to sell the Purchased Assets to the Stalking Horse Bidder, subject

to the terms and conditions contained therein, (iii) approving the form and manner of notice of

the sale of the Purchased Assets (the "Sale Notice"), (iv) scheduling a hearing for approval of the

sale of the Purchased Assets (the "Sale Hearing") and setting other related dates and deadlines

and (v) approving procedures for the assumption and assignment of the Assumed Leasehold

Interests and Assumed Contracts and the form of and manner of notice of proposed cure

amounts; and the Court having considered the Motion and all exhibits, objections, and other

papers filed in connection therewith; and it appearing that the relief requested in the Motion is in

the best interests of the Debtor's estate, its creditors and all other parties in interest; and due and

adequate notice of the Motion having been given under the circumstances; and upon the record

of the hearing on the Motion, and the full record of the Chapter 11 Case; and after due

deliberation, and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[3]

A.    This Court has jurisdiction over the Motion and the transactions contemplated

therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (M) and (O).   Venue in this district is proper under 28 U.S.C. §§ 1408

and 1409.

---

[3]    Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.

B.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Auction and Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.      The Debtor's proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of the Debtor's assets, and the Bidding Procedures to be employed in connection therewith.

D.      The Debtor has articulated good and sufficient business reasons for this Court to approve the Bidding Procedures, including: (i) the scheduling of a Bid Deadline, Auction, and Sale Hearing for the sale of the Debtor's assets; and (ii) the establishment of procedures to fix the cure amounts to be paid under section 365 of the Bankruptcy Code in connection with the assumption, assignment and/or transfer of the Assumed Leases and Contracts.

E.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Debtor's assets.

F.      The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED to the extent provided herein.

2.      All objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits.

3.      The Stalking Horse APA, including the Breakup Fee and Expense

Reimbursement provided therein, are approved, and the Breakup Fee and Expense Reimbursement are entitled to administrative priority pursuant to sections 503(a) and 507(a)(2) of the Bankruptcy Code.  Except for the Stalking Horse Bidder, no other Potential Bidder shall be entitled to any breakup fee, overbid fee, termination fee, expense reimbursement, or similar type of payment.

4.      The Stalking Horse APA is a Qualified Bid, and the Stalking Horse Bidder is authorized to submit any Overbids during the Auction at any time, pursuant to the Bidding Procedures.

5.      The Debtor is authorized and directed to perform all of its pre-closing obligations under the Stalking Horse APA, including, without limitation, all obligations set forth in Article VIII (Pre-Closing Covenants) and XI (Termination) (collectively, the "Pre-Closing Obligations").

6.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved, and the Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures. The Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to sale of the Purchased Assets, and any party desiring to submit a higher or better offer for the Purchased Assets shall do so in accordance with the terms of the Bidding Procedures and this Bidding Procedures Order.

7.      As described in the Bidding Procedures, if the Debtor does not receive any Qualified Bids other than from the Stalking Horse Bidder, or if no bidder other than the Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtor will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtor will seek approval of the Stalking Horse APA at the Sale Hearing.  If one or more Qualified Bids are

timely received from a Qualified Bidder (other than the Stalking Horse Bidder) in accordance with the Bidding Procedures, the Debtor shall conduct the Auction as set forth herein.

8.      If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm on the record that it has not engaged in any collusion with respect to the bidding process or the proposed Sale.  The Auction will be conducted openly and shall be transcribed, audiotaped or videotaped.

9.      The Auction and Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.

10.     Within three (3) Business Days of entry of this Bidding Procedures Order, the Debtor shall serve the Auction and Sale Notice by email or first class mail upon the following parties: (i) the Office of the United States Trustee for the District of Delaware, (ii) the Internal Revenue Service, (iii) the United States Attorney for the District of Delaware, (iv) counsel to any committee of unsecured creditors appointed in the Chapter 11 Case, (v) the U.S. Securities and Exchange Commission, (vi) any party known or reasonably believed to have asserted any lien, claim, encumbrance or other interest in the Purchased Assets, (vii) all non-Debtor parties to the Leases and Contracts and any parties who are known to claim interests therein; (viii) all applicable federal, state, and local taxing authorities; (ix) the Debtor's [  ] largest unsecured creditors; (x) the Debtor's insurance providers; (xi) all known parties that have expressed interest to the Debtor, within the six (6) months prior to the Petition Date and/or since the Petition Date, in purchasing some or all of the Debtor's assets; and (xii) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002.  In addition to the foregoing, electronic notification of the Motion, this Bidding Procedures Order and the Auction

and Sale Hearing also will be posted on the Court's electronic case filing (ECF) website, http://ecf.deb.uscourts.gov.

11.     On or before three (3) Business Days after entry of this Order, the Debtor will (i) serve by email or first class mail the Auction and Sale Notice on all creditors appearing on the Debtor's creditor matrix (to the extent not already served pursuant to paragraph above); and (ii) subject to applicable submission deadlines and cost considerations, publish the Auction and Sale Notice once in one or more publications as the Debtor deems appropriate, including but not limited to *The Wall Street Journal* (national edition).

12.     The procedures set forth below regarding the proposed assumption and assignment of certain Assumed Leasehold Interests and Assumed Contracts that may be designated to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder selected at the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code (as defined in the Stalking Horse APA, collectively, the "Assumed Leases and Contracts") in connection with the sale of the Purchased Assets are hereby approved (the "Assumption Procedures").

13.     These Assumption Procedures, as may be modified or supplemented by the Sale Order, shall govern the assumption and assignment of all Assumed Leases and Contracts:

> a.     **Cure Notice**.  The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved. On or before the date that is five (5) Business Days following the entry of this Bidding Procedures Order, the Debtor shall file with the Bankruptcy Court and serve via first class mail the Cure Notice on all non-Debtor counterparties to all Assumed Leases and Contracts and their respective known counsel, and provide a copy of

same to the Stalking Horse Bidder. The Cure Notice shall inform each recipient that its respective Assumed Lease or Contract may be designated by the Stalking Horse Bidder as either assumed or excluded and the timing and procedures relating to such designation, and, to the extent applicable, (i) the name of the counterparty to the Assumed Lease or Contract (ii) the Debtor's good faith estimates of the cure amounts required in connection with such Assumed Lease or Contract, (iii) the identity of the Stalking Horse Bidder and (iv) the deadline by which any such Assumed Lease or Contract counterparty may file an objection to the proposed assumption and assignment and/or cure amount, and the procedures relating thereto; provided, however, that service of a Cure Notice does not constitute an admission that such Assumed Lease or Contract is an executory contract or unexpired lease.

b. **Adequate Assurance**. Upon request by a counterparty under any Assumed Lease or Contract, the Debtor shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Assumed Leases and Contracts provided by the Stalking Horse Bidder, including the legal name of the proposed assignee, the proposed use of any leased premises, the proposed assignee's financial ability to perform under the Assumed Lease or Contract and a contact person with the proposed assignee that counterparties may contact if they wish to obtain further information regarding the Stalking Horse Bidder.

c.     **Objections**. Objections, if any, to the proposed assumption and assignment of any Assumed Lease or Contract, or to the cure amount proposed with respect thereto <u>must</u>: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any orders of the Bankruptcy Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof and (iv) be filed with the Bankruptcy Court and served so as to be **<u>actually received</u>** by the Notice Parties before the Sale Objection Deadline.

d.     Promptly following the Debtor's selection of the Successful Bidder and the Back-Up Bidder, if any, at the conclusion of the Auction, the Debtor shall announce the Successful Bidder and the Back-Up Bidder, if any, and shall file with the Bankruptcy Court a notice of the Successful Bidder and the Back-Up Bidder, if any. If and only if the Stalking Horse Bidder is **not** the Successful Bidder for the Debtor's assets, counterparties to the Assumed Leases and Contracts shall have until two (2) calendar days before the Sale Hearing to object to the assumption and assignment of an Assumed Lease or Contract *solely on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code*. For the avoidance of doubt, if the Stalking Horse Bidder is the Successful Bidder,

all adequate assurance objections must be filed by the Sale Objection Deadline.

e.    **Dispute Resolution**. Any objection to the proposed assumption and assignment or related cure of an Assumed Lease or Contract in connection with the proposed sale that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Bankruptcy Court) provided that any such objection may be adjourned, in full or in part, by the Debtor with the consent of the [Winning Bidder] to a later date by listing such adjournment in a notice of agenda or other notice filed on the docket of the Chapter 11 Case and served on the affected counterparty.

14.    **Any party who fails to timely file an objection to its scheduled cure amount listed on the Cure Notice or to the assumption and assignment of an Assumed Lease or Contract shall (i) be deemed to have consented to the assumption, assignment and/or transfer of such of the Assumed Lease or Contract to Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any; (ii) be forever barred from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtor, its estate or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such Assumed Lease or Contract and (b) asserting that the Stalking Horse Bidder or other Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order.**

15.    Except as otherwise provided in this Bidding Procedures Order or the Bidding Procedures, the Debtor further reserves the right as it may reasonably determine to be in the best interests of its estate, subject to conformity with the Bidding Procedures, to:  (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid or combination of Qualified Bids is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (v);waive terms and conditions set forth herein with respect to all bidders; (vi) impose additional terms and conditions with respect to all bidders; (vii) extend the deadlines set forth herein; (viii)or (ix) withdraw the Motion at any time prior to the Sale Hearing with or without prejudice.

16.    The Debtor is authorized and empowered to take all actions necessary to effectuate the relief granted in this Bidding Procedures Order in accordance with the Motion.

17.    Notwithstanding any Bankruptcy Rules to the contrary, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

18.    The Bankruptcy Court retains jurisdiction with respect to all matters arising from, or related to, the implementation and interpretation of this Bidding Procedures Order.

Dated: _____, 2017
          Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 to Bidding Procedures Order**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------x
In re                                        :        Chapter 11
                                             :
Bostwick Laboratories, Inc.,[1]              :        Case No. 17-_____ ( )
                                             :
                    Debtor.                  :
-------------------------------------------------------x

## BIDDING PROCEDURES

The following bidding procedures shall apply in connection with counteroffers for certain assets of Bostwick Laboratories, Inc. (the "Purchased Assets") as described in the Asset Purchase and Sale Agreement between Bostwick Laboratories, Inc. ("Seller" or the "Debtor") and Poplar Healthcare Management, LLC ("Purchaser") (such agreement, the "Stalking Horse APA"):[2]

**Bid Requirements**

1.    Any counteroffer or bid for any of the Purchased Assets (a "Qualified Bid") shall comply with the following requirement:

    1.1.    Any Qualified Bid shall provide for a purchase price with a minimum cash or cash equivalent component payable at closing equal to the sum of (i) the Purchase Price, $5,405,000.00 plus (ii) $500,000 (the "Initial Overbid Requirement").

2.    Any Qualified Bid shall further comply with all of the following requirements; provided, that the Debtor may, in its discretion exercised in good faith and without further order of the Bankruptcy Court, waive any such requirements:

    2.1.    Any Qualified Bid shall:

        2.1.1.    be in writing and be served (both electronic copy and hard copy) on counsel to the Debtor, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899-1709, Attn: David B. Stratton, strattod@pepperlaw.com and counsel to the Stalking Horse [Baker Donelson and MNAT] so as to be received on or before 12:00 noon (Prevailing Eastern Time) on [ ], 2017 (the "Qualified Bid Determination Deadline"), three business days prior to the first scheduled date of the Auction; and

---

[1]   The last four digits of the taxpayer identification number of the Debtor are ([ ]).

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the order approving these bidding procedures.

2.1.2.   be accompanied by (i) a deposit in the amount of ten percent of the initial bid, delivered to an escrow agent (the identity of which is to be determined by the Debtor), by certified or cashier's check or wire transfer, so as to be received on or before [ ], 2017, the last business day prior to the first scheduled date of the Auction (as defined below) (the "<u>Good Faith Deposit</u>"); (ii) an executed asset purchase agreement (the "<u>Counteroffer Asset Purchase Agreement</u>") and executed copies of all other transaction documents necessary to effect the proposed transaction (including all schedules) and a copy of the Stalking Horse APA marked to show all changes requested by the bidder (including those related to purchase price); (iii) an executed confidentiality agreement; (iv) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and pay the purchase price at the Closing; (v) if any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, then such party shall provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with the bid; (vi) confirm that the offer shall remain open and irrevocable as provided below; (vii) fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid, and the complete terms of any such participation; and (viii) not be conditioned on obtaining financing or the outcome of any due diligence.

2.2.   The entity submitting a Qualified Bid shall enter into joint escrow instructions with Seller and the escrow agent regarding the deposit delivered in connection with such Qualified Bid.

2.3.   The terms and conditions of the Qualified Bid must be, in aggregate, not materially more burdensome to Seller than provisions contained in the Stalking Horse APA.

2.4.   Any entity submitting a Qualified Bid shall demonstrate to Seller's satisfaction, in Seller's sole discretion exercised in good faith, that such entity is able to consummate the transaction on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement.

2.5.   The Debtor reserves its right to contact bidders before or after the Qualified Bid Determination Deadline to discuss or clarify the terms of their bid and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or otherwise evaluate the bid.

2.6.   Each bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such bidder's financial wherewithal to consummate and perform obligations in connection with the sale.  Failure by the bidder to comply with requests for additional information may be a basis for the Debtor to determine that a bidder is not a Qualified Bidder and that a bid made by a bidder or a Qualified Bidder is not a Qualified Bid.

2

2.7.  The Debtor shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders and the Stalking Horse Bidder whether the relevant bids have been determined to be Qualified Bids by no later than one business day  after the Bid Deadline (the "Qualiofied Bid Determination Date").

2.8.  After the Qualified Bid Determination Deadline, the Debtor shall determine which Qualified Bid or combination of Qualified Bids represents the Starting Qualified Bid.  No later than one business day prior to the commencement of the Auction, the Debtor shall distribute copies of all Qualified Bids to each Qualified Bidder, and shall indicate therein which Qualified Bid has been selected by the Debtor as the Starting Qualified Bid.

### The Auction

3.  If more than one Qualified Bid by a Qualified Bidder is received by the Bid Deadline, other than the bid of the Stalking Horse Bidder, an auction (the "Auction") for the Purchased Assets will be conducted by the Debtor at the offices of its counsel, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899-1709, on [ ], 2017, at [ ] a.m. (Prevailing Eastern Time), or at such other date and time as determined by the Debtor with the consent of the Stalking Horse Bidder. The Debtor will send notice by electronic mail to the Notice Parties and counsel to any entity that has submitted a Qualified Bid if the date, time, or place of the Auction changes.

4.  If, however, no such Qualified Bids other than the bid of the Stalking Horse Bidder are received by the Qualified Bid Determination Deadline, then the Auction will not be held, the Stalking Horse APA shall be designated as the Successful Bid, and the Debtor shall seek approval of the sale of the Assets to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement at the Sale Hearing

4.1.  The Auction will be conducted openly and shall be transcribed, audiotaped or videotaped.

4.2.  Only Qualified Bidders who have submitted a Qualified Bid for some or all of the assets and their authorized representatives will be eligible to participate at the Auction and to increase their bids.

4.3.  The Debtor and its professionals will direct and preside over the Auction.

4.4.  At the Auction, the Debtor may announce additional procedural or bidding rules for the Auction so long as the rules are not inconsistent with these Bidding Procedures. The Debtor shall maintain a transcript of all bids made and announced at the Auction.

4.5.  Each bidder participating at the Auction will certify on record at the commencement of the Auction that it has not and will not engage in any collusion with respect to the bidding or the sale; provided, however, in order to obtain the highest and/or otherwise best bid, the Debtor may engage in discussions with one or more Qualified Bidders if the Debtor determines that the combination of all or a portion of

3

bids received from such Qualified Bidders would yield the highest and/or otherwise best offer at the Auction.

4.6.   The Breakup Fee and Expense Reimbursement will be credited to the Stalking Horse Bidder's bid.

4.7.   Each subsequent bid at the Auction must comply with the requirements for a Qualified Bid set forth herein and be at least $50,000.00 greater than the preceding bid (such bid, an "Overbid") or such greater amount as designated by the Debtor.

4.8.   During the course of the Auction, the Debtor shall inform each participant which Qualified Bid(s) reflects, in the Debtor's view, the highest or otherwise best offer or combination of offers.

4.9.   At the conclusion of the Auction, the Debtor, in the exercise of its business judgment, will select (i) the highest or otherwise best bid for the Purchased Assets (the "Successful Bid" and the bidder who makes the Successful Bid, the "Successful Bidder") and (ii) at the Debtor's discretion, the next highest or otherwise best bid after the Successful Bid (the "Back-Up Bid" and the bidder who makes the Back-Up Bid, the "Back-Up Bidder").

4.10. The Auction will close when the Debtor announces that the Auction has concluded and a Successful Bid and, at the Debtor's discretion, a Back-Up Bid, have been selected.  Notwithstanding anything herein to the contrary, the Debtor is authorized, but not required, to select a Back-Up Bidder and Back-Up Bid.

4.11. The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until the earlier of (x) consummation of the Successful Bid with the Successful Bidder and (y) [20] days after the Sale Hearing. If the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtor will be authorized, but not required, to select the Back-Up Bidder, if any, as the new Successful Bidder, and shall proceed to consummate the Successful Bid of the new Successful Bidder.  In such case, the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the Debtor and the Debtor shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.

4.12. If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction, (ii) definitive documentation has been executed in respect thereof and (iii) the Court has approved the sale to the Successful Bidder.  Such acceptance by the Debtor is conditioned upon approval by the Court of the Successful Bid and the entry of an order approving such Successful Bid.

## Other Terms

5.   Except to the extent provided for in the Stalking Horse APA and the Bidding Procedures Order, any bidder presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved.

4

6.   All Good Faith Deposits will be held by the escrow agent. Good Faith Deposits of bidders other than the Successful Bidder and the Back-Up Bidder, if any, will be returned to the unsuccessful bidders within five (5) Business Days after selection of the Successful Bidder and Back-Up Bidder, if any, in accordance with these Bidding Procedures. The Successful Bidder's Good Faith Deposit will be applied to the Purchase Price of the Successful Bid at closing.

7.   A hearing to consider approval of the sale to Purchaser pursuant to the Stalking Horse APA or another bidder submitting a higher and better offer at the Auction and any objections to such sale will be held on [ ], 2017, at [ ] a.m./p.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

8.   Except as otherwise provided in the Bidding Procedures Order or these Bidding Procedures, the Debtor reserves the right as it may reasonably determine to be in the best interests of its estate, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid or combination of Qualified Bids is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (v)  waive terms and conditions set forth herein with respect to all bidders; (vi) impose additional terms and conditions with respect to all bidders; (viii) extend the deadlines set forth herein with the consent of the Stalking Horse Bidder; or (ix)  modify the Bidding Procedures, as the Debtor may determine to be in the best interests of its estate.

**Exhibit 2 to Bidding Procedures Order**

**Form of Auction and Sale Notice**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

-----------------------------------------------------x

In re                                          :      Chapter 11
                                               :
Bostwick Laboratories, Inc.,[1]                :      Case No. 17-_____ ( )
                                               :
                Debtor.                        :
-----------------------------------------------------x

## NOTICE OF SALE BY AUCTION AND SALE HEARING

PLEASE TAKE NOTICE that, on [ ], 2017, Bostwick Laboratories, Inc. (the "Debtor") in the above-captioned chapter 11 case filed a motion [Docket No. [ ]] (the "Bidding Procedures Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking an order (a) authorizing and approving bidding procedures for the sale of the Purchased Assets, (b) approving the form and manner of notice of the Auction and Sale Hearing, and (c) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Bidding Procedures Motion. On [ ], the Bankruptcy Court entered an order (the "Bidding Procedures Order")[2] approving certain bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures").

PLEASE TAKE FURTHER NOTICE that the Debtor is soliciting offers for the purchase of the Purchased Assets.  All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order. To the extent there are any inconsistencies between this notice and the Bidding Procedures, the latter shall govern in all respects.  If you are a party to an executory contract or lease with the Debtor, you will receive a separate notice that contains relevant dates and other information that may impact you as a party to an executory contract or lease.

PLEASE TAKE FURTHER NOTICE that, if the Debtor receives competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtor will conduct an auction (the "Auction") for the Purchased Assets at the offices of its counsel, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899-1709, on [ ], 2017, at [ ] a.m./p.m. (Prevailing Eastern Time).

PLEASE TAKE FURTHER NOTICE that the Debtor will seek approval of the sale of the Purchased Assets at a hearing scheduled to commence on [ ] at [ ] a.m./p.m. (prevailing Eastern Time) (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable [ ], United States Bankruptcy Judge in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in

---

[1]   The last four digits of the taxpayer identification number of the Debtor are (2162).

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

PLEASE TAKE FURTHER NOTICE that objections to the proposed sale of the Purchased Assets (other than with respect to cure amounts and adequate assurance which are subject to a separate notice), if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with the Bankruptcy Court and served so the objection is actually received no later than [ ], 2017 at 4:00 p.m. (Eastern Time) (the "Sale Objection Deadline") by the following parties (the "Notice Parties"): (a) counsel to the Debtor, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899, Attn: David B. Stratton; (b) counsel to any committee of unsecured creditors appointed in the Chapter 11 Case; [need to add counsel to the Stalking Horse Purchaser] and (c) parties required by Bankruptcy Rule 2002(a).

**PLEASE TAKE FURTHER NOTICE THAT UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

PLEASE TAKE FURTHER NOTICE that this Notice and the Sale Hearing is subject to the complete terms and conditions of the Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Debtor encourages parties-in-interest to review such documents in their entirety.  Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures and other relevant documents can be found: (a) on the Court's website, http://ecf.deb.uscourts.gov and (b) with the Clerk of the Bankruptcy Court, 824 N. Market St., Wilmington, DE 19801.

