# EXHIBIT A

**$5,116,000**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of March _____, 2017**

**between**

**BOSTWICK LABORATORIES, INC.**

**<u>as Borrower</u>**

**and**

**POPLAR HEALTHCARE, PLLC**

**<u>as Lender</u>**

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01     Certain Defined Terms..........................................................................1
SECTION 1.02     Computation of Time Periods; Other Definitional Provisions ...................8
SECTION 1.03     Accounting Terms.................................................................................8

## ARTICLE II

### AMOUNTS AND TERMS OF THE CREDIT ADVANCES

SECTION 2.01     The Credit Advances.............................................................................8
SECTION 2.02     Conditions to Making the Credit Advances..............................................9
SECTION 2.03     Interest..............................................................................................9
SECTION 2.04     Use of Proceeds.................................................................................10
SECTION 2.05     Evidence of Debt................................................................................10

## ARTICLE III

### SECURITY FOR the loan

SECTION 3.01     Description of Collateral for Loan.........................................................10
SECTION 3.02     Perfection of Security Interests in the Collateral ......................................11

## ARTICLE IV

### CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 4.01     Conditions Precedent .........................................................................12
SECTION 4.02     Conditions Precedent to Advance.........................................................12
SECTION 4.03     Determinations Under Section 4.01 ......................................................13

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

SECTION 5.01     Representations and Warranties of the Borrower ......................................13

## ARTICLE VI

### AFFIRMATIVE COVENANTS

SECTION 6.01     Compliance with Laws, Etc ................................................................16
SECTION 6.02     Payment of Taxes, Etc ......................................................................16
SECTION 6.03     Compliance with Environmental Laws...................................................16

i

SECTION 6.04    Maintenance of Insurance ...............................................................16
SECTION 6.05    Preservation of Corporate Existence, Etc ...............................................16
SECTION 6.06    Visitation Rights ...............................................................................17
SECTION 6.07    Keeping of Books ...............................................................................17
SECTION 6.08    Maintenance of Properties, Etc ...............................................................17
SECTION 6.09    Further Assurances ...............................................................................17
SECTION 6.10    Performance of Loan Documents ...............................................................17
SECTION 6.11    Healthcare Matters ...............................................................................17
SECTION 6.12    Compliance with Terms of Leaseholds ...............................................................18
SECTION 6.13    Performance of Material Contracts ...............................................................18
SECTION 6.14    Bankruptcy Actions ...............................................................................18

ARTICLE VII

NEGATIVE COVENANTS

SECTION 7.01    Liens, Etc ...............................................................................18
SECTION 7.02    Debt ...............................................................................19
SECTION 7.03    Change in Nature of Business ...............................................................19
SECTION 7.04    Mergers, Etc ...............................................................................19
SECTION 7.05    Sales, Etc. of Assets ...............................................................................19
SECTION 7.06    Restricted Payments ...............................................................................19
SECTION 7.07    Amendments of Constitutive Documents ...............................................................19
SECTION 7.08    Accounting Changes ...............................................................................19
SECTION 7.09    Negative Pledge ...............................................................................19
SECTION 7.10    Amendment, Etc., of Material Contracts ...............................................................19
SECTION 7.11    Budget ...............................................................................19
SECTION 7.12    Return of Collateral ...............................................................................20
SECTION 7.13    Critical Vendor and Other Payments; Certain Receipts ...............................................................20
SECTION 7.14    Exercise of Remedies ...............................................................................20
SECTION 7.15    Bankruptcy Related Negative Covenants ...............................................................20
SECTION 7.16    [Intentionally Omitted] ...............................................................................21

ARTICLE VIII

REPORTING COVENANTS

SECTION 8.01    Default Notice ...............................................................................21
SECTION 8.02    Material Contracts ...............................................................................21
SECTION 8.03    Budget ...............................................................................21
SECTION 8.04    Litigation ...............................................................................21
SECTION 8.05    Agreement Notices ...............................................................................22
SECTION 8.06    Environmental Conditions ...............................................................................22
SECTION 8.07    Bankruptcy Reports ...............................................................................22
SECTION 8.08    Other Information ...............................................................................22

ARTICLE IX

EVENTS OF DEFAULT

SECTION 9.01     Events of Default ..................................................................................22

ARTICLE X

MISCELLANEOUS

SECTION 10.01    Amendments, Etc ...............................................................................25
SECTION 10.02    Notices, Etc ......................................................................................25
SECTION 10.03    No Waiver; Remedies ........................................................................25
SECTION 10.04    [Intentionally Omitted] ......................................................................25
SECTION 10.05    Binding Effect ...................................................................................25
SECTION 10.06    Execution in Counterparts .................................................................25
SECTION 10.07    Confidentiality ..................................................................................25
SECTION 10.08    Release of Collateral .........................................................................26
SECTION 10.09    Patriot Act Notice .............................................................................26
SECTION 10.10    Jurisdiction, Etc ................................................................................26
SECTION 10.11    Governing Law ..................................................................................26
SECTION 10.12    Waiver of Jury Trial ..........................................................................26
SECTION 10.13    Release ..............................................................................................27
SECTION 10.14    Financing Order .................................................................................27

SCHEDULES

Schedule 5.01(f)            Borrower Compliance

EXHIBITS

Exhibit A            Initial Budget

Exhibit B            Form of Post-Petition Note

Exhibit C            Form of Interim Financing Order

Exhibit D            Form of Borrowing Notice

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of March \_\_\_\_, 2017 between Bostwick Laboratories, Inc., a Delaware corporation (the ***"Borrower"*** or ***"Debtor"***) and Poplar Healthcare PLLC, a Tennessee professional limited liability company ( the "**Lender**").

## PRELIMINARY STATEMENTS:

WHEREAS, on March \_\_, 2017 (the ***"Petition Date"***), Debtor filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the ***"Bankruptcy Court"***) initiating its case (the ***"Bankruptcy Case"***) that is pending under Chapter 11 of Title 11 of the United States Code (the ***"Bankruptcy Code"***) and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Debtor requires financing in an amount necessary to satisfy (the outstanding balance of the Pre-Petition Loan of Capital One),to fund the Debtor's normal business operations during the Bankruptcy Case pending the Section 363 sale of substantially all of its assets ("the ***Asset Sale***"), the "wind down" of the Business, and to fund the administrative costs of the Chapter 11 Case (collectively, the "***Post-Petition Funding Obligations***");

WHEREAS, Debtor has requested that Lender provide a secured multiple draw term loan credit facility of up to $5,116,000.00 ("***Stated Principal Amount***") to fund Post-Petition Funding Obligations and Lender is willing to extend such financing to the Debtor, on the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Bankruptcy Case, Debtor has requested that the Lender provide up to an aggregate amount of $5,116,000.00 in a credit facility pursuant to a senior secured priming debtor-in-possession credit agreement (together with all other transactions contemplated thereby, the ***"DIP Facility"***);

WHEREAS, Lender is committing hereby to provide post-petition financing in an amount necessary to fund the Post-Petition Funding Obligations as set forth in an agreed-upon budget submitted by Debtor and acceptable to Lender, in an amount not more than the Stated Principal Amount, pursuant to the DIP Facility upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"***Agreement***" means this debtor-in-possession credit agreement, as amended.

**"Bankruptcy Case"** has the meaning specified in the Preliminary Statements.

**"Bankruptcy Code"** the meaning specified in the Preliminary Statements.

**"Bankruptcy Court"** has the meaning specified in the Preliminary Statements.

**"Borrower"** has the meaning specified in the recital of parties to this Agreement.

**"Borrower's Account"** means the account of the Borrower specified by the Borrower in writing to the Lender from time to time with no less than one (1) Business Days prior written notice.

**"Budget"** means, as of any date, the Initial Budget or the updated Budget delivered pursuant to Section 2.01(a), as applicable, most recently delivered to and approved by the Lender on or prior to such date.

**"Capital Expenditures"** means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person or have a useful life of more than one year plus (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

**"Capital One Obligations"** means the "Obligations" as such term is defined in that certain Credit Agreement dated as of September 17, 2012 (as may have been amended, restated, or otherwise modified and in effect as of the date hereof) by and among Bostwick Laboratories Holdings, Inc. and Bostwick Laboratories, Inc., as the borrowers, the other persons party thereto that are designated as "Credit Parties," General Electric Capital Corporation as lender and as agent for the lenders thereto, and the other financial institutions party thereto.

**"Carve Out"** has the meaning specified in the Financing Order.

**"Closing Date"** means the date upon which the Post-Petition Note is executed.

**"CMS"** has the meaning specified in Section 5.01(v).

**"Code'"** means the United States Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

**"Collateral"** means all **"Collateral"** referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of any or all of the Secured Parties.

**"*Collateral Documents*'"** means the Security Agreement and each of the collateral documents, instruments and agreements delivered pursuant to <u>Section 5.09</u>, and each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

**"*Committee*"** has the meaning specified in the Financing Order.

**"*Communications*'"** has the meaning specified in Section 12.02(b).

**"*Confidential Information*'"** means information that Borrower furnishes to Lender in a writing designated as confidential, but does not include any such information that is or becomes generally available to the public or that is or becomes available to Lender from a source other than the Borrower.

**"*Credit Advance*"** has the meaning specified in Section 2.01.

**"*Debt*"** of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Obligations of such Person in respect of Hedge Agreements, (i) all Guaranteed Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

**"*Default*"** means any Event of Default or any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

**"*Default Interest Rate*"** has the meaning set forth in Section 2.03(b).

**"*DIP Facility*"** has the meaning specified in the Preliminary Statements.

**"*Environmental Action*"** means any action, suit, demand, demand letter, claim, notice of noncompliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory

authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

*"Environmental Law"* means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

*"Estate Professionals"* means any professional, claims agent, or other Person employed in the Bankruptcy Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

*"Events of Default"* has the meaning specified in Section 9.01.

*"Final DIP Facility Amount"* means a maximum aggregate commitment of $5,116,000.00.

*"Final Order"* means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to the Lender in its sole discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of Lender in its sole discretion).

*"Financing Order"* means the Interim Order or, when applicable, the Final Order.

*"GAAP"* has the meaning specified in Section 1.03.

