**Execution Version**

# AMENDED STALKING HORSE ASSET PURCHASE AGREEMENT

dated March 20, 2017

by and between

**POPLAR HEALTHCARE, PLLC**

and

**BOSTWICK LABORATORIES, INC.**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................................ 1
1.1      Previously Defined Terms .................................................................................. 1
1.2      Definitions ........................................................................................................ 1
1.3      Additional Defined Terms ................................................................................. 6
1.4      Interpretation .................................................................................................... 7

**ARTICLE II PURCHASE AND SALE, PURCHASE PRICE** ....................................... 7
2.1      Purchase and Sale ............................................................................................. 7
2.2      Purchase Price; Deposit .................................................................................. 11
2.3      Payments at Closing ....................................................................................... 11
2.4      Assumed Liabilities and Retained Liabilities .................................................. 12
2.5      Transfer Taxes ............................................................................................... 12
2.6      Allocation ...................................................................................................... 12
2.7      Government Receivables; Post-Termination Wind Down ................................ 13

**ARTICLE III CLOSING AND CLOSING DATE DELIVERIES** ................................ 13
3.1      Closing ........................................................................................................... 13
3.2      Closing Deliveries by Seller ............................................................................ 13
3.3      Closing Deliveries by Purchaser ..................................................................... 14
3.4      Cooperation .................................................................................................... 14

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** ................... 15
4.1      Due Incorporation .......................................................................................... 15
4.2      Noncontravention ........................................................................................... 15
4.3      Brokers .......................................................................................................... 15
4.4      Title to Purchased Assets ................................................................................ 15
4.5      Condition of Assets ........................................................................................ 15
4.6      NO OTHER REPRESENTATIONS ............................................................... 15

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** ................. 16
5.1      Organization; Authorization ........................................................................... 16
5.2      Noncontravention ........................................................................................... 16
5.3      No Brokers ..................................................................................................... 16
5.4      Financing Ability ............................................................................................ 16

**ARTICLE VI** ............................................................................................................... 17
6.1      Competing Bid ............................................................................................... 17
6.2      Cooperation in Bankruptcy Court Matters ...................................................... 17
6.3      Sale Order ...................................................................................................... 17
6.4      Back-up Bidder .............................................................................................. 18
6.5      Break-up Fee and Expense Reimbursement ..................................................... 18

**ARTICLE VII EMPLOYEE MATTERS** ..................................................................... 19

#43236677 v1

7.1   Employees to be Hired by Purchaser ........................................................... 19
7.2   Authorization to Communicate with Certain Employees ............................. 20

**ARTICLE VIII COVENANTS** ............................................................................ 20

A.   Pre-Closing Covenants ................................................................................ 20
8.1   Access to Governmental Authorities and Payors ....................................... 20
8.2   Maintenance of Business ............................................................................. 20
8.3   Seller Pre-Closing Covenants ..................................................................... 21
8.4   Cooperation to Transfer Memphis Facility ................................................ 21
8.5   Commercially Reasonable Efforts to Close ................................................ 21
8.6   Exclusivity ................................................................................................... 21
B.   Certain other Covenants and Agreements ................................................... 22
8.7   Access to Uniondale Facility ...................................................................... 22
8.8   Use of Name ................................................................................................ 22
8.9   Tax Matters .................................................................................................. 22

**ARTICLE IX CONDITIONS TO CLOSING APPLICABLE TO PURCHASER** .............. 23

9.1   No Termination ............................................................................................ 23
9.2   Bankruptcy Court Approval ........................................................................ 23
9.3   Bring-Down of Seller Warranties, Representations and Covenants ........... 23
9.4   Pending Actions ........................................................................................... 23

**ARTICLE X CONDITIONS TO CLOSING APPLICABLE TO SELLER** ........................ 24

10.1   No Termination ............................................................................................ 24
10.2   Bankruptcy Court Approval ........................................................................ 24
10.3   Bring-Down of Purchaser Warranties, Representations and Covenants ..... 24
10.4   Pending Actions ........................................................................................... 24
10.5   All Necessary Documents ........................................................................... 24

**ARTICLE XI TERMINATION** ............................................................................. 24

11.1   Termination .................................................................................................. 24
11.2   Breakup Fee ................................................................................................. 26
11.3   Purchaser Deposit ........................................................................................ 26

**ARTICLE XII MISCELLANEOUS** ...................................................................... 26

12.1   Costs and Expenses ..................................................................................... 26
12.2   Bankruptcy Court Approval ........................................................................ 27
12.3   Entire Agreement ......................................................................................... 27
12.4   Counterparts ................................................................................................. 27
12.5   Assignment, Successors and Assigns .......................................................... 27
12.6   Survival ........................................................................................................ 27
12.7   Severability .................................................................................................. 27
12.8   Headings ....................................................................................................... 27
12.9   Risk of Loss ................................................................................................. 27
12.10   **GOVERNING LAW** ................................................................................. 27
12.11   Press Releases and Public Announcements ................................................. 28

-iii-

61183747_11

12.12    U.S. Dollars ................................................................................. 29
12.13    Notices........................................................................................... 29
12.14    WAIVER OF JURY TRIAL ......................................................... 30
12.15    Waiver ............................................................................................ 30
12.16    No Third-Party Beneficiary........................................................... 30
12.17    SELLER DISCLAIMER................................................................ 30
12.18    PURCHASER DISCLAIMER....................................................... 31
12.19    Disclosures .................................................................................... 32
12.20    Specific Performance .................................................................... 32

## Exhibits

Exhibit A – Form of Bid Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of DIP Credit Agreement
Exhibit D – Form of Second Lien Notes Amendment

## Schedule Index

Schedule 2.1(b)(iv) -  Assumed Leasehold Interests
Schedule 2.1(b)(v) -  Assumed Contracts
Schedule 4.3 -  Brokers
Schedule 7.1(a) -  Employees List

61183747_11

This Asset Purchase Agreement is made and entered into as of March 13, 2017 (this "<u>Agreement</u>") by and between Poplar Healthcare, PLLC, a Tennessee professional limited liability company ("<u>Purchaser</u>"), and Bostwick Laboratories, Inc., a Delaware corporation (the "<u>Seller</u>").

RECITALS:

A.      Seller is engaged in the business of providing anatomic pathology laboratory services to physicians and other healthcare providers (the "<u>Business</u>").

B.      Seller desires to sell certain of its assets and properties and transfer certain specified liabilities related to the Business, and Purchaser desires to acquire certain of Seller's assets and properties and assume certain specified liabilities related to the Business from Seller, on the terms and subject to the conditions set forth herein.

C.      Seller intends to commence a bankruptcy case (the "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>") on or after March 14, 2017 in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

D.      In connection with the Chapter 11 Case and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, Seller shall sell, transfer and assign to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and Purchaser shall assume from Seller the Second Lien Notes and the other Assumed Liabilities (each as defined herein), all as more specifically set forth herein and in the Sale Order; and

E.      The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Chapter 11 Case.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     <u>Previously Defined Terms</u>. Each term defined in the first paragraph and Recitals shall have the meaning set forth above whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

1.2     <u>Definitions</u>. Whenever used herein, the following terms shall have the meanings set forth below unless otherwise expressly provided or unless the context clearly requires otherwise:

"Accounts Receivable" - As defined in clause (i) of the definition of Purchased Assets.