Dated: _____, 2017          PEPPER HAMILTON LLP
Wilmington, Delaware

_____
David B. Stratton (DE No. 960)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware  19899-1709
Telephone:     (302) 777-6500
Facsimile:      (302) 421-8390
E-mail:          strattond@pepperlaw.com

Proposed Counsel to the Debtor and Debtor-In-Possession

2

**<u>Exhibit 3 to Bidding Procedures Order</u>**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

----------------------------------------------------------x

In re                                            :        Chapter 11
                                                 :
Bostwick Laboratories, Inc.,[1]                  :        Case No. 17-_____ ( )
                                                 :
                        Debtor.                  :
----------------------------------------------------------x

**NOTICE OF (A) PROPOSED ASSUMPTION AND**
**ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES IN CONNECTION WITH SALE AND (B) ASSOCIATED CURE COSTS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On [ ], 2017, the above-captioned debtor (the "<u>Debtor</u>") filed the *Debtor's*
*Motion for (I) an Order (A) Authorizing and Approving Bidding Procedures, Breakup Fee and*
*Expense Reimbursement, (B) Authorizing and Approving the Debtor's Entry Into and*
*Assumption of the Stalking Horse Asset Purchase Agreement, (C) Approving Notice Procedures,*
*(D) Scheduling A Sale Hearing and (E) Approving Procedures for Assumption and Assignment*
*of Certain Contracts and Leases and Determining Cure Amounts and (II) an Order*
*(A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Claims,*
*Liens, Rights, Interests and Encumbrances, (B) Approving the Asset Purchase Agreement and*
*(C) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired*
*Leases* [Docket No. [ ]] (the "<u>Sale Motion</u>") with the United States Bankruptcy Court for the
District of Delaware (the "<u>Bankruptcy Court</u>").[2]

2.      As outlined in the Sale Motion, the Debtor has agreed upon the terms of a
Stalking Horse APA with the Stalking Horse Bidder and will seek capable and willing bidders

---

[1]   The last four digits of the taxpayer identification number of the Debtor are (2162).

[2]   Capitalized terms not otherwise defined herein have the meanings given them in the Sale Motion.

for all or substantially all of the Debtor's assets (the "Purchased Assets") prior to the Auction date as provided in the Sale Motion and the Bidding Procedures Order.

3.    On [ ], the Bankruptcy Court entered the *Order (I) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (II) Authorizing and Approving the Debtor's Performance of Pre-Closing Obligations Under the Stalking Horse Asset Purchase Agreement, (III) Approving Notice Procedures, (IV) Scheduling a Sale Hearing and (V) Approving Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts* [Docket No. [ ]] (the "Bidding Procedures Order"). The Bidding Procedures Order specifies, among other things, the procedures regarding the proposed assumption and assignment of the executory contracts and unexpired leases that may be designated to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder selected at the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code in connection with the sale of substantially all of the Debtor's assets (the "Sale").

4.    A list of the Debtor's executory contracts and unexpired leases that are subject to potential assumption and assignment (the "Assumed Leases and Contracts") in connection with the Sale and the cure costs associated therewith (the "Contract and Cure Schedule") is attached to this notice (the "Cure Notice") as **Schedule 1**.  The Debtor believes that any and all defaults (other than the filing of this Chapter 11 Case) and actual pecuniary losses under the Assumed Leases and Contracts can be cured by the payment of the cure amounts listed on Contract and Cure Schedule.

5.    Objections, if any, to the proposed assumption and assignment of any of the executory contracts or unexpired leases listed on the Contract and Cure Schedule or to the

cure amount proposed with respect thereto must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any order orders of the Bankruptcy Court; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed with the Bankruptcy Court no later than **[ ], 2017 at 4:00 p.m. (Eastern Time)** (the "<u>Assignment and Cure Objection Deadline</u>"); <u>provided</u>, that if and only if the Stalking Horse Bidder is **not** the Successful Bidder for the Debtor's assets, counterparties to the Assumed Leases and Contracts shall have until **[ ], 2017 at 12:00 p.m. (Eastern Time)** to object to the assumption and assignment of an Assumed Lease or Contract ***solely on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code***; and (v) be served so as to be actually received no later than the Assignment and Cure Objection Deadline, as applicable, by the following parties: (a) counsel to the Debtor, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899, Attn: David B. Stratton; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the any official committee of unsecured creditors appointed in the Chapter 11 Case; and (d) counsel to the Stalking Horse Bidder.

6.     The Sale Hearing will be held in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, on **[ ], 2017, at [ ] a.m./p.m. (Eastern Time)**, or such other date and time that the Bankruptcy Court may later direct.  Any objection to the proposed assumption and assignment or related cure of an executory contract or unexpired lease listed on the Contract and Cure Schedule in connection with the proposed sale that remains unresolved as of the Sale Hearing shall be heard at the Sale

Hearing (or at a later date as fixed by the Bankruptcy Court) provided that any such objection may be adjourned, in full or in part, by the Debtor to a later date by listing such adjournment in a notice of agenda or other notice filed on the docket of the Chapter 11 Cases and served on the affected counterparty.

7.     ***Any party who fails to timely file an objection to its scheduled cure amount listed on the Contract and Cure Schedule or to the assumption and assignment of an executory contract or unexpired lease listed on the Contract and Cure Schedule shall (i) be deemed to have waived and released any and all rights to assert against the Debtor, the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, cure amounts different from the cure amounts listed on Contract and Cure Schedule and (ii) be forever barred from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtor, its estate or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such an executory contract or unexpired lease and (b) asserting that the Stalking Horse Bidder or other Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order***.

8.     Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, may determine to add or exclude any the executory contracts or unexpired leases listed on the Contract and Cure Schedule to be assumed and assigned under the Stalking Horse APA or Counteroffer Asset Purchase Agreement through the Closing Date; <u>provided</u>, <u>however</u>, the non-Debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice.

4

9.      Copies of the Bidding Procedures Order and other relevant documents can be found: (a) on the Court's website, http://ecf.deb.uscourts.gov and (b) with the Clerk of the Bankruptcy Court, 824 N. Market St., Wilmington, DE 19801.

10.      The Debtor's decision to sell, assign and/or transfer to the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, the Assumed Leases and Contracts is subject to Court approval and the Closing Date of the Sale.  Accordingly, absent such Closing Date, the Assumed Leases and Contracts shall not be deemed to be sold, assigned and/or transferred, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of any document on the Contract and Cure Schedule shall not constitute or be deemed to be a determination or admission that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).  Nor shall the inclusion of any document constitute an admission of liability by the Debtor or its estate.

Dated: _____, 2017          PEPPER HAMILTON LLP
Wilmington, Delaware

_____
David B. Stratton (DE No. 960)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware  19899-1709
Telephone:      (302) 777-6500
Facsimile:      (302) 421-8390
E-mail:          strattond@pepperlaw.com

Proposed Counsel to the Debtor and Debtor-In-Possession

5

# SCHEDULE 1

**Contract and Cure Schedule**

**<u>Exhibit B</u>**

**Form of Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

\------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Bostwick Laboratories, Inc.,[1] | : | Case No. 17-_____ ( ) |
| | : | |
| Debtor. | : | |

\------------------------------------------------------x

## ORDER (I) AUTHORIZING AND APPROVING THE SALE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES, (II) APPROVING THE ASSET PURCHASE AGREEMENT AND (III) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion (the "Motion")[2] of the above-captioned debtor (the "Debtor") for entry of an order approving the sale of substantially all of the Debtor's assets; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that no other or further notice is needed or necessary; and the Court having reviewed the Motion and the [Declaration] and having heard statements in support of the Motion at a hearing held before the Court on [ ], 2017 (the "Sale Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and the relief requested in the Motion being in the best interests of the Debtor's estate, its creditors, and other parties in interest; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

---

[1] The last four digits of the taxpayer identification number of the Debtor are ([ ]).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.    <u>Notice</u>. Notice of the Motion, the Auction, and the Sale Hearing was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement attached hereto as <u>Exhibit A</u> (the "<u>APA</u>") or the transactions contemplated thereby (the "<u>Transactions</u>") is required. The disclosures made by the Debtor concerning the APA, the Auction, the Transactions and the Sale Hearing were good, complete, and adequate.

B.    <u>Cure Notice</u>. The Debtor has filed and served cure notices (the "<u>Cure Notices</u>") upon all non-Debtor counterparties to all Assumed Leasehold Interests and Assumed Contracts notifying such parties: (i) that the Debtor seeks to assume and assign such Assumed Leasehold Interests and Assumed Contracts as provided in the APA and (ii) of the Debtor's good faith estimates of the cure amounts required in connection with such Assumed Leasehold Interest or Assumed Contract. The service of the Cure Notice was good, sufficient and appropriate under the circumstances, and no further notice is required.

C.    <u>Opportunity to Bid</u>. As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtor conducted a marketing process in accordance with, and has otherwise complied in all material respects with, the Bid Procedures. The Bid Procedures were non-collusive and substantively and procedurally fair to all parties. All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit higher or otherwise better bids to purchase the assets of the Debtor and (iii) object and be heard in connection with the Sale Motion and the relief granted by this Order. [The Auction contemplated by the Bid Procedures was held on [ ], 2017. At the conclusion of the Auction, [ ]

("<u>Purchaser</u>") was selected by the Debtor as the Successful Bidder.] [The Debtor did not receive any Qualified Bids for the Purchased Assets prior to the Qualified Bid Determination Deadline. Therefore, no Auction was necessary under the terms of the Bid Procedures and Purchaser was named by the Debtor as the Successful Bidder.]

D.    <u>Highest and Best Bid</u>. The Purchaser submitted the highest and best bid for the Purchased Assets pursuant to the APA.

E.    <u>Good Faith Purchaser; No Fraudulent Transfer</u>. The Purchaser is a "good faith" purchaser entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to entry into the APA and consummation of the Transactions and no reversal or modification of this Order on appeal will affect the validity of the APA or the Transactions. The APA and the Transactions have been negotiated and entered into by the Debtor and Purchaser in good faith, at arms' length and without collusion or fraud. The Purchase Price constitutes reasonably equivalent and fair value in consideration for the Purchased Assets (as those terms are defined in the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), the terms and conditions of the APA and the Transactions are fair and reasonable, and approval of the APA and consummation of the Transactions are in the best interest of the Debtor, its creditors, and its estate. The Transactions are not for the purpose of hindering, delaying or defrauding the Debtor's creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor the Purchaser is or will be entering into the APA or Transactions fraudulently.

F.    <u>No Collusion</u>. The APA was not controlled by or the result of an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n). The

Debtor and the Purchaser have not engaged in any conduct that would cause or permit the APA or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363 of the Bankruptcy Code or otherwise. The Purchaser is entitled to all the protections and immunities of a good faith purchaser for value, including without limitation under section 363(m) of the Bankruptcy Code.

G.    <u>Satisfaction of Section 363(f)</u>. The Debtor may sell the Assets free and clear of Encumbrances (except Permitted Encumbrances as provided in this Order because one or more of the provisions set forth in section 363(f) of the Bankruptcy Code have been satisfied with respect to each of the Encumbrances. Those holders of Encumbrances who did not object or who withdrew their objections to the Motion are deemed to have consented to the Motion and the sale of the Purchased Assets pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the sales ultimately attributable to the Purchased Assets in which such holders allege Encumbrances, in the same order of priority, with the same validity, force and effect that such holder had before such sale, and subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

H.    <u>Compliance with Bankruptcy Code</u>. The consummation of the sale of the Purchased Assets is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation, sections 363(b), 363(f), 363(m), and 365 and all of the applicable requirements of such sections have been or will be complied with in respect of the Sales.

**IT IS HEREBY ORDERED, THAT:**

1.      <u>Relief Granted</u>. The Motion is GRANTED as set forth herein.

2.      <u>Approval and Authorization</u>. The Debtor and [ ] are authorized to enter into the APA, to take all actions necessary to consummate the transactions contemplated thereby, and to execute such other documents and take such other actions as are necessary to effectuate the terms of the APA and the Transactions contemplated thereby, without further order of the Court.

3.      <u>Sale Free and Clear of Encumbrances</u>. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the sale and transfer of the Purchased Assets (as defined in the APA) to [ ] as the party that submitted the highest and best bid at the Auction pursuant to the APA is a legal, valid and effective disposition of the Purchased Assets, and vests the Purchaser with all right, title and interest of the Debtor in and to the Purchased Assets free and clear of all liens and claims, including but not limited to the Excluded Liabilities (as defined in the APA), other than the Permitted Encumbrances (as defined in the APA), with all such liens and claims attaching to the sale proceeds, pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code. All Encumbrances (except Permitted Encumbrances) on the Purchased Assets shall attach to the proceeds of the Sale of the Purchased Assets pursuant to this order to the same extent and with the same priority as such Encumbrances existed in respect of the Purchased Assets immediately before the Closing.

4.      <u>Order Authorizes Recording Offices</u>. All filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or

60992914_4

who may be required to report or insure any title or state of title in or to any of the Assets are hereby authorized to do so in accordance with this Order. Each and every federal, state, and local governmental agency or department or office is hereby authorized to accept this Order and any and all documents and instruments necessary and appropriate to consummate the sale contemplated by the APA and to cancel, terminate and release the Encumbrances (other than Permitted Encumbrances).

5.      <u>Authorization to Release Encumbrances</u>. If any person or entity that has filed a financing statement, deed of mortgage, or other deeds, documents or agreements evidencing an Encumbrance on a Purchased Asset shall not have delivered, in proper form for filing, termination statements, deeds of cancelation of mortgage, instruments of satisfaction, cancelation, termination, releases, and other deeds and documents to the Debtor before the Closing, then the Debtor and the Purchaser shall be and hereby are authorized to execute such termination statements, deeds of cancelation of mortgage, instruments of satisfaction, cancelation, termination, releases, and other deeds and documents on behalf of such person or entity and to file the same with any appropriate registry or public filing office. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Encumbrances (subject to Permitted Encumbrances) shall be self-executing.

6.      <u>Release of Escrow</u>. The Debtor is hereby authorized and directed to instruct the Escrow Holder to (i) hold the Purchaser Deposit in accordance with the APA and (ii) release and deliver the Purchaser Deposit pursuant to the terms of the APA.

7.      <u>No Successor Liability</u>. By consummating the Transactions, Purchaser is not a successor to the Debtor or its estate by

reason of any theory of law or equity, whether with respect to any liens and claims against the Debtor, the Purchased Assets or otherwise, and the Purchaser shall not be subject to successor liabilities for products sold prior to the closing.

8.     <u>Good Faith</u>. The Purchaser will be acting in good faith in closing under the APA and consummating the Transactions at any time on or after entry of this Order and is entitled to the protections of section 363(m) of the Bankruptcy Code. The Purchaser is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

9.     <u>Assignment of Contracts; Cure of Defaults</u>. The Debtor is authorized to assume and assign each of the Assumed Leasehold Interests and Assumed Contracts to Purchaser in accordance with the APA and this Order free and clear of all interests pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Leasehold Interests and Assumed Contracts to Purchaser. The payment of the applicable Cure Amounts by Purchaser shall (i) effect a cure of all defaults existing thereunder as of the Closing, (ii) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default and (iii) together with the assumption of the Assumed Leasehold Interests and Assumed Contracts by the Debtor and the assignment of such Assumed Leasehold Interests and Assumed Contracts to Purchaser, constitute adequate assurance of future performance thereof. For purposes of this Order, "<u>Cure Amounts</u>" shall mean the applicable Cure Amounts set forth on <u>Exhibit 2</u> attached hereto, or such other Cure Amounts as agreed, in writing, by the Debtor, Purchaser and the counterparty to the applicable Assumed Leasehold Interest or Assumed Contract.

10.     <u>Provisions Prohibiting Assignment Unenforceable</u>. Any provisions in any Assumed Leasehold Interest or Assumed Contract that prohibit or condition the assignment of such Assumed Leasehold Interest or Assumed Contract or allow the counterparty to such Assumed Leasehold Interest or Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Leasehold Interest or Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtor's assumption and assignment of such Assumed Leasehold Interests and Assumed Contracts in accordance with the APA but will be effective and binding upon Purchaser with respect to any purported assignment for the remaining term of such Assumed Leasehold Interest or Assumed Contract. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Purchaser of the Assumed Leasehold Interests and Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assumed Leasehold Interests and Assumed Contracts, and such Assumed Leasehold Interests and Assumed Contracts shall remain in full force and effect for the benefit of Purchaser.

11.     <u>Injunction Against Certain Actions by Assumed Contract Counter-Parties</u>. Each non-Debtor counterparty to the Assumed Leasehold Interests and Assumed Contracts shall be forever barred, estopped, and permanently enjoined from (i) asserting against the Debtor or Purchaser or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing or the transfer of the Purchased Assets, including any breach

related to or arising out of change-in-control provisions in such Assumed Leasehold Interests and Assumed Contracts, or any purported written or oral modification to the Assumed Leasehold Interests and Assumed Contracts and (ii) asserting against Purchaser (or its property, including the Purchased Assets) any claim, counterclaim, breach, or condition asserted or assertable against the Debtor existing as of the Closing or arising by reason of the transfer of the Purchased Assets, except for the Assumed Liabilities.

12.     <u>Effect of Assumption; Payment of Cure Amounts</u>. Upon the Closing, Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Assumed Leasehold Interests and Assumed Contracts and shall pay all outstanding undisputed Cure Amounts with respect thereto, and the Debtor shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Leasehold Interests and Assumed Contracts from and after such assignment. There shall be no assignment fees, increases or any other fees charged to Purchaser or the Debtor as a result of the assumption and assignment of the Assumed Leasehold Interests and Assumed Contracts.

13.     <u>Adequate Assurance</u>. Purchaser has provided adequate assurance of future performance under the Assumed Leasehold Interests and Assumed Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

14.     <u>Binding Effect of Order</u>. This Order and the APA shall inure to the benefit of and be binding on the Purchaser and the Debtor, its estate, its creditors, and any trustees, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to Chapter 7 under the Bankruptcy Code, and their respective successors and assigns.

15.    <u>Interpretation</u>. To the extent of any inconsistency between this Order and the APA, this Order shall control.

16.    <u>No Stay; Order Effective Immediately</u>. The Debtor has shown cause as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d). Accordingly, notwithstanding any Bankruptcy Rules to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

17.    <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from, or related to, the implementation and interpretation of this Order.


Dated: _____, 2017
    Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit C**

**Form of DIP Credit Agreement**

**$5,116,000**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of March _____, 2017**

**between**

**BOSTWICK LABORATORIES, INC.**

**<u>as Borrower</u>**

**and**

**POPLAR HEALTHCARE, PLLC**

**<u>as Lender</u>**

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01    Certain Defined Terms...............................................................................1
SECTION 1.02    Computation of Time Periods; Other Definitional Provisions ...................8
SECTION 1.03    Accounting Terms......................................................................................8

## ARTICLE II

## AMOUNTS AND TERMS OF THE CREDIT ADVANCES

SECTION 2.01    The Credit Advances...................................................................................8
SECTION 2.02    Conditions to Making the Credit Advances................................................9
SECTION 2.03    Interest........................................................................................................9
SECTION 2.04    Use of Proceeds........................................................................................10
SECTION 2.05    Evidence of Debt......................................................................................10

## ARTICLE III

## SECURITY FOR the loan

SECTION 3.01    Description of Collateral for Loan............................................................10
SECTION 3.02    Perfection of Security Interests in the Collateral ......................................11

## ARTICLE IV

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 4.01    Conditions Precedent ...............................................................................12
SECTION 4.02    Conditions Precedent to Advance.............................................................12
SECTION 4.03    Determinations Under Section 4.01 .........................................................13

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

SECTION 5.01    Representations and Warranties of the Borrower ......................................13

## ARTICLE VI

## AFFIRMATIVE COVENANTS

SECTION 6.01    Compliance with Laws, Etc .....................................................................16
SECTION 6.02    Payment of Taxes, Etc .............................................................................16
SECTION 6.03    Compliance with Environmental Laws.....................................................17

i

SECTION 6.04     Maintenance of Insurance ...................................................................17
SECTION 6.05     Preservation of Corporate Existence, Etc ................................................17
SECTION 6.06     Visitation Rights ......................................................................................17
SECTION 6.07     Keeping of Books .....................................................................................17
SECTION 6.08     Maintenance of Properties, Etc .................................................................17
SECTION 6.09     Further Assurances....................................................................................17
SECTION 6.10     Performance of Loan Documents ..............................................................18
SECTION 6.11     Healthcare Matters ...................................................................................18
SECTION 6.12     Compliance with Terms of Leaseholds.....................................................18
SECTION 6.13     Performance of Material Contracts...........................................................18
SECTION 6.14     Bankruptcy Actions ..................................................................................19

## ARTICLE VII

## NEGATIVE COVENANTS

SECTION 7.01     Liens, Etc .................................................................................................19
SECTION 7.02     Debt...........................................................................................................19
SECTION 7.03     Change in Nature of Business ...................................................................19
SECTION 7.04     Mergers, Etc .............................................................................................19
SECTION 7.05     Sales, Etc. of Assets .................................................................................19
SECTION 7.06     Restricted Payments .................................................................................19
SECTION 7.07     Amendments of Constitutive Documents ..................................................19
SECTION 7.08     Accounting Changes .................................................................................20
SECTION 7.09     Negative Pledge ........................................................................................20
SECTION 7.10     Amendment, Etc., of Material Contracts ...................................................20
SECTION 7.11     Budget .......................................................................................................20
SECTION 7.12     Return of Collateral...................................................................................20
SECTION 7.13     Critical Vendor and Other Payments; Certain Receipts ............................20
SECTION 7.14     Exercise of Remedies................................................................................20
SECTION 7.15     Bankruptcy Related Negative Covenants ..................................................20
SECTION 7.16     Press Releases; Public Disclosures ...........**Error! Bookmark not defined.**

## ARTICLE VIII

## REPORTING COVENANTS

SECTION 8.01     Default Notice ..........................................................................................21
SECTION 8.02     Material Contracts.....................................................................................22
SECTION 8.03     Budget .......................................................................................................22
SECTION 8.04     Litigation...................................................................................................22
SECTION 8.05     Agreement Notices....................................................................................22
SECTION 8.06     Environmental Conditions ........................................................................22
SECTION 8.07     Bankruptcy Reports ..................................................................................22
SECTION 8.08     Other Information .....................................................................................22

## ARTICLE IX

ii

EVENTS OF DEFAULT

SECTION 9.01          Events of Default .......................................................................................23

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01    Amendments, Etc .................................................................................25
SECTION 10.02    Notices, Etc .........................................................................................25
SECTION 10.03    No Waiver; Remedies ........................................................................26
SECTION 10.04    Indemnification ...................................................................................26
SECTION 10.05    Binding Effect .....................................................................................26
SECTION 10.06    Execution in Counterparts ..................................................................26
SECTION 10.07    Confidentiality ....................................................................................26
SECTION 10.08    Release of Collateral ...........................................................................26
SECTION 10.09    Patriot Act Notice ...............................................................................26
SECTION 10.10    Jurisdiction, Etc ..................................................................................26
SECTION 10.11    Governing Law ....................................................................................27
SECTION 10.12    Waiver of Jury Trial ............................................................................27
SECTION 10.13    Release ................................................................................................27
SECTION 10.14    Financing Order ..................................................................................28

SCHEDULES

Schedule 5.01(b)              - Disclosure of Borrower

Schedule 5.01(k)              - Leases of Real Property

Schedule 5.01(l)              - Borrower Intellectual Property

Schedule 5.01(m)             - Material Contracts

Schedule 5.01(n)             -Borrower Compliance


EXHIBITS

Exhibit A                        Initial Budget

Exhibit B                        Form of Note

Exhibit C                        Form of Interim Financing Order

Exhibit D                        Form of Borrowing Notice

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of March \_\_\_\_, 2017 between Bostwick Laboratories, Inc., a Delaware corporation (the ***"Borrower"*** or ***"Debtor"***) and Poplar Healthcare PLLC, a Tennessee professional limited liability company ( the "**Lender**").