*"Governmental Authority"* means the government of the United States of America, but not CMS as payor, or the United States of America as creditor or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Governmental Authorization"* means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any

*"Healthcare Law"* means:

(a) all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters primarily relating to patient

healthcare, healthcare providers and healthcare services, including but not limited to Title XIX (Medicaid Program) of 42 U.S.C.;

(b)      the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b), (ii) the Stark Law (42 U.S.C. §1395nn and §1395(q)), (iii) the civil False Claims Act (31 U.S.C. §3729 et seq.), (iv) Sections 1320a-7a and 1320a-7b of Title 42 of the United States Code, (v) applicable state statutes similar to any of the foregoing and (vi) the regulations promulgated pursuant to such federal and state statutes;

(c)      the federal Food, Drug & Cosmetic Act (21 U.S.C. §§301 et seq.) and the regulations promulgated pursuant thereto;

(d)      the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated pursuant thereto;

(e)      laws, rules and regulations governing Medicaid and SCHIP Programs;

(f)      the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) and the regulations promulgated pursuant thereto;

(g)      quality, safety and accreditation standards and requirements of all applicable federal, state or local laws or regulatory bodies relating to ownership, management or operation of a dental practice, or assets used in connection therewith;

(h)      any applicable law relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, any and all of the foregoing; and

(i)      any and all other applicable healthcare laws, regulations, manual provisions, policies and administrative guidance having the force of law with respect to each of clause (b) through (h) above, as may be amended from time to time.

*"Initial Budget"* means a detailed receipts and disbursements forecast, for the 13-week period immediately following the Closing Date, of the Borrower in form and substance satisfactory to the Lender, a copy of which is attached as Exhibit A.

*"Interim Financing Order"* means the order of the Bankruptcy Court entered at the initial emergency hearing in the Bankruptcy Case, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion), a copy of which draft order is attached as Exhibit C.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

**"Lender"** means Poplar Healthcare, PLLC, a Tennessee professional limited liability company.

**"Lien"** means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional.

**"Loan"** means the loan made by Lender to Borrower pursuant to Article II hereof as evidenced by the Post-Petition Note in the amount up to $5,116,000.00, a copy of which is attached as Exhibit B.

**"Loan Documents"** means (i) this Agreement and (ii) the Post-Petition Note, in each case as amended.

**"Material Adverse Effect"** means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Borrower, taken as a whole, (b) the rights and remedies of Lender under any Loan Document or (c) the ability of any Borrower, taken as a whole, to perform its Obligations under the Loan Documents other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or to the conduct of the sale process contemplated by this Asset Purchase Agreement and/or the Bid Procedures Order..

**"Medicaid"** means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**"Medicare"** means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**"Obligation"** means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured. Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Borrower under any Loan Document and (b) the obligation of Borrower to reimburse any amount in respect of any of the foregoing that Lender, in its sole discretion, may elect to pay or advance on behalf of Borrower.

**"Operating Business"** means the business of providing anatomic pathology laboratory services to physicians and other healthcare providers.

**"Outside Date"** means the date that is 90 days following the Closing Date (unless extended by one optional 30-day extension at the request of the Borrower, and in the sole discretion of Lender).

**"Patriot Act"** means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

**"Permitted Liens"** means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) prepetition Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 6.02; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business that (i) are not overdue for a period of more than 30 days; (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (iii) are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, or (iv) as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; and (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations.

**"Person"** means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Authority.

**"Petition Date"** has the meaning specified in the Preliminary Statements.

**"Post-Petition Note"** means that certain promissory note to be executed by Borrower evidencing the Loan in in the amount up to $5,116,000.00.

**"Requirement of Law"** means, as to any Person, any law (statutory or common), ordinance, treaty, rule, Governmental Authorization, Permit, regulation, order, policy, or other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including, without limitation, any Healthcare Law.

**"Secured Obligations"** means the Obligations under the Loan Documents secured by the lien created in favor of Lender pursuant to Section 3.01.

**"Secured Party"** means Lender.

**"Security Agreement"** has the meaning specified in Section 3.01(a)(ii).

**"Stalking Horse Agreement"** has the meaning specified in Section 9.01(s).

**"Taxes"** has the meaning specified in Section 2.11.

"**_Termination Date_**" means the earliest of (i) the Outside Date, (ii) the date that is 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or before such date, (iii) May 30, 2017, and (iv) the date of termination in whole of the this commitment, pursuant to Section 9.01.

SECTION 1.02    Computation of Time Periods; Other Definitional Provisions.    In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03    Accounting Terms.    All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles ("GAAP").

# ARTICLE II

## AMOUNTS AND TERMS OF THE CREDIT ADVANCES

SECTION 2.01    The Credit Advances.    Subject to the terms and conditions set forth in the Post-Petition Note evidencing the Loan, Lender shall make advances to Borrower as follows (each individually a "Credit Advance" and collectively, the "Credit Advances"):

(a)    on the day of entry of the Interim Financing Order (the "Initial Advance"), in the amount of $3,323,000.00 to (A) to satisfy the Capital One Obligations plus (B) provide the funding requirements as set forth in the Budget for week one and two of the Budget attached hereto as Exhibit A as may be modified from time to time by the Borrower with the consent of the Lender in its sole discretion; and

(b)    Except with respect to the Initial Advance, which shall be automatically funded by the Lender not later than the first business day after entry of the Interim Financing Order, by noon prevailing eastern time on the business day immediately prior to a Funding Date, Borrower shall give Lender written notice of its request for a Credit Advance and shall specify the Funding Date (which must be the immediately subsequent business day) and the amount of the requested Credit Advance (a "Borrowing Notice"). After the Initial Advance, Borrower may make request for the next Credit Advance upon entry of the final Financing Order.  The Borrowing Notice shall include (a) a calculation of the requested Credit Advance amount including reasonable detail regarding the cash on hand included in the calculation and the projected Disbursements for the borrowing period, (b) an updated Budget including actuals for prior periods, and (c) a calculation of any variance from the Budget. The Borrowing Notice shall also be accompanied by a comparison of actual weekly receipts to those set forth in the Budget. The obligation of Lender to fund is subject to Section 2.02 hereof.  Lender shall make each properly authorized Credit Advance in immediately available funds by wire transfer to an account

designated by Borrower, as soon as practicable, but in no event later than the noon prevailing eastern time on the applicable Funding Date.

(c)     The final Borrowing Notice (the "<u>Final Borrowing Notice</u>") shall include the amount of accrued fees estimated to be due and owing to the Estate Professionals, pursuant to further order of the Court, including such allowed fees to be paid after the consummation of the Asset Sale and the funds budgeted for the wind down of Debtor's business. The accrued fees to be funded under the DIP Facility may not exceed amounts budgeted under the Budget for each respective Estate Professional and for the wind down of the business. Lender will fund the amounts sought under the Final Borrowing Notice from balance remaining of the Stated Principal Amount after deduction of the prior Credit Advances. Such amounts shall be held in escrow by counsel for Debtor, or subsequently, a distribution agent, in a segregated account, payable only upon further fee order from the Court.

SECTION 2.02     <u>Conditions to Making the Credit Advances</u>.  Lender shall not be obligated to make any Credit Advance (including the initial Loan hereunder), or to take, fulfill, or perform any other action hereunder, unless the following conditions are satisfied as of the making of such Credit Advance, in Lender's reasonable discretion, or waived in writing by Lender in its sole discretion:

(a)     The Post-Petition Note, together with any additional agreements, documents, instruments and certificates executed and any orders in connection therewith, or otherwise delivered in connection therewith by the Borrower (collectively, the "<u>Post-Petition Documents</u>") shall have been executed or entered, as applicable, and delivered, if applicable, in form and substance acceptable to Lender and shall be in full, force and effect.

(b)     The applicable Budget shall have been approved in writing by Lender.

(c)     Lender shall have received a copy of the applicable Financing Order, and such Financing Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Lender in its sole discretion, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(d)     No event shall have occurred and be continuing, or would result from the Credit Advance requested thereby, which, with the giving of notice or the passage of time or both, would constitute an Event of Default and no Event of Default shall be continuing.

(e)     Borrower shall have timely delivered a Borrowing Notice related to such Credit Advance, other than the Initial Advance, which shall be substantially in the form set forth in Exhibit D hereof.

(f)     The aggregate principal and amount of all Credit Advances extended shall not exceed the Stated Principal Amount.

SECTION 2.03     <u>Interest</u>. (a) The Post-Petition Note shall bear interest on the unpaid principal amount thereof plus all obligations owing to, and rights of Lender pursuant to the Post-Petition Note, including without limitation, all interest accruing thereon, together with

fees, and costs as provided under the Post-Petition Note (collectively, the "Post-Petition Obligations") from the Closing Date to and including the Maturity Date at a fixed rate per annum equal to eight percent (8%), calculated on the basis of a 360-day year for the actual number of days elapsed.

(b)     Accrued, unpaid interest on the Post-Petition Note shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default, the Post-Petition Obligations shall bear interest at a rate equal to the interest rate set forth in subsection 2.03(a) above plus two percent (2%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate")

(c)     Interest shall be payable, in cash, upon prepayment of any portion of the Post-Petition Obligations, on the Maturity Date, or upon payment in full of the Loan.

(d)     Notwithstanding anything to the contrary set forth in this Section 2.03, if a court of competent jurisdiction determines in a Final Financing Order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

(e)     Except as otherwise set forth herein or in the Financing Order, the Post-Petition Obligations shall be due and payable on the earlier to occur of (i) the date of the Closing of the Asset Sale; (ii) May 30, 2017 (the "Maturity Date"); or (iii) upon acceleration of the Post-Petition Note pursuant to the terms hereof.

SECTION 2.04     Use of Proceeds.   The proceeds of the Credit Advances shall be available solely to provide funding in an amount necessary to satisfy(the outstanding balance of the Pre-Petition Loan of Capital One), fund the Debtor's normal business operations during the Bankruptcy Case pending the Asset Sale and the "wind down" of the business, and to fund the administrative costs of the Chapter 11 Case in accordance with the Budget.