"Affiliate" means (a) with respect to an individual, (i) the members of the immediate family (including parents, siblings and children) of the individual, (ii) the individual's spouse and (iii) any Business Entity that directly or indirectly, through one or more intermediaries is Controlled by, or is under common Control with, any of the foregoing individuals, or (b) with respect to any Person other than an individual, any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such Person. The term "Control" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Assumed Tax" means any Liability for real property, personal property and similar ad valorem Taxes with respect to the Purchased Assets that are due and payable by Purchaser on or after the Closing Date and which are attributable to a Pre-Closing Tax Period.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"Bid Procedures Motion" means the motion filed by Seller seeking entry of the Bid Procedures Order.

"Bid Procedures Order" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, substantially in the form attached hereto as Exhibit A, establishing bidding procedures for the solicitation of higher or otherwise better bids for the Purchased Assets.

"Business Day" means any day other than a Saturday or Sunday or other day on which banks in Wilmington, Delaware are authorized or required by Law to be closed.

"Business Entity" means any Person other than an individual or a Governmental Authority.

"CMS" means the Centers for Medicare & Medicaid Services.

"CMS Claim Amount" means the amount as determined upon the Closing of the claim of CMS in the amount of the Pre-Petition CMS Payables.

"Code" means the Internal Revenue Code of 1986.

"Commercial Payor" means, each Payor that is not a Governmental Authority.

"Confidentiality Agreement" means that certain Nondisclosure Agreement, dated August 31, 2016, by and between Seller and Purchaser.

- 2 -

"Contracts" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, arrangement or undertaking, written or oral, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

"DIP Facility" means a debtor-in-possession financing facility under which the Purchaser will provide financing of up to $5,116,000.00 to the Seller pursuant to a credit agreement substantially in the form attached hereto as Exhibit C.

"Encumbrances" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"Environmental Laws" means any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"Excluded Tax" means any Liability of Seller for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract or other agreement): (i) income Taxes of Seller; and (ii) Taxes that relate to the Purchased Assets, the Business, or any Transferred Employee for any Pre-Closing Tax Period that are not Assumed Taxes.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"Government Receivables" means, collectively, all amounts received by Seller after the Closing pursuant to accounts receivable due from any Governmental Authority payor or governmental third-party payors for services performed by any of Seller's employees, agents or contractors prior to Closing in connection with the operation of the Business, including, but not limited to, the United States Centers for Medicare and Medicaid Services.

"IP Confidential Information" means all of the following U.S., state and foreign intellectual property of any Person related to the Business: (a) inventions, discoveries, processes, designs, techniques, developments, technology and related improvements, whether or not

- 3 -

patented or patentable; (b) proprietary computer programs and software (including source code, object code and executable code form), confidential and proprietary data, proprietary databases, and related documentation thereof, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof; (c) mask works; and (d) confidential or proprietary information (including trade secrets, know-how, drawings, specifications, designs, technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes). For the avoidance of doubt, "IP Confidential Information" excludes any data or information which is in the public domain.

"IRS" means the Internal Revenue Service.

"Law" means any law, statute, code, regulation, ordinance, rule or Order enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"LIS System" means the Laboratory Information System maintained by Seller, which logs specimens and maintains patient and other records regarding Seller's business.

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Materials of Environmental Concern" means any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, chemicals, petroleum or petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws; provided, that neither the Slides nor any medical specimens contained or incorporated therein shall be deemed or construed to be Materials of Environmental Concern.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement with, a Governmental Authority.

61183747_11

"Ordinary Course" means the ordinary course of business of Seller, taking into account that Seller will be operating its business under chapter 11 of the Bankruptcy Code as a debtor-in-possession.

"Payors" means any third party payors who pay or reimburse the cost of health services provided by Seller in connection with the Business such as Medicare, Medicaid, CHAMPUS/TRICARE, Blue Cross and/or Blue Shield, State government insurers, private insurers or any other Person.

"Permitted Encumbrances" means (a) Encumbrances for Taxes not yet due and payable or being contested in good faith; (b) landlord and lessor Encumbrances existing under the terms and conditions of leases of real and personal property; (c) mechanic's, materialmen's, landlord's and similar Encumbrances incurred in the Ordinary Course; (d) Encumbrances arising in the Ordinary Course under worker's compensation, unemployment insurance, social security, retirement and similar legislation; (e) Encumbrances on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course; (f) any recorded easement, covenant, zoning or other restriction on the Leased Real Property; and (g) any lien, claim or encumbrance of which Seller, as a debtor under the Bankruptcy Code, could not sell its property free and clear pursuant to section 363(f) of the Bankruptcy Code.

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) that ends on or prior to the Closing Date.

"Pre-Petition CMS Payables" means the pre-petition setoff rights of CMS in payables owed to the Seller.

"Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures Order. This Agreement shall constitute a Qualified Bid.

"Qualified Bid Determination Deadline" shall have the meaning ascribed to it in the Bid Procedures Order.

"Sale Motion" means the motion filed by Seller seeking approval of this Agreement and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, and substantially in the form attached hereto as Exhibit B, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby.

"Second Lien Notes" means the second lien secured notes issued by the Seller pursuant to that certain Note Purchase Agreement, dated February 21, 2017, between Bostwick

Laboratories Group Holdings, L.P., Seller, certain "Purchasers" identified therein, and Bostwick Laboratories Group Holdings GP, LLC.

"Second Lien Notes Amendment" means an amendment of the Second Lien Notes substantially in the form attached as Exhibit D.

"Second Lien Noteholders" means the holders of the Second Lien Notes.

"Successful Bidder" means any party or parties who acquires all, substantially all, or a portion of the Purchased Assets (in a single transaction or a series of transactions) by reason of having submitted the successful bid at the Auction in a manner consistent with and authorized by the Bid Procedures Order.

"Tax Return" means any report, return (including estimated) or other information required (including any attachments or schedules required to be attached to such report, return, or other information) to be filed, with a Governmental Authority in connection with any Taxes (and any amendment thereto).

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental (including Section 59A of the Code), capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"Transaction" means the sale and purchase of the Purchased Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Purchased Assets.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109, or any similar applicable state or local laws.