## PRELIMINARY STATEMENTS:

WHEREAS, on March \_\_, 2017 (the ***"Petition Date"***), Debtor filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the ***"Bankruptcy Court"***) initiating its case (the ***"Bankruptcy Case"***) that is pending under Chapter 11 of Title 11 of the United States Code (the ***"Bankruptcy Code"***) and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Debtor requires financing in an amount necessary to satisfy (the outstanding balance of the Pre-Petition Loan of Capital One), to fund the Debtor's normal business operations during the Bankruptcy Case pending the Section 363 sale of substantially all of its assets ("the ***Asset Sale***") and the "wind down" of the Business, and to fund the administrative costs of the Chapter 11 Case (collectively, the "***Post-Petition Funding Obligations***");

WHEREAS, Debtor has requested that Lender provide a secured multiple draw term loan credit facility of up to $5,116,000.00 ("***Stated Principal Amount***") to fund Post-Petition Funding Obligations and Lender is willing to extend such financing to the Debtor, on the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Bankruptcy Case, Debtor has requested that the Lender provide up to an aggregate amount of $5,116,000.00 in a credit facility pursuant to a senior secured priming debtor-in-possession credit agreement (together with all other transactions contemplated thereby, the ***"DIP Facility"***);

WHEREAS, Lender is committing hereby to provide post-petition financing in an amount necessary to fund the Post-Petition Funding Obligations as set forth in an agreed-upon budget submitted by Debtor and acceptable to Lender, in an amount not more than the Stated Principal Amount, pursuant to the DIP Facility upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01      Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

***"Agreement"*** means this debtor-in-possession credit agreement, as amended.

1

*"Bankruptcy Case"* has the meaning specified in the Preliminary Statements.

*"Bankruptcy Code"* the meaning specified in the Preliminary Statements.

*"Bankruptcy Court"* has the meaning specified in the Preliminary Statements.

*"Borrower"* has the meaning specified in the recital of parties to this Agreement.

*"Borrower's Account"* means the account of the Borrower specified by the Borrower in writing to the Lender from time to time with no less than one (1) Business Days prior written notice.

*"Budget"* means, as of any date, the Initial Budget or the updated Budget delivered pursuant to Section 2.01(a), as applicable, most recently delivered to and approved by the Lender on or prior to such date.

*"Capital Expenditures"* means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person or have a useful life of more than one year plus (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures.  For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

*"Capital One Obligations"* means the "Obligations" as such term is defined in that certain Credit Agreement dated as of September 17, 2012 (as may have been amended, restated, or otherwise modified and in effect as of the date hereof) by and among Bostwick Laboratories Holdings, Inc. and Bostwick Laboratories, Inc., as the borrowers, the other persons party thereto that are designated as "Credit Parties," General Electric Capital Corporation as lender and as agent for the lenders thereto, and the other financial institutions party thereto.

*"Carve Out"* has the meaning specified in the Financing Order.

*"Closing Date"* has the meaning specified in Section 4.01.

*"CMS"* has the meaning specified in Section 5.01(v).

*"Code"* means the United States Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

*"Collateral"* means all *"Collateral"* referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of any or all of the Secured Parties.

2

***"Collateral Documents"***" means the Security Agreement and each of the collateral documents, instruments and agreements delivered pursuant to <u>Section 5.09</u>, and each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

***"Committee"*** has the meaning specified in the Financing Order.

***"Communications"*** has the meaning specified in Section 12.02(b).

***"Confidential Information"***" means information that Borrower furnishes to Lender in a writing designated as confidential, but does not include any such information that is or becomes generally available to the public or that is or becomes available to Lender from a source other than the Borrower.

***"Credit Advance***" has the meaning specified in Section 2.01.

***"Debt"*** of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Obligations of such Person in respect of Hedge Agreements, (i) all Guaranteed Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

***"Default"*** means any Event of Default or any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

***"Default Interest Rate"*** has the meaning set forth in Section 2.03(b).

***"DIP Facility"*** has the meaning specified in the Preliminary Statements.

***"Environmental Action"*** means any action, suit, demand, demand letter, claim, notice of noncompliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health,

3

safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

*"Environmental Law"* means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

*"Estate Professionals"* means any professional, claims agent, or other Person employed in the Bankruptcy Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

*"Events of Default"* has the meaning specified in Section 9.01.

*"Final DIP Facility Amount"* means a maximum aggregate commitment of $5,116,000.00.

*"Final Order"* means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to the Lender in its sole discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of Lender in its sole discretion).

*"Financing Order"* means the Interim Order or, when applicable, the Final Order.

*"GAAP"* has the meaning specified in Section 1.03.

*"Governmental Authority"* means the government of the United States of America, but not CMS as payor, or the United States of America as creditor or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Governmental Authorization"* means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any

*"Healthcare Law"* means:

(a)      all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters primarily relating to patient

4

healthcare, healthcare providers and healthcare services, including but not limited to Title XIX (Medicaid Program) of 42 U.S.C.;

(b)     the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b), (ii) the Stark Law (42 U.S.C. §1395nn and §1395(q)), (iii) the civil False Claims Act (31 U.S.C. §3729 et seq.), (iv) Sections 1320a-7a and 1320a-7b of Title 42 of the United States Code, (v) applicable state statutes similar to any of the foregoing and (vi) the regulations promulgated pursuant to such federal and state statutes;

(c)     the federal Food, Drug & Cosmetic Act (21 U.S.C. §§301 et seq.) and the regulations promulgated pursuant thereto;

(d)     the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated pursuant thereto;

(e)     laws, rules and regulations governing Medicaid and SCHIP Programs;

(f)     the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) and the regulations promulgated pursuant thereto;

(g)     quality, safety and accreditation standards and requirements of all applicable federal, state or local laws or regulatory bodies relating to ownership, management or operation of a dental practice, or assets used in connection therewith;

(h)     any applicable law relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, any and all of the foregoing; and

(i)     any and all other applicable healthcare laws, regulations, manual provisions, policies and administrative guidance having the force of law with respect to each of clause (b) through (h) above, as may be amended from time to time.

*"Initial Budget"* means a detailed receipts and disbursements forecast, for the 13-week period immediately following the Closing Date, of the Borrower in form and substance satisfactory to the Lender, a copy of which is attached as Exhibit A.

*"Interim Financing Order"* means the order of the Bankruptcy Court entered at the initial emergency hearing in the Bankruptcy Case, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion), a copy of which draft order is attached as Exhibit C.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

61288247_4

*"Lender"* means Poplar Healthcare Management, PLLC, a Tennessee professional limited liability company.

*"Lien"* means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional.

*"Loan"* means the loan made by Lender to Borrower pursuant to Article II hereof, as evidenced by the Note in an amount up to $5,116,000.00, a copy of which is attached as Exhibit B.

*"Loan Documents"* means (i) this Agreement, (ii) the Note, and (iii) the Collateral Documents, in each case as amended.

*"Material Adverse Effect"* means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Borrower, taken as a whole, (b) the rights and remedies of Lender under any Loan Document or (c) the ability of any Borrower, taken as a whole, to perform its Obligations under the Loan Documents other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or to the conduct of the sale process contemplated by this Asset Purchase Agreement and/or the Bid Procedures Order.

*"Medicaid"* means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

*"Medicare"* means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

*"Obligation"* means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured. Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Borrower under any Loan Document and (b) the obligation of Borrower to reimburse any amount in respect of any of the foregoing that Lender, in its sole discretion, may elect to pay or advance on behalf of Borrower.

*"Operating Business"* means the business of providing anatomic pathology laboratory services to physicians and other healthcare providers.

6

*"Outside Date"* means the date that is 90 days following the Closing Date (unless extended by one optional 30-day extension at the request of the Borrower, and in the sole discretion of Lender).

*"Patriot Act"* means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

*"Permitted Liens"* means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) prepetition Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 6.02; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business that (i) are not overdue for a period of more than 30 days; (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (iii) are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, or (iv) as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; and (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations.

*"Person"* means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Authority.

*"Petition Date"* has the meaning specified in the Preliminary Statements.

*"Requirement of Law"* means, as to any Person, any law (statutory or common), ordinance, treaty, rule, Governmental Authorization, Permit, regulation, order, policy, or other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including, without limitation, any Healthcare Law.

*"Secured Obligations"* means the Obligations under the Loan Documents secured by the lien created in favor of Lender pursuant to Section 3.01.

*"Secured Party"* means Lender.

*"Security Agreement"* has the meaning specified in Section 3.01(a)(ii).

*"Stalking Horse Agreement"* has the meaning specified in Section 9.01(s).

*"Taxes"* has the meaning specified in Section 2.11.

*"Termination Date"* means the earliest of (i) the Outside Date, (ii) the date that is 30 days after the entry of the Interim Order if the Final Order has not been entered by the

7

Bankruptcy Court on or before such date, (iii) May 30, 2017, and (iv) the date of termination in whole of the this commitment, pursuant to Section 9.01.

SECTION 1.02    Computation of Time Periods; Other Definitional Provisions.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles ("GAAP").

# ARTICLE II

## AMOUNTS AND TERMS OF THE CREDIT ADVANCES

SECTION 2.01    The Credit Advances.  Subject to the terms and conditions set forth in the Note evidencing the Loan, Lender shall make advances to Borrower as follows (each individually a "Credit Advance" and collectively, the "Credit Advances"):

(a)    on the day of entry of the Interim Financing Order (the "Initial Advance"), an amount equal to (A) an amount necessary to satisfy the Capital One Obligations plus (B) the estimated "Disbursements" set forth in the Budget less (X) any actual cash on hand as of the Funding Date, as set forth in week one and two of the Budget attached hereto as Exhibit A as may be modified from time to time by the Borrower with the consent of the Lender in its sole discretion; and

(b)    Except with respect to the Initial Advance, which shall be automatically funded by the Lender not later than the first business day after entry of the Interim Financing Order, by noon prevailing eastern time on the business day immediately prior to a Funding Date, Borrower shall give Lender written notice of its request for a Credit Advance and shall specify the Funding Date (which must be the immediately subsequent business day) and the amount of the requested Credit Advance (a "Borrowing Notice"). After the Initial Advance, Borrower may make request for the next Credit Advance upon entry of the final Financing Order.  The Borrowing Notice shall include (a) a calculation of the requested Credit Advance amount including reasonable detail regarding the cash on hand included in the calculation and the projected Disbursements for the borrowing period, (b) an updated Budget including actuals for prior periods, and (c) a calculation of any variance from the Budget. The Borrowing Notice shall also be accompanied by a comparison of actual weekly receipts to those set forth in the Budget. The obligation of Lender to fund is subject to Section 2.02 hereof.  Lender shall make each properly authorized Credit Advance in immediately available funds by wire transfer to an account designated by Borrower, as soon as practicable, but in no event later than the noon prevailing eastern time on the applicable Funding Date.

8

(c)  The final Borrowing Notice (the "Final Borrowing Notice") shall include the amount of accrued fees estimated to be due and owing to the Estate Professionals, pursuant to further order of the Court, including such allowed fees to be paid after the consummation of the Asset Sale and the budget funds for the wind down of Debtor's business. The accrued fees to be funded under the DIP Facility may not exceed amounts budgeted under the Budget for each respective Estate Professional and the wind down of the business. Lender will fund the amounts sought under the Final Borrowing Notice from balance remaining of the Stated Principal Amount after deduction of the prior Credit Advances. Such amounts shall be held in escrow by the counsel for Debtor, or subsequently, a distribution agent, in a segregated account, payable only upon further fee order from the Court.

SECTION 2.02    Conditions to Making the Credit Advances.  Lender shall not be obligated to make any Credit Advance (including the initial Loan hereunder), or to take, fulfill, or perform any other action hereunder, unless the following conditions are satisfied as of the making of such Credit Advance, in Lender's reasonable discretion, or waived in writing by Lender in its sole discretion:

(a)  The Note, together with any additional agreements, documents, instruments and certificates executed and any orders in connection therewith, or otherwise delivered in connection therewith by the Borrower (collectively, the "Post-Petition Documents") shall have been executed or entered, as applicable, and delivered, if applicable, in form and substance acceptable to Lender and shall be in full, force and effect.

(b)  The applicable Budget shall have been approved in writing by Lender.

(c)  Lender shall have received a copy of the applicable Financing Order, and such Financing Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Lender in its sole discretion, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(d)  No event shall have occurred and be continuing, or would result from the Credit Advance requested thereby, which, with the giving of notice or the passage of time or both, would constitute an Event of Default and no Event of Default shall be continuing.

(e)  Borrower shall have timely delivered a Borrowing Notice related to such Credit Advance, which shall be substantially in the form set forth in Exhibit D hereof.

(f)  The aggregate principal and amount of all Credit Advances extended shall not exceed the Stated Principal Amount.

SECTION 2.03    Interest.  (a)  The Note shall bear interest on the unpaid principal amount thereof plus all obligations owing to, and rights of Lender pursuant to the Note, including without limitation, all interest accruing thereon, along with fees, and costs as provided under the Note (collectively, the "Post-Petition Obligations") from the Closing Date to and including the Maturity Date, at a fixed rate per annum equal to eight percent (8%), calculated on the basis of a 360-day year for the actual number of days elapsed.

9

(b)     Accrued, unpaid interest on the Note shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default, the Post-Petition Obligations shall bear interest at a rate equal to the interest rate set forth in subsection 2.03(a) above plus two percent (2%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate")

(c)     Interest shall be payable, in cash, upon prepayment of any portion of the Post-Petition Obligations, on the Maturity Date, or upon payment in full of the Loan.

(d)     Notwithstanding anything to the contrary set forth in this Section 2.03, if a court of competent jurisdiction determines in a Final Financing Order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

(e)     Except as otherwise set forth herein or in the Financing Order, the Post-Petition Obligations shall be due and payable on the earlier to occur of (i) the date of the Closing of the Asset Sale; (ii) May 30, 2017 (the "Maturity Date"); or (iii) upon acceleration of the Note pursuant to the terms hereof.

SECTION 2.04     Use of Proceeds.  The proceeds of the Credit Advances shall be available solely to provide funding in an amount necessary to satisfy(the outstanding balance of the Pre-Petition Loan of Capital One), fund the Debtor's normal business operations during the Bankruptcy Case pending the Asset Sale and the "wind down" of the business, and to fund the administrative costs of the Chapter 11 Case in accordance with the Budget.

SECTION 2.05     Evidence of Debt.  Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Credit Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

## ARTICLE III
## SECURITY FOR THE LOAN

SECTION 3.01     Description of Collateral for Loan.  To induce the Lender to make the Credit Advances, Borrower hereby grants to Lender, as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of the Post-Petition Obligations, a continuing first priority lien and security interest (subject only to the Carve- Out and Permitted Liens) in and to all assets of the Debtor (collectively the "Collateral") whether owned, leased or otherwise possessed, to which the Debtor now has or at any time in the future may acquire any right, title or interest (capitalized terms used in clause (a) through (n) shall have the meanings provided for such term in the Uniform Commercial Code in effect on the date hereof in the State of Delaware (the "UCC")):

(a)     all Accounts;

10

(b)     all Chattel Paper;

(c)     all Deposit Accounts, including any monies or other property held therein;

(d)     all Documents;

(e)     all Equipment;

(f)     all General Intangibles, including all intellectual property, including any trademarks or tradenames, and any licenses;

(g)     all Instruments;

(h)     all Inventory;

(i)     all books and records pertaining to the Debtor, its business and any property described herein;

(j)     all other goods and personal property of the Debtor and/or the Estate, whether tangible or intangible, wherever located, including money, letters of credit and all rights of payment or performance under letters of credit;

(k)     to the extent not otherwise included, all monies and other property of any kind which is received by the Estate in connection with any refunds with respect to taxes, assessments and other governmental charges;

(l)     all insurance claims with the exception of any D & O claim; and

(m)     to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any proceeds of insurance, indemnity, warranty or guaranty payable to the Estate from time to time with respect to any of the foregoing.

SECTION 3.02     Perfection of Security Interests in the Collateral.  The Financing Order shall provide for the perfection, maintenance, protection, and enforcement of the Lender's security interest in the Collateral without further action of Lender. Upon the request of the Lender, Borrower shall deliver to the Lender those Loan Documents necessary or desirable to perfect the Lender's lien. Upon reasonable request of the Lender, Borrower shall take such other reasonable steps as are deemed necessary or desirable to maintain the Post-Petition Lender's security interest in the Collateral.  To the extent required of Lender, Debtor hereby authorizes the Lender to execute and file financing statements or continuation statements, and amendments thereto, on the Debtor's  behalf covering the Collateral.

11

## ARTICLE IV
## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 4.01    Conditions Precedent.  In addition to the requirements set forth in Section 2.02, Section 2.01 of this Agreement shall become effective on and as of the first date (the "Closing Date") on which the following conditions precedent have been satisfied:

(a)    Certified copies of the resolutions of the Board of Directors (or equivalent) of Borrower approving the DIP Facility and each Loan Document to which it is or is to be a party and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the DIP Facility and each Loan Document to which it is or is to be a party.

(b)    A certificate of the Secretary or an Assistant Secretary of Borrower certifying the names and true signatures of the officers of Borrower authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(c)    The Interim Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of Lender in its sole discretion).

(d)    Lender shall have received the Initial Budget, dated no more than seven days prior to the Petition Date and covering the period of the first 13 weeks after the Closing Date, in form and substance satisfactory to Lender.

(e)    Within 15 days after the Closing Date, Borrower shall have delivered evidence of the insurance, in form and substance satisfactory to Lender, as required by the terms of the Security Agreement.

SECTION 4.02    Conditions Precedent to Advance.  The obligation of Lender to make an Advance (on the occasion of each Advance (including the initial Advance)) shall be subject to the further conditions precedent that on the date of such Advance:

(a)    the following statements shall be true:

(i)    the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Advance, in which case as of such specific date;

(ii)    Borrower is in compliance in all material respects with the Budget most recently delivered to and approved by Lender;

(iii)    no Default or Event of Default has occurred and is continuing or would result from such Advance or from the application of the proceeds therefrom; and

12

SECTION 4.03    <u>Determinations Under Section 4.01</u>.  For purposes of determining compliance with the conditions specified in Section 4.01, Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless an officer of Lender responsible for the transactions contemplated by the Loan Documents prior to the Closing Date specifies its objection thereto to Borrower.

## ARTICLE V

## <u>REPRESENTATIONS AND WARRANTIES</u>

SECTION 5.01    <u>Representations and Warranties of the Borrower</u>.  The Borrower represents and warrants as follows:

(a)    Borrower (i) is duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) is qualified as a foreign corporation or company in any other jurisdiction in which such qualification is required, except as could not reasonably be expected to have a Material Adverse Effect and (iii) subject to the Financing Order, has all requisite corporate, limited liability company or limited partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted).

(b)    Set forth on Schedule 5.01(b) hereto is a complete and accurate disclosure of Borrower of the jurisdiction of its formation, the address of its principal place of business and its U.S. taxpayer identification number.

(c)    Subject to the Financing Order, the execution, delivery and performance by Borrower of each Loan Document to which it is or is to be a party, and the consummation of the DIP Facility, are within Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene Borrower's charter, bylaws or other constituent documents, or (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award.  Borrower is not in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to Borrower or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(d)    Other than the Financing Order, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by Borrower of any Loan Document to which it is or is to be a party, or for the consummation of the DIP Facility, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof), except for the authorizations, approvals, actions, notices and filings required to perfect security interests under the Loan Documents.

13

(e)    Subject to the Financing Order, this Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by Borrower.  This Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

(f)    Upon entry of the Financing Order, all filings and other actions necessary or desirable to perfect and protect the security interest in the Collateral created under the Collateral Documents have been duly made or taken and are in full force and effect, and the Collateral Documents create in favor of the Collateral Agent for the benefit of Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken. Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(g)    Set forth on Schedule 5.01(k) hereto is a complete and accurate list of all leases of real property under which Borrower is the lessee or lessor as of the date hereof, showing the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Each such lease is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms.

(h)    Set forth on Schedule 5.01(l) hereto is a complete and accurate list of all patents, trademarks, trade names, service marks and copyrights, and all applications therefor and material licenses thereof, of Borrower as of the date hereof, showing the jurisdiction in which registered, the registration number, the date of registration and the expiration date.

(i)    Set forth on Schedule 5.01(m) hereto is a complete and accurate list of all Material Contracts of Borrower as of the date hereof, showing the parties, subject matter and term thereof.

(j)    Except as set forth on Schedule 5.01(n) hereto or as disclosed in a signed writing delivered by the Borrower to Lender on or within [nine] months prior to the date of this Agreement:

(i)    Borrower is in compliance in all material respects with all Healthcare Laws applicable to it, its products and its properties or other assets or its Operating Business, including its provision of professional services, except as would not reasonably be expected to have a Material Adverse Effect.