SECTION 2.05     Evidence of Debt.   Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Credit Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

**ARTICLE III**
**SECURITY FOR THE LOAN**

SECTION 3.01     Description of Collateral for Loan.   To induce the Lender to make the Credit Advances, Borrower hereby grants to Lender, as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of the Post-Petition Obligations, a continuing first priority lien and security interest (subject only to the Carve- Out and Permitted Liens); in and to all assets of the Debtor (collectively the "Collateral") whether owned, leased or otherwise possessed, to which the Debtor now has or at any time in the future may acquire any right, title or interest (capitalized terms used in clause (a) through (n) shall have

the meanings provided for such term in the Uniform Commercial Code in effect on the date hereof in the State of Delaware (the "UCC")):

     (a)     all Accounts;

     (b)     all Chattel Paper;

     (c)     all Deposit Accounts, including any monies or other property held therein;

     (d)     all Documents;

     (e)     all Equipment;

     (f)     all General Intangibles, including all intellectual property, including any trademarks or tradenames, and any licenses;

     (g)     all Instruments;

     (h)     all Inventory;

     (i)     all books and records pertaining to the Debtor, its business and any property described herein;

     (j)     all other goods and personal property of the Debtor and/or the Estate, whether tangible or intangible, wherever located, including money, letters of credit and all rights of payment or performance under letters of credit;

     (k)     to the extent not otherwise included, all monies and other property of any kind which is received by the Estate in connection with any refunds with respect to taxes, assessments and other governmental charges;

     (l)     all insurance claims with the exception of claims under or against the Debtors' directors' and officers' liability insurance policy; and

     (m)     to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any proceeds of insurance, indemnity, warranty or guaranty payable to the Estate from time to time with respect to any of the foregoing.

     SECTION 3.02     Perfection of Security Interests in the Collateral.  The Financing Order shall provide for the perfection, maintenance, protection, and enforcement of the Lender's security interest in the Collateral without further action of Lender. Upon the request of the Lender, Borrower shall deliver to the Lender those Loan Documents necessary or desirable to perfect the Lender's lien. Upon reasonable request of the Lender, Borrower shall take such other reasonable steps as are deemed necessary or desirable to maintain the Post-Petition Lender's security interest in the Collateral.  To the extent required of Lender, Debtor hereby authorizes the Lender to execute and file financing statements or continuation statements, and amendments thereto, on the Debtor's  behalf covering the Collateral.

## ARTICLE IV
## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 4.01     Conditions Precedent.  In addition to the requirements set forth in Section 2.02, Section 2.01 of this Agreement shall become effective on and as of the first date (the "Closing Date") on which the following conditions precedent have been satisfied:

(a)     Certified copies of the resolutions of the Board of Directors (or equivalent) of Borrower approving the DIP Facility and each Loan Document to which it is or is to be a party and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the DIP Facility and each Loan Document to which it is or is to be a party.

(b)     A certificate of the Secretary or an Assistant Secretary of Borrower certifying the names and true signatures of the officers of Borrower authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(c)     The Interim Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of Lender in its sole discretion).

(d)     Lender shall have received the Initial Budget, dated no more than seven days prior to the Petition Date and covering the period of the first 13 weeks after the Closing Date, in form and substance satisfactory to Lender.

(e)     Within 15 days after the Closing Date, Borrower shall have delivered evidence of the insurance, in form and substance satisfactory to Lender, as required by the terms of the Security Agreement.

SECTION 4.02     Conditions Precedent to Advance.  The obligation of Lender to make an Advance (on the occasion of each Advance (including the initial Advance)) shall be subject to the further conditions precedent that on the date of such Advance:

(a)     the following statements shall be true:

(i)     the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Advance, in which case as of such specific date;

(ii)     Borrower is in compliance in all material respects with the Budget most recently delivered to and approved by Lender;

(iii)     no Default or Event of Default has occurred and is continuing or would result from such Advance or from the application of the proceeds therefrom; and

SECTION 4.03    Determinations Under Section 4.01.  For purposes of determining compliance with the conditions specified in Section 4.01, Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless an officer of Lender responsible for the transactions contemplated by the Loan Documents prior to the Closing Date specifies its objection thereto to Borrower.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

SECTION 5.01    Representations and Warranties of the Borrower.  The Borrower represents and warrants as follows:

(a)    Borrower (i) is duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) is qualified as a foreign corporation or company in any other jurisdiction in which such qualification is required, except as could not reasonably be expected to have a Material Adverse Effect and (iii) subject to the Financing Order, has all requisite corporate, limited liability company or limited partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted).

(b)    Subject to the Financing Order, the execution, delivery and performance by Borrower of each Loan Document to which it is or is to be a party, and the consummation of the DIP Facility, are within Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene Borrower's charter, bylaws or other constituent documents, or (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award.

(c)    Other than the Financing Order, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by Borrower of any Loan Document to which it is or is to be a party, or for the consummation of the DIP Facility, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof), except for the authorizations, approvals, actions, notices and filings required to perfect security interests under the Loan Documents.

(d)    This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by Borrower.  Subject to the entry of the Interim Financing Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

(e)     Upon entry of the Financing Order, all filings and other actions necessary or desirable to perfect and protect the security interest in the Collateral created under the Collateral Documents have been duly made or taken and are in full force and effect, and the Collateral Documents create in favor of the Collateral Agent for the benefit of Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken. Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(f)     Except as set forth on Schedule 5.01(f) hereto or as disclosed in a signed writing delivered by the Borrower to Lender on or within nine months prior to the date of this Agreement:

(i)     Borrower is in compliance in all material respects with all Healthcare Laws applicable to it, its products and its properties or other assets or its Operating Business, including its provision of professional services, except as would not reasonably be expected to have a Material Adverse Effect.

(ii)     Borrower has in effect all necessary and material Permits and Accreditations, including, without limitation, all Permits and Accreditations necessary for it to own, lease or operate its properties and other assets and to carry on its Operating Business, including its provision of professional services, as presently conducted. All such Permits and Accreditations are valid and in full force and effect and there is no default under, or violation of, any such Permits or Accreditations, except as would not reasonably be expected to have a Material Adverse Effect. No action, demand, requirement or, to Borrower's knowledge, investigation by any Governmental Authority and no suit, action or proceeding by any other person, in each case with respect Borrower, or any of its respective properties or other assets relating to the provision of professional services under any Requirements of Law, is pending or, to Borrower's knowledge, threatened, except as would not reasonably be expected to have a Material Adverse Effect.

(iii)     Neither Borrower nor any officer, Affiliate, Subsidiary, employee or agent of Borrower has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact required to any Governmental Authority, or committed an act, made a statement of a material fact, or failed to make a statement of a material fact related to the Operating Business, including its provision of professional services, that, at the time such disclosure was made, would reasonably be expected to constitute a violation of any Healthcare Law, except as would not reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any officer, affiliate, employee or agent of Borrower (in their capacity as such acting on behalf of Borrower), has made any untrue statement of material fact regarding claims incurred but not reported, that, at the time such material statement was made, would reasonably be expected to constitute a violation of any Healthcare Law, except as would not reasonably be expected to have a Material Adverse Effect.

(iv) To the Borrower's knowledge, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any material investigation, suit, claim, audit (except in the ordinary course), action (legal or regulatory) or proceeding (legal or regulatory) by a Governmental Authority against any Borrower that would reasonably be expected to have a Material Adverse Effect.

(v) To the extent required by any Governmental Authority to engage in the Operating Business as presently conducted, Borrower currently maintains certifications by the Centers for Medicare & Medicaid Services (***"CMS"***), except where the failure to have such Governmental Authorization would not reasonably be expected to have a Material Adverse Effect. To the extent required by any Governmental Authority to engage in the Operating Business as presently conducted Borrower is duly certified and authorized to provide services under Medicaid programs and is eligible for reimbursement thereunder, except where the failure to have such Governmental Authorization would not reasonably be expected to have a Material Adverse Effect.

(vi) Except as would not reasonably be expected to have a Material Adverse Effect, there are no judgments, lawsuits, actions, proceedings, claims, complaints, injunctions, orders or, to Borrower's knowledge, investigations pending, or to Borrower's knowledge, threatened (either orally or in writing) against Borrower by or before any Governmental Authority with respect to the Medicaid program. Within the past three (3) years, Borrower has not received any written notice or other communication from any Governmental Authority regarding any actual or alleged violation in any material respect of, or failure to comply in any material respect with, any of the requirements of any applicable Healthcare Laws (excluding any such actual or alleged violation or failure to comply that was resolved pursuant to the settlements with the Department of Justice (the ***"DOJ Settlement"***), except as would not reasonably be expected to have a Material Adverse Effect.

(vii) Borrower is in compliance in all material respects with the DOJ Settlement.

(viii) Borrower has timely filed all material filings, reports, billings and claims required to be filed in accordance with governmental and private programs, with third party administrators and state programs and other insurance carriers and all such filings, reports, billings and claims are complete and accurate in all material respects and have been prepared in compliance in all material respects with all applicable Healthcare Laws, rules and regulations governing reimbursement and payment of claims, except in each case as would not reasonably be expected to have a Material Adverse Effect. Borrower has paid, is paying in the ordinary course of business or has caused to be paid all known and undisputed refunds, overpayments or adjustments relating to the Operating Business, and, there are no pending appeals, adjustments, challenges or audits of any such reports, billings or claims, except in each case as would not reasonably be expected to have a Material Adverse Effect.

(g)     Priority of Borrower's Obligations and Lender's Liens.  Upon entry of the Financing Order Borrower has granted to Lender, perfected security interests in all Collateral with the priority required by the Financing Order with respect to all Collateral.

(h)     The Interim Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Required Lenders).

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid, except as excused or limited by the Bankruptcy Code or an order of the Bankruptcy Court, the Borrower will:

SECTION 6.01     Compliance with Laws, Etc.  Comply in all material respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and Healthcare Laws.

SECTION 6.02     Payment of Taxes, Etc.  Pay and discharge, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, however, that Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that (x) arose prior to the Petition Date or (y) is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until (with respect to (y)) any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

SECTION 6.03     Compliance with Environmental Laws.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; and obtain and renew all Environmental Permits necessary for its operations and properties in accordance with the requirements of all Environmental Laws.

SECTION 6.04     Maintenance of Insurance.  Maintain insurance (including, without limitation, medical malpractice insurance to the extent applicable to Borrower) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates.

SECTION 6.05     Preservation of Corporate Existence, Etc.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; provided that Borrower shall not be required to preserve any right, permit, license, approval, privilege or franchise if the Board of Directors (or equivalent) of the Borrower shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and that the loss thereof is not disadvantageous in any material respect to the Borrower or Lender.

SECTION 6.06    Visitation Rights.  At any reasonable time during normal business hours, and at Lender's expense, and from time to time, permit Lender, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of Borrower, and to discuss the affairs, finances and accounts of Borrower the Chief Restructuring Officer.

SECTION 6.07    Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time.