1.3    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Aggregate Purchase Price | 2.2 |
| Assumed Contracts | 2.1(b)(v) |
| Assumed Leasehold Interests | 2.1(b)(iv) |
| Assumed Liabilities | 2.7(a) |
| Auction | 6.4 |
| Bankruptcy Code | Preamble |
| Bill of Sale and Assignment Agreement | 3.2(a) |
| Business | Recitals |

- 6 -

| | |
|---|---|
| Business Employees | 7.1(a) |
| Closing | 3.1(a) |
| Competing Bid | 6.1 |
| Closing Date | 3.1(a) |
| Credit Bid | 2.2(a) |
| Effective Time | 3.1 |
| Intellectual Property | 2.1(b) |
| Inventory | 2.1(b) |
| Permits | 4.16 |
| Pre-Closing Period | 8.2 |
| Purchased Assets | 2.1(b) |
| Purchase Price Allocation Schedule | 2.6 |
| Purchaser | Preamble |
| Real Property Leases | 4.6(b) |
| Required Closing Payment | 2.3 |
| Retained Assets | 2.1(c) |
| Seller | Preamble |
| Slides | 2.1(b) |
| Specified Categories | Schedule 7.1(a) |
| Transfer Taxes | 2.7 |
| Transferred Employees | 7.1(a) |

1.4     Interpretation. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement, (d) all references in this Agreement to Articles, Sections and Exhibits shall mean and refer to Articles, Sections and Exhibits of this Agreement, (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (g) the term "including" shall be deemed to mean "including, without limitation" and "including, but not limited to" and (i) all references to "day" or "days" in this Agreement shall refer to calendar day(s), unless such reference is specifically to "Business Days."

## ARTICLE II
## PURCHASE AND SALE, PURCHASE PRICE

2.1     Purchase and Sale.

(a)     Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, the Bid Procedures Order, and the Sale Order, at the Closing on the Closing Date, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall acquire from Seller, the Purchased Assets, free and clear of any Encumbrances pursuant to Bankruptcy Code Section 363(f), other than Permitted Encumbrances, and Purchaser shall assume from Seller the Assumed Liabilities. Notwithstanding anything herein to the contrary, the Excluded

- 7 -

Liabilities shall not be assumed by Purchaser and the Retained Assets will be retained by Seller and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

(b)    <u>Purchased Assets</u>. For purposes of this Agreement, "<u>Purchased Assets</u>" means all assets, rights and properties of Seller identified below (other than the Retained Assets), whether or not carried and reflected on the books of Seller, wherever located:

(i)    Except as limited by <u>Section 2.1(c)(ii)</u> with respect to Government Receivables, all accounts, accounts receivable, notes, contract or other rights to payments of Seller of whatever kind or nature, including all current or deferred rights to payment for goods or services rendered on or prior to the Closing Date and all claims (excluding claims arising under Chapter 5 of the Bankruptcy Code), rights, interests and proceeds related thereto (collectively, "<u>Accounts Receivable</u>");

(ii)    all supply inventories of Seller used in the conduct of the Business, including all testing supplies and reagents (collectively, "<u>Inventory</u>");

(iii)    all laboratory and other equipment owned by Seller;

(iv)    all of Seller's right, title and interest in and to the real property leases described in <u>Schedule 2.1(b)(iv)</u> (which <u>Schedule 2.1(b)(iv)</u> Purchaser may amend at any time in Purchaser's discretion prior to one (1) business day prior to entry of the Bid Procedures Order) and the leasehold improvements situated on such leased real property which is the subject of each such lease (collectively, the "<u>Assumed Leasehold Interests</u>");

(v)    to the extent authorized by the Bankruptcy Court, all of Seller's right, title and interest in, to or under the Contracts of Seller described in <u>Schedule 2.1(b)(v)</u> (which <u>Schedule 2.1(b)(v)</u> Purchaser may amend at any time in Purchaser's discretion prior to one (1) business day following entry of the Bid Procedures Order) (such purchased Contracts the "<u>Assumed Contracts</u>");

(vi)    all of Seller's right, title and interest in and to the following intellectual property used in the conduct of the Business: trade names, trademarks, trademark registrations (including "Bostwick Laboratories", "Bostwick Scientific", "Dermatocor", "Gastrocor", "Gynecor", "Hematocor", "Nephrocor", "Renaissance", and "QC Sciences"), trademark applications, service marks, service mark registrations, service mark applications; copyrights, copyright registrations, copyright applications; patent rights (including issued patents, applications, divisions, continuations and continuations-in-part, reissues, patents of addition, utility models and inventors' certificates); domain names; licenses with respect to any of the foregoing; IP Confidential Information; customer and vendor lists; patient lists in respect of the Assumed Contracts; and the goodwill associated with any of the foregoing (collectively, the "<u>Intellectual Property</u>");

(vii)    the LIS System;

- 8 -

(viii)   any patient records in respect of the Purchased Assets or the conduct of the Business, including those maintained on the LIS System, which Purchaser agrees to maintain in accordance with applicable law;

(ix)   any test results generated in respect of the Business, which Seller is required to maintain in accordance with applicable law;

(x)   all slides and blocks of Seller in respect of the Business (the "Slides"), which Seller is required to maintain in accordance with applicable law.

(c)   Retained Assets. For purposes of this Agreement, "Retained Assets" means all assets and property of Seller, other than the Purchased Assets, including the following:

(i)   All bank accounts of Seller and all cash and cash equivalents of Seller;

(ii)   all Government Receivables (but not Purchaser's right to amounts collected with respect to the Government Receivables pursuant to Section 2.7);

(iii)   all deposits and advances, prepaid expenses and other prepaid items of Seller, which includes any prepaid Taxes and deposits under any Assumed Leasehold Interests;

(iv)   Seller's corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents;

(v)   all of Seller's right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character, including under warranties, guarantees and indemnitees and actions under Chapter 5 of the Bankruptcy Code;

(vi)   all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith;

(vii)   (i) all attorney-client privilege and attorney work-product protection of Seller or associated with the Business as a result of legal counsel representing Seller or the Business; (ii) all documents of Seller or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by Seller in connection with the transactions contemplated by this Agreement;

(viii)   Seller's national provider identifier number and Provider Transaction Access Number (PTAN) (i.e., Medicare number) and all related provider Contracts;

(ix)   all Contracts of Seller, other than the Assumed Contracts;

- 9 -

(x)    all rights to any refund or credit of Taxes of Seller;

(xi)    all rights in laboratory equipment leased by Seller;

(xii)    all of Seller's billing records, other than the LIS System; and

(xiii)    Seller's rights under this Agreement and the transactions contemplated hereby.

(d)    <u>Excluded Liabilities</u>. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Purchased Assets shall be or become liable for or subject to, any liabilities or obligations of Seller or the Business, including the following liabilities and obligations (collectively, "<u>Excluded Liabilities</u>"), which shall be and remain liabilities of Seller:

(i)    liabilities accrued on any financial statements of Seller;

(ii)    liabilities or obligations associated with any Retained Assets;

(iii)    liabilities or obligations associated with any and all indebtedness of Seller for borrowed money to the extent the liability therefor is not one of the Assumed Liabilities;

(iv)    liabilities or obligations arising under any Contracts that are not Assumed Contracts;

(v)    liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Seller that occurred, or arise from events that occurred, prior to the Closing Date;

(vi)    liabilities retained by Seller pursuant to <u>Section 7.1(b)</u> and all other liabilities or obligations prior to the Closing to current, former or prospective employees (including any Business Employees who do not become Transferred Employees) of Seller and other individual service providers or their respective dependents or beneficiaries, other than liabilities or obligations with respect to any Transferred Employees on or after the Closing;

(vii)    liabilities of Seller to the Internal Revenue Service or any other Governmental Authority including those relating to Seller's employees to the extent such liabilities are not Assumed Taxes;

(viii)    penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Seller of any Legal Requirement and/or Environmental Law prior to the Closing Date;

- 10 -

(ix)    compliance with or any payment under the terms of the Settlement Agreement among the United States of America and Seller and others dated August 28, 2014;

(x)    liabilities of Seller to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law; and

(xi)    liabilities or obligations under the WARN Act, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction.