(ii)    Borrower has in effect all necessary and material Permits and Accreditations, including, without limitation, all Permits and Accreditations necessary for it to own, lease or operate its properties and other assets and to carry on its Operating Business, including its provision of professional services, as presently conducted.  All such Permits and Accreditations are valid and in full force and effect and there is no default under, or violation of, any such Permits or Accreditations, except as would not reasonably be expected to have a Material Adverse Effect.  No action, demand,

14

requirement or, to Borrower's knowledge, investigation by any Governmental Authority and no suit, action or proceeding by any other person, in each case with respect Borrower, or any of its respective properties or other assets relating to the provision of professional services under any Requirements of Law, is pending or, to Borrower's knowledge, threatened, except as would not reasonably be expected to have a Material Adverse Effect.

(iii)    Neither Borrower nor any officer, Affiliate, Subsidiary, employee or agent of Borrower has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact required to any Governmental Authority, or committed an act, made a statement of a material fact, or failed to make a statement of a material fact related to the Operating Business, including its provision of professional services, that, at the time such disclosure was made, would reasonably be expected to constitute a violation of any Healthcare Law, except as would not reasonably be expected to have a Material Adverse Effect.  Neither Borrower nor any officer, affiliate, employee or agent of Borrower (in their capacity as such acting on behalf of Borrower), has made any untrue statement of material fact regarding claims incurred but not reported, that, at the time such material statement was made, would reasonably be expected to constitute a violation of any Healthcare Law, except as would not reasonably be expected to have a Material Adverse Effect.

(iv)    To the Borrower's knowledge, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any material investigation, suit, claim, audit (except in the ordinary course), action (legal or regulatory) or proceeding (legal or regulatory) by a Governmental Authority against any Borrower  that would reasonably be expected to have a Material Adverse Effect.

(v)    To the extent required by any Governmental Authority to engage in the Operating Business as presently conducted, Borrower currently maintains certifications by the Centers for Medicare & Medicaid Services (**"CMS"**), except where the failure to have such Governmental Authorization would not reasonably be expected to have a Material Adverse Effect.  To the extent required by any Governmental Authority to engage in the Operating Business as presently conducted Borrower is duly certified and authorized to provide services under Medicaid programs and is eligible for reimbursement thereunder, except where the failure to have such Governmental Authorization would not reasonably be expected to have a Material Adverse Effect.

(vi)    Except as would not reasonably be expected to have a Material Adverse Effect, there are no judgments, lawsuits, actions, proceedings, claims, complaints, injunctions, orders or, to Borrower's knowledge, investigations pending, or to Borrower's knowledge, threatened (either orally or in writing) against Borrower by or before any Governmental Authority with respect to the Medicaid program.  Within the past three (3) years, Borrower has not received any written notice or other communication from any Governmental Authority regarding any actual or alleged violation in any material respect of, or failure to comply in any material respect with, any of the requirements of any applicable Healthcare Laws (excluding any such actual or alleged violation or failure to comply that was resolved pursuant to the settlements with

15

the Department of Justice (the ***"DOJ Settlement"***), except as would not reasonably be expected to have a Material Adverse Effect.

    (vii) Borrower is in compliance in all material respects with the DOJ Settlement.

    (viii) Borrower has timely filed all material filings, reports, billings and claims required to be filed in accordance with governmental and private programs, with third party administrators and state programs and other insurance carriers and all such filings, reports, billings and claims are complete and accurate in all material respects and have been prepared in compliance in all material respects with all applicable Healthcare Laws, rules and regulations governing reimbursement and payment of claims, except in each case as would not reasonably be expected to have a Material Adverse Effect. Borrower has paid, is paying in the ordinary course of business or has caused to be paid all known and undisputed refunds, overpayments or adjustments relating to the Operating Business, and, there are no pending appeals, adjustments, challenges or audits of any such reports, billings or claims, except in each case as would not reasonably be expected to have a Material Adverse Effect.

    (k)  <u>Priority of Borrower's Obligations and Lender's Liens</u>.  Upon entry of the Financing Order, Borrower has granted to Lender, perfected security interests in all Collateral with the priority required by the Financing Order with respect to all Collateral.

    (l)  The Interim Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Required Lenders).

**ARTICLE VI**

**<u>AFFIRMATIVE COVENANTS</u>**

  So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid, except as excused or limited by the Bankruptcy Code or an order of the Bankruptcy Court, the Borrower will:

  SECTION 6.01  <u>Compliance with Laws, Etc</u>.  Comply in all material respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and Healthcare Laws.

  SECTION 6.02  <u>Payment of Taxes, Etc</u>.  Pay and discharge, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, however, that Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that (x) arose prior to the Petition Date or (y) is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until (with respect to (y)) any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

16

SECTION 6.03     Compliance with Environmental Laws.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; and obtain and renew all Environmental Permits necessary for its operations and properties in accordance with the requirements of all Environmental Laws.

SECTION 6.04     Maintenance of Insurance.  Maintain insurance (including, without limitation, medical malpractice insurance to the extent applicable to Borrower) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates.

SECTION 6.05     Preservation of Corporate Existence, Etc.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; provided that Borrower shall not be required to preserve any right, permit, license, approval, privilege or franchise if the Board of Directors (or equivalent) of the Borrower shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and that the loss thereof is not disadvantageous in any material respect to the Borrower or Lender.

SECTION 6.06     Visitation Rights.  At any reasonable time during normal business hours, and at Lender's expense, and from time to time, permit Lender, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of Borrower, and to discuss the affairs, finances and accounts of Borrower the Chief Restructuring Officer.

SECTION 6.07     Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time.

SECTION 6.08     Maintenance of Properties, Etc.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 6.09     Further Assurances.  (a) Promptly upon request by Lender correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and

(b)     Promptly upon request of Lender do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as Lender may reasonably require from time to time, including, without limitation, any Intellectual Property Security Agreements, perfection certificates, insurance policy endorsements, landlord consents, collateral assignments in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law,

17

subject Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Party the rights granted or now or hereafter intended to be granted to the Secured Party under any Loan Document or under any other instrument executed in connection with any Loan Document to which Borrower is or is to be a party.

SECTION 6.10    Performance of Loan Documents.  Perform and observe all of the terms and provisions of each Loan Document to be performed or observed by it, maintain each Loan Document in full force and effect, enforce such Loan Document in accordance with its terms, take all such action to such end as may be from time to time requested by the Lender and, upon request of Lender, make to each other party to each such Loan Document such demands and requests for information and reports or for action as Borrower is entitled to make under such Loan Document.

SECTION 6.11    Healthcare Matters.  Notify Lender of (i) any receipt by Borrower of notice of, or Borrower's knowledge of any investigation or audit, or pending or threatened proceedings relating to, any material violation by Borrower of any Healthcare Law, including, (A) any investigation or audit or proceeding involving violation of any of the Medicare and/or Medicaid fraud and abuse provisions and (B) any criminal or civil investigation initiated, claim filed or disclosure required by the Office of the Inspector General, the Department of Justice, CMS, or any other Governmental Authority; or (ii) any receipt by Borrower of a written recommendation from any Governmental Authority that Borrower should have its permit, licensure, provider or supplier number or accreditation suspended, revoked, or limited in any material way or have its eligibility to participate in Medicaid or any other government program, or to accept assignments or rights to reimbursement under Medicaid or any other government program regulations suspended, revoked, or limited in any material way.

SECTION 6.12    Compliance with Terms of Leaseholds.  Make all payments and otherwise perform all material obligations in respect of all leases of real property to which the Borrower is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Case or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

SECTION 6.13    Performance of Material Contracts.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by Lender and, upon request of Lender, make to each other party to each such Material Contract such demands and requests for information and reports or for action Borrower is entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Case or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

SECTION 6.14     Bankruptcy Actions.    The Borrower shall at all times use its commercially reasonable best efforts to timely comply with the requirements contained in the Financing Order.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid:

SECTION 7.01     Liens, Etc.    From and after the Petition Date, the Borrower will not create, incur, assume or suffer to exist any Lien on or with respect to any of its or their properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction, a financing statement that names Borrower as debtor, or sign or suffer to exist any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except the Borrower may create or incur (i) Liens under the Collateral Documents and (ii) Permitted Liens.

SECTION 7.02     Debt.    From and after the Petition Date, the Borrower will not create, incur, assume or suffer to exist any Debt, except:

(a)     Debt under the Loan Documents; and

(b)     Debt incurred in the ordinary course of business.

SECTION 7.03     Change in Nature of Business.    Borrower will not make any material change in the nature of its business as carried on at the date hereof.

SECTION 7.04     Mergers, Etc.    Borrower will not make, or permit any of its Subsidiaries to merge into or consolidate with any Person or permit any Person to merge into it.

SECTION 7.05     Sales, Etc. of Assets.    Except in connection with sales in the ordinary course of business, Borrower will not sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets except as authorized by order of the Bankruptcy Court.

SECTION 7.06     Restricted Payments.    Borrower will not declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such or issue or sell any Equity Interests or accept any capital contributions.

SECTION 7.07     Amendments of Constitutive Documents.    Borrower will not amend its certificate of incorporation or bylaws or other constitutive documents.

19

SECTION 7.08      Accounting Changes.   Borrower will not make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

SECTION 7.09      Negative Pledge.   Borrower will not enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except agreements in favor of Lender or agreements entered into prior to the Petition Date.

SECTION 7.10      Amendment, Etc., of Material Contracts.   Without the prior written consent of Lender, Borrower will not cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract or give any consent, waiver or approval thereunder, waive any default under or breach of any Material Contract, agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract or take any other action in connection with any Material Contract that would impair the value of the interest or rights of Borrower thereunder or that would impair the interest or rights of Lender.

SECTION 7.11      Budget.   Borrower shall not use the proceeds of any Collateral or the Credit Advances other than in accordance with the Budget, subject to an allowed cumulative variance of up to 10% per line item in the Budget at any time.   Borrower shall not make any material change to the amounts indicated in the Budget without the prior written consent of Lender in its sole discretion.   In no case shall Borrower use any proceeds of Collateral or any Credit Advance to bring any claim or suit against the Lender.

SECTION 7.12      Return of Collateral.   Borrower shall not enter into any agreement to return any of its inventory or other Collateral outside the ordinary course of business to any of its creditors for application against any pre-petition Debt, pre-petition trade payables or other pre-petition claims under section 546(h) of the Bankruptcy Code.

SECTION 7.13      Critical Vendor and Other Payments; Certain Receipts.   Borrower shall not make (i) any payments on account of any creditor's claims against Borrower, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by Lender in writing.

SECTION 7.14      Exercise of Remedies.   Borrower shall not obtain, or seek to obtain, any stay on the exercise of the remedies of Lender hereunder, under any Loan Document or the Financing Order.

SECTION 7.15      Bankruptcy Related Negative Covenants.   Borrower will not seek, consent to, or permit to exist any of the following:

20

(a)     any modification, stay, vacation or amendment to the Financing Order as to which the Lender has not consented in writing;

(b)     a priority claim or administrative expense claim or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve Out;

(c)     any Lien on any Collateral (other than Permitted Liens or as may be granted by the Financing Order) having a priority equal or superior to the Lien securing the Obligations other than with respect to the Carve Out;

(d)     any order that authorizes the return of any of the Borrower's property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the consent of the Lender;

(e)     any order which authorizes the payment of any Debt incurred prior to the Petition Date, unless such payments are in compliance with the Budget, or otherwise approved by Lender in writing;

(f)     any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

(g)     any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

SECTION 7.16     [Intentionally Omitted].

## ARTICLE VIII

## REPORTING COVENANTS

So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid, Borrower will furnish to Lender:

SECTION 8.01     <u>Default Notice</u>.  As soon as possible and in any event within three (3) days after Borrower becomes aware of the occurrence of any Default, a statement of the Chief Restructuring Officer of Borrower setting forth details of such Default or event, development or occurrence and the action that Borrower has taken and proposes to take with respect thereto.

21

SECTION 8.02      Material Contracts.  As soon as practicable and in any event within three (3) days after it has knowledge thereof, notice that any Material Contracts have been breached or violated, amended or terminated.

SECTION 8.03      Budget.  Not later than the close of business on the Wednesday of each week commencing with the week following the entry of the Interim Order, an updated Budget on a rolling 13 week basis, in a form similar to the Initial Budget and satisfactory to the Lender, which updated Budget shall include (i) a comparison of the cash flow projections described therein to the cash flow projections provided for the immediately preceding week, and (ii) a written narrative explanation of any variance in excess of 10% on a cumulative basis of such actual results from those reflected in the previous Budget.

SECTION 8.04      Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting Borrower of the type described in Section 4.01(f) and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower of the Disclosed Litigation from that described on Schedule 4.01(f) hereto, in each case that could reasonably be expected to have a Material Adverse Effect.  Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material license, accreditations and approvals of any Governmental Authorities (including any Governmental Authorizations) or such Persons necessary for Borrower to own its assets or to carry on its business.

SECTION 8.05      Agreement Notices.  Promptly upon receipt thereof, copies of all notices, requests and other documents received by Borrower under or pursuant to any Material Contract or instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Lender, such information and reports regarding the Material Contracts and such instruments, indentures and loan and credit and similar agreements as the Lender may reasonably request.

SECTION 8.06      Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance Borrower with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse.

SECTION 8.07      Bankruptcy Reports.  Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents Borrower sends, receives or files in connection with the Bankruptcy Case, including all correspondence with the Bankruptcy Court.

SECTION 8.08      Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender through the Lender, may from time to time reasonably request.

# ARTICLE IX

## EVENTS OF DEFAULT

SECTION 9.01        Events of Default.  If any of the following events (***"Events of Default"***) shall occur and be continuing:

(a)        (i) the Borrower shall fail to pay any principal of any Credit Advance when the same shall become due and payable or (ii) the Borrower shall fail to pay any interest on any Credit Advance, or Borrower shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three Business Days after the same shall become due and payable; or

(b)        any representation or warranty made by Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made which such disclosures when taken together in the aggregate is reasonably likely to have a Material Adverse Effect; or

(c)        Borrower shall fail to perform or observe in any material way any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 20 days after the earlier of the date on which (i) any officer of Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by Lender; or

(d)        any order, judgment or decree shall be rendered against Borrower that will reasonably be likely to have a Material Adverse Effect, and there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(e)        any Collateral Document after delivery thereof and after giving effect to the Financing Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby; or

(f)        at any time there shall have occurred the loss or termination of, or the receipt by Borrower of notice of the loss or termination of any Governmental Authorization of Borrower other than any loss or termination not reasonably likely to cause a Material Adverse Effect; or

(g)        Borrower shall institute any proceeding or investigation or support the same by any other Person who may challenge the status, validity, perfection or priority of the Liens on the Collateral created by the Loan Documents, or the Financing Order securing the Obligations; or

(h)        Borrower shall, without the consent of the Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations

23

under this Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation; or

       (i)     the entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or

       (j)     without Lender's consent, the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

       (k)     the entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender, other than the Carve Out, without the Lender's prior written consent; or

       (l)     the entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset, in an amount equal to or exceeding $50,000; or

       (m)     the entry of an order staying, reversing, vacating or otherwise modifying the Credit Advances, any Liens securing the Obligations (or the validity or first priority status thereof) or the Financing Order; or

       (n)     the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of Borrower's assets, if the order does not provide for the net cash consideration for such sales to be immediately applied to payment in whole or in part in cash of the Obligations; or

       (o)     failure of the Borrower to file and properly serve a motion (the "**Sale Motion**") by March __, 2017, in form and substance acceptable to Lender in its sole and absolute discretion, seeking Bankruptcy Court approval of: (A) the sale of the assets (the "**Assets**") described in an Asset Purchase Agreement in form and substance acceptable to the Lender in its sole and absolute discretion (the "**Stalking Horse Agreement**"), by and among Borrower as seller, and Lender as purchaser (the "**Purchaser**"), subject to higher or otherwise better offers under the Bidding Procedures (as defined below); (B) bidding procedures in connection with the sale of the Assets (the "**Bidding Procedures**") in form and substance acceptable to the Lender, in its sole and absolute discretion; and (C) the scheduling of an auction for the sale of the Assets in accordance with the Bidding Procedures and a sale hearing with respect thereto (the "**Auction**" and "**Sale Hearing**", respectively), which Sale Motion shall include copies of the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order (as defined below), and (ii) by no later than the date prescribed in the Bidding Procedures Order (as defined below) properly serve each counterparty to a Contract (as defined in the Stalking Horse Agreement) a notice, in form and substance reasonably acceptable to the Purchaser, setting forth the amount necessary to satisfy any cure costs.  The Sale Motion shall be served on all parties that are required to receive notice in the Bankruptcy Cases;

       (p)     failure of the Borrower to have the Bankruptcy Court enter an order within seventeen (17) days of the filing of the Sale Motion in form and substance acceptable to Lender

in its sole and absolute discretion (i) approving the Stalking Horse Agreement and the Bidding Procedures; and (ii) scheduling the Auction and Sale Hearing (together, the "***Bidding Procedures Order***"); or

(q)     the failure of Borrower to conduct an auction of substantially all of its assets within forty-five (45) days of the Petition Date; or

(r)     the failure of Borrower to have the Bankruptcy Court enter an order not later than May 30, 2017 (the "***Sale Order***") approving a sale of substantially all of Borrower's assets and providing for the immediate repayment in full of the Obligations from the proceeds of such sale; or

(s)     the failure of Borrower to obtain (i) entry of the Interim Order by the Bankruptcy Court in form and substance acceptable to Lender in its sole and absolute discretion by Borrower within three (3) business days of the Petition Date, and (ii) entry of the Final Order within thirty (30) days of the Petition Date; or

(t)     The Purchaser validly terminates the Asset Purchase Agreement pursuant to the terms thereto on or before the Auction;

then, and in any such event, Lender, by notice to the Borrower, declare the Credit Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Credit Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01     Amendments, Etc.  (a) No amendment or waiver of any provision of this Agreement or the Note, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (a) no amendment, waiver or consent shall, unless in writing and signed by Lender do any of the following at any time:

(i)     postpone any date scheduled for any payment of principal of, or interest on, the  Credit Advances or reduce the amount of any principal or interest payment due hereunder;

(ii)     release all or substantially all of the Collateral in any transaction or series of related transactions;

SECTION 10.02     Notices, Etc.  (a) All notices and other communications provided for hereunder shall be in writing (including telecopy or electronic communication) and mailed, telecopied or delivered

SECTION 10.03      No Waiver; Remedies.   No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under the Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.   The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 10.04      [Intentionally Omitted].

SECTION 10.05      Binding Effect.   This Agreement shall become effective when it shall have been approved by entry of the Interim Financing Order and executed by the Borrower and Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, and Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

SECTION 10.06      Execution in Counterparts.   This Agreement may be executed in counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 10.07      Confidentiality.   Lender shall not disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Lender's officers, directors, employees, agents and advisors and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) in connection with any litigation or proceeding to which Lender may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 10.08      Release of Collateral.   Upon the sale, lease, transfer or other disposition of any item of Collateral of the Loan in accordance with the terms of the Loan Documents, Lender will, at the Borrower's expense, execute and deliver to Borrower such documents as Borrower may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

SECTION 10.09      Patriot Act Notice.   Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act. Borrower shall provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the Patriot Act.

SECTION 10.10      Jurisdiction, Etc.   EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER, ON THE ONE HAND, AND LENDER, ON THE OTHER

26

HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWER HEREBY WAIVES ANY OBJECTION THAT BORROWERI MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

SECTION 10.11     Governing Law.  This Agreement and the Revolving Credit Notes shall be governed by, and construed in accordance with, the laws of the State of Delaware.

SECTION 10.12     Waiver of Jury Trial.  Each of the Borrower and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Credit Advances or the actions of Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 10.13     Release.  Borrower, hereby acknowledge and agrees that, as of the date hereof: (a) Borrower has no claim except as may be provided under this Agreement or the Asset Purchase Agreement or cause of action against Lender (or any of their directors, officers, employees, attorneys or agents); (b) Borrower has no offset rights, counterclaims or defenses of any kind against any of their obligations, indebtedness or liabilities to Lender; and (c) Lender has heretofore properly performed and satisfied in a timely manner all of their obligations to the Borrower. Lender wishes (and Borrower agree) to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters would impair or otherwise adversely affect any of the rights, interests, contracts, collateral security or remedies of Lender. Therefore, Borrower on its own behalf and on behalf of each of its respective successors and assigns, hereby waives, releases and discharges Lender and all of their directors, officers, employees, attorneys and agents, from any and all claims, demands, actions or causes of action on or before the date hereof and arising out of or in any way relating to this Agreement, the Loan Documents and any other documents, instruments, agreements, dealings or other matters connected with this Agreement, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date hereof relating to this Agreement. The waivers, releases, and discharges contained in this paragraph shall be effective regardless of any other event that may occur or not occur prior to, or on or after the date hereof.

SECTION 10.14    <u>Financing Order</u>.  In the event of any inconsistency between the terms and conditions of any of the Loan Documents and the Financing Order, the provisions of the Financing Order shall govern and control.