SECTION 6.08    Maintenance of Properties, Etc.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 6.09    Further Assurances.  (a) Promptly upon request by Lender correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and

(b)    Promptly upon request of Lender do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as Lender may reasonably require from time to time, including, without limitation, any Intellectual Property Security Agreements, perfection certificates, insurance policy endorsements, landlord consents, collateral assignments in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Party the rights granted or now or hereafter intended to be granted to the Secured Party under any Loan Document or under any other instrument executed in connection with any Loan Document to which Borrower is or is to be a party.

SECTION 6.10    Performance of Loan Documents.  Perform and observe all of the terms and provisions of each Loan Document to be performed or observed by it, maintain each Loan Document in full force and effect, enforce such Loan Document in accordance with its terms, take all such action to such end as may be from time to time requested by the Lender and, upon request of Lender, make to each other party to each such Loan Document such demands and requests for information and reports or for action as Borrower is entitled to make under such Loan Document.

SECTION 6.11    Healthcare Matters.  Notify Lender of (i) any receipt by Borrower of notice of, or Borrower's knowledge of any investigation or audit, or pending or threatened proceedings relating to, any material violation by Borrower of any Healthcare Law, including, (A) any investigation or audit or proceeding involving violation of any of the Medicare and/or

Medicaid fraud and abuse provisions and (B) any criminal or civil investigation initiated, claim filed or disclosure required by the Office of the Inspector General, the Department of Justice, CMS, or any other Governmental Authority; or (ii) any receipt by Borrower of a written recommendation from any Governmental Authority that Borrower should have its permit, licensure, provider or supplier number or accreditation suspended, revoked, or limited in any material way or have its eligibility to participate in Medicaid or any other government program, or to accept assignments or rights to reimbursement under Medicaid or any other government program regulations suspended, revoked, or limited in any material way.

SECTION 6.12     Compliance with Terms of Leaseholds.  Make all payments and otherwise perform all material obligations in respect of all leases of real property to which the Borrower is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Case or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

SECTION 6.13     Performance of Material Contracts.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by Lender and, upon request of Lender, make to each other party to each such Material Contract such demands and requests for information and reports or for action Borrower is entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Case or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

SECTION 6.14     Bankruptcy Actions.  The Borrower shall at all times use its commercially reasonable best efforts to timely comply with the requirements contained in the Financing Order.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid:

SECTION 7.01     Liens, Etc.  From and after the Petition Date, the Borrower will not create, incur, assume or suffer to exist any Lien on or with respect to any of its or their properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction, a financing statement that names Borrower as debtor, or sign or suffer to exist any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except the Borrower may create or incur (i) Liens under the Collateral Documents and (ii) Permitted Liens.

SECTION 7.02        Debt.  From and after the Petition Date, the Borrower will not create, incur, assume or suffer to exist any Debt, except:

(a)        Debt under the Loan Documents; and

(b)        Debt incurred in the ordinary course of business.

SECTION 7.03        Change in Nature of Business.  Borrower will not make any material change in the nature of its business as carried on at the date hereof.

SECTION 7.04        Mergers, Etc.  Borrower will not make, or permit any of its Subsidiaries to merge into or consolidate with any Person or permit any Person to merge into it.

SECTION 7.05        Sales, Etc. of Assets.  Except in connection with sales in the ordinary course of business, Borrower will not sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets except as authorized by order of the Bankruptcy Court.

SECTION 7.06        Restricted Payments.  Borrower will not declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such or issue or sell any Equity Interests or accept any capital contributions.

SECTION 7.07        Amendments of Constitutive Documents.  Borrower will not amend its certificate of incorporation or bylaws or other constitutive documents.

SECTION 7.08        Accounting Changes.  Borrower will not make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

SECTION 7.09        Negative Pledge.  Borrower will not enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except agreements in favor of Lender or agreements entered into prior to the Petition Date.

SECTION 7.10        Amendment, Etc., of Material Contracts.  Without the prior written consent of Lender, Borrower will not cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract or give any consent, waiver or approval thereunder, waive any default under or breach of any Material Contract, agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract or take any other action in connection with any Material Contract that would impair the value of the interest or rights of Borrower thereunder or that would impair the interest or rights of Lender.

SECTION 7.11        Budget.  Borrower shall not use the proceeds of any Collateral or the Credit Advances other than in accordance with the Budget, subject to an allowed cumulative

variance of up to 10% per line item in the Budget at any time. Borrower shall not make any material change to the amounts indicated in the Budget without the prior written consent of Lender in its sole discretion. In no case shall Borrower use any proceeds of Collateral or any Credit Advance to bring any claim or suit against the Lender.

SECTION 7.12 <u>Return of Collateral</u>. Borrower shall not enter into any agreement to return any of its inventory or other Collateral outside the ordinary course of business to any of its creditors for application against any pre-petition Debt, pre-petition trade payables or other pre-petition claims under section 546(h) of the Bankruptcy Code.

SECTION 7.13 <u>Critical Vendor and Other Payments; Certain Receipts</u>. Borrower shall not make (i) any payments on account of any creditor's claims against Borrower, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by Lender in writing.

SECTION 7.14 <u>Exercise of Remedies</u>. Borrower shall not obtain, or seek to obtain, any stay on the exercise of the remedies of Lender hereunder, under any Loan Document or the Financing Order.

SECTION 7.15 <u>Bankruptcy Related Negative Covenants</u>. Borrower will not seek, consent to, or permit to exist any of the following:

(a) any modification, stay, vacation or amendment to the Financing Order as to which the Lender has not consented in writing;

(b) a priority claim or administrative expense claim or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve Out;

(c) any Lien on any Collateral (other than Permitted Liens or as may be granted by the Financing Order) having a priority equal or superior to the Lien securing the Obligations other than with respect to the Carve Out;

(d) any order that authorizes the return of any of the Borrower's property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the consent of the Lender;

(e) any order which authorizes the payment of any Debt incurred prior to the Petition Date, unless such payments are in compliance with the Budget, or otherwise approved by Lender in writing;

(f)     any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

(g)     any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

SECTION 7.16      [Intentionally Omitted].

## ARTICLE VIII

## REPORTING COVENANTS

So long as any Credit Advance or any other Obligation of Borrower under any Loan Document shall remain unpaid, Borrower will furnish to Lender:

SECTION 8.01      Default Notice.  As soon as possible and in any event within three (3) days after Borrower becomes aware of the occurrence of any Default, a statement of the Chief Restructuring Officer of Borrower setting forth details of such Default or event, development or occurrence and the action that Borrower has taken and proposes to take with respect thereto.

SECTION 8.02      Material Contracts.  As soon as practicable and in any event within three (3) days after it has knowledge thereof, notice that any Material Contracts have been breached or violated, amended or terminated.

SECTION 8.03      Budget.  Not later than the close of business on the Wednesday of each week commencing with the week following the entry of the Interim Order, an updated Budget on a rolling 13 week basis, in a form similar to the Initial Budget and satisfactory to the Lender, which updated Budget shall include (i) a comparison of the cash flow projections described therein to the cash flow projections provided for the immediately preceding week, and (ii) a written narrative explanation of any variance in excess of 10% on a cumulative basis of such actual results from those reflected in the previous Budget.

SECTION 8.04      Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting Borrower of the type described in Section 4.01(f) and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower of the Disclosed Litigation from that described on Schedule 4.01(f) hereto, in each case that could reasonably be expected to have a Material Adverse Effect.  Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material license, accreditations and approvals of any Governmental Authorities (including any Governmental Authorizations) or such Persons necessary for Borrower to own its assets or to carry on its business.

SECTION 8.05    Agreement Notices.  Promptly upon receipt thereof, copies of all notices, requests and other documents received by Borrower under or pursuant to any Material Contract or instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Lender, such information and reports regarding the Material Contracts and such instruments, indentures and loan and credit and similar agreements as the Lender may reasonably request.

SECTION 8.06    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance Borrower with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse.

SECTION 8.07    Bankruptcy Reports.  Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents Borrower sends, receives or files in connection with the Bankruptcy Case, including all correspondence with the Bankruptcy Court.

SECTION 8.08    Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender through the Lender, may from time to time reasonably request.

# ARTICLE IX

# EVENTS OF DEFAULT

SECTION 9.01    Events of Default.  If any of the following events (***"Events of Default"***) shall occur and be continuing:

(a)    (i) the Borrower shall fail to pay any principal of any Credit Advance when the same shall become due and payable or (ii) the Borrower shall fail to pay any interest on any Credit Advance, or Borrower shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three Business Days after the same shall become due and payable; or

(b)    any representation or warranty made by Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made when such disclosures when taken together in the aggregate is reasonably likely to have a Material Adverse Effect; or

(c)    Borrower shall fail to perform or observe in any material way any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 20 days after the earlier of the date on which (i) any officer of Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by Lender; or

(d)    any order, judgment or decree shall be rendered against Borrower that will reasonably be likely to have a Material Adverse Effect, and there shall be any period of 10

consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(e)     except as permitted by the Loan Documents any Collateral Document after delivery thereof and after giving effect to the Financing Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby; or

(f)     at any time there shall have occurred the loss or termination of, or the receipt by Borrower of notice of the loss or termination of any Governmental Authorization of Borrower other than any loss or termination not reasonably likely to cause a Material Adverse Effect; or

(g)     Borrower shall institute any proceeding or investigation or support the same by any other Person who may challenge the status, validity, perfection or priority of the Liens on the Collateral created by the Loan Documents, or the Financing Order securing the Obligations; or

(h)     Borrower shall, without the consent of the Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations under this Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation; or

(i)     the entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or

(j)     without Lender's consent, the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

(k)     the entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender, other than the Carve Out, without the Lender's prior written consent; or

(l)     the entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset, in an amount equal to or exceeding $50,000; or

(m)     the entry of an order staying, reversing, vacating or otherwise modifying the Credit Advances, any Liens securing the Obligations (or the validity or first priority status thereof) or the Financing Order; or

(n)     the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of Borrower's assets, if the order does not provide for the net cash consideration for such sales to be immediately applied to payment in whole or in part in cash of the Obligations; or