2.2    Purchase Price; Deposit.

(a)    The purchase price payable by Purchaser for the Purchased Assets shall be equal to: (a) Six Million Five Hundred and Five Thousand Dollars ($6,505,000.00)[1], which shall be paid in the form of (i) a credit bid in an amount sufficient to pay in full the outstanding obligations under the DIP Facility (the "Credit Bid") and (ii) cash, including the amount necessary to satisfy the CMS Claim Amount, plus (b) the assumption by Purchaser at the Closing of the Assumed Liabilities, collectively, the "Aggregate Purchase Price".

(b)    Within three (3) Business Days after entry into this Agreement, Purchaser shall deposit Five Hundred Thousand Five Hundred Dollars ($540,500.00) (the "Buyer Deposit") with Pepper Hamilton LLP ("Pepper") by wire transfer of immediately available funds. Pepper shall hold the Buyer Deposit in escrow in a segregated, non-interest-bearing account (the "Escrow Account"). An amount equal to the Buyer Deposit (the "Closing Release Amount") shall become payable, and shall be paid, to Seller from the Escrow Account at the Closing. At the Closing, Purchaser and Seller shall instruct Pepper to deliver so much of the Closing Release Amount to Seller as is necessary for payment of the Aggregate Purchase Price by wire transfer of immediately available funds into an account designated by Seller, pursuant to the terms of this Agreement. If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Purchaser or Seller in accordance with the terms set forth in Section 11.3.

2.3    Payments at Closing. At the Closing, an amount equal to $6,505,000.00[2] ("Required Closing Payment"), less the Credit Bid and the Closing Release Amount, shall be paid by Purchaser to Seller by delivery to Seller by bank wire transfer (in immediately available funds) to an account or account designated Seller, which account or accounts will be designated by Seller to Purchaser in writing at least three (3) Business Days prior to the date of the required payment. To the extent that total of the Credit Bid and the Closing Release Amount exceeds the Required Closing Payment, the excess of the Buyer Deposit shall be refunded to Purchaser.

---

[1] The Purchase Price is subject to reduction by the amount in which the CMS Claim Amount is determined at Closing to be less than $1.1 million.

[2] The Required Closing Payment is subject to reduction by the amount in which the CMS Claim Amount is determined at Closing to be less than $1.1 million.

2.4    <u>Assumed Liabilities and Retained Liabilities</u>.

(a)    As additional consideration for the purchase of the Purchased Assets, Purchaser shall, at the Closing, pursuant to the Sale Order, agree to perform, and in due course pay and discharge, only the following obligations and liabilities of Seller relating to the Business (collectively, the "<u>Assumed Liabilities</u>"):

(i)    $950,000 in principal amount of Second Lien Notes plus accrued interest through the date of the Closing, after giving effect to the modification of the Second Lien Notes pursuant to the Second Lien Notes Amendment substantially in the form of <u>Exhibit D</u> providing for (X) amortization over a period of 18 months at an interest rate of 8% and (Y) the right for Purchaser to prepay the Second Lien Notes at any time without penalty;

(ii)    the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees;

(iii)    cure costs under Bankruptcy Code Section 365 for all Assumed Contracts and Assumed Leasehold Interests; and

(iv)    Assumed Taxes.

(b)    Purchaser shall only be responsible for the Assumed Liabilities and shall not assume or pay any, and Seller shall continue to be responsible for each, liability of Seller whether or not relating to the Business including, but not limited to the Excluded Liabilities set forth in <u>Section 2.1(d)</u> (collectively, the "<u>Retained Liabilities</u>").

2.5    <u>Transfer Taxes</u>. Any and all transfer, sales, use, purchase, value added, excise, real property, personal property, intangible stamp, registration or similar Taxes or fees imposed on, or resulting from, the transfer of any Purchased Assets (collectively "<u>Transfer Taxes</u>"), regardless of when payable, shall be paid by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, fees and charges, and, if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.

2.6    <u>Allocation</u>. Within sixty (60) days of the Closing, Purchaser shall provide to Seller, for Seller's review, comment and consent, a schedule allocating the Aggregate Purchase Price (taking into account any Assumed Liabilities that are Liabilities for Tax purposes) among the Purchased Assets (the "<u>Purchase Price Allocation Schedule</u>"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code. The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Aggregate Purchase Price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation Schedule, as adjusted pursuant to the prior sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

2.7    <u>Government Receivables; Post-Termination Wind Down</u>. The Parties acknowledge that, notwithstanding anything to the contrary herein, Purchaser is not acquiring, and the Purchased Assets do not include, the Government Receivables; <u>provided</u>, <u>however</u>, that Purchaser is purchasing the Purchased Assets, and the Purchased Assets include all amounts collected with respect to the Government Receivables. Seller hereby appoints Purchaser (at Purchaser's sole cost and expense) to act as Seller's collection agent with respect to the Government Receivables. In connection therewith, on or before the Closing Date, Seller shall establish a new, or maintain an existing, depository bank account at a financial institution mutually acceptable to Seller and Purchaser. After the Closing, Seller shall receive in such bank account cash, checks, drafts or other similar items of payment received with respect to the Government Receivables, and Seller shall cause such amounts to be swept into an account controlled by Purchaser. To the extent any Accounts Receivable of a Commercial Payor are not assignable to Purchaser pursuant to any Assumed Contract, any amounts collected related to such receivables shall be collected and transferred to Purchaser through a separate bank account controlled by Seller in the manner provided in this <u>Section 2.7</u>.

## ARTICLE III
## CLOSING AND CLOSING DATE DELIVERIES

3.1    <u>Closing</u>. The term "<u>Closing</u>" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser in exchange for the consideration delivered to Seller pursuant to this Agreement. The Closing shall take place at the offices of Pepper Hamilton LLP, 1313 North Market Street, Suite 5100, Wilmington, DE 19899, or at such other place as is mutually agreed to in writing by Seller and Purchaser, at 10:00 am local time not later than five (5) Business Days following the date on which all of the conditions set forth in <u>Articles IX</u> and <u>X</u> are satisfied (other than conditions the fulfillment of which is to occur at the Closing). The date upon which the Closing actually takes place is referred to as the "<u>Closing Date</u>". The Closing shall be deemed effective as of 12:01 a.m. (Eastern Time) on the Closing Date (the "<u>Effective Time</u>").