*[Signature pages follow.]*

28

   IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**:

**BOSTWICK LABORATORIES, INC.**


By _____

Title:



**LENDER:**

**POPLAR HEALTHCARE PLLC**

By _____

Title:

Schedule I

## **Exhibit A to DIP Credit Agreement**

**Form of Initial Budget**

**Bostwick Laboratories Inc**
**Cash Forecast/ DIP Budget**

| | ops | Forecast Daily 10-Mar | Forecast Daily 13-Mar | Forecast Daily 14-Mar | Forecast Daily 15-Mar | Forecast Daily 16-Mar | Forecast Daily 17-Mar | Forecast Week 1 24-Mar | Forecast Week 2 31-Mar | Forecast Week 3 7-Apr | Forecast Week 4 14-Apr | Forecast Week 5 21-Apr | Forecast Week 6 28-Apr | Forecast Week 7 5-May | Forecast Week 8 13-May | Forecast Week 9 20-May | Forecast Week 10 27-May | Forecast Week 11 3-Jun | Forecast Week 12 10-Jun | Forecast Week 13 17-Jun | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Cash | | 1,294,000 | 1,187,279 | 427,883 | 665,264 | 813,722 | 915,986 | 776,457 | 1,419,745 | 994,302 | 1,315,523 | 1,638,728 | 2,128,894 | 1,891,591 | 845,818 | 843,718 | 841,618 | 131,798 | 104,698 | 104,698 | 1,294,000 |
| **Cash Receipts** | | | | | | | | | | | | | | | | | | | | | |
| Cash Receipts | | 92,955 | 153,698 | 144,427 | 148,458 | 102,264 | 96,335 | 671,928 | 655,667 | 651,799 | 650,398 | 674,733 | 699,068 | | | | | | | | 4,741,729 |
| Revolver Repayments | | (98,676) | (92,955) | (153,698) | | | | | | | | | | | | | | | | | (345,328) |
| Revolver Draws | | | | 246,653 | | | | | | | | | | | | | | | | | 246,653 |
| Poplar Funding -DIP | | | | | | | | 1,500,000 | | 1,000,000 | | 793,000 | | | | | | | | | 3,293,000 |
| Poplar Take out of Secured Facility | | | | 1,823,000 | | | | | | | | | | | | | | | | | 1,823,000 |
| Sale Proceeds | | | | | | | | | | | | | | 289,000 | | | | | | | 289,000 |
| **Total Cash Receipts** | | (5,721) | 60,743 | 2,060,382 | 148,458 | 102,264 | 96,335 | 2,171,928 | 655,667 | 1,651,799 | 650,398 | 1,467,733 | 699,068 | 289,000 | | | | | | | 10,048,053 |
| **Total Available Cash** | | 1,288,279 | 1,248,022 | 2,488,264 | 813,722 | 915,986 | 1,012,321 | 2,948,385 | 2,075,412 | 2,646,101 | 1,965,921 | 3,106,461 | 2,827,962 | 2,180,591 | 845,818 | 843,718 | 841,618 | 131,798 | 104,698 | 104,698 | 11,342,053 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | |
| Payroll | | | 58,000 | | | | | 535,000 | | 585,000 | | 585,000 | | 585,000 | | | | | | | 2,348,000 |
| Accrued Vacation | | | | | | | | | | | | | | 165,000 | | | | | | | 165,000 |
| Commissions | | | | | | | | 89,000 | | | | | 89,000 | | | | 89,000 | | | | 267,000 |
| Incentives | | | | | | | | 55,000 | | | | | 55,000 | | | | 55,000 | | | | 165,000 |
| Employer Payroll Taxes & Expenses | | | 7,540 | | | | | 88,270 | | 76,050 | | 76,050 | 18,720 | 76,050 | | | 18,720 | | | | 361,400 |
| Insurance - health/Benefits | x | | 102,100 | | | | 1,000 | 3,943 | 1,500 | 113,443 | 1,000 | 3,943 | 13,674 | 7,500 | | | | | | | 248,103 |
| 401K | | | | | | | | | | | | 81,000 | | | | | | 25,000 | | | 106,000 |
| Employee Expense Reports | | | | | | | | 40,000 | | | | | | | | | | | | | 40,000 |
| Bank Chgs/Misc | x | | 5,800 | | | | | | 7,800 | | | | | | | | | | | | 13,600 |
| Logistics | x | | 61,608 | | | | 65,963 | 57,682 | 54,103 | 57,730 | 60,000 | 57,000 | 57,000 | 57,000 | | | 25,000 | | | | 553,086 |
| Maintenance | x | | | | | | 6,750 | 4,180 | 3,750 | 4,000 | 3,750 | 4,000 | 3,750 | 4,000 | | | | | | | 34,180 |
| Office Expense | x | | | | | | 6,730 | 2,600 | 2,000 | 3,160 | 2,000 | 6,600 | | | | | | | | | 23,090 |
| IT - Technology Support | x | | 63,060 | | | | 21,400 | 41,352 | 39,650 | 15,500 | 14,331 | 21,000 | 46,534 | 33,000 | | | | | | | 295,827 |
| Rent- NYC, FL VA, CA, TX | | | | | | | 8,645 | 135,855 | 71,000 | 135,855 | 20,000 | 8,645 | 2,000 | 135,855 | | | | | | | 517,855 |
| Insurance - Operations | | | 307,708 | | | | | | 57,648 | | | | 57,648 | | | | | | | | 423,004 |
| Pathology | x | | 21,768 | | | | | 5,000 | 25,000 | 5,618 | 5,000 | | 25,000 | 6,618 | | | | | | | 94,004 |
| Temps/techs Other | | | | | | | 4,890 | 4,500 | 8,000 | 500 | | 2,000 | | | | | | | | | 19,890 |
| Critical Trade Vendors | | | | | | | | 437,000 | 200,000 | 200,000 | 125,000 | | | | | | | | | | 962,000 |
| Waste Removal | x | | 9,356 | | | | 9,607 | 1,710 | 4,000 | | 4,000 | 4,710 | 4,000 | | | | | | | | 37,383 |
| Equipment Lease | x | | | | | | 13,573 | 2,546 | 12,744 | 3,600 | | 12,519 | 12,744 | | | | | | | | 57,726 |
| Lab Supplies | x | | 74,117 | | | | 89,506 | 41,701 | 109,615 | 111,522 | 80,000 | 80,000 | 73,000 | 50,000 | | | | | | | 709,461 |
| Contingency | | | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | | | | | | 40,000 |
| Licensing | | | 28,645 | | | | | | 15,000 | | | | 15,000 | | | | | | | | 28,645 |
| Travel | x | | | | | | | | | | | | | | | | | | | | 30,000 |
| Utilities | x | | 687 | | | | 700 | 16,201 | | 3,700 | 5,012 | 15,000 | 1,201 | 8,000 | | | 15,000 | | | | 65,501 |
| Security | x | | | | | | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | | | 25,200 |
| **Bankruptcy Costs** | | | | | | | | | | | | | | | | | | | | | |
| Pepper Hamilton | | 61,000 | 50,000 | | | | | | 250,000 | | | | 200,000 | | | | 200,000 | | | | 761,000 |
| CRO Fees | | 25,000 | | | | | | | 60,000 | | | | 60,000 | | | | 40,000 | | | | 185,000 |
| Other Legal Fees | | | | | | | | | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | 13,000 | | | | | | | 13,000 | 26,000 |
| Travel | | | | | | | | | | | | | | | | | | | | | |
| Investment Bank Fee | | | | | | | | | 50,000 | | | | | 50,000 | 199,650 | | | | | | 299,650 |
| Claims Agent | | 15,000 | | | | | | | 50,000 | | | | | 25,000 | | | 10,000 | | | | 100,000 |
| Unsecured Creditor Committee | | | | | | | | | | | | | | 50,000 | | | | | | | 50,000 |
| UCC Financial Advisors | | | | | | | | | | | | | | 50,000 | | | | | | | 50,000 |
| Pay down Debt | | | | 1,823,000 | | | | | | | | | | | | | | | | | 1,823,000 |
| **Post Sale Estate Wind Down Items** | | | | | | | | | | | | | | | | | | | | | |
| Final Tax Returns | | | 29,750 | | | | | | 20,000 | | | | | 20,000 | | | 50,000 | | | | 119,750 |
| Wind Down Professional | | | | | | | | | | | | | | | | | 150,000 | | | | 150,000 |
| 401K Plan wind down | | | | | | | | | | | | | | | | | 50,000 | | | | 50,000 |
| Preparation of W-2's and 1099's | | | | | | | | | | | | | | | | | 5,000 | | | | 5,000 |
| **Total Cash Disbursements** | | 101,000 | 820,139 | 1,823,000 | | | 235,864 | 1,528,640 | 1,081,100 | 1,330,578 | 327,193 | 977,567 | 936,371 | 1,334,773 | 2,100 | 2,100 | 709,820 | 27,100 | | 13,000 | 11,250,355 |
| *Change in Cash* | | (106,721) | (759,396) | 237,382 | 148,458 | 102,264 | (139,529) | 643,288 | (425,443) | 321,221 | 323,205 | 490,166 | (237,303) | (1,045,773) | (2,100) | (2,100) | (709,820) | (27,100) | | (13,000) | (1,202,302) |
| **Ending Cash** | | 1,187,279 | 427,883 | 665,264 | 813,722 | 915,986 | 776,457 | 1,419,745 | 994,302 | 1,315,523 | 1,638,728 | 2,128,894 | 1,891,591 | 845,818 | 843,718 | 841,618 | 131,798 | 104,698 | 104,698 | 91,698 | 91,698 |

*Assumptions*

Sale Closes approx 4/28/17
Total Critical Trade Exposure $1.5M, $962K included above
No Severance Accrual

## **Exhibit B to DIP Credit Agreement**

**Form of Note**

[TO COME]

## **Exhibit C to DIP Credit Agreement**

**Form of Interim Financing Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **BOSTWICK LABORATORIES, INC.** [1] | ) | **CASE NO. 17-_____-___** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |
| | ) | |
| _____ | | **Re: DKT, No. _____** |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(D)(1), 364(E) AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING CHAPTER 11 TRUSTEE TO (A) OBTAIN POST-PETITION SECURED FINANCING FROM POPLAR HEALTHCARE, PLLC; (B) UTILIZE CASH COLLATERAL; AND (II) *SCHEDULING A FINAL HEARING***

Upon the motion (the "Motion")[2] of Bostwick Laboratories, Inc., a Delaware corporation, a debtor and debtor in possession (the "Borrower" or the "Debtor") in the above-captioned case (the "Case") commenced on March __, 2017 (the "Petition Date") under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim financing order (the "Interim Financing Order") and final financing order (the "Final Financing Order"), and among other things:

    i.       authorization for the Debtor, as borrower, to enter into a first priority senior secured multiple draw term loan credit facility (the "DIP Facility") with Poplar

---

[1] The last four digits of the Debtor's federal tax identification number are ____. The Debtor's mailing address and corporate headquarters is _____, _____, _____.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") and the Motion. The DIP Credit Agreement is attached hereto as Exhibit A and are made a part of this Order.

4824-5243-3732 v2
2790010-000001 03/12/2017

Healthcare, PLLC, a Tennessee Professional Limited Liability Company (the "Post-Petition Lender") in an aggregate maximum principal amount of $5,116,000 (the "Post-Petition Financing" and each individual advance thereunder, a "Credit Advance" and, collectively, the "Credit Advances"), pursuant to the terms and conditions of the DIP Credit Agreement, that certain post-petition promissory note in substantially the form attached hereto as Exhibit B (the "Post-Petition Note" together with any additional agreements, documents, instruments and certificates executed therewith, or otherwise delivered in connection therewith by the Debtor, collectively, the "Post-Petition Documents");

ii.     authorizing Debtor to execute and deliver the Post-Petition Note and other Post-Petition Documents and to perform such other and further acts as may be necessary or desirable in connection with the Post-Petition Documents;

iii.    authorizing the Debtor's use of cash collateral, as defined in section 363(a) of the Bankruptcy Code (collectively, "Cash Collateral"), pursuant to the terms and conditions set forth in the Interim Financing Order, the Final Financing Order and the Post-Petition Note;

iv.    authorization to grant, subject to the Carve Out and the terms of this Interim Financing Order, (a) to the Post-Petition Lender on account of the Post-Petition Financing (i) postpetition first priority liens on unencumbered assets of the Debtor, (ii) consensual priming liens on collateral securing the prepetition Second Lien Notes[3]; and (iii) superpriority administrative expense claims (collectively,

---

[3] "Second Lien Notes" means the second lien secured notes issued by the Seller pursuant to that certain Note Purchase Agreement, dated February 21, 2017, between Bostwick Laboratories Group Holdings, L.P., Seller, certain "Purchasers" identified therein, and Bostwick Laboratories Group Holdings GP, LLC.

the "DIP Liens"); and (b) to the holders of the Second Lien Notes, as adequate protection to the extent of diminution in value on account of the Second Lien Notes, (i) replacement liens on collateral securing the Post-Petition Financing, subordinate to the DIP Liens, (ii) superiority administrative expenses claims, subordinate to the DIP superpriority administrative expense claims.

v.    authorization for the Post-Petition Lender to exercise remedies upon the occurrence and continuance of an Event of Default (as defined below) after written notice, including without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtor's assets pursuant to the DIP Liens granted to the Post-Petition Lender;

vi.    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this order authorizing the Borrower, on an interim basis, to obtain and initial Credit Advance (the "Initial Credit Advance") under the DIP Credit Agreement of $_____ to be used satisfy the Capital One Obligations and to fund the Debtor's normal business operations in accordance with Debtor's budget attached hereto as Exhibit C (as such budget may be supplemented or modified in accordance with the terms hereof and the Post-Petition Documents, the "Budget"); and

vii.    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") to be held on or before March __, 2017 (not sure about timing here, will it be April before the final hearing?)for this Court to consider entry of the

Final Order authorizing the Post-Petition Financing, authorizing the Borrower, on a final basis, to obtain under the DIP Credit Agreement the balance of the Credit Advances, and authorizing and approving, on a final basis, the relief requested in the Motion.

Due and appropriate notice of the Motion under the circumstances, the relief requested therein and an Interim Hearing on the Motion having been held before this Court on March __, 2017; and upon the entire record made at the Interim Hearing; and this Court having found good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.     This Court has jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtor on its twenty five largest unsecured creditors, Poplar Healthcare, PLLC, the Post-Petition Lender, the holders of the Second Lien Notes, and the United States Trustee for the District of Delaware (the "U.S. Trustee").   Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

C.     The Debtor has an immediate need to obtain the Post-Petition Financing in order to, among other things, fund the Debtor's normal business operations during the Case pending the Section 363 sale of substantially all of its assets ("the Asset Sale") and the "wind down" of

-4-

the Business, to fund the administrative costs of the Case, and to satisfy the Capital One Obligations (collectively, the "Post-Petition Funding Obligations").  The Debtor's incurrence of the Post-Petition Financing is, therefore, necessary to ensure that the Debtor has sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtor's estate and to avoid irreparable harm to the Debtor's estate and creditors.

D.      The Debtor is unable to obtain financing from sources other than the Post-Petition Lender pursuant to, and for the purposes set forth in, the Post-Petition Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code without granting the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims (each as defined below), and the other adequate protection granted herein, in each case on the terms and conditions set forth in this Order and the Post-Petition Documents.

E.      The terms of the Post-Petition Financing pursuant to this Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

F.      The Post-Petition Documents have been the subject of extensive negotiations conducted in good faith and at arm's length among the Borrower and the Post-Petition Lender, and all of the Debtor's obligations and indebtedness arising under or in connection with the Post-Petition Financing, including without limitation, (i) all Credit Advances made to the Borrower as contemplated and authorized by this Order and (ii) all other obligations of the Debtor under the Post-Petition Documents and this Order shall be deemed to have been extended by the Post-Petition Lender in "good faith" as such term is used in section 364(e) of the Bankruptcy Code,

and in express reliance upon the protections set forth therein, and shall be entitled to the full

protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision

hereof is vacated, reversed, or modified on appeal or otherwise.

G.    The Post-Petition Lender will commit to providing Post-Petition Financing in an

amount necessary to fund the Post-Petition Funding Obligations as set forth in the Budget and

acceptable to the Post-Petition Lender, in an amount not more than $5,116,000 (the "Stated

Principal Amount"), upon the terms and conditions set forth herein.

H.    Based on the record before this Court, it appears that the terms of this Interim

Financing Order, including, without limitation, the terms of the Post-Petition Financing are fair

and reasonable under the circumstances, reflect the Debtor's exercise of prudent business

judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value

and fair consideration.

I.    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy

Rules 4001(b)(2) and 4001(c)(2).  Absent granting the interim relief set forth in this Order, the

Debtor's estate will be immediately and irreparably harmed.  Consummation of the Post-Petition

Financing in accordance with this Order and the Post-Petition Documents are, therefore, in the

best interest of the Debtor's estate.  Good cause has been shown for the entry of this Order.

Based upon the foregoing findings and conclusions, and upon the record made before this

Court at the Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY**

**ORDERED, DETERMINED AND DECREED** that:

**Motion Granted**

1.    The Motion is granted on the terms and conditions set forth in this Interim

Financing Order, with the foregoing findings incorporated herein by reference. Any objections to

4824-5243-3732 v2
2790010-000001 03/12/2017

the Motion that have not previously been withdrawn or resolved are hereby overruled. This Interim Financing Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry.

**Authorizations**

2.      The Debtor is hereby authorized to execute and enter into the Post-Petition Documents. The Post-Petition Note, the other Post-Petition Documents and this Interim Financing Order shall govern the financial and credit accommodations to be provided to the Debtor by the Post-Petition Lender as described herein; *provided* that in the event of a conflict between the Post-Petition Documents and the Interim Financing Order, the Interim Financing Order shall control.

3.      The Debtor is hereby authorized to obtain the Initial Credit Advance, on an interim basis, under the DIP Credit Agreement of up to an aggregate principal amount of $\rule{3cm}{0.4pt}$ to be used satisfy the Capital One Obligations and to fund the Debtor's normal business operations in accordance with the Budget and the permitted variances set forth herein and the Post-Petition Documents..

4.      In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents that the Post-Petition Lender determines to be required or necessary for the Debtor's performance of their obligations under the Post-Petition Documents, including without limitation:

      (i)      the execution, delivery and performance of the Post-Petition Documents, including, without limitation, the Post-Petition Note;

      (ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the Post-Petition Documents, in each case in such form as the Debtor and the Post-Petition

Lender may agree; *provided, that*, written notice of any material modification or amendment to the Post-Petition Documents shall be filed on the docket of the Chapter 11 Case and shall be served upon (i) counsel to any official committee appointed in the Chapter 11 Case (the "<u>Committee</u>"), (ii) the U.S. Trustee, and (iii) counsel to the Debtor (collectively, the "<u>Notice Parties</u>") each of whom shall have ten (10) days from the date of service of such notice within which to object in writing to such modification or amendment. If any Notice Party (or any other party in interest with requisite standing) timely objects to any such material modification or amendment to the Post-Petition Documents, such modification or amendment shall only be effective pursuant to an order of this Court; and

(iii)     the performance of all other acts required under or in connection with the Post-Petition Documents.

5.      Upon execution and delivery of the Post-Petition Note and the other Post-Petition Documents, such Post-Petition Documents shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of the Interim Financing Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any case. No obligation, payment, transfer or grant of security under the Post-Petition Note, the other Post-Petition Documents or the Interim Financing Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

**<u>Borrowing; Use of Cash Collateral</u>**

6.      Subject to the Budget attached as <u>Exhibit C</u> to the Post-Petition Note (as modified from time to time with the consent of the Post-Petition Lender in its sole discretion, but without

-8-

need for further Court order and solely in compliance therewith and subject further to the terms and conditions of the Interim Financing Order and the Post-Petition Documents, (a) the Post-Petition Lender will provide the Post-Petition Financing in accordance with the terms of the Post-Petition Documents, and (b) the Debtor, on behalf of the Estate, is authorized to use Cash Collateral in accordance with the terms of the Interim Financing Order.

**Interest, Fees, Costs and Expenses**

7.      . The Post-Petition Obligations shall bear interest at nine percent (8%) per annum payable as provided in the Post-Petition Note. After an Event of Default (as described below), the interest shall accrue at the interest rate set forth in the preceding sentence plus two percent (2%) per annum, along with costs and expenses as provided in the Post-Petition Note.