(o)    failure of the Borrower to file and properly serve a motion (the "***Sale Motion***") by March 15, 2017, in form and substance acceptable to Lender in its sole and absolute discretion, seeking Bankruptcy Court approval of: (A) the sale of the assets (the "***Assets***") described in an Asset Purchase Agreement in form and substance acceptable to the Lender in its sole and absolute discretion (the "***Stalking Horse Agreement***"), by and among Borrower as seller, and Lender as purchaser (the "***Purchaser***"), subject to higher or otherwise better offers under the Bidding Procedures (as defined below); (B) bidding procedures in connection with the sale of the Assets (the "***Bidding Procedures***") in form and substance acceptable to the Lender, in its sole and absolute discretion; and (C) the scheduling of an auction for the sale of the Assets in accordance with the Bidding Procedures and a sale hearing with respect thereto (the "***Auction***" and "***Sale Hearing***", respectively), which Sale Motion shall include copies of the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order (as defined below), and (ii) by no later than the date prescribed in the Bidding Procedures Order (as defined below) properly serve each counterparty to a Contract (as defined in the Stalking Horse Agreement) a notice, in form and substance reasonably acceptable to the Purchaser, setting forth the amount necessary to satisfy any cure costs.  The Sale Motion shall be served on all parties that are required to receive notice in the Bankruptcy Cases;

(p)    failure of the Borrower to have the Bankruptcy Court enter an order by April 5, 2017, in form and substance acceptable to Lender in its sole and absolute discretion (i) approving the Stalking Horse Agreement and the Bidding Procedures; and (ii) scheduling the Auction and Sale Hearing (together, the "***Bidding Procedures Order***"); or

(q)    the failure of Borrower to conduct an auction of substantially all of its assets within forty-five (45) days of the Petition Date; or

(r)    the failure of Borrower to have the Bankruptcy Court enter an order not later than May 30, 2017 (the "***Sale Order***") approving a sale of substantially all of Borrower's assets and providing for the immediate repayment in full of the Obligations from the proceeds of such sale; or

(s)    the failure of Borrower to obtain (i) entry of the Interim Order by the Bankruptcy Court in form and substance acceptable to Lender in its sole and absolute discretion by Borrower within three (3) business days of the Petition Date, and (ii) entry of the Final Order within thirty (30) days of the Petition Date; or

(t)    The Purchaser validly terminates the Asset Purchase Agreement pursuant to the terms thereto on or before the Auction;

then, and in any such event, Lender, by notice to the Borrower, declare the Credit Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Credit Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01    Amendments, Etc.  (a) No amendment or waiver of any provision of this Agreement or the Post-Petition Note, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (a) no amendment, waiver or consent shall, unless in writing and signed by Lender do any of the following at any time:

(i)    postpone any date scheduled for any payment of principal of, or interest on, the  Credit Advances or reduce the amount of any principal or interest payment due hereunder;

(ii)    release all or substantially all of the Collateral in any transaction or series of related transactions;

SECTION 10.02    Notices, Etc.  (a) All notices and other communications provided for hereunder shall be in writing (including telecopy or electronic communication) and mailed, telecopied or delivered

SECTION 10.03    No Waiver; Remedies.   No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under the Post-Petition Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 10.04    [Intentionally Omitted].

SECTION 10.05    Binding Effect.   This Agreement shall become effective when it shall have been approved by entry of the Interim Financing Order and executed by the Borrower and Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, and Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

SECTION 10.06    Execution in Counterparts.   This Agreement may be executed in counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 10.07    Confidentiality.   Lender shall not disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Lender's officers, directors, employees, agents and advisors and then only on a confidential basis, (b) as

required by any law, rule or regulation or judicial process, (c) in connection with any litigation or proceeding to which Lender may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 10.08    Release of Collateral.   Upon the sale, lease, transfer or other disposition of any item of Collateral of the Loan in accordance with the terms of the Loan Documents, Lender will, at the Borrower's expense, execute and deliver to Borrower such documents as Borrower may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

SECTION 10.09    Patriot Act Notice.  Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act. Borrower shall provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the Patriot Act.

SECTION 10.10    Jurisdiction, Etc.    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER, ON THE ONE HAND, AND LENDER, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWER HEREBY WAIVES ANY OBJECTION THAT BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

SECTION 10.11    Governing Law.  This Agreement and the Post-Petition Note shall be governed by, and construed in accordance with, the laws of the State of Delaware.

SECTION 10.12    Waiver of Jury Trial.   Each of the Borrower and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Credit Advances or the actions of Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 10.13    <u>Release</u>.  Borrower, hereby acknowledge and agrees that, as of the date hereof: (a) Borrower has no claim except as may be provided under this Agreement or the Asset Purchase Agreement or cause of action against Lender (or any of their directors, officers, employees, attorneys or agents); (b) Borrower has no offset rights, counterclaims or defenses of any kind against any of their obligations, indebtedness or liabilities to Lender; and (c) Lender has heretofore properly performed and satisfied in a timely manner all of their obligations to the Borrower.  Lender wishes (and Borrower agree) to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters would impair or otherwise adversely affect any of the rights, interests, contracts, collateral security or remedies of Lender.  Therefore, Borrower on its own behalf and on behalf of each of its respective successors and assigns, hereby waives, releases and discharges Lender and all of their directors, officers, employees, attorneys and agents, from any and all claims, demands, actions or causes of action on or before the date hereof and arising out of or in any way relating to this Agreement, the Loan Documents and any other documents, instruments, agreements, dealings or other matters connected with this Agreement, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date hereof relating to this Agreement.  The waivers, releases, and discharges contained in this paragraph shall be effective regardless of any other event that may occur or not occur prior to, or on or after the date hereof.

SECTION 10.14    <u>Financing Order</u>.  In the event of any inconsistency between the terms and conditions of any of the Loan Documents and the Financing Order, the provisions of the Financing Order shall govern and control.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**:

**BOSTWICK LABORATORIES, INC.**

By _____

Title:

**LENDER:**

**POPLAR HEALTHCARE, PLLC**

By _____

Title:

# EXHIBIT A
# INITIAL BUDGET

**Bostwick Laboratories Inc**
**Cash Forecast/ DIP Budget**

| | Forecast At Filing 15-Mar | Forecast Daily 16-Mar | Forecast Daily 17-Mar | Forecast Week 1 24-Mar | Forecast Week 2 31-Mar | Forecast Week 3 7-Apr | Forecast Week 4 14-Apr | Forecast Week 5 21-Apr | Forecast Week 6 28-Apr | Forecast Week 7 5-May | Forecast Week 8 13-May | Forecast Week 9 20-May | Forecast Week 10 27-May | Forecast Week 11 3-Jun | Forecast Week 12 10-Jun | Forecast Week 13 17-Jun | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Cash | 665,315 | 813,773 | 916,037 | 776,509 | 1,492,797 | 1,067,354 | 1,388,575 | 1,711,780 | 2,201,946 | 1,964,643 | 918,870 | 916,770 | 914,670 | 204,850 | 177,750 | 177,750 | 665,315 |
| **Cash Receipts** | | | | | | | | | | | | | | | | | |
| Cash Receipts | 148,458 | 102,264 | 96,335 | 671,928 | 655,667 | 651,799 | 650,398 | 674,733 | 699,068 | - | | | | | | | 4,350,650 |
| Poplar Funding -DIP | | | | 1,573,000 | | 1,000,000 | | 793,000 | | | | | | | | | 3,366,000 |
| Poplar Take out of Secured Facility | | | 1,750,000 | | | | | | | | | | | | | | 1,750,000 |
| Sale Proceeds | | | | | | | | | | 289,000 | | | | | | | 289,000 |
| **Total Cash Receipts** | 148,458 | 102,264 | 1,846,335 | 2,244,928 | 655,667 | 1,651,799 | 650,398 | 1,467,733 | 699,068 | 289,000 | - | - | - | - | - | - | 9,755,650 |
| **Total Available Cash** | 813,773 | 916,037 | 2,762,373 | 3,021,437 | 2,148,464 | 2,719,153 | 2,038,973 | 3,179,513 | 2,901,014 | 2,253,643 | 918,870 | 916,770 | 914,670 | 204,850 | 177,750 | 177,750 | 10,420,966 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll commissions and related benefits | | - | 1,000 | 771,213 | 41,500 | 774,493 | 1,000 | 745,993 | 176,394 | 833,550 | | | 162,720 | 25,000 | | | 3,532,863 |
| Logistics and shipping cost | | | 65,963 | 57,682 | 54,103 | 57,730 | 60,000 | 57,000 | 57,000 | 57,000 | | | 25,000 | | | | 491,478 |
| Laboratory Costs | | | 114,719 | 494,927 | 374,109 | 325,240 | 213,750 | 98,519 | 129,494 | 60,618 | | | | | | | 1,811,376 |
| IT - Technology Support | | | 21,400 | 41,352 | 39,650 | 15,500 | 14,331 | 21,000 | 46,534 | 33,000 | | | | | | | 232,767 |
| Rent Expense | | | 8,645 | 135,855 | 71,000 | 135,855 | 20,000 | 8,645 | 2,000 | 135,855 | | | | | | | 517,855 |
| Insurance | | | | | 57,648 | | | | 57,648 | | | | | | | | 115,296 |
| Office Expense and other | | | 8,830 | 4,700 | 4,100 | 13,060 | 4,100 | 8,700 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | | | 56,090 |
| Utilities and waste removal | | | 15,307 | 22,911 | 9,000 | 8,700 | 14,012 | 24,710 | 10,201 | 13,000 | | | 15,000 | | | | 132,841 |
| **Bankruptcy Costs** | | | | | | | | | | | | | | | | | |
| Debtor Counsel | - | - | | | 250,000 | | | | 200,000 | | | | 200,000 | | | | 650,000 |
| CRO Fees | - | - | | | 60,000 | | | | 60,000 | | | | 40,000 | | | | 160,000 |
| US Trustee Fees | - | - | | | | | | 13,000 | | | | | | | | 13,000 | 26,000 |
| Investment Bank Fee | - | - | | | 50,000 | | | | 50,000 | 199,650 | | | | | | | 299,650 |
| Claims Agent | - | - | | | 50,000 | | | | 25,000 | | | | 10,000 | | | | 85,000 |
| Unsecured Creditor Committee | - | - | | | | | | | 50,000 | | | | | | | | 50,000 |
| UCC Financial Advisors | - | - | | | | | | | 50,000 | | | | | | | | 50,000 |
| Pay down revolver | - | - | 1,750,000 | | | | | | | | | | | | | | 1,750,000 |
| **Post Sale Estate Wind Down** | | | | | | | | | | | | | | | | | |
| Wind Down Expense | - | - | | | 20,000 | | | | 20,000 | | | | 255,000 | | | | 295,000 |
| **Total Cash Disbursements** | | - | 1,985,864 | 1,528,640 | 1,081,110 | 1,330,578 | 327,193 | 977,567 | 936,371 | 1,334,773 | 2,100 | 2,100 | 709,820 | 27,100 | - | 13,000 | 10,256,216 |
| *Change in Cash* | 148,458 | 102,264 | (139,529) | 716,288 | (425,443) | 321,221 | 323,205 | 490,166 | (237,303) | (1,045,773) | (2,100) | (2,100) | (709,820) | (27,100) | - | (13,000) | (500,566) |
| **Ending Cash** | 813,773 | 916,037 | 776,509 | 1,492,797 | 1,067,354 | 1,388,575 | 1,711,780 | 2,201,946 | 1,964,643 | 918,870 | 916,770 | 914,670 | 204,850 | 177,750 | 177,750 | 164,750 | 164,750 |

# EXHIBIT B
# FORM OF POST-PETITION NOTE

# POST-PETITION NOTE

$5,116,000.00                                                    Memphis, Tennessee
                                                                March __, 2017


On May 30, 2017, (the "Maturity Date") or at such earlier time as provided herein, the undersigned, **Bostwick Laboratories, Inc.**, a Delaware corporation ("Maker"), promises to pay to the order of **Poplar Healthcare PLLC**, a Tennessee professional limited liability company located in Memphis, Tennessee ("Lender"), the principal sum of FIVE MILLION ONE HUNDRED SIXTEEN THOUSAND DOLLARS ($5,116,000.00) or so much of such amount as shall have been disbursed, together with interest at the rate of eight percent (8.0%) per annum, until paid, upon the disbursed and unpaid principal balance.