3.2    <u>Closing Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

(a)    a Bill of Sale and Assignment Agreement (the "<u>Bill of Sale and Assignment Agreement</u>"), executed by Seller; and all such other bills of sale, lease assignments, trademark assignments, copyright assignments, patent assignments, employee work product assignments, and contract assignments (and any other appropriate title transfer documentation) and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser may deem necessary or desirable;

(b)    a certificate executed by an executive officer of Seller certifying as to the matters set forth in <u>Section 9.3</u>;

(c)    a certified copy of the Sale Order;

- 13 -

(d)     a certificate, duly completed and executed by Seller pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(e)     a duly completed and executed IRS Form W-9 establishing that Seller is exempt from U.S. back-up withholding; and

(f)     all documents furnished by Purchaser that are necessary to amend Seller's name to not include "Bostwick," or any derivative thereof or any other similar name, which shall be executed by Seller and in a form that Purchaser may file in the State of Delaware and in each other state in which Seller is qualified to transact business.

3.3     <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Seller:

(a)     the payments to be delivered by Purchaser pursuant to <u>Section 2.3</u>;

(b)     a certificate of the Secretary or an Assistant Secretary of Purchaser certifying as to: (i) the certificate of formation of Purchaser; and (ii) the resolutions of the board of managers of Purchaser authorizing and approving the execution, delivery and performance by Purchaser of this Agreement and any agreements, instruments, certificates or other documents executed by Purchaser pursuant to this Agreement;

(c)     a certificate executed by an authorized officer of Purchaser certifying as to the matters set forth in <u>Section 10.3</u>;

(d)     the Bill of Sale and Assignment Agreement as executed by Purchaser;

(e)     the Second Lien Notes Amendment and related documentation;

(f)     a payoff letter reflecting the cancellation of the DIP Facility as a portion of the Aggregate Purchase Price; and

(g)     a certificate, duly completed and executed by Purchaser pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code; <u>provided</u>, <u>however</u>, that if Purchaser is a disregarded entity (as described in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations), such certification shall be provided by the Purchaser's owner.

3.4     <u>Cooperation</u>. Seller and Purchaser shall, on request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents and/or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

- 14 -

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as of the Closing as follows:

4.1     Due Incorporation. Seller is (i) duly organized, validly existing and in good standing under the Laws of the State of Delaware and (ii) duly qualified to do business and in good standing in each jurisdiction where such qualification is required. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Seller and, if applicable, have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and, subject to entry of the Sale Order, is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Seller has the full power and authority necessary to own, lease, operate and use the Purchased Assets.

4.2     Noncontravention. Subject to entry of the Sale Order, neither the execution, delivery and performance by Seller of this Agreement nor the consummation of the transactions contemplated hereby will, after the giving of notice, or the lapse of time, or otherwise result in a breach or violation of, or default under, Seller's organizational documents.

4.3     Brokers. Except as set forth in Schedule 4.3, neither this Agreement nor the sale of the Purchased Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of, or representing Seller or any of its Affiliates as broker, finder, investment banker, financial advisor or in any similar capacity.

4.4     Title to Purchased Assets.

(a)     Seller has good and marketable title to, or, in the case of property held under a lease or other contractual obligation, a valid leasehold interest in, all of the Purchased Assets, whether real or personal property and whether tangible or intangible, other than Permitted Encumbrances.

(b)     Subject to entry of the Sale Order, Purchaser will be vested with title to the Purchased Assets, free and clear of all liens and Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5     Condition of Assets. The Purchased Assets are being sold by Seller in AS-IS condition. Neither Seller nor any other Person makes any other express or implied representation or warranty on behalf of Seller, including, without limitation, any representation or warranty as to the condition of the Purchased Assets.

4.6     NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLER DOES NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR

- 15 -

WARRANTY WITH RESPECT TO SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS, AND SELLER DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLER, ANY AFFILIATE OF SELLER OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1     Organization; Authorization. Purchaser is (a) duly organized, validly existing and in good standing under the laws of the State of Delaware and (b) duly qualified to do business and in good standing in each jurisdiction where such qualification is required. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by such party and is a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2     Noncontravention. Neither the execution, delivery and performance by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby will result in a breach or violation of, or default under, Purchaser's organizational documents.

5.3     No Brokers. Purchaser has no Liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller could be liable.

5.4     Financing Ability. Purchaser has the financial ability to pay the Aggregate Purchase Price as of the date hereof and the Closing and to otherwise perform Purchaser's obligations under this Agreement and provide the DIP Facility. Accordingly, there are no financing conditions to the payment of the Aggregate Purchase Price.

- 16 -

## ARTICLE VI
## BANKRUPTCY MATTERS

6.1    Competing Bid.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of any assets of the Seller to a purchaser or purchasers other than Purchaser (whether consummated pursuant to a sale, consensual foreclosure, liquidation, credit bid or chapter 11 plan, a "Competing Bid").

(b)    Nothing contained herein shall be construed to prohibit Seller and its representatives or Affiliates from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bid.

6.2    Cooperation in Bankruptcy Court Matters.

(a)    Seller shall pursue diligently the entry of the Bid Procedures Order and the Sale Order. Seller shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bid Procedures Order.

(b)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bid Procedures Order. In the event the entry of the Bid Procedures Order shall be appealed, Seller and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

6.3    Sale Order.

(a)    The Sale Order shall contain, without limitation, the following provisions:

(i)    finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that Seller and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Seller under the Assumed Leasehold Interests and Assumed Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)    authorizing Seller to transfer to Purchaser all of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)    authorizing Seller to assume and sell and assign the Assumed Leasehold Interests and Assumed Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code;

(iv)    finding that Purchaser is a not a successor to Seller or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Seller, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing, all as set forth in more detail in the form of Sale Order attached hereto as Exhibit C; and

(v)    Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Assumed Leasehold Interests and Assumed Contracts.

(b)    Subject to any Competing Bid, (i) Seller agrees that it will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order, (ii) Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller and are reasonably necessary or appropriate to assist Seller in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Aggregate Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code; and (iii) if the entry of the Sale Order shall be appealed or collaterally attacked, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; provided, that Purchaser shall reimburse to Seller the costs and expenses (including professional fees and expenses) of Seller in any such appeal. After consultation with the Purchaser, in Seller's sole discretion, Seller may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement. Seller shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Bankruptcy Case reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; provided, however, Seller's obligations in connection with any such efforts shall terminate upon the Closing.

6.4    Back-up Bidder. Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Bid Procedures Order (the "Auction"), if and only if Purchaser submits the next highest or otherwise best bid at the Auction, as contemplated by the Bid Procedures Order and the winning bidder fails to consummate the transaction, Purchaser shall promptly consummate the transactions upon the terms and conditions as set forth herein, including the Aggregate Purchase Price, as the same may modified by Purchaser at the Auction.

6.5    Break-up Fee and Expense Reimbursement.

(a)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser a break-up fee (the "Break-Up Fee") in an amount equal to the sum of: (i) $199,650 plus (ii) the reasonable and documented out of pocket amounts actually expended or incurred by or on behalf of Purchaser, payable to third parties, in connection with Purchaser's due diligence review and the preparation, negotiation, execution and delivery of this Agreement (including attorneys' fees) and its representation in the Chapter 11 Case through the later of (A) the consummation of any such Alternative Transaction and (B) the payment of the Break-Up Fee in full, up to a maximum of $150,000, in accordance with the terms hereof, the Bid Procedures Order, and only upon the Bankruptcy Court having approved the Break-Up Fee. The Break-Up Fee shall be deemed to be an allowed expense in the Chapter 11 Case of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

(b)     Seller shall seek, pursuant to the Bid Procedures Order, Bankruptcy Court approval of the Break-Up Fee. For the avoidance of doubt, the Break-Up Fee provided for hereunder shall only be paid to the Purchaser if this Agreement is approved pursuant to the Bid Procedures Order and the Bankruptcy Court approves the Break-Up Fee.