**Event of Default**.

8.      Each of the following events, unless waived by the Post-Petition Lender in writing, shall constitute an "**Event of Default**":

(i)      (a) the Borrower shall fail to pay any principal of any Credit Advance when the same shall become due and payable or (b) the Borrower shall fail to pay any interest on any Credit Advance, or Borrower shall fail to make any other payment under any Post-Petition Document, in each case under this clause (c) within three Business Days after the same shall become due and payable;

(ii)     any representation or warranty made by Borrower (or any of its officers) under or in connection with any Post-Petition Document shall prove to have been incorrect in any material respect when made, which such disclosures when taken together in the aggregate is reasonably likely to have a Material Adverse Effect;

(iii)    Borrower shall fail to perform or observe any term, covenant or agreement contained in Post-Petition Document on its part to be performed or observed if such failure shall remain unremedied for 20 days after the earlier of the date on which (i) any officer of Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by Post-Petition Lender;

4824-5243-3732 v2
2790010-000001 03/12/2017

(iv)     the security interest granted to the Post-Petition Lender shall cease to be in full force and effect, or shall cease to create a perfected security interest in, and lien on, the Post-Petition Collateral purported to be created thereby;

(v)      the Post-Petition Note is, or becomes, invalid or ineffective or unenforceable against the Debtor, in whole or in part, or the Debtor so asserts or at any time denies the liability or the Post-Petition Obligations under the Post-Petition Note;

(vi)     any Post-Petition Document after delivery thereof and after giving effect to the Interim or Final Financing Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Post-Petition Collateral purported to be covered thereby;

(vii)    at any time there shall have occurred the loss or termination of, or the receipt by Borrower of notice of the loss or termination of any Governmental Authorization of Borrower other than any loss or termination not reasonably likely to cause a Material Adverse Effect;

(viii)   Borrower shall institute any proceeding or investigation or support the same by any other Person who may challenge the status and/or validity, and/or perfection and/or priority of the DIP Liens on the Post-Petition Collateral created by the Post-Petition Documents, or the Financing Order securing the Post-Petition Funding Obligations, other than to the extent required by the Bankruptcy Court;

(ix)     Borrower shall, without the consent of the Post-Petition Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations under the DIP Credit Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation;

(x)      the entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4));

(xi)     the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(xii)    the entry of an order granting any other super-priority claim or lien equal or superior in priority to the DIP Liens securing the Post-Petition Funding Obligations granted to the Post-Petition Lender, other than the Carve Out, without the Post-Petition Lender's prior written consent;

-10-

(xiii) the entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset, in an amount equal to or exceeding $50,000;

(xiv) the entry of an order staying, reversing, vacating or otherwise modifying the Credit Advances, any DIP Liens securing the Post-Petition Funding Obligations (or the validity or first priority status thereof) or the Interim Financing Order or Final Financing Order;

(xv) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of Borrower's assets, if the net cash consideration for such sales are not immediately applied to payment in whole or in part in cash of the Post-Petition Funding Obligations;

(xvi) failure of the Borrower to file and properly serve a motion (the "**Sale Motion**") by March __, 2017, in form and substance acceptable to Lender in its sole and absolute discretion, seeking Bankruptcy Court approval of: (A) the sale of the assets (the "**Assets**") described in an Asset Purchase Agreement in form and substance acceptable to the Lender in its sole and absolute discretion (the "**Stalking Horse Agreement**"), by and among Borrower as seller, and Lender as purchaser (the "**Purchaser**"), subject to higher or otherwise better offers under the Bidding Procedures (as defined below); (B) bidding procedures in connection with the sale of the Assets (the "**Bidding Procedures**") in form and substance acceptable to the Lender, in its sole and absolute discretion; and (C) the scheduling of an auction for the sale of the Assets in accordance with the Bidding Procedures and a sale hearing with respect thereto (the "**Auction**" and "**Sale Hearing**", respectively), which Sale Motion shall include copies of the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order (as defined below), and (ii) by no later than the date proscribed in the Bidding Procedures Order (as defined below) properly serve each counterparty to a Contract (as defined in the Stalking Horse Agreement) a notice, in form and substance reasonably acceptable to the Purchaser, setting forth the amount necessary to satisfy any cure costs;

(xvii) failure of the Borrower to have the Bankruptcy Court enter an order within fourteen (14) days of the filing of the Sale Motion in form and substance acceptable to Lender in its sole and absolute discretion (i) approving the Stalking Horse Agreement and the Bidding Procedures; and (ii) scheduling the Auction and Sale Hearing (together, the "**Bidding Procedures Order**");

(xviii) the failure of Borrower to conduct an auction for substantially all of its assets within forty-five (45) days of the Petition Date;

(xix) the failure of Borrower to have the Bankruptcy Court enter an order not later than May 30, 2017 (the "**Sale Order**") approving a sale of

4824-5243-3732 v2
2790010-000001 03/12/2017

substantially all of Borrower's assets and providing for the immediate repayment in full of the Obligations from the proceeds of such sale;

(xx)    Post-Petition Lender validly terminates the Asset Purchase Agreement pursuant to the terms thereto on or before the Auction;

(xxi)    a Post-Petition Financing Order shall be entered in form and substance that is not acceptable to the Post-Petition Lender in its sole discretion or, from and after the date of entry thereof, any Post-Petition Financing Order shall cease to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended  without the consent of the Post-Petition Lender;

(xxii)    the Debtor,shall make any payments on any indebtedness which arose before the Petition Date other than as provided in the Budget or otherwise consented to by the Post-Petition Lender;

(xxiii)    the Debtor shall be in breach or shall fail to comply with the terms of the Interim Financing Order in any material respect;

(xxiv)    the occurrence of the Maturity Date; or

(xxv)    an application or motion shall be filed by the Debtor for the approval of post-petition financing from any party other than Post-Petition Lender, including financing that provides for super-priority claims or priming liens on any of Post-Petition Lender's collateral without Post-Petition Lender's consent in writing in its sole and absolute discretion; or

9.    Upon the occurrence of an Event of Default under subparagraphs 8(i)- (xxv) above and after ten (10) days' written notice by the Post-Petition Lender to the Notice Parties (the "Default Notice Period"), the automatic stay shall terminate, and the Post-Petition Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions, unless the Court determines during the Default Notice Period that an Event of Default has not occurred:

(i)    declare all or any portion of the outstanding Post-Petition Obligations due and payable, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Debtor;

(ii)    enforce all liens and security interests in the Post-Petition Collateral;

4824-5243-3732 v2
2790010-000001 03/12/2017

      (iii)    institute proceedings to enforce payment of such Post-Petition Obligations;

      (iv)    terminate the obligation of the Post-Petition Lender to make an additional Credit Advance; and

      (v)    exercise any other remedies and take any other actions available to it at law, in equity, under the Post-Petition Note, the Bankruptcy Code, other applicable law or pursuant to this Financing Order.

*provided however* that the Post-Petition Lender shall continue to fund the Debtor's operations, pursuant to the Budget, through the Default Notice Period.

      10.    <u>Termination of the Post-Petition Financing and Use of Cash Collateral</u>. Except with respect to the payment of the Carve-Out (as defined herein), the Post-Petition Lender's agreement to provide the Post-Petition Financing in accordance with the Post-Petition Documents and the Debtor's authorization to use Cash Collateral shall immediately and automatically terminate (except as the Post-Petition Lender may otherwise agree in writing in its sole discretion), upon the earliest to occur of any of the following (each, a "<u>Termination Date</u>"):

      (i)    May 30, 2017;

      (ii)    the date of final indefeasible payment and satisfaction in full in cash of the Post-Petition Obligations;

      (iii)    the entry of an order by the Court granting a motion by the Debtor to obtain additional financing from a party other than Post-Petition Lender under section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the Post-Petition Obligations or unless such financing is subordinate to the Post-Petition Obligations and consented to in writing by the Post-Petition Lender;

      (iv)    the dismissal the Chapter 11. Case or the conversion of the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code;

      (v)    the Interim Financing Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Post-Petition Lender (which consent may be withheld in its sole discretion); or

(vi)    upon ten (10) days written notice of any Event of Default as defined in paragraph 8 above.

**Liens  and Administrative Status to Secure the Post-Petition Obligations**

11.    <u>Superpriority Claims</u>. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Post-Petition Obligations shall constitute allowed senior administrative expense claims against the Debtor (the "DIP <u>Superpriority Claims</u>") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, excluding, however, the proceeds of all Avoidance Actions and Estate Actions (as defined below), subject only to the Carve-Out to the extent specifically provided for herein.

12.    <u>DIP Liens</u>.  As security for the Post-Petition Funding Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Post-Petition Lender of any property, the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a), (b) and (c) below being

collectively referred to as the "DIP Collateral"), in each case subject only to the Carve Out (all such liens and security interests granted to the DIP Lender on account of the DIP Obligations pursuant to this Order, the "DIP Liens") to provide Post-Petition Lender with a valid first and prior lien on all of Debtor's assets:

(a)    Senior Liens On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior lien on, and security interest in, (i) all cash or cash proceeds; and (ii) all tangible and intangible prepetition and postpetition property of the Debtor, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to a valid, perfected, non-avoidable and enforceable lien in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, inventory, equipment, general intangibles, intercompany notes, insurance policies, contracts, securities, chattel paper, real property leaseholds, fixtures, machinery, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property and the proceeds of all of the foregoing.

(b)    Priming Liens On Collateral Securing Second Lien Notes.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, senior priming lien on, and security interest in, all collateral of the holders of the Second Lien Notes (the "Second Lien Note Collateral").  The DIP Liens on the Second Lien Note Collateral shall be senior in all respects to the security interests in, and liens on, the Second Lien Note Collateral.

(c)    Liens Senior To Certain Other Liens.  Except as provided herein, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(d)    Avoidance Actions.  For purposes of the Interim Financing Order, the Property shall expressly exclude the proceeds of the Estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") and other Estate causes of actions (the "Estate Actions"), which Avoidance Actions and Estate Actions shall not be subject to the Post-Petition Liens, Superpriority Claims or any other liens or superpriority claims.

4824-5243-3732 v2
2790010-000001 03/12/2017

**Carve-Out**

13.     All liens and claims of or granted to the Post-Petition Lender shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"): (a) all allowed fees and expenses of attorneys, investment bankers and financial advisors (collectively, the "Estate Professionals") employed by the Debtor or the Committee (as applicable) pursuant to sections 327, 328, 1102 and 1103 of the Bankruptcy Code which are accrued prior to the Termination Date to the extent set forth in (and limited by) the Budget, in each case, are accrued prior to the Termination Date (i) to the extent set forth in (and limited by) the Budget to be shared by all of each of the Estate Professionals (and to fund any operations) (the "Termination Carve-Out Amount"); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court or to the Debtor's appointed claims agent. After the Termination Date, the Post-Petition Lender will fund the Termination Carve-Out Amount to the Debtor. Notwithstanding any other provision of this Interim Order (including this paragraph above), the Court retains and shall have all authority to consider and approve all applications for fees and expenses by any Estate Professionals, including for reasonableness thereof, or on any other basis under the Bankruptcy Code or Bankruptcy Rules, or otherwise under applicable law, and all funds that may be set aside for or applied to any such amounts or obligations shall remain fully subject to disgorgement or reallocation, based on the Court's orders exercising such reserved rights as described previously in this sentence, and all professionals described above in this sentence shall be and remain subject to the jurisdiction of this Court for the purposes described in this sentence.

4824-5243-3732 v2
2790010-000001 03/12/2017

14.     Notwithstanding the foregoing, none of the Carve-Out proceeds from the Post-Petition Financing or Cash Collateral may be used (1) to investigate or challenge in any respect the validity, perfection, priority, extent or enforceability of the Post-Petition Liens, (2) to delay, challenge or impede any rights of the Post-Petition Lender under any of the Post-Petition Documents, or the Interim Financing Order, or (3) to pursue any claims or causes of action of any kind against the Post-Petition Lender the Bid Approval Order, the Post-Petition Financing Order or the Post-Petition Note. Nothing herein shall restrict the ability of the Committee, if any, or any other party to investigate or object to a disclosure statement or a plan of reorganization, and the Carve-Out, proceeds from the Post-Petition Financing and/or Cash Collateral may be used to pay approved fees and expenses of Estate Professionals employed by the Committee, if any, in connection therewith.

15.     Notwithstanding any other provision of this Interim Order, under no circumstances shall any fees or expenses be paid to any Estate Professional absent order of the Court approving the same, upon application or motion on notice. Subject to the terms of the Interim Financing Order, the Debtor shall be permitted to pay compensation and reimbursement of any Court-approved reasonable fees and expenses of the Estate Professionals allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code, as the same may be due and payable, that constitute pre-Termination Date expenses and such payments shall not reduce or be deemed to reduce the post-Termination Date fees and expenses.

(i)     For the avoidance of doubt, and as provided for in the Post-Petition Note, the final Credit Advance Notice (the "Final Borrowing Notice") shall include the amount of accrued fees estimated to be due and owing to the Estate Professionals, pursuant to further order from the Court, including such Court-approved fees to be paid after the consummation of the Asset Sale. Such accrued amounts may not exceed amounts budgeted under the Budget for each respective Estate Professional. The Post-Petition Lender will fund the Final Borrowing Notice from the Post-Petition Loans to be

-17-

held by the Debtor, or subsequently, a distribution agent, in a segregated account, payable only upon further fee order from the Court.

**Adequate Protection to Holders of the Second Lien Notes**

16.     The holders of the Second Lien Notes are entitled pursuant to sections 361, 363(c)(2), and 364(d)(1) of the Bankruptcy Code, to adequate protection of its interest in the Second Lien Note Collateral, including Cash Collateral, in an amount equal to the diminution in value of the Second Lien Note Collateral, including any such diminution resulting from the sale, lease, or use by the Debtor (or other decline in value) of the Second Lien Note Collateral and Cash Collateral, the priming by the DIP Liens of the Second Lien Note Collateral, as well as the imposition of the automatic stay (such diminution, the "Adequate Protection Obligations").  As adequate protection, the holders of the Second Lien Notes are hereby granted the following:

(a)     Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, the holders of the Second Lien Notes are hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, and (ii) the Carve Out.

(b)     Section 507(b) Claim.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the DIP Superpriority Claims.

**Automatic Perfection of DIP Liens and Adequate Protection Liens**

17.     The Post-Petition Lender and the holders of the Second Lien Notes are authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens and the Adequate Protection

-18-

Liens granted to it hereunder.  Whether the Post-Petition Lender or the holders of the Second Lien Notes shall in their respective sole discretion choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens or Adequate Protection Liens, such DIP Liens and Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

18.    A certified copy of this Order may, in the discretion of the Post-Petition Lender or the holders of the Second Lien Notes, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Order for filing and recording.

19.    The Debtor shall execute and deliver to the Post-Petition Lender and the holders of the Second Lien Notes all such agreements, financing statements, instruments, and other documents as the Post-Petition Lender and the holders of the Second Lien Notes may request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

**Preservation of Rights Granted Under this Interim Financing Order**

20.    No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Financing Order to the Post-Petition Lender shall be granted or allowed, except as to Permitted Liens and/or as provided under applicable non-bankruptcy law, until the occurrence of (i) the payment in full in cash or immediately available funds of all of the Post-Petition Obligations, or  (ii) the termination or expiration of all commitments to extend credit to the Debtor under the Post-Petition Documents.

-19-

21.     If an order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is entered at any time prior to the Post-Petition Obligations being Paid in Full, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, Post-Petition Liens granted to the Post-Petition Lender and the Adequate Protection Obligations granted to the holders of the Second Lien Notes shall continue in full force and effect and shall maintain their priorities as provided in the Interim Financing Order until all Post-Petition Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims and Post-Petition Liens and Adequate Protection Obligations, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

22.     If any or all of the provisions of the Interim Financing Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any Post-Petition Obligations incurred prior to the actual receipt of written notice by the Post-Petition Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the Superpriority Claims and Post-Petition Liens granted hereby with respect to any Post-Petition Obligations. To the extent permitted by applicable law, notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or Post-Petition Obligations incurred by the Debtor prior to the actual receipt of written notice by the Post-Petition Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the Interim Financing Order, and the Post-Petition Lender shall be entitled to all the

rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the Interim Financing Order and pursuant to the Post-Petition Documents with respect to all uses of Cash Collateral and the Post-Petition Obligations.

23.     Except as expressly provided in the Interim Financing Order or in the Post-Petition Documents, or until the Post-Petition Obligations are Paid in Full, the Post-Petition Liens, the Superpriority Claims, and all other rights and remedies of the Post-Petition Lender granted by the provisions of the Interim Financing Order and the Post-Petition Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7, or dismissing the Chapter 11 Case or (ii) the entry of an order confirming a plan of reorganization in the Chapter 11 Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining Post-Petition Obligations. The terms and provisions of the Interim Financing Order and the Post-Petition Documents shall continue in the Chapter 11 Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Post-Petition Liens, and the Superpriority Claims and all other rights and remedies of the Post-Petition Lender granted by the provisions of the Interim Financing Order and the Post-Petition Documents shall continue in full force and effect until the Post-Petition Obligations are Paid in Full.

**Effect of Stipulations on Third Parties**

24.     Each stipulation, admission and agreement contained in the Interim Financing Order, shall be binding upon the Debtor, and any successor thereto (including, without limitation, any chapter 7 trustee or any chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes existing as of the date hereof. Each stipulation, admission and agreement contained in the Interim Financing Order shall also be binding upon all

-21-

other parties in interest, including, without limitation, the Committee, if any, under all circumstances and for all purposes.

25.     The stipulations and admissions contained in this Order shall be binding upon all other parties in interest, including without limitation, the Committee, unless (a)(i) the Committee or (ii) any other party-in-interest that obtains standing prior to the expiration of the Challenge Period (as defined below) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in paragraphs 11 and _ herein), by no later than the date that is 60 days after the Committee is appointed or, if no Committee is appointed, 75 days after entry of this Order (the "Challenge Period").

26.     Upon approval of the Interim Financing Order, notwithstanding anything to the contrary herein, upon written notice to the landlord of any of Debtor's leased premises that an Event of Default has occurred and is continuing, to the extend allowed by applicable non-bankruptcy law, the Post-Petition Lender shall be entitled to the Debtor's rights and privileges under such lease(s) without interference from such landlord, including, if applicable, the right to enter upon such leased premises for the purpose of exercising any right or remedy with respect to the collateral located thereon; *provided* that such Post-Petition Lender shall pay to such landlord rent first accruing after the above referenced written notice and during the period of occupancy by such Post-Petition Lender, calculated on a per diem basis and any such amount paid shall be deemed to be Post-Petition Obligations, as applicable.

**Financial Reporting**

27.     The Debtor shall provide any reporting provided for under the DIP Credit Agreement.

**Covenants**

28.    Unless otherwise modified pursuant to the Interim Financing Order, the Debtor acknowledges and agrees that it shall cause the timely compliance with all of the covenants set forth in the Interim Financing Order and the Post-Petition Documents.

**Binding Effect on Successors and Assigns**

29.    The Post-Petition Documents and the provisions of the Interim Financing Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Committee, if any, the Debtor, the Post-Petition Lender and each of their respective successors and assigns (including any chapter 7 or any chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the Post-Petition Lender, the Debtor, and each of their respective successors and assigns, *provided, however*, that the Post-Petition Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any Credit Advance (whether under the Post-Petition Note or otherwise) or permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Financing Order or the Post-Petition Documents, the Post-Petition Lender shall <u>not</u> (i) be deemed to be in control of the operations of the Debtor, or (ii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response,

4824-5243-3732 v2
2790010-000001 03/12/2017

Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute)

**<u>Limitation on Use of Post-Petition Financing and DIP Collateral</u>**

30.    The Debtor shall use the Post-Petition Financing solely as provided in this Order and the Post-Petition Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, no Credit Advances under the Post-Petition Financing, no DIP Liens, no DIP Collateral, no Adequate Protection Obligations, no 507(b) Claims, no Adequate Protection Liens, or the Carve Out may be used to (a) object, prosecute, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of any amount due under the Post-Petition Documents, the Post-Petition Funding Obligations, the Adequate Protection Obligations, the Second Lien Notes, the DIP Liens, the Adequate Protection Obligations, or the liens or claims granted under this Order or the DIP Documents, (b) assert any Claims and Defenses, Avoidance Actions, or any other causes of action against the Post-Petition Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the Post-Petition Lender's assertion, enforcement, or realization on the DIP Collateral in accordance with the Post-Petition Documents or this Order, (d) seek to modify any of the rights granted to the Post-Petition Lender hereunder or under the Post-Petition Documents (including the adequate protection granted herein), in the case of each of the foregoing clauses (a) through (d), without the Post-Petition Lender's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii) permitted under the Post-Petition Documents

4824-5243-3732 v2
2790010-000001 03/12/2017

**Credit Bid**

31.     Subject to section 363(k) of the Bankruptcy Code and entry of this Interim Financing Order, the Post-Petition Lender shall have the right to "credit bid" the full amount of the Post-Petition Obligations then outstanding in connection with the Asset Sale or any sale of all or any portion of the Debtor's assets, including, without limitation, a sale transaction under section 363 of the Bankruptcy.

**Effectiveness**

32.     This Interim Financing Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim Financing Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Interim Financing Order.

**Controlling Effect of Interim Financing Order**

33.     To the extent any provisions in this Interim Financing Order conflict with any provisions of the Motion, or any Post-Petition Document, the provisions of this Interim Financing Order shall control.

**Final Hearing**

34.     The Final Hearing to consider to consider entry of a Final Financing Order authorizing the Post-Petition Financing on a final basis shall be held, if necessary, on _____ __, 2017 at 9:30 a.m. (ET) before this Court.

**Final Hearing Notice**

35.     The Debtor shall promptly mail copies of this Interim Financing Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtor, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899, Attn: David B. Stratton, Esq.(ii) counsel to the Post-Petition Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn:  Derek Abbot, Esq., and Baker Donelson Bearman Caldwell & Berkowitz, PC, 165 Madison Avenue, Suite 2000, Memphis, Tennessee 38103, Attn:  E. Franklin Childress, Jr, (iii) counsel to any committee of unsecured creditors appointed in the Chapter 11 Case, (iv) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 and (v) parties required by Bankruptcy Rule 2002(a) and shall be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each case to allow actual receipt by the foregoing no later than March __, 2017 at 4:00 p.m., prevailing Eastern time.

Dated: March _____, 2017
Wilmington, Delaware

_____
Honorable _____
United States Bankruptcy Judge

4824-5243-3732 v2
2790010-000001 03/12/2017

**<u>Exhibit D to DIP Credit Agreement</u>**

**Form of Borrowing Notice**

[TO COME]

**<u>Exhibit D</u>**

**Form of Second Lien Notes Amendment**

<u>ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT</u>

THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT (as from time to time amended, supplemented or modified, this "**Agreement**"), dated as of [  ], 2017, is entered into by and between Bostwick Laboratories, Inc., a Delaware corporation (the "**Company**"), Poplar Healthcare, PLLC (the "**Assignee**"), and the Purchasers (as defined below).

WITNESSETH:

WHEREAS, the Company, Bostwick Laboratories Group Holdings, L.P., a Delaware limited partnership ("**Group Holdings**"), Bostwick Laboratories Group Holdings GP, LLC (the "**GP**") and each of the Persons from time to time listed on <u>Schedule I</u> hereto (each a "**Purchaser**" and collectively, the "**Purchasers**"), are parties to that certain Note Purchase Agreement, dated as of February 21, 2017 ("**Original Note Purchase Agreement**"), pursuant to which the Purchasers purchased the Company's 18% Secured Subordinated Notes due 2017 in an aggregate original principal amount of $950,000 (the "**Original Notes**");

WHEREAS, on March __, 2017 (the "**Petition Date**"), the Company filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating its case (the "**Bankruptcy Case**") that is pending under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the Bankruptcy Case, the Company has entered into a stalking horse asset purchase agreement with Assignee to sell Assignee substantially all of the Company's assets in an auction pursuant to Bankruptcy Code section 363 (the "**Stalking Horse APA**"); and

WHEREAS, concurrently with the closing of the transactions contemplated by the Stalking Horse APA (the "**Effective Date**"), the Company desires to assign, and the Assignee is willing to assume, all of the Company's rights and obligations of the Company under (i) the Original Note Purchase Agreement, as amended and restated on the terms set forth in the Amended and Restated Note Purchase Agreement attached hereto as <u>Exhibit A</u> (the "**A&R Note Purchase Agreement**"), and (ii) the Original Notes in an aggregate principal amount of Nine Hundred Fifty Thousand Dollars ($950,000.00) plus all accrued and unpaid interest thereunder as of the Effective Date (the "**Assumption Cap**"), as amended and restated on the terms set forth in the Amended and Restated 8% Secured Notes due 2018 attached hereto as <u>Exhibit B</u> (the "**A&R Notes**").

NOW, THEREFORE, the parties hereto agree as follows:

1.    <u>Assignment, Assumption and Amendment</u>.    On the Effective Date, the Company shall assign to the Assignee and be released from, and the Assignee shall assume, the Company's obligations under (i) the Original Note Purchase Agreement, as amended and restated on the terms set forth in the A&R Note Purchase Agreement, and (ii) the Original Notes, as amended and restated on the terms set forth in the A&R Notes, in aggregate principal amount of the Original Notes (including all accrued and unpaid interest thereunder) as of the Effective Date not to exceed the Assumption Cap.  To the extent the aggregate principal amount of the Original Notes (including all accrued and unpaid interest thereunder)

as of the Effective Date exceeds the Assumption Cap, the principal amount of the Original Notes (including all accrued and unpaid interest thereunder) in excess of the Assumption Cap shall not be assumed by Assignee and shall remain an obligation of the Company and the Company shall remain bound by the Original Note Purchase Agreement with respect to such Original Notes (including all accrued and unpaid interest thereunder).