Accrued, unpaid interest on the Post-Petition Note shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default, this Post-Petition Note shall bear interest at a rate equal to the interest rate set forth in the paragraph above plus two percent (2%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate").

In the event that the foregoing provisions should be construed by a court of competent jurisdiction not to constitute a valid, enforceable designation of a rate of interest or method of determining same, the indebtedness hereby evidenced shall bear interest at the maximum effective variable contract rate which may be charged by the Lender under applicable law from time to time in effect.

The Maker can obtain advances against the principal (each a "Credit Advance" and collectively, the "Credit Advances") upon submission of a Borrowing Notice to Lender, until the Maturity Date, but cannot reborrow disbursed amounts.

The outstanding principal balance and interest accrued thereon shall be due and payable on the earlier to occur of (i) the date of the Closing of the Asset Sale; (ii) the Maturity Date; or (iii) upon acceleration of the Post-Petition Note pursuant to the terms hereof.

This Post-Petition Note is secured by the Collateral.

Payment of interest, and the principal hereof shall be made at the office of the Lender, 3495 Hacks Cross Road, Memphis, Tennessee 38125, or at such other place as the holder may designate in writing, in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment.

Upon the occurrence of an Event of Default, then, and in any such event, Lender, by notice to the Borrower, may declare the Credit Advances, all interest thereon and all other amounts payable under this Post-Petition Note to be forthwith due and payable, whereupon the Credit Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

If this Post-Petition Note is placed in the hands of an attorney for collection, by suit or otherwise, or to protect the security for its payment, or to enforce its collection, or to represent the rights of the Lender in connection with any loan documentation executed in connection herewith, or to defend successfully against any claim, cause of action or suit brought by the Maker against the Lender, the Maker shall pay on demand all costs of collection and litigation (including court costs), together with a reasonable attorney's fee.

This Post-Petition Note is made and issued in accordance with, and shall be governed by the terms of that certain Debtor-In-Possession Credit Agreement executed between Maker and Lender. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain Debtor-in-Possession Credit Agreement.

This Post-Petition Note shall be governed by, and construed in accordance with, the laws of the State of Delaware.

**Bostwick Laboratories, Inc**

By:_____

Title:_____

4811-6100-9477 v1
2790010-000031 03/14/2017

# EXHIBIT C
# FORM OF INTERIM FINANCING ORDER

| | |
|---|---|
| In re: | Chapter 11 |
| Bostwick Laboratories, Inc., *et al.*,[1] | Case No. 17-_____ (___) |
| Debtors. | (Joint Administration Requested)<br>**Related Docket No.** |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(D)(1), 364(E) AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING BOSTWICK LABORATORIES, INC. TO (A) OBTAIN POST-PETITION SECURED FINANCING FROM POPLAR HEALTHCARE, PLLC; (B) UTILIZE CASH COLLATERAL; AND (II) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion")[2] of the above captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases (the "Cases") commenced on March 15, 2017 (the "Petition Date") under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim financing order (the "Interim Financing Order") and final financing order (the "Final Financing Order"), seeking among other things:

     i.     authorizing Bostwick Laboratories, Inc. ("BLI" or "Debtor" or "Borrower"), as borrower, to enter into a first priority senior secured multiple draw term loan

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): (i) Bostwick Laboratories, Inc., a Delaware corporation (3169); and (ii) Bostwick Laboratories Holdings, Inc., a Delaware corporation (1042). The mailing address for the Debtors is 100 Charles Lindbergh Blvd., Uniondale, NY 11553.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") and the Motion. The DIP Credit Agreement is attached hereto as Exhibit A to this Order.

credit facility (the "<u>DIP Facility</u>") with Poplar Healthcare, PLLC, a Tennessee Professional Limited Liability Company (the "<u>Post-Petition Lender</u>") in an aggregate maximum principal amount of $5,116,000 (the "<u>Post-Petition Financing</u>" and each individual advance thereunder, a "<u>Credit Advance</u>" and, collectively, the "<u>Credit Advances</u>"), pursuant to the terms and conditions of the DIP Credit Agreement, that certain post-petition promissory note in substantially the form attached hereto as <u>Exhibit B</u> (the "<u>Post-Petition Note</u>" together with any additional agreements, documents, instruments and certificates executed therewith, or otherwise delivered in connection therewith by the Debtor, collectively, the "<u>Post-Petition Documents</u>");

ii.     authorizing BLI to execute and deliver the Post-Petition Note and other Post-Petition Documents and to perform such other and further acts as may be necessary or desirable in connection with the Post-Petition Documents;

iii.     authorizing BLI's use of cash collateral, as defined in section 363(a) of the Bankruptcy Code (collectively, "<u>Cash Collateral</u>"), pursuant to the terms and conditions set forth in the Interim Financing Order and the Final Financing Order;

iv.     granting, subject to the Carve Out and the terms of this Interim Financing Order, (a) to the Post-Petition Lender on account of the Post-Petition Financing (i) postpetition first priority liens on unencumbered assets of the Debtor, (ii) consensual priming liens on collateral securing the prepetition Second Lien Notes[3]; and (iii) superpriority administrative expense claims (collectively, the

---

[3] "<u>Second Lien Notes</u>" means the second lien secured notes issued by the Seller pursuant to that certain Note Purchase Agreement, dated February 21, 2017, between Bostwick Laboratories

"DIP Liens"); and (b) to the holders of the Second Lien Notes, as adequate protection to the extent of diminution in value of the collateral securing the Second Lien Notes, (i) replacement liens on collateral securing the Post-Petition Financing, subordinate to the DIP Liens, (ii) superiority administrative expenses claims, subordinate to the DIP superpriority administrative expense claims.

v.   authorizing the Post-Petition Lender to exercise remedies upon the occurrence and continuance of an Event of Default after written notice, including without limitation, upon the entry of an order or orders granting the Post-Petition Lender relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtor's assets;

vi.  Scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this order authorizing the Borrower, on an interim basis, to obtain and initial Credit Advance (the "Initial Credit Advance") under the DIP Credit Agreement of $3,323,000.00 to be used satisfy the Capital One Obligations and to fund the Debtor's normal business operations in accordance with Debtor's budget attached hereto as Exhibit C (as such budget may be supplemented or modified in accordance with the terms hereof and the Post-Petition Documents, the "Budget") pending entry of the Final Financing Order; and

vii. scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") to be held on or before April 5, 2017, for this Court to consider entry of the Final Financing Order authorizing the Post-Petition Financing, authorizing the

---

Group Holdings, L.P., Seller, certain "Purchasers" identified therein, and Bostwick Laboratories Group Holdings GP, LLC.

Borrower, on a final basis, to obtain under the DIP Credit Agreement the balance of the Credit Advances, and authorizing and approving, on a final basis, the relief requested in the Motion.

Due and appropriate notice of the Motion under the circumstances and the relief requested therein having been given and an Interim Hearing on the Motion having been held before this Court on March __, 2017; and upon the entire record made at the Interim Hearing; and this Court having found good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.     This Court has jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtor on its twenty largest unsecured creditors, Poplar Healthcare, PLLC, the Post-Petition Lender, the holders of the Second Lien Notes, Capitol One, CMS, the United States Attorney for the District of Delaware,  and the United States Trustee for the District of Delaware (the "U.S. Trustee").  Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

C.     BLI has an immediate need to obtain the Post-Petition Financing in order to, among other things, fund the Debtor's normal business operations during the Case pending the Section 363 sale of substantially all of its assets ("the Asset Sale") and the "wind down" of the Business, to fund the administrative costs of the Case, and to satisfy the Capital One Obligations

(collectively, the "Post-Petition Funding Obligations"). The Debtor's incurrence of the Post-Petition Financing is, therefore, necessary to ensure that the Debtor has sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtor's estate and to avoid irreparable harm to the Debtor's estate and creditors.

D.     BLI is unable to obtain financing from sources other than the Post-Petition Lender pursuant to, and for the purposes set forth in, the Post-Petition Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code without granting the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims (each as defined below), and the other adequate protection granted herein, in each case on the terms and conditions set forth in this Order and the Post-Petition Documents.

E.     The terms of the Post-Petition Financing pursuant to this Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

F.     The Post-Petition Documents have been the subject of extensive negotiations conducted in good faith and at arm's length among the Borrower and the Post-Petition Lender, and all of the Debtor's obligations and indebtedness arising under or in connection with the Post-Petition Financing, including without limitation, (i) all Credit Advances made to the Borrower as contemplated and authorized by this Order and (ii) all other obligations of the Debtor under the Post-Petition Documents and this Order shall be deemed to have been extended by the Post-Petition Lender in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full

protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

G.       The Post-Petition Lender will commit to providing Post-Petition Financing in an amount necessary to fund the Post-Petition Funding Obligations as set forth in the Budget, in the amount of $5,116,000 (the "Stated Principal Amount"), upon the terms and conditions set forth herein.