(c)     Seller acknowledges and agrees that the entry into this Agreement provides value to the Seller's chapter 11 estate by, among other things, inducing other parties to submit higher or better offers for the Purchased Assets. Seller and Purchaser agree that the Break-Up Fee is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated in this Agreement.

## ARTICLE VII
## EMPLOYEE MATTERS

7.1     Employees to be Hired by Purchaser.

(a)     Prior to the Closing. Purchaser will offer to employ, effective as of the Closing Date, the employees of Seller as of immediately prior to the Closing Date in respect of the Business as listed on Schedule 7.1(a) (which Purchaser shall deliver to Seller no later than one (1) Business Day prior to the Qualified Bid Determination Deadline) (the "Business Employees") as determined in the sole discretion of Purchaser. All Business Employees who are offered and accept employment with Purchaser and commence such employment immediately after the Closing shall be referred to as the "Transferred Employees". Seller shall terminate the employment of all Transferred Employees effective as of the Closing. Schedule 7.1(a) shall be filed under seal.

(b)     Seller shall be solely responsible, and Purchaser shall have no obligations whatsoever, for any salary, wages, bonuses, accrued vacations or paid time off, or other similar amounts payable to any current or former employee, independent contractor, consultant of Seller, or any of their eligible dependents, for any period relating to service with Seller. For the avoidance of doubt and notwithstanding anything to the contrary in this Section 7.1, Purchaser shall be responsible only for any Assumed Liabilities under Section 2.4(a)(i)-(iv).

- 19 -

(c)     Nothing in this Agreement shall be deemed or construed to limit or condition the delivery by the Seller of any notices required by, or the taking of any other action the Seller deems necessary or desirable to comply with, the WARN Act, which the Seller may take at such time and in such manner as the Seller deems appropriate in its sole discretion. Purchaser shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, within ninety (90) days after the Closing Date, take any action that would obligate Seller to have provided notice to any Business Employees prior to or on the Closing Date under the WARN Act.

(d)     The provisions of this Section 7.1 shall inure solely to the benefit of the parties to this Agreement, and nothing herein, express or implied, is intended to confer upon any other Person (including any Business or Transferred Employee) any rights or remedies of any nature (including any third-party beneficiary rights under this Agreement) whatsoever.

7.2     Authorization to Communicate with Certain Employees. In coordination and cooperation with Seller, Purchaser is authorized to communicate with the employees of Seller consisting of members of the pathology staff, laboratory operations, "Field Tech Reps", members of the sales, marketing, and customer service team for the purpose of negotiating and extending to such employees as it determines, offers of employment contingent on Purchaser being the successful purchaser of the Purchased Assets; provided, that this right shall terminate if Purchaser is not the winning bidder at the Auction.

## ARTICLE VIII
## COVENANTS

A.   Pre-Closing Covenants.

8.1     Access to Governmental Authorities and Payors. With Seller's cooperation and in coordination with Seller, Seller shall permit Purchaser to communicate with Governmental Authorities involved in the regulation of Seller's Business regarding the pending transactions contemplated by this Agreement; provided, that this right shall terminate if Purchaser is not the winning bidder at the Auction. At such time as Purchaser becomes the winning bidder, or at an earlier date as may be agreed by Seller, Purchaser shall be permitted to communicate directly with Seller's Payors regarding the transactions contemplated in this Agreement.

8.2     Maintenance of Business. For the period commencing on the date hereof and expiring on the earlier of the termination of this Agreement in accordance with Article XI and the Closing (the "Pre-Closing Period"), Seller shall, subject to the compliance by the Purchaser with its covenants hereunder and to applicable requirements of Law, conduct and carry on the Business in the Ordinary Course other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order.

8.3    <u>Seller Pre-Closing Covenants</u>. Without limiting the generality of Section 8.2(a), during the Pre-Closing Period, Seller shall not, without the prior written consent of Purchaser:

(a)    purchase, sell, lease, mortgage, pledge or otherwise acquire or dispose of any material Purchased Assets, except for inventory, parts and supplies purchased, sold or otherwise disposed of in the Ordinary Course;

(b)    waive, release or cancel in any material respect any claims against third parties or material debts owing to it, or any rights which have any material value, in each case, with respect to any Purchased Assets, other than in the Ordinary Course or related solely to Excluded Liabilities;

(c)    change, amend, terminate or otherwise modify in any material respect, any material Assumed Contract to which Seller is a party, other than in the Ordinary Course; and

(d)    agree to do any of the items prohibited by this <u>Section 8.3</u>.

8.4    <u>Cooperation to Transfer Memphis Facility</u>. Upon entry of the Sale Order, Seller shall, at Purchaser's cost, use reasonable efforts to cooperate with Purchaser in the transition of work to Purchaser's Memphis facility.

8.5    <u>Commercially Reasonable Efforts to Close</u>.

(a)    Subject to the terms and conditions hereof, each party hereto covenants and agrees to use all commercially reasonable efforts to consummate the transactions contemplated hereby within sixty (60) days of the date of this Agreement and will fully cooperate with the other parties hereto for such purpose.

(b)    Seller agrees to immediately notify Purchaser of any event, fact or circumstance of which Seller becomes aware that could reasonably be expected to result in the failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Purchaser a reasonable opportunity to satisfy such condition.

(c)    Purchaser agrees to immediately notify Seller of any event, fact or circumstance of which Purchaser becomes aware that could reasonably be expected to result in the failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Seller a reasonable opportunity to satisfy such condition.

8.6    <u>Exclusivity</u>.

(a)    During the period from the date hereof to the commencement of Seller's chapter 11 case, Seller shall, and shall cause its Affiliates and its and their respective stockholders, members, partners, directors, officers, employees, representatives and agents (collectively, "<u>Representatives</u>") to, cease immediately and cause to be terminated any and all activities, discussions or negotiations with any person, entity or group conducted heretofore with respect to, or that may reasonably be expected to lead to, an Alternative Transaction, and Seller shall not, and shall cause its Representatives to not, directly or indirectly, solicit, initiate or

- 21 -

encourage, or take any other action that facilitates any offer, inquiry or proposal concerning any Alternative Transaction.

(b)     Subject to the terms and conditions of the Bid Procedures Order, Purchaser shall have the right to bid against any Alternative Transaction Bids at the Auction.

B. Certain other Covenants and Agreements.

8.7     Access to Uniondale Facility. Seller will use commercially reasonable efforts, at Purchaser's cost, to provide Purchaser with access to Seller's facility in Uniondale, New York, for 30 days following the Closing.

8.8     Use of Name. After the Closing, Seller may not, directly or indirectly, use the name "Bostwick," "Bostwick Laboratories" or any derivative thereof or any similar name to identify itself. Seller shall be responsible for all filing fees required to be paid in connection with filing Seller's change of name amendments in the State of Delaware and in each other state in which it is qualified to transact business.