2.     Consent.   Notwithstanding anything to the contrary in the Original Note Purchase Agreement, the Purchasers hereby consent to the assumption and amendment of the Original Note Purchase Agreement and the Original Notes by Assignee on the terms set forth in the A&R Note Purchase Agreement and the A&R Notes conditioned upon and effective as of the occurrence of the Effective Date.

3.     <u>Representations and Warranties of the Assignee</u>.   The Assignee hereby represents and warrants to each Purchaser that as of the Effective Date, each of the representations and warranties of the Assignee set forth in Section 4 of the A&R Note Purchase Agreement are true and correct with respect to this Agreement, the A&R Note Purchase Agreement and the A&R Notes.

4.     <u>Governing Law</u>. THIS AGREEMENT, AND ALL CLAIMS ARISING HEREUNDER OR RELATING HERETO, SHALL BE GOVERNED AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.     <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

6.     <u>Counterparts; Third Party Beneficiaries</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   No provision of this Agreement shall confer upon any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies hereunder.

[Signature page follows]

61297722_5

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first written above.

BOSTWICK LABORATORIES, INC.,

By: _____
     Name:
     Title:

POPLAR HEALTHCARE, PLLC

By: _____
     Name:
     Title:

METALMARK CAPITAL PARTNERS II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS CAYMAN II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS
TE II, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner


By:_____
Name:  Howard Hoffen
Title:   Partner


METALMARK CAPITAL PARTNERS
II, EXECUTIVE FUND, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner


By:_____
Name:  Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS
II CO-INVESTMENT, L.P.


By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner

By:_____
Name:  Howard Hoffen
Title:   Partner

MCP (SILO) II AIF, L.P.


By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

## AMENDED AND RESTATED NOTE PURCHASE AGREEMENT

THIS AMENDED AND RESTATED NOTE PURCHASE AGREEMENT (as from time to time amended, supplemented or modified, this "**Agreement**"), dated as of [  ], 2017 is entered into by and between Poplar Healthcare, PLLC, a Tennessee professional limited liability company (the "**Issuer**") and each of the Persons from time to time listed on <u>Schedule I</u> hereto (each a "**Purchaser**" and collectively, the "**Purchasers**"). Capitalized terms used and not defined elsewhere in this Agreement have the meanings provided for them in Section 1 hereof.

WITNESSETH:

WHEREAS, Bostwick Laboratories Group Holdings, L.P., Bostwick Laboratories Group Holdings GP, LLC, Bostwick Laboratories, Inc. (the "**Company**") and the Purchasers are parties to that certain Note Purchase Agreement, dated as of February 21, 2017 ("**Original Note Purchase Agreement**"), pursuant to which the Purchasers purchased notes (the "**Original Notes**") issued by the Company in an aggregate original principal amount of $950,000;

WHEREAS, the Company and the Issuer are party to that certain Assignment, Assumption and Amendment Agreement, dated as of [   ] (the "**Assignment Agreement**"), pursuant to which the Company has assigned, and the Issuer has assumed, the rights and obligations under the Original Note Purchase Agreement and the Original Notes, in an aggregate principal amount of $950,000 (such Original Notes (plus all accrued and unpaid interest thereunder as of the Closing Date) subject to this Agreement, the "**Assumed Notes**");

WHEREAS, the Issuer and the Purchasers desire to amend (i) the rate of interest applicable to each Assumed Note, (ii) postpone the date fixed for payment of principal on all Assumed Notes and (iii) make certain other modifications to the Original Notes Purchase Agreement with respect to the Assumed Notes;

NOW, THEREFORE, the parties hereto agree as follows:

1    DEFINITIONS; CONSTRUCTION

1.1    *Certain Definitions*.  In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings when used herein with initial capital letters:

"**Business Day**" means any weekday other than a weekday on which banks in New York, New York are authorized or required to be closed.

"**Change of Control**" means (i) the immediate parent of the Issuer ceases to hold more than 50.1% of the Issuer or (ii) the immediate parent of the Issuer ceases to posses the right to elect at all times a majority of the board of directors of the Issuer.

"**Closing**" has the meaning assigned to it in Section 2.2.

"**Closing Date**" means [  ].

"**Code**" means the U.S. Internal Revenue Code of 1986, or any successor federal statute, and the regulations promulgated thereunder, as the same may be amended from time to time.

"**Collateral**" has the meaning provided for such term in the Guaranty and Security Agreement.

"**Default**" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Financial Officer**" means, with respect to any specified Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person, in each case in his or her capacity as such.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Guaranty and Security Agreement**" means the Guaranty and Security Agreement dated as of February 21, 2017 entered into by the Company, Bostwick Laboratories Holdings, Inc. and the Purchasers.

"**Holder**" means any holder of Notes and its successors and assigns.

"**Liquidation Event**" means (a) a liquidation, dissolution or winding up of the Issuer or (b) a Change of Control.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, assets, liabilities, financial condition or results of operations of the Issuer and its Subsidiaries, taken as a whole, (b) the ability of the Issuer or any Subsidiary to perform any obligation under this Agreement or any Ancillary Agreement or (c) the rights of or benefits available to each Purchaser (or the Holders of the Notes) under this Agreement or the Ancillary Agreement.

"**Maturity Date**" means [  ].[1]

"**Notes**" means the notes being issued by the Issuer under this Agreement as of the Closing Date.

"**Note Obligations**" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under, or with respect to, this Agreement and the Notes.

"**Organizational Documents**" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation, organization or formation and any joint venture, limited liability company, operating or partnership agreement and other

---

[1] To be set at 18 months anniversary of the Closing Date.

similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended, modified or supplemented from time to time.

"**Person**" means any natural person, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other legal entity of any nature whatsoever.

"**Qualified Public Offering**" means the issuance by the Issuer or any direct or indirect parent of the Issuer of its common equity interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchanges Commission in accordance with the Securities Act of 1933 (whether alone or in connection with a secondary public offering).

"**Required Holders**" means Holders holding a majority in aggregate principal amount of the Notes at the time outstanding.

"**Securities Act**" means the Securities Act of 1933, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission thereunder, as the same may be amended from time to time.

"**Significant Subsidiary**" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the date hereof. For purposes of determining whether an Event of Default has occurred, if any group of Subsidiaries as to which a particular event has occurred and is continuing at any time would be, when taken as a whole, a "Significant Subsidiary" then such event shall be deemed to have occurred with respect to a Significant Subsidiary.

"**Subsidiary**" means, with respect to any other Person, any Person of which such other Person owns securities having a majority of the voting power in electing the board of directors (or similar governing body) directly or through one or more Subsidiaries (or, in the case of a partnership, limited liability company or other similar entity, securities conveying, directly or indirectly, a majority of the economic interests in such partnership or entity), including any Person of which such other Person or any Subsidiary serves as general partner or managing member.

"**Tax**" or "**Taxes**" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, accumulated earnings, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including under the Federal Insurance Contributions Act), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not

3

and (b) any liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another person's taxes as a transferee or successor, by contract or otherwise.

1.2     *Accounting Principles*.  The character or amount of any asset, liability, capital account or reserve and of any item of income or expense to be determined, and any consolidation or other accounting computation to be made, and the construction of any definition containing a financial term, pursuant to this Agreement shall be determined or made in accordance with GAAP, consistently applied, unless such principles are inconsistent with the express requirements of this Agreement.

1.3     *Other Definitional Provisions; Construction*.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement. Unless the context otherwise requires: (i) "or" is disjunctive but not exclusive, (ii) words in the singular include the plural, and in the plural include the singular, (iii) the words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (iv) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement, (v) the word "Section" is a reference to the sections of this Agreement unless otherwise specified and (vi) whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation".  A Default or Event of Default shall "continue" or be "continuing" until such Default or Event of Default has been cured or waived by each Purchaser.  References in this Agreement to any Persons shall include such Persons' successors and permitted assigns.  Other terms contained in this Agreement (which are not otherwise specifically defined herein) shall have meanings provided in Article 9 of the New York Uniform Commercial Code on the date hereof to the extent the same are used or defined therein.

2     ISSUANCE AND SALE OF THE NOTES.

2.1     *Issuance and Delivery of Notes at Closing*.  Upon the terms and subject to the conditions of this Agreement, on the date hereof, at Closing, the Issuer shall issue, sell and deliver to each Purchaser a Note in the principal amount set forth opposite such Purchaser's name on Schedule I hereto, for an aggregate amount equal to the amount set forth opposite such Purchaser's name on Schedule I hereto.

2.2     *The Closing*.  The issuance of the Notes to be issued pursuant to Section 2.1 above on the Closing Date (the "**Closing**") will take place at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 on the date hereof, subject to the satisfaction or waiver of the conditions set forth in Section 6.  The failure to consummate the issuance of the Notes provided for in this Agreement on the date and time and at the place

specified herein will not relieve any party to this Agreement of any obligation under this Agreement.

3    REPAYMENT OF THE NOTES.

3.1    *Interest.* The Issuer covenants and agrees to make cash payments of accrued interest on the principal amount of the Notes, at the rate of eight percent (8.0%) per annum and payable quarterly on the last Business Day of each March, June, September and December, commencing on [   ], 2017 (each such payment date being referred to as an "**Interest Payment Date**"). The Issuer shall pay interest on overdue principal at the rate of ten percent (10.0%) per annum and shall pay interest on overdue installments of interest at the rate of ten percent (10.0%) per annum to the extent lawful. Interest shall be computed on the basis of a 360-day year of twelve 30-day months and shall accrue from and after the date of issuance of the applicable Notes. The parties agree that they will treat the Notes as indebtedness for U.S. federal income tax purposes, except upon a final determination by the applicable taxing authority.

3.2    *Repayment*. The Issuer shall repay to the Holders, on the last Business Day of each March, June, September and December, commencing June [ ], 2017, the unpaid principal amounts of the Notes, in equal quarterly installments from the Closing Date to the Maturity Date (with any partial quarters to be appropriately pro-rated), as set forth on Schedule II (which installments to be reduced in direct order of maturity as a result of the application of prepayments in accordance with Section 3.3). Notwithstanding anything herein the entire unpaid principal balance of each Note shall be due and payable on the Maturity Date.

3.3    *Optional Prepayment.* The Issuer may prepay any or all amounts outstanding under the Notes, upon notice to the Holders as specified in Section 3.5.

3.4    *Mandatory Prepayment*. Following the earliest to occur of (a) a Liquidation Event or (b) a Qualified Public Offering, the Issuer shall prepay in full in cash the outstanding principal amount of the Notes, plus any accrued but unpaid interest thereon.

3.5    *Notice of Prepayment and Other Notices*. The Issuer shall give written notice of any prepayment of any of the Notes or any portion thereof (i) pursuant to Section 3.3 not less than 30 days prior to the date fixed for such prepayment and (ii) pursuant to Section 3.4 not less than five Business Days prior to the date fixed for such prepayment. The Issuer shall give such notice of prepayment and all other notices to be given to the Holders at the address designated for such Holders on the register on the date of mailing such notice of prepayment or other notice. Upon notice of any such prepayment being given as aforesaid, the Issuer shall be irrevocably obligated to prepay, on the date therein fixed for prepayment, the Notes or the portion thereof, as the case may be, so called for prepayment, at the principal amount thereof so called for prepayment, together with interest accrued thereon to the date fixed for such prepayment. A prepayment of less than all of the outstanding principal amount of the Notes shall not relieve the Issuer of its obligation to make scheduled payments of interest in respect of the principal remaining outstanding on any Interest Payment Date.

3.6    *Surrender of Notes; Notation Thereon*.  Upon any prepayment of a portion of the principal amount of the Notes, the Holder, at its option, may require the Issuer to execute and deliver at the expense of the Issuer (except for Taxes or other governmental charges imposed in connection therewith), upon surrender of the Notes, new Notes registered in the name of the Holder or such other Persons as may be designated by the Holder for the principal amount of the Notes then remaining unpaid, dated as of the most recent date to which interest has been paid on the principal amount of the Notes then remaining unpaid (or the date hereof if prior to the first Interest Payment Date), or may present the Notes to the Issuer for notation of the payment of the portion of the principal amount of the Notes so prepaid.

3.7    *Maximum Lawful Rate*.  This Agreement and the Notes are hereby limited by this Section 3.7.  In no event, whether by reason of acceleration of the maturity of the amounts due hereunder or otherwise, shall interest and fees contracted for, charged, received, paid or agreed to be paid to the Holder exceed the maximum amount permissible under such applicable law.  If, from any circumstance whatsoever, interest and fees would otherwise be payable to the Holder in excess of the maximum amount permissible under such applicable law, the interest and fees shall be reduced to the maximum amount permitted under applicable law.  If from any circumstance, the Holder shall have received anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excess of interest shall be applied to the reduction of the principal amount of the Notes, in such manner as may be determined by the Holder, and not to the payment of fees or interest, or if such excessive interest exceeds the unpaid balance of the principal amount of the Notes, such excess shall be refunded to the Issuer.

3.8    *Certain Waivers*.  The Issuer unconditionally waives (a) any rights to presentment, demand, protest or (except as expressly required hereby) notice of any kind, and (b) any rights of rescission, setoff, counterclaim or defense to payment under the Notes or otherwise that the Issuer may have or claim against the Holder.

4    REPRESENTATIONS AND WARRANTIES OF THE ISSUER.

Issuer hereby represents and warrants to each Purchaser that:

4.1    *Existence and Power*.  The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Tennessee. The Issuer has the power and authority necessary to (i) own its properties and assets, (ii) carry on its business as now being conducted and (iii) execute and deliver this Agreement and each of the other agreements, instruments and certificates being executed and delivered in connection with this Agreement (the "**Ancillary Agreements**") to which it is a party, and to perform its obligations hereunder and thereunder, including the issuance, sale and delivery of any and all Notes to be issued and sold by it hereunder.

4.2    *Authorization; Validity*.  The execution and delivery by the Issuer of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the transactions contemplated hereby (including the issuance, sale and delivery of any and all Notes to be sold by it hereunder) and thereby have been duly authorized by all necessary action on the part of the Issuer.  This Agreement has been duly executed and delivered by the

Issuer and each Ancillary Agreement to which the Issuer is a party will be duly executed and delivered by the Issuer on the Closing Date. This Agreement constitutes, and each Ancillary Agreement to which the Issuer is a party, when executed and delivered by the Issuer, on the Closing Date, will constitute, a valid and binding agreement of the Issuer, enforceable against the Issuer in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) with respect to provisions relating to indemnification and contribution, as limited by considerations of public policy and by federal or state securities laws.

4.3    *Authorization of Governmental Authorities*.    Assuming the accuracy of each Purchaser's representations and warranties set forth in Section 5 hereof, no order, license, consent, authorization or approval of, or exemption by, or action by or in respect of, or notice to, or filing or registration with, any governmental body, agency or official is required by or with respect to the Issuer in connection with the execution, delivery and performance by the Issuer of this Agreement or any Ancillary Agreement to which the Issuer is a party except (i) for such filings as may be required under Regulation D promulgated under the Securities Act ("**Regulation D**"), or under any applicable state securities laws, (ii) for such other filings and approvals as have been made or obtained, or (iii) where the failure to obtain any such order, license, consent, authorization, approval or exemption or give any such notice or make any filing or registration would not have a Material Adverse Effect.

4.4    *Noncontravention*.    The execution, delivery and performance by the Issuer of this Agreement and each Ancillary Agreement to which the Issuer is a party, do not and will not (i) violate the Organizational Documents of the Issuer, (ii) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon the Issuer, (iii) violate any contract, agreement, license, lease or other instrument, arrangement, commitment, obligation, understanding or restriction of any kind to which the Issuer is a party or (iv) require any consent or other action by any person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Issuer or to a loss of any benefit to which the Issuer is entitled under any provision of any agreement or other instrument binding upon the Issuer or any of its assets or properties.

4.5    *Subsidiaries*. After giving effect to the transactions contemplated herein, Schedule III hereto will set forth all of the Subsidiaries of the Issuer.

4.6    *Litigation*.    There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Issuer, threatened against or affecting the Issuer before any court or arbitrator or any other governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or any Ancillary Agreement.

4.7    *No Brokers*.    The Issuer will not have any liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

61297716_5

4.8    *[Reserved]*.

4.9    *Issuance of Notes*.  Neither the Issuer nor any person authorized to act on behalf of the Issuer has taken or will take any action that would subject the transactions contemplated by this Agreement to the registration requirements of the Securities Act and, subject to the accuracy of the Purchasers' representations in Section 5 of this Agreement, the issuance of the Notes as contemplated hereunder constitute transactions exempt from the registration and qualification requirements of the Securities Act and all applicable state securities laws.

4.10    *[Reserved]*.

4.11    *Investment Company Act*.  The Issuer is not an "investment company" (as such term is defined or used in the Investment Company Act of 1940, as amended) that is required to be registered under such Act.

4.12    *Collateral Documents*; *Valid Liens.*  The provisions of the Guaranty and Security Agreement, together with such filings and other actions required to be taken by the Guaranty and Security Agreement, are effective to create in favor of the Purchasers, a legal, valid, enforceable and perfected (except for any Collateral located outside the United States) Lien on all right, title and interest of the Holders in the Collateral.

5    <u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS</u>.

Each Purchaser represents and warrants to the Issuer that:

5.1    *Existence*.  Each Purchaser (if not a natural person) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

5.2    *Authorization; Power; Validity*.  The execution and delivery by each Purchaser (if not a natural person) of this Agreement and each Ancillary Agreement to which each Purchaser is a party and the consummation of the transactions contemplated hereby and thereby are within each Purchaser's powers and have been duly authorized by all necessary action on the part of each Purchaser.  This Agreement has been duly executed and delivered by each Purchaser and each Ancillary Agreement to which each Purchaser is a party will be duly executed and delivered by each Purchaser at Closing. This Agreement constitutes, and each Ancillary Agreement to which each Purchaser is a party, when executed and delivered by each Purchaser at Closing, will constitute, a valid and binding agreement of each Purchaser, enforceable against each Purchaser in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) with respect to provisions relating to indemnification and contribution, as limited by considerations of public policy and by federal or state securities laws.

5.3    *Governmental Authorization*.    Assuming the accuracy of the Issuer's representations and warranties set forth in Section 4 above, no order, license, consent, authorization or approval of, or exemption by, or action by or in respect of, or notice to, or

filing or registration with, any governmental body, agency or official is required by or with respect to each Purchaser in connection with the execution, delivery and performance by each Purchaser of this Agreement or any Ancillary Agreement to which each Purchaser is a party except (i) for such filings and notices of sale, if any, as may be required under Regulation D or under any applicable state securities laws, (ii) for such other filings and approvals as have been made or obtained, or (iii) where the failure to obtain any such order, license, consent, authorization, approval or exemption or give any such notice or make any filing or registration would not have a material adverse effect on the ability of each Purchaser to perform each Purchaser's obligations hereunder or thereunder.

5.4     *Noncontravention*.  The execution, delivery and performance by each Purchaser of this Agreement and each Ancillary Agreement to which each Purchaser is a party do not and will not (i) violate, if each Purchaser is not a natural person, the Organizational Documents of each Purchaser, (ii) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon each Purchaser, (iii) violate any contract, agreement, license, lease or other instrument, arrangement, commitment, obligation, understanding or restriction of any kind to which each Purchaser is a party, (iv) require any consent or other action by any Person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of each Purchaser under any provision of any agreement or other instrument binding upon each Purchaser or any of its assets or properties or (v) result in the creation or imposition of any material lien, claim, charge, pledge, security interest or other encumbrance on or with respect to any Notes acquired hereunder.

5.5     *Acquisition for Investment*.  Each Purchaser is acquiring the Notes for investment for each Purchaser's own account and not with a view to, or for sale in connection with, any distribution thereof.

5.6     *Private Placement*.

5.6.1     Each Purchaser's financial situation is such that each Purchaser can afford to bear the economic risk of holding the Notes for an indefinite period of time, and each Purchaser can afford to suffer the complete loss of each Purchaser's investment in the Notes.

5.6.2     Each Purchaser's knowledge and experience in financial and business matters are such that each Purchaser is capable of evaluating the merits and risks of each Purchaser's investment in the Notes or each Purchaser has been advised by a representative possessing such knowledge and experience.

5.6.3     Each Purchaser understands that the Notes acquired hereunder are a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of the Notes and that following the date hereof there will be no public market for the Notes and that, accordingly, it may not be possible for each Purchaser to sell or pledge the Notes, or any interest in the Notes, in case of emergency or otherwise.

5.6.4     Each Purchaser and each Purchaser's representatives, including, to the extent each Purchaser deems appropriate, each Purchaser's legal, professional, financial, tax and other advisors, have reviewed all documents provided to them in connection with each Purchaser's investment in the Notes, and each Purchaser understands and is aware of the risks related to such investment.

5.6.5     Each Purchaser and each Purchaser's representatives have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Issuer and its representatives concerning the Issuer, the terms and conditions of each Purchaser's acquisition of the Notes and related matters and to obtain all additional information which each Purchaser or each Purchaser's representatives deem necessary.

5.6.6     Each Purchaser is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act.

5.6.7     Each Purchaser does not have any plan or intention to sell, exchange, transfer or otherwise dispose of (including by way of gift) any of its Notes immediately after the purchase of the Notes.

5.7     *Absence of Related Litigation*.   There is no action, suit, investigation or proceeding pending against, or to the knowledge of each Purchaser, threatened against or affecting each Purchaser before any court or arbitrator or any other governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or any Ancillary Agreement.

6     <u>CONDITIONS TO CLOSING</u>

6.1     <u>*Conditions to Closing*</u>.

6.1.1     *Conditions to the Obligations of each Purchaser*.  The obligation of each Purchaser to consummate the transactions contemplated hereby is subject to the satisfaction (or waiver) by the Purchasers of the following conditions:

6.1.1.1 The representations and warranties of the Issuer contained in this Agreement shall be true and correct in all material respects.