H.       Based on the record before this Court, it appears that the terms of this Interim Financing Order, including, without limitation, the terms of the Post-Petition Financing are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

I.       BLI has requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the interim relief set forth in this Order, the Debtor's estate will be immediately and irreparably harmed.  Consummation of the Post-Petition Financing in accordance with this Order and the Post-Petition Documents is, therefore, in the best interest of the Debtor's estate.  Good cause has been shown for the entry of this Order.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED, DETERMINED AND DECREED** that:

**<u>Motion Granted</u>**

1.       The Motion is granted on the terms and conditions set forth in this Interim Financing Order, with the foregoing findings incorporated herein by reference. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled. This

Interim Financing Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry.

**Authorizations**

2.      The Debtor is hereby authorized to execute and enter into the Post-Petition Documents. The Post-Petition Note, the other Post-Petition Documents and this Interim Financing Order shall govern the financial and credit accommodations to be provided to the Debtor by the Post-Petition Lender as described herein; *provided* that in the event of a conflict between the Post-Petition Documents and the Interim Financing Order, the Interim Financing Order shall control.

3.      The Debtor is hereby authorized to obtain the Initial Credit Advance, on an interim basis, under the DIP Credit Agreement of up to an aggregate principal amount of $3,323,000.00 to be used satisfy the Capital One Obligations and to fund the Debtor's normal business operations in accordance with the Budget and the permitted variances set forth herein and the Post-Petition Documents..

4.      In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents that the Post-Petition Lender determines to be required or necessary for the Debtor's performance of their obligations under the Post-Petition Documents, including without limitation:

> (i)      the execution, delivery and performance of the Post-Petition Documents, including, without limitation, the Post-Petition Note;
>
> (ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the Post-Petition Documents, in each case in such form as the Debtor and the Post-Petition Lender may agree; *provided, that*, written notice of any material modification or amendment to the Post-Petition Documents shall be filed on the docket of the Chapter 11 Case and shall be served upon (i) counsel

to any official committee appointed in the Chapter 11 Case (the "Committee"), (ii) the U.S. Trustee, (iii) counsel to the holders of the Second Lien Notes, (iv) counsel to the Debtors, and (vi) all parties requesting service and appearing on the Bankruptcy Rule 2002 service list (collectively, the "Notice Parties") each of whom shall have ten (10) days from the date of service of such notice within which to object in writing to such modification or amendment. If any Notice Party (or any other party in interest with requisite standing) timely objects to any such material modification or amendment to the Post-Petition Documents, such modification or amendment shall only be effective pursuant to an order of this Court; and

(iii)     the performance of all other acts required under or in connection with the Post-Petition Documents.

5.     Upon execution and delivery of the Post-Petition Note and the other Post-Petition Documents, such Post-Petition Documents shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of the Interim Financing Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any case. No obligation, payment, transfer or grant of security under the Post-Petition Note, the other Post-Petition Documents or the Interim Financing Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

**Borrowing; Use of Cash Collateral**

6.     Subject to the Budget attached as Exhibit C (as modified from time to time with the consent of the Post-Petition Lender in its sole discretion, but without need for further Court order and solely in compliance therewith and subject further to the terms and conditions of this

Interim Financing Order and the Post-Petition Documents, (a) the Post-Petition Lender will provide the Post-Petition Financing in accordance with the terms of the Post-Petition Documents, and (b) the Debtor, on behalf of the Estate, is authorized to use Cash Collateral in accordance with the terms of the Interim Financing Order.

**Interest, Fees, Costs and Expenses**

7. . The Post-Petition Obligations shall bear interest at eight percent (8%) per annum payable as provided in the Post-Petition Note. After an Event of Default (as described below), the interest shall accrue at the interest rate set forth in the preceding sentence plus two percent (2%) per annum, along with costs and expenses as provided in the Post-Petition Note.

**Event of Default**.

8. Unless waived by the Post-Petition Lender in writing, the occurrence of any one or more of the events as set forth in the Section 9.01(a)-(t) of the DIP Credit Agreement, shall constitute an "<u>Event of Default</u>" under this Order.

9. Upon the occurrence of an Event of Default and after ten (10) days' written notice by the Post-Petition Lender to the Notice Parties (the "<u>Default Notice Period</u>"), unless the Court determines during the Default Notice Period that an Event of Default has not occurred, the automatic stay shall terminate, and the Post-Petition Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions:

(i)      declare all or any portion of the outstanding Post-Petition Obligations due and payable, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Debtor;

(ii)     enforce all liens and security interests in the Post-Petition Collateral;

(iii)    institute proceedings to enforce payment of such Post-Petition Obligations;

(iv)     terminate the obligation of the Post-Petition Lender to make an additional Credit Advance; and

(v)     exercise any other remedies and take any other actions available to it at law, in equity, under the Post-Petition Note, the Bankruptcy Code, other applicable law or pursuant to this Financing Order.

*provided however* that the Post-Petition Lender shall continue to fund the Debtor's operations, pursuant to the Budget, through the Default Notice Period.

10.     <u>Termination of the Post-Petition Financing and Use of Cash Collateral</u>. Except with respect to the payment of the Carve Out (as defined herein), the Post-Petition Lender's agreement to provide the Post-Petition Financing in accordance with the Post-Petition Documents and the Debtor's authorization to use Cash Collateral shall immediately and automatically terminate (except as the Post-Petition Lender may otherwise agree in writing in its sole discretion), upon the earliest to occur of any of the following (each, a "<u>Termination Date</u>"):

(i)     May 30, 2017;

(ii)     the date of final indefeasible payment and satisfaction in full in cash of the Post-Petition Obligations;

(iii)     the entry of an order by the Court granting a motion by the Debtor to obtain additional financing from a party other than Post-Petition Lender under section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the Post-Petition Obligations or unless such financing is subordinate to the Post-Petition Obligations and consented to in writing by the Post-Petition Lender;

(iv)     the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code;

(v)     the Interim Financing Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Post-Petition Lender (which consent may be withheld in its sole discretion); or

(vi)     upon ten (10) days written notice of any Event of Default as defined in paragraph 8 above.

**Liens  and Administrative Status to Secure the Post-Petition Obligations**

11.     Superpriority Claims. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Post-Petition Obligations shall constitute allowed senior administrative expense claims against the Debtor (the "DIP Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, excluding, however, the proceeds of all Avoidance Actions and Estate Actions (as defined below) and subject at all times to the Carve Out to the extent specifically provided for herein.

12.     DIP Liens.  As security for the Post-Petition Funding Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Post-Petition Lender of any property, the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), in each case subject only to the Carve Out (all such liens and security interests granted to the DIP Lender on account of the DIP Obligations

pursuant to this Order, the "DIP Liens") to provide Post-Petition Lender with a valid first and prior lien on all of Debtor's assets:

(a)     Senior Liens On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior lien on, and security interest in, (i) all cash or cash proceeds; and (ii) all tangible and intangible prepetition and postpetition property of the Debtor, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to a valid, perfected, non-avoidable and enforceable lien in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, inventory, equipment, general intangibles, intercompany notes, insurance policies, contracts, securities, chattel paper, real property leaseholds, fixtures, machinery, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property and the proceeds of all of the foregoing.

(b)     Priming Liens On Collateral Securing Second Lien Notes.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, senior priming lien on, and security interest in, all collateral of the holders of the Second Lien Notes (the "Second Lien Note Collateral").  The DIP Liens on the Second Lien Note Collateral shall be senior in all respects to the security interests in, and liens on, the Second Lien Note Collateral.

(c)     Liens Senior To Certain Other Liens.  Except as provided herein, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(d)     Avoidance Actions.  For purposes of the Interim Financing Order, the DIP Collateral shall expressly exclude the claims and the proceeds of any of the Estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") and other Estate causes of actions (the "Estate Actions"), which Avoidance Actions and Estate Actions shall not be subject to the Post-Petition Liens, Superpriority Claims or any other liens or superpriority claims.

## Carve Out

13.     All liens and claims of or granted to the Post-Petition Lender and the liens and claims of the holders of the Second Lien Notes shall be and are subject and subordinate to the payment, without duplication, of the following fees and claims (in the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve Out"): (a) all allowed fees

and expenses of attorneys, investment bankers and financial advisors (collectively, the "Estate Professionals") employed by the Debtor or the Committee (as applicable) pursuant to sections 327, 328, 363, 1102 and 1103 of the Bankruptcy Code which are (i) accrued prior to the Termination Date to the extent set forth in (and limited by) the Budget and (ii) following the Termination Date up to ($_____) (the "Termination Carve-Out Amount"); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court or to the Debtor's appointed claims agent. After the Termination Date, the Post-Petition Lender will fund the Termination Carve-Out Amount and forward to counsel for the Debtor which shall hold such amount to pay fees and expenses as may be approved by order of this Court. Notwithstanding any other provision of this Interim Financing Order (including the paragraph above), and except as specifically provided in any order authorizing the retention of any Estate Professional, the Court retains and shall have all authority to consider and approve all applications for fees and expenses by any Estate Professionals, including for reasonableness thereof, or on any other basis under the Bankruptcy Code or Bankruptcy Rules, or otherwise under applicable law, and all funds that may be set aside for or applied to any such amounts or obligations shall remain fully subject to disgorgement or reallocation, based on the Court's orders exercising such reserved rights as described previously in this sentence, and all professionals described above in this sentence shall be and remain subject to the jurisdiction of this Court for the purposes described in this sentence.

14.     Notwithstanding the foregoing, none of the Carve Out proceeds from the Post-Petition Financing or Cash Collateral may be used (1) to investigate or challenge in any respect the validity, perfection, priority, extent or enforceability of the Post-Petition Liens, (2) to delay, challenge or impede any rights of the Post-Petition Lender under any of the Post-Petition

Documents, or the Interim Financing Order, or (3) to pursue any claims or causes of action of any kind against the Post-Petition Lender, related to the Interim or Final Financing Order or the Post-Petition Note. Nothing herein shall restrict the ability of the Committee, if any, or any other party to investigate or object to a disclosure statement or a plan of reorganization, and the Carve Out, proceeds from the Post-Petition Financing and Cash Collateral may be used to pay approved fees and expenses of Estate Professionals employed by the Committee, if any, in connection therewith.

15.     Notwithstanding any other provision of this Interim Financing Order and except as provided for in any order approving the retention of an Estate Professional, under no circumstances shall any fees or expenses be paid to any Estate Professional absent order of the Court approving the same, upon application or motion on notice. Subject to the terms of the Interim Financing Order, the Debtor shall be permitted to pay compensation and reimbursement of any Court-approved reasonable fees and expenses of the Estate Professionals allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code, as the same may be due and payable, that constitute pre-Termination Date expenses and such payments shall not reduce or be deemed to reduce the post-Termination Date fees and expenses.

(i)     For the avoidance of doubt, and as provided for in the Post-Petition Note, the final Credit Advance Notice (the "Final Borrowing Notice") shall include the amount of accrued fees estimated to be due and owing to the Estate Professionals, pursuant to further order from the Court, including such Court-approved fees to be paid after the consummation of the Asset Sale. Such accrued amounts may not exceed the aggregate amounts budgeted under the Budget for each respective Estate Professional. The Post-Petition Lender will fund the Final Borrowing Notice from the Post-Petition Loans to be held by counsel for the Debtor, or subsequently, a distribution agent, in a segregated account, payable only upon further fee order from the Court.

**Adequate Protection to Holders of the Second Lien Notes**

16.     The holders of the Second Lien Notes are entitled pursuant to sections 361, 363(c)(2), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Second Lien Note Collateral, including Cash Collateral, in an amount equal to the diminution in value of the Second Lien Note Collateral, including any such diminution resulting from the sale, lease, or use by the Debtor (or other decline in value) of the Second Lien Note Collateral and Cash Collateral, the priming by the DIP Liens of the Second Lien Note Collateral, as well as the imposition of the automatic stay (such diminution, the "Adequate Protection Obligations").  As adequate protection, the holders of the Second Lien Notes are hereby granted the following:

(a)     Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, the holders of the Second Lien Notes are hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, and (ii) the Carve Out.

(b)     Section 507(b) Claim.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the DIP Superpriority Claims.

**Automatic Perfection of DIP Liens and Adequate Protection Liens**

17.     The Post-Petition Lender and the holders of the Second Lien Notes are authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens and the Adequate Protection Liens granted to it hereunder.  Regardless of whether the Post-Petition Lender or the holders of the Second Lien Notes shall in their respective sole discretion choose to file such financing

statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens or Adequate Protection Liens, such DIP Liens and Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

18.     A certified copy of this Order may, in the discretion of the Post-Petition Lender or the holders of the Second Lien Notes, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Order for filing and recording.

19.     Debtors are authorized to execute and deliver to the Post-Petition Lender and the holders of the Second Lien Notes all such agreements, financing statements, instruments, and other documents as the Post-Petition Lender and the holders of the Second Lien Notes may request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

**Preservation of Rights Granted Under this Interim Financing Order**

20.     No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Financing Order to the Post-Petition Lender shall be granted or allowed, except as to Permitted Liens[4] and as provided under applicable non-bankruptcy law, until the occurrence of (i) the payment in full in cash or immediately available funds of all of the Post-Petition Obligations.

21.     If an order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is entered at any time prior to the Post-Petition Obligations being Paid in Full,

---

[4] As defined in the DIP Credit Agreement.

such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, Post-Petition Liens granted to the Post-Petition Lender, the Adequate Protection Obligations granted to the holders of the Second Lien Notes and the Carve Out shall continue in full force and effect and shall maintain their priorities as provided in the Interim Financing Order until all Post-Petition Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims and Post-Petition Liens and Adequate Protection Obligations, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

22.     If any or all of the provisions of the Interim Financing Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any Post-Petition Obligations incurred prior to the actual receipt of written notice by the Post-Petition Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the Superpriority Claims and Post-Petition Liens granted hereby with respect to any Post-Petition Obligations. To the extent permitted by applicable law, notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or Post-Petition Obligations incurred by the Debtor prior to the actual receipt of written notice by the Post-Petition Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the Interim Financing Order, and the Post-Petition Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the

Interim Financing Order and pursuant to the Post-Petition Documents with respect to all uses of Cash Collateral and the Post-Petition Obligations.

23.     Except as expressly provided in the Interim Financing Order or in the Post-Petition Documents, or until the Post-Petition Obligations are Paid in Full, the Post-Petition Liens, the Superpriority Claims, and all other rights and remedies of the Post-Petition Lender granted by the provisions of the Interim Financing Order and the Post-Petition Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7, or dismissing the Chapter 11 Case or (ii) the entry of an order confirming a plan of reorganization in the Chapter 11 Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining Post-Petition Obligations. The terms and provisions of the Interim Financing Order and the Post-Petition Documents shall continue in the Chapter 11 Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Post-Petition Liens, and the Superpriority Claims and all other rights and remedies of the Post-Petition Lender granted by the provisions of the Interim Financing Order and the Post-Petition Documents shall continue in full force and effect until the Post-Petition Obligations are Paid in Full.

**Effect of Stipulations on Third Parties**

24.     Each stipulation, admission and agreement contained in the Interim Financing Order, shall be binding upon the Debtor, and any successor thereto (including, without limitation, any chapter 7 trustee or any chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes existing as of the date hereof. Each stipulation, admission and agreement contained in the Interim Financing Order shall also be binding upon all other parties in interest, including, without limitation, the Committee, if any, under all circumstances and for all purposes.

25.     Upon approval of the Interim Financing Order, notwithstanding anything to the contrary herein, upon written notice to the landlord of any of Debtor's leased premises that an Event of Default has occurred and is continuing, to the extent allowed by applicable non-bankruptcy law, the Post-Petition Lender shall be entitled to the Debtor's rights and privileges under such lease(s) without interference from such landlord, including, if applicable, the right to enter upon such leased premises for the purpose of exercising any right or remedy with respect to the collateral located thereon; *provided* that such Post-Petition Lender shall pay to such landlord rent first accruing after the above referenced written notice and during the period of occupancy by such Post-Petition Lender, calculated on a per diem basis and any such amount paid shall be deemed to be Post-Petition Obligations, as applicable.

**Binding Effect on Successors and Assigns**

26.     The Post-Petition Documents and the provisions of the Interim Financing Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Committee, if any, the Debtor, the Post-Petition Lender and each of their respective successors and assigns (including any chapter 7 or any chapter 11 trustee hereafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the Post-Petition Lender, the Debtor, and each of their respective successors and assigns, *provided, however*, that the Post-Petition Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any Credit Advance (whether under the Post-Petition Note or otherwise) or permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Financing Order

or the Post-Petition Documents, the Post-Petition Lender shall <u>not</u> (i) be deemed to be in control of the operations of the Debtor, or (ii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute)

**<u>Limitation on Use of Post-Petition Financing and DIP Collateral</u>**

27.     The Debtor shall use the Post-Petition Financing solely as provided in this Order and the Budget.  Notwithstanding anything herein or in any other order of this Court to the contrary, no Credit Advances under the Post-Petition Financing, no DIP Liens, no DIP Collateral, no Adequate Protection Obligations, no 507(b) Claims, no Adequate Protection Liens, or the Carve Out may be used to (a) object, prosecute, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of any amount due under the Post-Petition Documents, the Post-Petition Funding Obligations, the Adequate Protection Obligations, the Second Lien Notes, the DIP Liens, the Adequate Protection Obligations, or the liens or claims granted under this Order or the DIP Documents, (b) assert any Claims and Defenses, Avoidance Actions, or any other causes of action against the Post-Petition Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the Post-Petition Lender's assertion, enforcement, or realization on the DIP Collateral in accordance with the Post-Petition Documents or this Order, (d) seek to modify any of the rights granted to the Post-Petition Lender hereunder or under the Post-Petition Documents (including the adequate protection granted herein), in the case of each of the foregoing clauses (a) through (d), without the Post-Petition Lender's prior written consent, or (e) pay any amount

on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii) permitted under the Post-Petition Documents

**Credit Bid**

28.     Subject to section 363(k) of the Bankruptcy Code and entry of this Interim Financing Order, the Post-Petition Lender shall have the right to "credit bid" the full amount of the <u>Post-Petition Obligations</u> then outstanding in connection with the Asset Sale or any sale of all or any portion of the Debtor's assets, including, without limitation, a sale transaction under section 363 of the Bankruptcy.

**Effectiveness**

29.     This Interim Financing Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim Financing Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Interim Financing Order.

**Controlling Effect of Interim Financing Order**

30.     To the extent any provisions in this Interim Financing Order conflict with any provisions of the Motion, or any Post-Petition Document, the provisions of this Interim Financing Order shall control.

**Final Hearing**

31.     The Final Hearing to consider to consider entry of a Final Financing Order authorizing the Post-Petition Financing on a final basis shall be held, if necessary, on _____ __, 2017 at 9:30 a.m. (ET) before this Court.

**Final Hearing Notice**

32.     The Debtor shall promptly mail copies of this Interim Financing Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtor, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899, Attn: David B. Stratton, Esq.(ii) counsel to the Post-Petition Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn:  Derek Abbot, Esq., and Baker Donelson Bearman Caldwell & Berkowitz, PC, 165 Madison Avenue, Suite 2000, Memphis, Tennessee 38103, Attn:  E. Franklin Childress, Jr, (iii) counsel to any committee of unsecured creditors appointed in the Chapter 11 Case, (iv) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 and (v) parties required by Bankruptcy Rule 2002(a) and shall be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each case to allow actual receipt by the foregoing no later than March __, 2017 at 4:00 p.m., prevailing Eastern time.


Dated: March _____, 2017                    _____
Wilmington, Delaware                        Honorable _____
                                            United States Bankruptcy Judge

# EXHIBIT D
# FORM OF BORROWING NOTICE

**Form of Borrowing Notice**

To: Poplar Healthcare, PLLC

Dear Sirs:

Reference is made to the DIP Credit Agreement dated as of March __, 2017 between Bostwick Laboratories, Inc., as Borrower and Poplar Healthcare, PLLC, as Lender.  Terms defined in the DIP Credit Agreement are used herein with the same meanings.  This notice constitutes a Borrowing Notice, and the Borrower hereby requests a Credit Advance under the DIP Credit Agreement in the amount of $_____, and in that connection the Borrower represents and warrants the following:

> No Event of Default has occurred and is continuing.  All representations and warranties of Borrower set forth in the Loan Documents are true and correct in all material respects as of the date of this request and will be as of the date of the requested Credit Advance.

The requested Funding Date is _____.

Attached as Exhibit A to this Borrowing Notice please find:

    i.    a calculation of the requested Credit Advance amount including reasonable detail regarding the cash on hand included in the calculation and the projected Disbursements for the borrowing period;

    ii.    an updated Budget including actuals for prior periods;

    iii.    a calculation of any variance from the Budget; and

    iv.    a comparison of actual weekly receipts to those set forth in the Budget.


Submitted this __ day of _____, 2017

Bostwick Laboratories, Inc.

By:_____

Title:_____