8.9     Tax Matters.

(a)     All refunds for Taxes for any Excluded Tax, Transfer Taxes, or that are attributable to the carry forward of a Tax attribute from a Pre-Closing Period shall be for the sole benefit of Seller and to the extent that Purchaser receives a refund that is for the benefit of Seller, Purchaser shall promptly advise Seller of the receipt of the refund and within two (2) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Seller. All refunds for Taxes relating to the Business, the Purchased Assets or Transferred Employees for a Post-Closing Tax Period or that are Assumed Taxes shall be for the sole benefit of Purchaser and to the extent that Seller receives a refund for a Tax that is for the benefit of Purchaser, Seller shall promptly advise Seller of the receipt of the refund and within two (2) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Purchaser.

(b)     If any Tax (or Tax refund) relates to a period that begins before and ends after the Closing Date, the parties shall use the following conventions for determining the portion of such Tax (or Tax refund) that relate to a Pre-Closing Tax Period and the portion that relates to a Post-Closing Tax Period: (A) in the case of property Taxes and other similar Taxes imposed on a periodic basis, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined by multiplying the Taxes (or Tax refund) for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period, and the remaining amount of such Taxes (or Tax refunds) shall be attributable to the Post-Closing Tax Period; and (B) in the case of all other Taxes, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined as if a separate return was filed for the period ending as of the end of the day on the Closing Date using a "closing of the books methodology," and the remaining amount of the Taxes (or Tax refunds) for such period shall be attributable to the Post-Closing Tax Period.

- 22 -

(c)     Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such reasonably requested information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return or other filings or otherwise in connection with Tax matters, in each case relating to the Purchased Assets or the Business.

8.10    Transfer of Slides. Seller shall, at Seller's expense, use commercially reasonable efforts to catalogue the Slides in accordance with cataloguing instructions provided by Purchaser, with such catalogue to be completed by the Closing. Following the Closing, Seller shall, at Seller's expense, use commercially reasonable efforts to transfer the Slides to Purchaser's Memphis, Tennessee location. Seller shall remain solely responsible for the Slides until delivered to Purchaser's Memphis, Tennessee location.

## ARTICLE IX
## CONDITIONS TO CLOSING APPLICABLE TO PURCHASER

The obligations of Purchaser hereunder (including the obligation of Purchaser to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Purchaser):

9.1     No Termination. Seller shall not have terminated this Agreement pursuant to Section 11.1.

9.2     Bankruptcy Court Approval. The Bankruptcy Court shall have entered (i) the Bid Procedures Order and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

9.3     Bring-Down of Seller Warranties, Representations and Covenants. Each of the representations and warranties of Seller contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Seller will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing.

9.4     Pending Actions.  No proceeding by any Governmental Authority shall be pending on the Closing Date which seeks to enjoin the consummation of this Agreement or any transactions contemplated hereby.

9.5     Condition of Assets. There shall have been no material adverse change in the condition or affecting the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of Seller's Bankruptcy Case or to the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order.

- 23 -

## ARTICLE X
## CONDITIONS TO CLOSING APPLICABLE TO SELLER

The obligations of Seller hereunder (including the obligation of Seller to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Seller):

10.1    No Termination. Purchaser shall not have terminated this Agreement pursuant to Section 11.1.

10.2    Bankruptcy Court Approval. The Bankruptcy Court shall have entered (i) the Bid Procedures Order and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

10.3    Bring-Down of Purchaser Warranties, Representations and Covenants. Each of the representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Purchaser will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing.

10.4    Pending Actions.  No proceeding by any Governmental Authority shall be pending on the Closing Date which seeks to enjoin the consummation of this Agreement or any transaction contemplated hereby.

10.5    All Necessary Documents. All proceedings to be taken in connection with the consummation of the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Seller, and Seller shall have received copies of such documents as it may reasonably request in connection therewith, including those documents to be delivered pursuant to Section 3.3.

## ARTICLE XI
## TERMINATION

11.1    Termination. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual consent of Purchaser and Seller;

(b)    by Seller, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred on or before May 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; provided that Seller is not in material breach of or default under this Agreement;

- 24 -

(ii)    any representation or warranty made herein for the benefit of Seller is untrue in any material respect, or Purchaser shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(c)    by Purchaser, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred on or before May 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; provided that Purchaser is not in material breach of or default under this Agreement;

(ii)    any representation or warranty made herein for the benefit of Purchaser is untrue in any material respect, or Seller shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(iii)    if Seller fails to file, on or prior to March 16, 2017, the Sale Motion and the Bid Procedures Motion; provided, however, that if Seller makes such filing after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(i);

(iv)    if Bankruptcy Court does not enter the Bid Procedures Order on or prior to April 5, 2017; provided, however, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(iv);

(v)    if Seller fails to conduct the Auction in accordance with the Bid Procedures Order within seven (7) Business Days of the Qualified Bid Determination Deadline; provided, however, that if such auction concludes after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(v);

(vi)    if the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after the conclusion of the Auction; provided, however, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vi);

(vii)    if, after the entry of the Bid Procedures Order, the Auction is cancelled by Seller and the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after such cancellation; provided, however, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vii); or

(viii)    if, upon there being no Competing Bids resulting in cancellation of the Auction, or in the alternative, if Purchaser is declared the winning bidder at the Auction such that Purchaser will be the successful purchaser of the Purchased Assets upon entry of the Sale Order, and less than 66% of those employees of Seller in the

Specified Categories who are provided with offers of employment by Purchaser pursuant to <u>Section 7.2</u> (with compensation substantially similar to, or better than, such employees' compensation from Seller and on other terms consistent with Purchaser's current employment practices for similarly situated employees) accept such offers of employment; <u>provided</u>, <u>however</u>, that Purchaser must exercise its right to terminate this Agreement under this <u>Section 11.1(c)(viii)</u> within 5 calendar days of the entry of the Sale Order.

(d)    automatically if, in accordance with the Bid Procedures Order, an alternative bidder is selected by Seller at the conclusion of the Auction as having the highest or otherwise best bid, and such alternative bidder transaction closes.

11.2    <u>Breakup Fee</u>. In the event that this Agreement is terminated pursuant to <u>Section 11.1(c)(vii)</u> or <u>Section 11.1(d)</u>, Seller shall immediately become obligated to pay Purchaser the Break-Up Fee, in accordance with the terms of this Agreement and the Bid Procedures Order. In the event that this Agreement is terminated pursuant to any other provision of <u>Section 11.1</u>, Purchaser shall not be entitled to the Break-Up Fee.

11.3    <u>Purchaser Deposit</u>. In the event that Purchaser terminates this Agreement pursuant to <u>Section 11.1(a)</u>, <u>Section 11.1(c)</u>, or <u>Section 11.1(d)</u>, Purchaser shall be entitled to disbursement of the Purchaser Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Escrow Account. In the event of a termination of this Agreement pursuant to any provision of <u>Section 11.1(b)</u>, Seller shall be entitled to disbursement of the Purchaser Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Escrow Account. In the event that this Agreement is terminated pursuant to <u>Section 11.1</u> and Seller or Purchaser is entitled to receive the Purchaser Deposit, then Seller or Purchaser may deliver to the Escrow Holder, at any time following the effective date of any such termination, a letter instructing the Escrow Holder to pay Seller or Purchaser, as applicable, the Purchaser Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Holder shall be subject to the terms of the Escrow Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1    <u>Costs and Expenses</u>. Subject to Seller's obligations under <u>Section 6.5</u>, Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). Seller will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein).

12.2 <u>Bankruptcy Court Approval</u>. The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

12.3 <u>Entire Agreement</u>. The Schedules and Exhibits referenced in this Agreement are incorporated into this Agreement and collectively with the Confidentiality Agreement and this Agreement contain the entire agreement between the parties hereto with respect to the transactions contemplated hereunder, and supersede all negotiations, representations, warranties, commitments, offers, contracts and writings prior to the date hereof. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

12.4 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimiles or other electronic copies of signatures will be deemed to be originals.

12.5 <u>Assignment, Successors and Assigns</u>. The respective rights and obligations of the parties hereto shall not be assignable without the prior written consent of the other parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

12.6 <u>Survival</u>. The representations and warranties of Seller contained in this Agreement (whether or not contained in Article IV) shall not survive, and shall terminate at, the Closing, and Seller shall have no liability after the Closing for any breach of any representation or warranty. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each surviving covenant or agreement shall survive the Closing for the period contemplated by its terms. For the avoidance of doubt, Seller shall have no obligations under this Agreement after the earlier of (i) the date that is three months from the date of this Agreement and (ii) the effective date of any plan confirmed in the Chapter 11 Case.

12.7 <u>Severability</u>. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof.

12.8 <u>Headings</u>. The captions of the various Articles and Sections of this Agreement have been inserted only for convenience of reference and shall not be deemed to modify, explain, enlarge or restrict any of the provisions of this Agreement.

12.9 <u>Risk of Loss</u>. Risk of loss, damage or destruction to the Purchased Assets shall be upon Seller until the Closing, and shall thereafter be upon Purchaser.

12.10 **<u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT**

61183747_11

LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND PURCHASER AND SELLER EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASE SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 12.13</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 12.13</u>.

12.11   <u>Press Releases and Public Announcements</u>. No public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the Transaction without the prior written consent of Purchaser and Seller; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 12.11</u> will not prohibit (a) any disclosure required by any applicable Laws (in which case the disclosing party will provide the other parties with the opportunity to review in advance any such disclosure) or an Order of the Bankruptcy Court (b) any disclosure made in connection with the enforcement of any right or remedy relating to the Transaction and (c) any disclosure by Purchaser or Seller to report and disclose the status of this Agreement and the transactions contemplated hereunder to their respective Affiliates and/or their respective members or limited partners. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate.  If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing Party required to

- 28 -

make such announcement or disclosure shall give the other Party prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the Parties. The Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bid Procedures Order and/or the Sale Order and shall make any applicable disclosures regarding this Agreement in the Sale Motion and that Seller may provide copies of this Agreement (including any draft versions of this Agreement) to the statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

12.12   U.S. Dollars. All amounts expressed in this Agreement and all payments required by this Agreement are in United States dollars.

12.13   Notices.

(a)     All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by facsimile or sent by reputable overnight delivery service and properly addressed as follows:

To Purchaser:

> Poplar Healthcare, PLLC
> 3495 Hacks Cross Road
> Memphis, TN 38125
> Fax: (901) 271-2684
> Attention: James P. Sweeney

with a **copy** to (which shall not constitute notice):

> Baker Donelson
> 2000 First Tennessee Building
> 165 Madison Avenue
> Memphis, TN 38103
> Fax: 901-577-0845
> Attention: E. Franklin Childress, Jr.

To Seller Prior to the Closing:

> Bostwick Laboratories, Inc.
> 100 Charles Lindbergh Boulevard
> Uniondale, NY 11553
> Fax: (516) 512-5300
> Attention: James Carroll, Chief Restructuring Officer

with a **copy** to (which shall not constitute notice):

61183747_11

Pepper Hamilton LLP
Hercules Plaza
1313 North Market Street, Suite 5100
Wilmington, DE 19899
Fax: 302-656-8865
Attention: David B. Stratton, David M. Fournier, and Evelyn J. Meltzer

(b)     Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)     All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 12.13 if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of proof of transmission.

12.14   WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.15   Waiver. Any party hereto may waive compliance by or extend the time of performance of any obligation or act for any other party with respect to any provision of this agreement. No waiver of any provision or extension shall be construed as a waiver of any other provision or an extension of time for the performance of any other obligation or act hereunder. Any waiver or extension must be in writing.

12.16   No Third-Party Beneficiary. This Agreement is being entered into solely for the benefit of the parties hereto, and the parties do not intend that any employee or any other person shall be a third-party beneficiary of the covenants by either Seller or Purchaser contained in this Agreement.

12.17   SELLER DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED

- 30 -

BY THE SCHEDULES) ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO PURCHASER IN CONNECTION WITH THIS AGREEMENT, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, SELLER HAS NOT MADE AND IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF SELLER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF SELLER ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER REPRESENTS, WARRANTS, COVENANTS AND AGREES, THAT SELLER IS NOT MAKING ANY REPRESENTATION OR WARRANTY, OTHER THAN THOSE EXPRESSLY MADE BY SELLER AS SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), AND THAT PURCHASER SHALL ACQUIRE THE PURCHASED ASSETS AND ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY SELLER AS SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES).

12.18 PURCHASER DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN ARTICLE V ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLER IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, PURCHASER HAS NOT MADE OR IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF PURCHASER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V HEREOF, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ASSETS OF PURCHASER ARE HEREBY EXPRESSLY DISCLAIMED. SELLER REPRESENTS, WARRANTS, COVENANTS AND AGREES, ON BEHALF OF IT AND ITS AFFILIATES,

- 31 -

THAT PURCHASER IS NOT MAKING ANY REPRESENTATION OR WARRANTY OTHER THAN THOSE EXPRESSLY MADE BY PURCHASER AS SET FORTH IN ARTICLE V, AND THAT SELLER SHALL ACQUIRE THE EQUITY CONSIDERATION WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY PURCHASER AS SET FORTH IN ARTICLE V.

12.19 <u>Disclosures</u>. No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.

12.20 <u>Specific Performance</u>. Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties hereto will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms hereof in any Action instituted in any court specified in <u>Section 12.10</u> in addition to any other remedy to which he, she or it may be entitled, at law or in equity.

[signature page follows]

61183747_11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

POPLAR HEALTHCARE, PLLC

By: _____
  Name: _____
  Title:  CEO

**SELLER:**

BOSTWICK LABORATORIES, INC.

By: _____
  Name: _____
  Title: _____

61183747_11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

PURCHASER:

POPLAR HEALTHCARE, PLLC

By: _____
  Name: _____
  Title:

SELLER:

BOSTWICK LABORATORIES, INC.

By: _~James~ _signature_____
Name: James P. Carroll
Title: Chief Restructuring Officer

61183747_11