6.1.1.2  Each of the Ancillary Agreements requested by the Purchasers shall have been executed and delivered by the other parties thereto.

6.1.1.3 Delivery by the Issuer of a certificate of secretary or other officer executed by such Person, providing verification of incumbency and attaching (A) such entities resolutions approving the transactions contemplated by this Agreement and (B) such Person's governing documents.

6.1.1.4 The Issuer, the Company, and the Purchasers shall have entered into the Assignment Agreement, and the transactions contemplated therein shall have been consummated.

10

6.1.2    *Conditions to the Obligations of the Issuer*.  The obligations of the Issuer to consummate the transactions contemplated hereby is subject to the satisfaction (or waiver by the Issuer) of the following conditions:

6.1.2.1 The representations and warranties of each Purchaser contained in this Agreement shall be true and correct in all material respects.

6.1.2.2 The Issuer, the Company, and the Purchasers shall have entered into the Assignment Agreement, and the transactions contemplated therein shall have been consummated.


7    AFFIRMATIVE COVENANTS.

Until the principal of and interest on the Notes and all fees, expenses and other amounts payable under this Agreement and Notes shall have been paid in full, the Issuer covenants and agree that:

7.1    *Financial Statements and Other Information*.  The Issuer will furnish to the Holders:

7.1.1    a certificate of a Financial Officer certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

7.1.2    promptly after obtaining knowledge thereof, written notice of the occurrence of any Default (accompanied by a statement of a Financial Officer or other executive officer of the Issuer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto); and

7.1.3    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Issuer and its Subsidiaries as the Holders may reasonably request;

provided, that the obligations of the Issuer to provide the information required to be provided to any Holder under this Section 7.1 shall be subject to such Holder executing a customary confidentiality agreement in form and substance reasonably satisfactory to the Issuer.

7.2    *Existence; Conduct of Business*.  The Issuer will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, permits, approvals, accreditations, authorizations, licenses, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except where the failure to do so is not reasonably likely to result in a Material Adverse Effect; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 8.1.

11

7.3    *Payment of Taxes*.  The Issuer will, and will cause each of the Subsidiaries to, pay its Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Issuer or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends the enforcement of any lien securing such obligation and (d) the failure to make payment pending such contest is not reasonably likely to result in a Material Adverse Effect.

7.4    *Maintenance of Properties*.  The Issuer will, and will cause each of the Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

7.5    *Insurance*.  The Issuer will, and will cause each of the Subsidiaries to, maintain, with financially sound and reputable insurance companies (which may include self-insurance), insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  The Issuer will furnish to the Holders, upon request of the Required Holders or any representative designated by the Required Holders, information in reasonable detail as to the insurance so maintained.

7.6    *Books and Records; Inspection and Audit Rights*.  The Issuer will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Issuer will, and will cause each of its Subsidiaries to, permit any representatives designated by the Required Holders, upon reasonable prior notice, to visit and inspect its properties during normal business hours, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and independent accountants (provided that the Issuer shall be provided the opportunity to participate in any such discussions with its independent accountants), all at such reasonable times and as often as reasonably requested.

7.7    *Compliance with Laws*.  The Issuer will cause each of its Subsidiaries to comply with all applicable laws, rules and regulations applicable to it or its property, except where the failure to do so, individually or in the aggregate, is not reasonably likely to result in a Material Adverse Effect.

8    <u>NEGATIVE COVENANTS</u>.

Until the principal of and interest on the Notes and all fees, expenses and other amounts payable under this Agreement and Notes shall have been paid in full, the Issuer covenants and agrees that:

8.1    *Fundamental Changes*.  The Issuer will not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, any Person may merge into the Issuer in a transaction in which the surviving entity is a Person organized or existing under the laws of

the United States of America, any State thereof or the District of Columbia and, if such surviving entity is not the Issuer, such Person expressly assumes, in writing, all the obligations the Issuer under this Agreement and the Notes. Nothing in this Agreement shall be deemed to prohibit any Subsidiary from liquidating or dissolving, or merging into or consolidating with any other Subsidiary, so long as the parent entity (in the case of a liquidation or dissolution) or the surviving entity (in the case of a merger or consolidation) is or becomes a Subsidiary upon the consummation of such merger.

9    TRANSFER OF NOTES.

9.1    *Restricted Securities*. Each Purchaser acknowledges that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, and that the Issuer is not required to register the Notes.

9.2    *Legends*. The Issuer may place an appropriate legend on the Notes owned by each Purchaser concerning the restrictions set forth in this Section 9.

9.3    *Transfer of Notes*. Subject to Section 9.2 hereof and any restrictions under applicable law, a Holder may transfer such Note to a new Holder, or may exchange such Note for Notes of different denominations, by surrendering such Note to the Issuer together with written instructions for the issuance of one ore more new Notes specifying the respective principal amounts of each new Note. Subject to Section 9.2 hereof and any restrictions under applicable law, with the prior written consent of the Required Holders, a Holder may transfer such Note to a new Holder, by surrendering such Note to the Issuer duly endorsed for transfer or accompanied by a duly executed instrument of transfer naming the new Holder (or the current Holder if submitted for exchange only), together with written instructions for the issuance of one or more new Notes specifying the respective principal amounts of each new Note and the name of each new Holder and each address therefor. In each case, the Issuer shall simultaneously deliver to such Holder or its designee such new Notes and shall mark the surrendered Notes as cancelled. In lieu of the foregoing procedures, a Holder may, with the prior written consent of the Required Holders, assign a Note (in whole but not in part) to a new Holder by sending written notice to the Issuer of such assignment specifying the new Holder's name and address; in such case, the Issuer shall promptly acknowledge such assignment in writing to both the old and new Holder. The Issuer shall not be required to recognize any subsequent Holder of a Note unless and until the Issuer has received reasonable assurance that all applicable transfer taxes have been paid.

9.4    *Replacement of Lost Notes*. Upon receipt of evidence reasonably satisfactory to the Issuer of the mutilation, destruction, loss or theft of any Notes and the ownership thereof, the Issuer shall, upon the written request of the Holder of such Notes, execute and deliver in replacement thereof new Notes in the same form, in the same original principal amount and dated the same date as the Notes so mutilated, destroyed, lost or stolen; and such Notes so mutilated, destroyed, lost or stolen shall then be deemed no longer outstanding hereunder. If the Notes being replaced have been mutilated, they shall be surrendered to the Issuer; and if such replaced Notes have been destroyed, lost or stolen, such Holder shall furnish the Issuer with an indemnity in writing to save it harmless in respect of such replaced Notes.

9.5    *Register*.    The Issuer shall establish and maintain a separate register (the "**Register**") setting forth the name and address of each Holder, the dates and amount of any payment of principal and interest on the Notes and the unpaid principal and interest amounts owed to each Holder.   The entries in the Register shall be conclusive, absent manifest error, and all parties shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Holder for all purposes of this Agreement, notwithstanding notice to the contrary.    The Issuer shall promptly record any assignment permitted or consented to pursuant to Section 9.3 above in the Register, and no assignment shall be effective unless and until reflected in the Register. This provision shall be construed so that the Notes are at all times maintained in "registered form" within the meaning of the Code and the United States Treasury Regulations promulgated thereunder.

9.6    *No Other Representations Affected.*   Nothing contained in this Section 9 shall limit the full force or effect of any representation, agreement or warranty made herein or in connection herewith to each Purchaser.

## 10   EVENTS OF DEFAULT.

10.1    *Events of Default*.   If any one or more of the following events (each, an "**Event of Default**") occurs and is continuing:

10.1.1    default in the payment of the principal of the Notes when and as the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by acceleration or otherwise; or

10.1.2    default in the payment of any interest or any other amount due under this Agreement or the Notes, when and as the same becomes due and payable, and such default continues for a period of 10 days; or

10.1.3    default in the due observance or performance by the Issuer of any covenant, condition or agreement with respect to the Issuer contained in Section 8; or

10.1.4    default in the due observance or performance by the Issuer of any covenant, condition or agreement contained in this Agreement or the Notes (other than those specified in Sections 10.1.1, 10.1.2 or 10.1.3 above) and such Default continues unremedied for a period of 30 days after written notice thereof from the Required Holders to the Issuer; or

10.1.5    the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any of its Significant Subsidiaries in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar laws, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Issuer or any of its Significant Subsidiaries for any substantial part of any of their respective properties, or ordering the winding-up or liquidation of any of their affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

14

10.1.6    the commencement by the Issuer or any of its Significant Subsidiaries of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar laws, or the consent by any of them to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Issuer or any of its Significant Subsidiaries for any substantial part of their respective properties, or the making by any of them of any assignment for the benefit of creditors, or the failure of the Issuer or any of its Significant Subsidiaries generally to pay its debts as such debts become due; or

10.1.7    one or more judgments for the payment of money in an aggregate amount (in each case to the extent not paid or covered by insurance provided by a carrier who has acknowledged coverage in writing and has the ability to perform) in excess of $5,000,000 is rendered against the Issuer or any of its Significant Subsidiaries, or any combination thereof and the same remains undischarged for a period of 30 consecutive days during which execution is not effectively stayed, or any action is legally taken by a judgment creditor to levy upon assets or properties of the Issuer or any of its Significant Subsidiaries to enforce any such judgment; or

10.1.8    any material provision of the Guaranty and Security Agreement shall for any reason cease to be valid and binding on or enforceable against the Issuer or any Subsidiary of the Issuer that is party thereto or the Issuer or any Subsidiary of the Issuer shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or the Guaranty and Security Agreement shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected;

then, the Required Holders may, at their option, by notice to the Issuer, declare all the Notes to be forthwith due and payable, whereupon the principal of the Notes, together with accrued and unpaid interest thereon, shall become forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Issuer; _provided_, that in any event described in Section 10.1.6 with respect to the Issuer, all the Notes, together with interest accrued thereon, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer.

At any time after any declaration of acceleration as to the Notes has been made as provided in this Section 10.1, the Required Holders may, by notice to the Issuer, rescind such declaration and its consequences, if (a) the Issuer has paid all overdue installments of interest on the Notes and all principal that has become due otherwise than by such declaration of acceleration and (b) all other Defaults and Events of Default under this Agreement and the Notes (other than nonpayments of principal and interest that have become due solely by reason of acceleration) have been remedied or cured or have been waived pursuant to this paragraph; _provided_, that no such rescission will extend to or affect any subsequent Default or Event of Default or impair any right consequent thereon.

15

10.2    *Suits for Enforcement*.  If an Event of Default specified in Section 10.1.1 or 10.1.2 occurs and is continuing or the Notes become immediately due and payable in accordance with this Section, the Holders may proceed to protect and enforce their rights by suit in equity, action at law and/or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement or in aid of the exercise of any power granted in this Agreement, or may proceed to enforce the payment of the Notes or to enforce any other legal or equitable right of the Holders.  In case of any Default under this Agreement, the Issuer will pay to the Holders such amounts as shall be sufficient to cover the costs and expenses of the Holders due to said Default, including, without limitation, collection costs and reasonable attorneys' fees.

## 11    MISCELLANEOUS.

11.1    *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as provided below and pursuant to Section 9.3, no party hereto shall assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other parties hereto. Notwithstanding the foregoing, after the Closing, each Purchaser may assign its rights under this Agreement to any transferee of any Notes so long as, such transfer is made in compliance with the terms of this Agreement.

11.2    *Amendments, Waivers and Consent*.  This Agreement may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively) with (and only with) the written consent of the Required Holders and the Issuer; provided, that no such amendment or waiver may, without the prior written consent of the Holder of each Note then outstanding and affected thereby, (a) reduce the principal of or rate of interest on, any Note, (b) postpone the date fixed for any payment of principal on any Note (other than a deferral or waiver of payment pursuant to Section 3.4) or (c) change the ranking or priority of any Notes relative to any other Note or the percentage of the aggregate principal amount of the Notes the Holders of which shall be required to consent or take any other action under this Section 11.2 or any other provision of this Agreement.  No amendment or waiver of this Agreement will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or thereby impair any right consequent thereon.

11.3    *No Implied Waivers; Cumulative Remedies; Writing Required*.  No delay or failure in exercising any right, power or remedy hereunder shall affect or operate as a waiver thereof; nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.  The rights and remedies hereunder are cumulative and not exclusive of any rights or remedies that each Purchaser or any Holders would otherwise have.  Any waiver, permit, consent or approval of any kind or character of any breach or default under this Agreement or any such waiver of any provision or condition of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.

11.4    *Transfer Taxes*.  All transfer taxes, fees and duties under applicable law incurred in connection with the sale and transfer of the Notes under this Agreement will be borne and

paid by the Issuer (in the case of any transfer of Notes) and the Issuer shall promptly reimburse the Holders for any such tax, fee or duty which any of them is required to pay under applicable law.

11.5    *Reimbursement of Expenses*.  The Issuer shall be obligated to pay or reimburse the Purchasers (and/or affiliates thereof) on demand for all fees and expenses incurred or payable by it (and/or affiliates thereof)  (including, without limitation, reasonable fees and expenses of counsel for each Purchaser (and/or affiliates thereof)), from time to time (a) arising in connection with the negotiation, preparation and execution of this Agreement and/or any Ancillary Agreement and related instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder, (b) relating to any amendments, waivers or consents pursuant to the provisions hereof or thereof, and (c) arising in connection with the enforcement of this Agreement or any such Ancillary Agreement or any collection of the Notes.

11.6    *Holidays*.  Whenever any payment or action to be made or taken hereunder or under the Notes shall be stated to be due on a day which is not a Business Day, such payment or action shall be made or taken on the next following Business Day, and such extension of time shall be included in computing interest or fees, if any, in connection with such payment or action.

11.7    *Notices*.  Any notice or communication required or permitted hereunder shall be in writing and shall be delivered personally, delivered by nationally recognized overnight courier service or sent by certified or registered mail, postage prepaid, or (if a facsimile number is provided) sent by facsimile (subject to confirmation of such facsimile transmission).  Any such notice or communication shall be deemed to have been given (i) when delivered, if personally delivered, (ii) three Business Days after it is deposited with a nationally recognized overnight courier service, if sent by nationally recognized overnight courier service, (iii) the day of sending, if sent by facsimile prior to 5:00 p.m. (EST) on any Business Day or the next succeeding Business Day if sent by facsimile after 5:00 p.m. (EST) on any Business Day or on any day other than a Business Day or (iv) five Business Days after the date of mailing, if mailed by certified or registered mail, postage prepaid, in each case, to the following address or facsimile number, or to such other address or addresses or facsimile number or numbers as such party may subsequently designate to the other parties by notice given hereunder:

if to the Issuer, to it at:

Poplar Healthcare, PLLC
Address: [  ]
Attention: [   ]
Telephone Number: [ ]

If to each Purchaser, to it at:

c/o Metalmark Capital Holdings LLC
1177 Avenue of the Americas

17

New York, NY 10036
Attention: John Richardson
Telephone Number: (212) 823-1920

with a copy to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attention:  Othon A. Prounis and Christopher W. Rile
Facsimile Number: (212) 596-9090
Telephone Number: (212) 596-9000

11.8    *Survival*.    All of the covenants, agreements, representations and warranties contained herein shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.    All obligations relating to indemnification hereunder shall survive any termination of this Agreement and shall continue for the length of any applicable statute of limitations.

11.9    *Governing Law*.    This Agreement, and all claims arising hereunder or relating hereto, shall be governed and construed and enforced in accordance with the laws of the State of New York.

11.10    *Jurisdiction*.    The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby may be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York County, New York, and each of the parties hereby consents to the jurisdiction of such courts in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.    Process in any such suit, action or proceeding may be served on any party anywhere in the world, and each party agrees that, in addition to any method of service of process otherwise permitted by law, service of process on each party may be made by any method for giving such party notice as provided in Section 12.7, and shall be deemed effective service of process on such party.

11.11    *Waiver of Jury Trial*.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.12    *Counterparts; Third Party Beneficiaries*.    This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.    No provision of this

Agreement shall confer upon any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies hereunder.

11.13 *Entire Agreement*.  This Agreement (together with the Ancillary Agreements) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, among the parties with respect to the subject matter hereof.

11.14 *Severability*.  If one or more provisions of this Agreement are finally held to be unenforceable under applicable law, such provision shall be deemed to be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforced in accordance with its terms to the maximum extent permitted by law.

11.15 *Indemnity*.  The Issuer hereby agrees indemnify, defend and hold harmless each Purchaser and its respective officers, directors, employees, managers, partners, members, stockholders, agents and representatives, and their respective successors, assigns, officers, directors, employees, managers, partners, members, stockholders, agents and representatives ("**Indemnified Parties**") in connection with any losses, claims, damages, liabilities and expenses, including reasonable attorneys' fees, to which any such Indemnified Party may become subject (other than as a result of the gross negligence or willful misconduct of any such Person), insofar as such losses, claims, damages, liabilities or liabilities (or actions in respect thereof) arise out of or by reason of any investigation, litigation or other proceedings related to or resulting from any act of, or omission by the Issuer or any officer, director, employee, manager, agent or representative of the Issuer with respect to the transactions contemplated by this Agreement or any Ancillary Agreement and to reimburse the Indemnified Parties, upon demand, for any reasonable legal or other expenses incurred in connection with investigating or defending any such loss, claim, damage, liability, expense or action; provided, that, each Purchaser shall not be entitled to indemnification pursuant to this Section 11.15 in connection with any suit, action or other proceeding brought against each Purchaser by the Issuer insofar as such suit, action or other proceeding arises from a breach by each Purchaser of this Agreement or any Ancillary Agreement.  To the extent that the foregoing undertakings may be unenforceable for any reason, the Issuer agrees to make the maximum contribution to the payment and satisfaction of indemnified liabilities set forth in this Section 11.15 which is permissible under applicable law.

*[Signatures appear on following page]*

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Note Purchase Agreement as of the day and year first above written.

THE ISSUER:                              POPLAR HEALTHCARE, PLLC


By:_____
   Name:
   Title:

\\DC - 088650/000175 - 10035637 v2
61297716_5

THE PURCHASERS:

METALMARK CAPITAL PARTNERS II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS CAYMAN II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS TE II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS II,
EXECUTIVE FUND, L.P.


By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner


By:_____
Name:  Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS II CO-
INVESTMENT, L.P.


By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner


By:_____
Name:  Howard Hoffen
Title:   Partner

MCP (SILO) II AIF, L.P.


By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name:  Howard Hoffen
Title:   Partner

SCHEDULE I

| Name of Purchaser | Principal Amount of Note Issued on [●] (in Dollars) |
|---|---|
| MCP (SILO) II AIF, L.P. | [●] |
| Metalmark Capital Partners II Co-Investment, L.P. | [●] |
| Metalmark Capital Partners II, L.P. | [●] |
| Metalmark Capital Partners TE II, L.P. | [●] |
| Metalmark Capital Partners Cayman II, L.P. | [●] |
| Metalmark Capital Partners II Executive Fund, L.P. | [●] |
| Total | [●][2] |

---

[2] NTD – to be no more than $950,000.

<u>SCHEDULE II</u>

AMORTIZATION SCHEDULE

| <u>Timing</u> | <u>Amount to be paid</u> |
|---|---|
| June 2017 | |
| September 2017 | |
| December 2017 | |
| March 2018 | |
| June 2018 | |
| September 2018 | |
| December 2018 | |

<u>SCHEDULE III</u>

SUBSIDIARIES OF ISSUER

| <u>Subsidiary</u> | Registered <u>Owner</u> | Jurisdiction of Formation | Percentage of <u>Equity Interest</u> |
|---|---|---|---|
| | | | |
| | | | |

<u>EXHIBIT A</u>

FORM OF
8% SECURED NOTE DUE [   ]

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS NOTE HAS BEEN ACQUIRED FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO THE DISTRIBUTION THEREOF. THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND REGISTRATION OR QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL THAT SUCH PROPOSED TRANSFER DOES NOT VIOLATE THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

POPLAR HEALTHCARE, PLLC

8% Secured Note Due [   ]

$[Principal Amount]                                                      [Date of Issuance]

Poplar Healthcare, PLLC, a Tennessee limited liability company (the "**Issuer**"), for value received, hereby promises to pay to [●], or its registered assigns (collectively, the "**Holder**"), the principal sum of [●] DOLLARS ($[●]) with interest thereon on the terms and conditions set forth in the hereinafter defined Amended and Restated Note Purchase Agreement.

Notwithstanding any provision to the contrary in this Note or the Note Purchase Agreement, the Issuer shall not be required to pay, and the Holder shall not be permitted to contract for, take, reserve, charge or receive, any compensation, which constitutes interest under applicable law in excess of the maximum amount of interest permitted by law.

This Note is issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of [   ], 2017 (as amended, restated or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and between the Issuer and each of the Purchasers (as defined therein) from time to time party thereto, and Holder is entitled to the benefits thereof. All capitalized terms used but not defined herein shall have the meanings respectively ascribed to them in the Note Purchase Agreement.  Each Holder of this Note will be deemed, by its acceptance hereof, to have agreed to the provisions and to have made the representations and warranties set forth in Section 5 of the Note Purchase Agreement.

This Note is transferable only by surrender hereof at the principal office of the Issuer, duly endorsed, accompanied by a written instrument of transfer duly executed by the registered

Holder of this Note as shown in the register of the Issuer or as otherwise permitted under the Note Purchase Agreement.

This Note is also subject to mandatory and optional prepayment, in whole or from time to time in part, at the times and on the terms specified in the Note Purchase Agreement, but not otherwise.

Except as provided in Section 3.1 of the Note Purchase Agreement, all payments of amounts due under this Note shall be in such coin or currency of the United States of America as at the time of payment shall be legal tender for payment of public and private debts.

If an Event of Default (as such term is defined in the Note Purchase Agreement) occurs and is continuing, the unpaid principal of this Note may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Note Purchase Agreement.

This Note and the rights and obligations of the parties hereto shall be deemed to be contracts under the laws of the State of New York and for all purposes shall be governed by and construed and enforced in accordance with the laws of said State.

*[Signature page follows.]*

IN WITNESS WHEREOF, this Note is executed and delivered as of the date first set forth above.

POPLAR HEALTHCARE, PLLC

By: _____
     Name:
     Title: