## EXHIBIT D

**FORM OF SECOND LIEN NOTES AMENDMENT**

<u>ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT</u>

THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT (as from time to time amended, supplemented or modified, this "**Agreement**"), dated as of [ ], 2017, is entered into by and between Bostwick Laboratories, Inc., a Delaware corporation (the "**Company**"), Poplar Healthcare, PLLC (the "**Assignee**"), and the Purchasers (as defined below).

WITNESSETH:

WHEREAS, the Company, Bostwick Laboratories Group Holdings, L.P., a Delaware limited partnership ("**Group Holdings**"), Bostwick Laboratories Group Holdings GP, LLC (the "**GP**") and each of the Persons from time to time listed on <u>Schedule I</u> hereto (each a "**Purchaser**" and collectively, the "**Purchasers**"), are parties to that certain Note Purchase Agreement, dated as of February 21, 2017 ("**Original Note Purchase Agreement**"), pursuant to which the Purchasers purchased the Company's 18% Secured Subordinated Notes due 2017 in an aggregate original principal amount of $950,000 (the "**Original Notes**");

WHEREAS, on March __, 2017 (the "**Petition Date**"), the Company filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating its case (the "**Bankruptcy Case**") that is pending under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the Bankruptcy Case, the Company has entered into a stalking horse asset purchase agreement with Assignee to sell Assignee substantially all of the Company's assets in an auction pursuant to Bankruptcy Code section 363 (the "**Stalking Horse APA**"); and

WHEREAS, concurrently with the closing of the transactions contemplated by the Stalking Horse APA (the "**Effective Date**"), the Company desires to assign, and the Assignee is willing to assume, all of the Company's rights and obligations of the Company under (i) the Original Note Purchase Agreement, as amended and restated on the terms set forth in the Amended and Restated Note Purchase Agreement attached hereto as <u>Exhibit A</u> (the "**A&R Note Purchase Agreement**"), and (ii) the Original Notes in an aggregate principal amount of Nine Hundred Fifty Thousand Dollars ($950,000.00) plus all accrued and unpaid interest thereunder as of the Effective Date (the "**Assumption Cap**"), as amended and restated on the terms set forth in the Amended and Restated 8% Secured Notes due 2018 attached hereto as <u>Exhibit B</u> (the "**A&R Notes**").

NOW, THEREFORE, the parties hereto agree as follows:

1.     <u>Assignment, Assumption and Amendment</u>.  On the Effective Date, the Company shall assign to the Assignee and be released from, and the Assignee shall assume, the Company's obligations under (i) the Original Note Purchase Agreement, as amended and restated on the terms set forth in the A&R Note Purchase Agreement, and (ii) the Original Notes, as amended and restated on the terms set forth in the A&R Notes, in aggregate principal amount of the Original Notes (including all accrued and unpaid interest thereunder) as of the Effective Date not to exceed the Assumption Cap.  To the extent the aggregate principal amount of the Original Notes (including all accrued and unpaid interest thereunder)

as of the Effective Date exceeds the Assumption Cap, the principal amount of the Original Notes (including all accrued and unpaid interest thereunder) in excess of the Assumption Cap shall not be assumed by Assignee and shall remain an obligation of the Company and the Company shall remain bound by the Original Note Purchase Agreement with respect to such Original Notes (including all accrued and unpaid interest thereunder).

2.      Consent.    Notwithstanding anything to the contrary in the Original Note Purchase Agreement, the Purchasers hereby consent to the assumption and amendment of the Original Note Purchase Agreement and the Original Notes by Assignee on the terms set forth in the A&R Note Purchase Agreement and the A&R Notes conditioned upon and effective as of the occurrence of the Effective Date.

3.      <u>Representations and Warranties of the Assignee</u>.    The Assignee hereby represents and warrants to each Purchaser that as of the Effective Date, each of the representations and warranties of the Assignee set forth in Section 4 of the A&R Note Purchase Agreement are true and correct with respect to this Agreement, the A&R Note Purchase Agreement and the A&R Notes.

4.      <u>Governing Law</u>. THIS AGREEMENT, AND ALL CLAIMS ARISING HEREUNDER OR RELATING HERETO, SHALL BE GOVERNED AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.      <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

6.      <u>Counterparts; Third Party Beneficiaries</u>.    This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.    No provision of this Agreement shall confer upon any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies hereunder.

[Signature page follows]

61297722_5

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first written above.

BOSTWICK LABORATORIES, INC.,

By: _____
      Name:
      Title:

POPLAR HEALTHCARE, PLLC

By: _____
      Name:
      Title:

METALMARK CAPITAL PARTNERS II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:  Partner

METALMARK CAPITAL PARTNERS CAYMAN II, L.P.

By: METALMARK CAPITAL PARTNERS II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:  Partner

METALMARK CAPITAL PARTNERS
TE II, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner


By:_____
Name: Howard Hoffen
Title:   Partner


METALMARK CAPITAL PARTNERS
II, EXECUTIVE FUND, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner


By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS
II CO-INVESTMENT, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

MCP (SILO) II AIF, L.P.

By: METALMARK CAPITAL
PARTNERS II GP, L.P., its general
partner

By: METALMARK CAPITAL
HOLDINGS LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

<u>AMENDED AND RESTATED NOTE PURCHASE AGREEMENT</u>

THIS AMENDED AND RESTATED NOTE PURCHASE AGREEMENT (as from time to time amended, supplemented or modified, this "**Agreement**"), dated as of [  ], 2017 is entered into by and between Poplar Healthcare, PLLC, a Tennessee professional limited liability company (the "**Issuer**") and each of the Persons from time to time listed on <u>Schedule I</u> hereto (each a "**Purchaser**" and collectively, the "**Purchasers**"). Capitalized terms used and not defined elsewhere in this Agreement have the meanings provided for them in Section 1 hereof.

WITNESSETH:

WHEREAS, Bostwick Laboratories Group Holdings, L.P., Bostwick Laboratories Group Holdings GP, LLC, Bostwick Laboratories, Inc. (the "**Company**") and the Purchasers are parties to that certain Note Purchase Agreement, dated as of February 21, 2017 ("**Original Note Purchase Agreement**"), pursuant to which the Purchasers purchased notes (the "**Original Notes**") issued by the Company in an aggregate original principal amount of $950,000;

WHEREAS, the Company and the Issuer are party to that certain Assignment, Assumption and Amendment Agreement, dated as of [  ] (the "**Assignment Agreement**"), pursuant to which the Company has assigned, and the Issuer has assumed, the rights and obligations under the Original Note Purchase Agreement and the Original Notes, in an aggregate principal amount of $950,000 (such Original Notes (plus all accrued and unpaid interest thereunder as of the Closing Date) subject to this Agreement, the "**Assumed Notes**");

WHEREAS, the Issuer and the Purchasers desire to amend (i) the rate of interest applicable to each Assumed Note, (ii) postpone the date fixed for payment of principal on all Assumed Notes and (iii) make certain other modifications to the Original Notes Purchase Agreement with respect to the Assumed Notes;

NOW, THEREFORE, the parties hereto agree as follows:

1    <u>DEFINITIONS; CONSTRUCTION</u>

1.1    *Certain Definitions.*  In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings when used herein with initial capital letters:

"**Business Day**" means any weekday other than a weekday on which banks in New York, New York are authorized or required to be closed.

"**Change of Control**" means (i) the immediate parent of the Issuer ceases to hold more than 50.1% of the Issuer or (ii) the immediate parent of the Issuer ceases to posses the right to elect at all times a majority of the board of directors of the Issuer.

"**Closing**" has the meaning assigned to it in Section 2.2.

"**Closing Date**" means [  ].

"**Code**" means the U.S. Internal Revenue Code of 1986, or any successor federal statute, and the regulations promulgated thereunder, as the same may be amended from time to time.

"**Collateral**" has the meaning provided for such term in the Guaranty and Security Agreement.

"**Default**" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Financial Officer**" means, with respect to any specified Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person, in each case in his or her capacity as such.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Guaranty and Security Agreement**" means the Guaranty and Security Agreement dated as of February 21, 2017 entered into by the Company, Bostwick Laboratories Holdings, Inc. and the Purchasers.

"**Holder**" means any holder of Notes and its successors and assigns.

"**Liquidation Event**" means (a) a liquidation, dissolution or winding up of the Issuer or (b) a Change of Control.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, assets, liabilities, financial condition or results of operations of the Issuer and its Subsidiaries, taken as a whole, (b) the ability of the Issuer or any Subsidiary to perform any obligation under this Agreement or any Ancillary Agreement or (c) the rights of or benefits available to each Purchaser (or the Holders of the Notes) under this Agreement or the Ancillary Agreement.

"**Maturity Date**" means [ ].[1]

"**Notes**" means the notes being issued by the Issuer under this Agreement as of the Closing Date.

"**Note Obligations**" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under, or with respect to, this Agreement and the Notes.

"**Organizational Documents**" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation, organization or formation and any joint venture, limited liability company, operating or partnership agreement and other

---

[1] To be set at 18 months anniversary of the Closing Date.

similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended, modified or supplemented from time to time.

"**Person**" means any natural person, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other legal entity of any nature whatsoever.

"**Qualified Public Offering**" means the issuance by the Issuer or any direct or indirect parent of the Issuer of its common equity interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchanges Commission in accordance with the Securities Act of 1933 (whether alone or in connection with a secondary public offering).

"**Required Holders**" means Holders holding a majority in aggregate principal amount of the Notes at the time outstanding.

"**Securities Act**" means the Securities Act of 1933, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission thereunder, as the same may be amended from time to time.

"**Significant Subsidiary**" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the date hereof. For purposes of determining whether an Event of Default has occurred, if any group of Subsidiaries as to which a particular event has occurred and is continuing at any time would be, when taken as a whole, a "Significant Subsidiary" then such event shall be deemed to have occurred with respect to a Significant Subsidiary.

"**Subsidiary**" means, with respect to any other Person, any Person of which such other Person owns securities having a majority of the voting power in electing the board of directors (or similar governing body) directly or through one or more Subsidiaries (or, in the case of a partnership, limited liability company or other similar entity, securities conveying, directly or indirectly, a majority of the economic interests in such partnership or entity), including any Person of which such other Person or any Subsidiary serves as general partner or managing member.

"**Tax**" or "**Taxes**" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, accumulated earnings, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including under the Federal Insurance Contributions Act), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not

3

and (b) any liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another person's taxes as a transferee or successor, by contract or otherwise.

1.2     *Accounting Principles.*  The character or amount of any asset, liability, capital account or reserve and of any item of income or expense to be determined, and any consolidation or other accounting computation to be made, and the construction of any definition containing a financial term, pursuant to this Agreement shall be determined or made in accordance with GAAP, consistently applied, unless such principles are inconsistent with the express requirements of this Agreement.

1.3     *Other Definitional Provisions; Construction.*  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement. Unless the context otherwise requires: (i) "or" is disjunctive but not exclusive, (ii) words in the singular include the plural, and in the plural include the singular, (iii) the words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (iv) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement, (v) the word "Section" is a reference to the sections of this Agreement unless otherwise specified and (vi) whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation".  A Default or Event of Default shall "continue" or be "continuing" until such Default or Event of Default has been cured or waived by each Purchaser.  References in this Agreement to any Persons shall include such Persons' successors and permitted assigns.  Other terms contained in this Agreement (which are not otherwise specifically defined herein) shall have meanings provided in Article 9 of the New York Uniform Commercial Code on the date hereof to the extent the same are used or defined therein.

## 2     ISSUANCE AND SALE OF THE NOTES.

2.1     *Issuance and Delivery of Notes at Closing.*  Upon the terms and subject to the conditions of this Agreement, on the date hereof, at Closing, the Issuer shall issue, sell and deliver to each Purchaser a Note in the principal amount set forth opposite such Purchaser's name on Schedule I hereto, for an aggregate amount equal to the amount set forth opposite such Purchaser's name on Schedule I hereto.

2.2     *The Closing.*  The issuance of the Notes to be issued pursuant to Section 2.1 above on the Closing Date (the "**Closing**") will take place at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 on the date hereof, subject to the satisfaction or waiver of the conditions set forth in Section 6.  The failure to consummate the issuance of the Notes provided for in this Agreement on the date and time and at the place

4

specified herein will not relieve any party to this Agreement of any obligation under this Agreement.

## 3   REPAYMENT OF THE NOTES.

3.1    *Interest.* The Issuer covenants and agrees to make cash payments of accrued interest on the principal amount of the Notes, at the rate of eight percent (8.0%) per annum and payable quarterly on the last Business Day of each March, June, September and December, commencing on [   ], 2017 (each such payment date being referred to as an "**Interest Payment Date**"). The Issuer shall pay interest on overdue principal at the rate of ten percent (10.0%) per annum and shall pay interest on overdue installments of interest at the rate of ten percent (10.0%) per annum to the extent lawful. Interest shall be computed on the basis of a 360-day year of twelve 30-day months and shall accrue from and after the date of issuance of the applicable Notes. The parties agree that they will treat the Notes as indebtedness for U.S. federal income tax purposes, except upon a final determination by the applicable taxing authority.

3.2    *Repayment.* The Issuer shall repay to the Holders, on the last Business Day of each March, June, September and December, commencing June [   ], 2017, the unpaid principal amounts of the Notes, in equal quarterly installments from the Closing Date to the Maturity Date (with any partial quarters to be appropriately pro-rated), as set forth on Schedule II (which installments to be reduced in direct order of maturity as a result of the application of prepayments in accordance with Section 3.3). Notwithstanding anything herein the entire unpaid principal balance of each Note shall be due and payable on the Maturity Date.

3.3    *Optional Prepayment.* The Issuer may prepay any or all amounts outstanding under the Notes, upon notice to the Holders as specified in Section 3.5.

3.4    *Mandatory Prepayment.* Following the earliest to occur of (a) a Liquidation Event or (b) a Qualified Public Offering, the Issuer shall prepay in full in cash the outstanding principal amount of the Notes, plus any accrued but unpaid interest thereon.

3.5    *Notice of Prepayment and Other Notices.* The Issuer shall give written notice of any prepayment of any of the Notes or any portion thereof (i) pursuant to Section 3.3 not less than 30 days prior to the date fixed for such prepayment and (ii) pursuant to Section 3.4 not less than five Business Days prior to the date fixed for such prepayment. The Issuer shall give such notice of prepayment and all other notices to be given to the Holders at the address designated for such Holders on the register on the date of mailing such notice of prepayment or other notice. Upon notice of any such prepayment being given as aforesaid, the Issuer shall be irrevocably obligated to prepay, on the date therein fixed for prepayment, the Notes or the portion thereof, as the case may be, so called for prepayment, at the principal amount thereof so called for prepayment, together with interest accrued thereon to the date fixed for such prepayment. A prepayment of less than all of the outstanding principal amount of the Notes shall not relieve the Issuer of its obligation to make scheduled payments of interest in respect of the principal remaining outstanding on any Interest Payment Date.

3.6   *Surrender of Notes; Notation Thereon.*   Upon any prepayment of a portion of the principal amount of the Notes, the Holder, at its option, may require the Issuer to execute and deliver at the expense of the Issuer (except for Taxes or other governmental charges imposed in connection therewith), upon surrender of the Notes, new Notes registered in the name of the Holder or such other Persons as may be designated by the Holder for the principal amount of the Notes then remaining unpaid, dated as of the most recent date to which interest has been paid on the principal amount of the Notes then remaining unpaid (or the date hereof if prior to the first Interest Payment Date), or may present the Notes to the Issuer for notation of the payment of the portion of the principal amount of the Notes so prepaid.

3.7   *Maximum Lawful Rate.*   This Agreement and the Notes are hereby limited by this Section 3.7. In no event, whether by reason of acceleration of the maturity of the amounts due hereunder or otherwise, shall interest and fees contracted for, charged, received, paid or agreed to be paid to the Holder exceed the maximum amount permissible under such applicable law. If, from any circumstance whatsoever, interest and fees would otherwise be payable to the Holder in excess of the maximum amount permissible under such applicable law, the interest and fees shall be reduced to the maximum amount permitted under applicable law. If from any circumstance, the Holder shall have received anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excess of interest shall be applied to the reduction of the principal amount of the Notes, in such manner as may be determined by the Holder, and not to the payment of fees or interest, or if such excessive interest exceeds the unpaid balance of the principal amount of the Notes, such excess shall be refunded to the Issuer.

3.8   *Certain Waivers.*   The Issuer unconditionally waives (a) any rights to presentment, demand, protest or (except as expressly required hereby) notice of any kind, and (b) any rights of rescission, setoff, counterclaim or defense to payment under the Notes or otherwise that the Issuer may have or claim against the Holder.

4   REPRESENTATIONS AND WARRANTIES OF THE ISSUER.

Issuer hereby represents and warrants to each Purchaser that:

4.1   *Existence and Power.*   The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Tennessee. The Issuer has the power and authority necessary to (i) own its properties and assets, (ii) carry on its business as now being conducted and (iii) execute and deliver this Agreement and each of the other agreements, instruments and certificates being executed and delivered in connection with this Agreement (the "**Ancillary Agreements**") to which it is a party, and to perform its obligations hereunder and thereunder, including the issuance, sale and delivery of any and all Notes to be issued and sold by it hereunder.

4.2   *Authorization; Validity.*   The execution and delivery by the Issuer of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the transactions contemplated hereby (including the issuance, sale and delivery of any and all Notes to be sold by it hereunder) and thereby have been duly authorized by all necessary action on the part of the Issuer. This Agreement has been duly executed and delivered by the

6

Issuer and each Ancillary Agreement to which the Issuer is a party will be duly executed and delivered by the Issuer on the Closing Date. This Agreement constitutes, and each Ancillary Agreement to which the Issuer is a party, when executed and delivered by the Issuer, on the Closing Date, will constitute, a valid and binding agreement of the Issuer, enforceable against the Issuer in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) with respect to provisions relating to indemnification and contribution, as limited by considerations of public policy and by federal or state securities laws.

4.3     *Authorization of Governmental Authorities.*   Assuming the accuracy of each Purchaser's representations and warranties set forth in Section 5 hereof, no order, license, consent, authorization or approval of, or exemption by, or action by or in respect of, or notice to, or filing or registration with, any governmental body, agency or official is required by or with respect to the Issuer in connection with the execution, delivery and performance by the Issuer of this Agreement or any Ancillary Agreement to which the Issuer is a party except (i) for such filings as may be required under Regulation D promulgated under the Securities Act ("**Regulation D**"), or under any applicable state securities laws, (ii) for such other filings and approvals as have been made or obtained, or (iii) where the failure to obtain any such order, license, consent, authorization, approval or exemption or give any such notice or make any filing or registration would not have a Material Adverse Effect.

4.4     *Noncontravention.*  The execution, delivery and performance by the Issuer of this Agreement and each Ancillary Agreement to which the Issuer is a party, do not and will not (i) violate the Organizational Documents of the Issuer, (ii) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon the Issuer, (iii) violate any contract, agreement, license, lease or other instrument, arrangement, commitment, obligation, understanding or restriction of any kind to which the Issuer is a party or (iv) require any consent or other action by any person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Issuer or to a loss of any benefit to which the Issuer is entitled under any provision of any agreement or other instrument binding upon the Issuer or any of its assets or properties.

4.5     *Subsidiaries.* After giving effect to the transactions contemplated herein, <u>Schedule III</u> hereto will set forth all of the Subsidiaries of the Issuer.

4.6     *Litigation.*  There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Issuer, threatened against or affecting the Issuer before any court or arbitrator or any other governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or any Ancillary Agreement.

4.7     *No Brokers.*  The Issuer will not have any liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

4.8    *[Reserved]*.

4.9    *Issuance of Notes*.  Neither the Issuer nor any person authorized to act on behalf of the Issuer has taken or will take any action that would subject the transactions contemplated by this Agreement to the registration requirements of the Securities Act and, subject to the accuracy of the Purchasers' representations in Section 5 of this Agreement, the issuance of the Notes as contemplated hereunder constitute transactions exempt from the registration and qualification requirements of the Securities Act and all applicable state securities laws.

4.10    *[Reserved]*.

4.11    *Investment Company Act*.  The Issuer is not an "investment company" (as such term is defined or used in the Investment Company Act of 1940, as amended) that is required to be registered under such Act.

4.12    *Collateral Documents*; *Valid Liens*.  The provisions of the Guaranty and Security Agreement, together with such filings and other actions required to be taken by the Guaranty and Security Agreement, are effective to create in favor of the Purchasers, a legal, valid, enforceable and perfected (except for any Collateral located outside the United States) Lien on all right, title and interest of the Holders in the Collateral.

## 5    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.

Each Purchaser represents and warrants to the Issuer that:

5.1    *Existence*.  Each Purchaser (if not a natural person) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

5.2    *Authorization; Power; Validity*.  The execution and delivery by each Purchaser (if not a natural person) of this Agreement and each Ancillary Agreement to which each Purchaser is a party and the consummation of the transactions contemplated hereby and thereby are within each Purchaser's powers and have been duly authorized by all necessary action on the part of each Purchaser.  This Agreement has been duly executed and delivered by each Purchaser and each Ancillary Agreement to which each Purchaser is a party will be duly executed and delivered by each Purchaser at Closing. This Agreement constitutes, and each Ancillary Agreement to which each Purchaser is a party, when executed and delivered by each Purchaser at Closing, will constitute, a valid and binding agreement of each Purchaser, enforceable against each Purchaser in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) with respect to provisions relating to indemnification and contribution, as limited by considerations of public policy and by federal or state securities laws.

5.3    *Governmental Authorization*.    Assuming the accuracy of the Issuer's representations and warranties set forth in Section 4 above, no order, license, consent, authorization or approval of, or exemption by, or action by or in respect of, or notice to, or

8

filing or registration with, any governmental body, agency or official is required by or with respect to each Purchaser in connection with the execution, delivery and performance by each Purchaser of this Agreement or any Ancillary Agreement to which each Purchaser is a party except (i) for such filings and notices of sale, if any, as may be required under Regulation D or under any applicable state securities laws, (ii) for such other filings and approvals as have been made or obtained, or (iii) where the failure to obtain any such order, license, consent, authorization, approval or exemption or give any such notice or make any filing or registration would not have a material adverse effect on the ability of each Purchaser to perform each Purchaser's obligations hereunder or thereunder.

5.4     *Noncontravention*.  The execution, delivery and performance by each Purchaser of this Agreement and each Ancillary Agreement to which each Purchaser is a party do not and will not (i) violate, if each Purchaser is not a natural person, the Organizational Documents of each Purchaser, (ii) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon each Purchaser, (iii) violate any contract, agreement, license, lease or other instrument, arrangement, commitment, obligation, understanding or restriction of any kind to which each Purchaser is a party, (iv) require any consent or other action by any Person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of each Purchaser under any provision of any agreement or other instrument binding upon each Purchaser or any of its assets or properties or (v) result in the creation or imposition of any material lien, claim, charge, pledge, security interest or other encumbrance on or with respect to any Notes acquired hereunder.

5.5     *Acquisition for Investment*.  Each Purchaser is acquiring the Notes for investment for each Purchaser's own account and not with a view to, or for sale in connection with, any distribution thereof.

5.6     *Private Placement*.

5.6.1     Each Purchaser's financial situation is such that each Purchaser can afford to bear the economic risk of holding the Notes for an indefinite period of time, and each Purchaser can afford to suffer the complete loss of each Purchaser's investment in the Notes.

5.6.2     Each Purchaser's knowledge and experience in financial and business matters are such that each Purchaser is capable of evaluating the merits and risks of each Purchaser's investment in the Notes or each Purchaser has been advised by a representative possessing such knowledge and experience.

5.6.3     Each Purchaser understands that the Notes acquired hereunder are a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of the Notes and that following the date hereof there will be no public market for the Notes and that, accordingly, it may not be possible for each Purchaser to sell or pledge the Notes, or any interest in the Notes, in case of emergency or otherwise.

9

5.6.4     Each Purchaser and each Purchaser's representatives, including, to the extent each Purchaser deems appropriate, each Purchaser's legal, professional, financial, tax and other advisors, have reviewed all documents provided to them in connection with each Purchaser's investment in the Notes, and each Purchaser understands and is aware of the risks related to such investment.

5.6.5     Each Purchaser and each Purchaser's representatives have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Issuer and its representatives concerning the Issuer, the terms and conditions of each Purchaser's acquisition of the Notes and related matters and to obtain all additional information which each Purchaser or each Purchaser's representatives deem necessary.

5.6.6     Each Purchaser is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act.

5.6.7     Each Purchaser does not have any plan or intention to sell, exchange, transfer or otherwise dispose of (including by way of gift) any of its Notes immediately after the purchase of the Notes.

5.7     *Absence of Related Litigation.*     There is no action, suit, investigation or proceeding pending against, or to the knowledge of each Purchaser, threatened against or affecting each Purchaser before any court or arbitrator or any other governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or any Ancillary Agreement.

## 6     CONDITIONS TO CLOSING

6.1     *Conditions to Closing.*

6.1.1     *Conditions to the Obligations of each Purchaser.*     The obligation of each Purchaser to consummate the transactions contemplated hereby is subject to the satisfaction (or waiver) by the Purchasers of the following conditions:

6.1.1.1 The representations and warranties of the Issuer contained in this Agreement shall be true and correct in all material respects.

6.1.1.2 Each of the Ancillary Agreements requested by the Purchasers shall have been executed and delivered by the other parties thereto.

6.1.1.3 Delivery by the Issuer of a certificate of secretary or other officer executed by such Person, providing verification of incumbency and attaching (A) such entities resolutions approving the transactions contemplated by this Agreement and (B) such Person's governing documents.

6.1.1.4 The Issuer, the Company, and the Purchasers shall have entered into the Assignment Agreement, and the transactions contemplated therein shall have been consummated.

10

6.1.2    *Conditions to the Obligations of the Issuer.*  The obligations of the Issuer to consummate the transactions contemplated hereby is subject to the satisfaction (or waiver by the Issuer) of the following conditions:

6.1.2.1 The representations and warranties of each Purchaser contained in this Agreement shall be true and correct in all material respects.

6.1.2.2 The Issuer, the Company, and the Purchasers shall have entered into the Assignment Agreement, and the transactions contemplated therein shall have been consummated.

# 7   AFFIRMATIVE COVENANTS.

Until the principal of and interest on the Notes and all fees, expenses and other amounts payable under this Agreement and Notes shall have been paid in full, the Issuer covenants and agree that:

7.1    *Financial Statements and Other Information.*  The Issuer will furnish to the Holders:

7.1.1       a certificate of a Financial Officer certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

7.1.2       promptly after obtaining knowledge thereof, written notice of the occurrence of any Default (accompanied by a statement of a Financial Officer or other executive officer of the Issuer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto); and

7.1.3       promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Issuer and its Subsidiaries as the Holders may reasonably request;

provided, that the obligations of the Issuer to provide the information required to be provided to any Holder under this Section 7.1 shall be subject to such Holder executing a customary confidentiality agreement in form and substance reasonably satisfactory to the Issuer.

7.2    *Existence; Conduct of Business.*  The Issuer will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, permits, approvals, accreditations, authorizations, licenses, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except where the failure to do so is not reasonably likely to result in a Material Adverse Effect; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 8.1.

11

7.3     *Payment of Taxes.*  The Issuer will, and will cause each of the Subsidiaries to, pay its Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Issuer or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends the enforcement of any lien securing such obligation and (d) the failure to make payment pending such contest is not reasonably likely to result in a Material Adverse Effect.

7.4     *Maintenance of Properties.*  The Issuer will, and will cause each of the Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

7.5     *Insurance.*  The Issuer will, and will cause each of the Subsidiaries to, maintain, with financially sound and reputable insurance companies (which may include self-insurance), insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  The Issuer will furnish to the Holders, upon request of the Required Holders or any representative designated by the Required Holders, information in reasonable detail as to the insurance so maintained.

7.6     *Books and Records; Inspection and Audit Rights.*  The Issuer will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.   The Issuer will, and will cause each of its Subsidiaries to, permit any representatives designated by the Required Holders, upon reasonable prior notice, to visit and inspect its properties during normal business hours, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and independent accountants (provided that the Issuer shall be provided the opportunity to participate in any such discussions with its independent accountants), all at such reasonable times and as often as reasonably requested.

7.7     *Compliance with Laws.*  The Issuer will cause each of its Subsidiaries to comply with all applicable laws, rules and regulations applicable to it or its property, except where the failure to do so, individually or in the aggregate, is not reasonably likely to result in a Material Adverse Effect.

8     NEGATIVE COVENANTS.

Until the principal of and interest on the Notes and all fees, expenses and other amounts payable under this Agreement and Notes shall have been paid in full, the Issuer covenants and agrees that:

8.1     *Fundamental Changes.*  The Issuer will not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, any Person may merge into the Issuer in a transaction in which the surviving entity is a Person organized or existing under the laws of

the United States of America, any State thereof or the District of Columbia and, if such surviving entity is not the Issuer, such Person expressly assumes, in writing, all the obligations the Issuer under this Agreement and the Notes. Nothing in this Agreement shall be deemed to prohibit any Subsidiary from liquidating or dissolving, or merging into or consolidating with any other Subsidiary, so long as the parent entity (in the case of a liquidation or dissolution) or the surviving entity (in the case of a merger or consolidation) is or becomes a Subsidiary upon the consummation of such merger.

9    TRANSFER OF NOTES.

9.1    *Restricted Securities.*  Each Purchaser acknowledges that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, and that the Issuer is not required to register the Notes.

9.2    *Legends.*  The Issuer may place an appropriate legend on the Notes owned by each Purchaser concerning the restrictions set forth in this Section 9.

9.3    *Transfer of Notes.*  Subject to Section 9.2 hereof and any restrictions under applicable law, a Holder may transfer such Note to a new Holder, or may exchange such Note for Notes of different denominations, by surrendering such Note to the Issuer together with written instructions for the issuance of one ore more new Notes specifying the respective principal amounts of each new Note.  Subject to Section 9.2 hereof and any restrictions under applicable law, with the prior written consent of the Required Holders, a Holder may transfer such Note to a new Holder, by surrendering such Note to the Issuer duly endorsed for transfer or accompanied by a duly executed instrument of transfer naming the new Holder (or the current Holder if submitted for exchange only), together with written instructions for the issuance of one or more new Notes specifying the respective principal amounts of each new Note and the name of each new Holder and each address therefor.  In each case, the Issuer shall simultaneously deliver to such Holder or its designee such new Notes and shall mark the surrendered Notes as cancelled.  In lieu of the foregoing procedures, a Holder may, with the prior written consent of the Required Holders, assign a Note (in whole but not in part) to a new Holder by sending written notice to the Issuer of such assignment specifying the new Holder's name and address; in such case, the Issuer shall promptly acknowledge such assignment in writing to both the old and new Holder.  The Issuer shall not be required to recognize any subsequent Holder of a Note unless and until the Issuer has received reasonable assurance that all applicable transfer taxes have been paid.

9.4    *Replacement of Lost Notes.*  Upon receipt of evidence reasonably satisfactory to the Issuer of the mutilation, destruction, loss or theft of any Notes and the ownership thereof, the Issuer shall, upon the written request of the Holder of such Notes, execute and deliver in replacement thereof new Notes in the same form, in the same original principal amount and dated the same date as the Notes so mutilated, destroyed, lost or stolen; and such Notes so mutilated, destroyed, lost or stolen shall then be deemed no longer outstanding hereunder.  If the Notes being replaced have been mutilated, they shall be surrendered to the Issuer; and if such replaced Notes have been destroyed, lost or stolen, such Holder shall furnish the Issuer with an indemnity in writing to save it harmless in respect of such replaced Notes.

9.5     *Register.*   The Issuer shall establish and maintain a separate register (the "**Register**") setting forth the name and address of each Holder, the dates and amount of any payment of principal and interest on the Notes and the unpaid principal and interest amounts owed to each Holder.  The entries in the Register shall be conclusive, absent manifest error, and all parties shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Holder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Issuer shall promptly record any assignment permitted or consented to pursuant to Section 9.3 above in the Register, and no assignment shall be effective unless and until reflected in the Register. This provision shall be construed so that the Notes are at all times maintained in "registered form" within the meaning of the Code and the United States Treasury Regulations promulgated thereunder.

9.6     *No Other Representations Affected.*   Nothing contained in this Section 9 shall limit the full force or effect of any representation, agreement or warranty made herein or in connection herewith to each Purchaser.

## 10   EVENTS OF DEFAULT.

10.1     *Events of Default.*   If any one or more of the following events (each, an "**Event of Default**") occurs and is continuing:

10.1.1     default in the payment of the principal of the Notes when and as the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by acceleration or otherwise; or

10.1.2     default in the payment of any interest or any other amount due under this Agreement or the Notes, when and as the same becomes due and payable, and such default continues for a period of 10 days; or

10.1.3     default in the due observance or performance by the Issuer of any covenant, condition or agreement with respect to the Issuer contained in Section 8; or

10.1.4     default in the due observance or performance by the Issuer of any covenant, condition or agreement contained in this Agreement or the Notes (other than those specified in Sections 10.1.1, 10.1.2 or 10.1.3 above) and such Default continues unremedied for a period of 30 days after written notice thereof from the Required Holders to the Issuer; or

10.1.5     the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any of its Significant Subsidiaries in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar laws, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Issuer or any of its Significant Subsidiaries for any substantial part of any of their respective properties, or ordering the winding-up or liquidation of any of their affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

14

10.1.6    the commencement by the Issuer or any of its Significant Subsidiaries of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar laws, or the consent by any of them to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Issuer or any of its Significant Subsidiaries for any substantial part of their respective properties, or the making by any of them of any assignment for the benefit of creditors, or the failure of the Issuer or any of its Significant Subsidiaries generally to pay its debts as such debts become due; or

10.1.7    one or more judgments for the payment of money in an aggregate amount (in each case to the extent not paid or covered by insurance provided by a carrier who has acknowledged coverage in writing and has the ability to perform) in excess of $5,000,000 is rendered against the Issuer or any of its Significant Subsidiaries, or any combination thereof and the same remains undischarged for a period of 30 consecutive days during which execution is not effectively stayed, or any action is legally taken by a judgment creditor to levy upon assets or properties of the Issuer or any of its Significant Subsidiaries to enforce any such judgment; or

10.1.8    any material provision of the Guaranty and Security Agreement shall for any reason cease to be valid and binding on or enforceable against the Issuer or any Subsidiary of the Issuer that is party thereto or the Issuer or any Subsidiary of the Issuer shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or the Guaranty and Security Agreement shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected;

then, the Required Holders may, at their option, by notice to the Issuer, declare all the Notes to be forthwith due and payable, whereupon the principal of the Notes, together with accrued and unpaid interest thereon, shall become forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Issuer; provided, that in any event described in Section 10.1.6 with respect to the Issuer, all the Notes, together with interest accrued thereon, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer.

At any time after any declaration of acceleration as to the Notes has been made as provided in this Section 10.1, the Required Holders may, by notice to the Issuer, rescind such declaration and its consequences, if (a) the Issuer has paid all overdue installments of interest on the Notes and all principal that has become due otherwise than by such declaration of acceleration and (b) all other Defaults and Events of Default under this Agreement and the Notes (other than nonpayments of principal and interest that have become due solely by reason of acceleration) have been remedied or cured or have been waived pursuant to this paragraph; provided, that no such rescission will extend to or affect any subsequent Default or Event of Default or impair any right consequent thereon.

15

10.2  *Suits for Enforcement.*  If an Event of Default specified in Section 10.1.1 or 10.1.2 occurs and is continuing or the Notes become immediately due and payable in accordance with this Section, the Holders may proceed to protect and enforce their rights by suit in equity, action at law and/or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement or in aid of the exercise of any power granted in this Agreement, or may proceed to enforce the payment of the Notes or to enforce any other legal or equitable right of the Holders.  In case of any Default under this Agreement, the Issuer will pay to the Holders such amounts as shall be sufficient to cover the costs and expenses of the Holders due to said Default, including, without limitation, collection costs and reasonable attorneys' fees.

11  <u>MISCELLANEOUS</u>.

11.1  *Successors and Assigns.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as provided below and pursuant to Section 9.3, no party hereto shall assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other parties hereto. Notwithstanding the foregoing, after the Closing, each Purchaser may assign its rights under this Agreement to any transferee of any Notes so long as, such transfer is made in compliance with the terms of this Agreement.

11.2  *Amendments, Waivers and Consent.*  This Agreement may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively) with (and only with) the written consent of the Required Holders and the Issuer; <u>provided</u>, that no such amendment or waiver may, without the prior written consent of the Holder of each Note then outstanding and affected thereby, (a) reduce the principal of or rate of interest on, any Note, (b) postpone the date fixed for any payment of principal on any Note (other than a deferral or waiver of payment pursuant to Section 3.4) or (c) change the ranking or priority of any Notes relative to any other Note or the percentage of the aggregate principal amount of the Notes the Holders of which shall be required to consent or take any other action under this Section 11.2 or any other provision of this Agreement.  No amendment or waiver of this Agreement will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or thereby impair any right consequent thereon.

11.3  *No Implied Waivers; Cumulative Remedies; Writing Required.*  No delay or failure in exercising any right, power or remedy hereunder shall affect or operate as a waiver thereof; nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.  The rights and remedies hereunder are cumulative and not exclusive of any rights or remedies that each Purchaser or any Holders would otherwise have.  Any waiver, permit, consent or approval of any kind or character of any breach or default under this Agreement or any such waiver of any provision or condition of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.

11.4  *Transfer Taxes.*  All transfer taxes, fees and duties under applicable law incurred in connection with the sale and transfer of the Notes under this Agreement will be borne and

paid by the Issuer (in the case of any transfer of Notes) and the Issuer shall promptly reimburse the Holders for any such tax, fee or duty which any of them is required to pay under applicable law.

11.5    *Reimbursement of Expenses*.  The Issuer shall be obligated to pay or reimburse the Purchasers (and/or affiliates thereof) on demand for all fees and expenses incurred or payable by it (and/or affiliates thereof) (including, without limitation, reasonable fees and expenses of counsel for each Purchaser (and/or affiliates thereof)), from time to time (a) arising in connection with the negotiation, preparation and execution of this Agreement and/or any Ancillary Agreement and related instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder, (b) relating to any amendments, waivers or consents pursuant to the provisions hereof or thereof, and (c) arising in connection with the enforcement of this Agreement or any such Ancillary Agreement or any collection of the Notes.

11.6    *Holidays*.  Whenever any payment or action to be made or taken hereunder or under the Notes shall be stated to be due on a day which is not a Business Day, such payment or action shall be made or taken on the next following Business Day, and such extension of time shall be included in computing interest or fees, if any, in connection with such payment or action.

11.7    *Notices*.  Any notice or communication required or permitted hereunder shall be in writing and shall be delivered personally, delivered by nationally recognized overnight courier service or sent by certified or registered mail, postage prepaid, or (if a facsimile number is provided) sent by facsimile (subject to confirmation of such facsimile transmission).  Any such notice or communication shall be deemed to have been given (i) when delivered, if personally delivered, (ii) three Business Days after it is deposited with a nationally recognized overnight courier service, if sent by nationally recognized overnight courier service, (iii) the day of sending, if sent by facsimile prior to 5:00 p.m. (EST) on any Business Day or the next succeeding Business Day if sent by facsimile after 5:00 p.m. (EST) on any Business Day or on any day other than a Business Day or (iv) five Business Days after the date of mailing, if mailed by certified or registered mail, postage prepaid, in each case, to the following address or facsimile number, or to such other address or addresses or facsimile number or numbers as such party may subsequently designate to the other parties by notice given hereunder:

if to the Issuer, to it at:

> Poplar Healthcare, PLLC
> Address: [  ]
> Attention: [  ]
> Telephone Number: [  ]

If to each Purchaser, to it at:

> c/o Metalmark Capital Holdings LLC
> 1177 Avenue of the Americas

61297716_5

New York, NY 10036
Attention: John Richardson
Telephone Number: (212) 823-1920

with a copy to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attention: Othon A. Prounis and Christopher W. Rile
Facsimile Number: (212) 596-9090
Telephone Number: (212) 596-9000

11.8    *Survival.*    All of the covenants, agreements, representations and warranties contained herein shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.    All obligations relating to indemnification hereunder shall survive any termination of this Agreement and shall continue for the length of any applicable statute of limitations.

11.9    *Governing Law.*    This Agreement, and all claims arising hereunder or relating hereto, shall be governed and construed and enforced in accordance with the laws of the State of New York.

11.10    *Jurisdiction.*    The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby may be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York County, New York, and each of the parties hereby consents to the jurisdiction of such courts in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.    Process in any such suit, action or proceeding may be served on any party anywhere in the world, and each party agrees that, in addition to any method of service of process otherwise permitted by law, service of process on each party may be made by any method for giving such party notice as provided in Section 12.7, and shall be deemed effective service of process on such party.

11.11    *Waiver of Jury Trial.*    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.12    *Counterparts; Third Party Beneficiaries.*    This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.    No provision of this

61297716_5

Agreement shall confer upon any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies hereunder.

11.13  *Entire Agreement.*  This Agreement (together with the Ancillary Agreements) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, among the parties with respect to the subject matter hereof.

11.14  *Severability.*  If one or more provisions of this Agreement are finally held to be unenforceable under applicable law, such provision shall be deemed to be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforced in accordance with its terms to the maximum extent permitted by law.

11.15  *Indemnity.*  The Issuer hereby agrees indemnify, defend and hold harmless each Purchaser and its respective officers, directors, employees, managers, partners, members, stockholders, agents and representatives, and their respective successors, assigns, officers, directors, employees, managers, partners, members, stockholders, agents and representatives ("**Indemnified Parties**") in connection with any losses, claims, damages, liabilities and expenses, including reasonable attorneys' fees, to which any such Indemnified Party may become subject (other than as a result of the gross negligence or willful misconduct of any such Person), insofar as such losses, claims, damages, liabilities or liabilities (or actions in respect thereof) arise out of or by reason of any investigation, litigation or other proceedings related to or resulting from any act of, or omission by the Issuer or any officer, director, employee, manager, agent or representative of the Issuer with respect to the transactions contemplated by this Agreement or any Ancillary Agreement and to reimburse the Indemnified Parties, upon demand, for any reasonable legal or other expenses incurred in connection with investigating or defending any such loss, claim, damage, liability, expense or action; provided, that, each Purchaser shall not be entitled to indemnification pursuant to this Section 11.15 in connection with any suit, action or other proceeding brought against each Purchaser by the Issuer insofar as such suit, action or other proceeding arises from a breach by each Purchaser of this Agreement or any Ancillary Agreement. To the extent that the foregoing undertakings may be unenforceable for any reason, the Issuer agrees to make the maximum contribution to the payment and satisfaction of indemnified liabilities set forth in this Section 11.15 which is permissible under applicable law.

*[Signatures appear on following page]*

61297716_5

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Note Purchase Agreement as of the day and year first above written.

THE ISSUER:                          POPLAR HEALTHCARE, PLLC


By:_____
   Name:
   Title:

\\DC - 088650/000175 - 10035637 v2
61297716_5

THE PURCHASERS:

METALMARK CAPITAL PARTNERS II, L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS
CAYMAN II, L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS TE II,
L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

Signature Page to Amended and Restated Note Purchase Agreement

METALMARK CAPITAL PARTNERS II,
EXECUTIVE FUND, L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

METALMARK CAPITAL PARTNERS II CO-
INVESTMENT, L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

MCP (SILO) II AIF, L.P.

By: METALMARK CAPITAL PARTNERS
II GP, L.P., its general partner

By: METALMARK CAPITAL HOLDINGS
LLC, its general partner

By:_____
Name: Howard Hoffen
Title:   Partner

Signature Page to Amended and Restated Note Purchase Agreement

SCHEDULE I

| Name of Purchaser | Principal Amount of Note Issued set [●] (in Dollars) |
|---|---|
| MCP (SILO) II AIF, L.P. | [●] |
| Metalmark Capital Partners II Co-Investment, L.P. | [●] |
| Metalmark Capital Partners II, L.P. | [●] |
| Metalmark Capital Partners TE II, L.P. | [●] |
| Metalmark Capital Partners Cayman II, L.P. | [●] |
| Metalmark Capital Partners II Executive Fund, L.P. | [●] |
| Total | [●][2] |

---

[2] NTD – to be no more than $950,000.

NDC -08865J000175 - 10035697-v2
61297776_5

SCHEDULE II

AMORTIZATION SCHEDULE

| Timing | Amount to be paid |
|---|---|
| June 2017 | |
| September 2017 | |
| December 2017 | |
| March 2018 | |
| June 2018 | |
| September 2018 | |
| December 2018 | |

WDC-036865/000175 - 10035617-v2
61297716_5

SCHEDULE III

SUBSIDIARIES OF ISSUER

| Subsidiary | Registered Owner | Jurisdiction of Formation | Percentage of Equity Interest |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

FORM OF
8% SECURED NOTE DUE [  ]

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS NOTE HAS BEEN ACQUIRED FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO THE DISTRIBUTION THEREOF. THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND REGISTRATION OR QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL THAT SUCH PROPOSED TRANSFER DOES NOT VIOLATE THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

## POPLAR HEALTHCARE, PLLC

8% Secured Note Due [  ]

$[Principal Amount]                                                      [Date of Issuance]

Poplar Healthcare, PLLC, a Tennessee limited liability company (the "**Issuer**"), for value received, hereby promises to pay to [●], or its registered assigns (collectively, the "**Holder**"), the principal sum of [●] DOLLARS ($[●]) with interest thereon on the terms and conditions set forth in the hereinafter defined Amended and Restated Note Purchase Agreement.

Notwithstanding any provision to the contrary in this Note or the Note Purchase Agreement, the Issuer shall not be required to pay, and the Holder shall not be permitted to contract for, take, reserve, charge or receive, any compensation, which constitutes interest under applicable law in excess of the maximum amount of interest permitted by law.

This Note is issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of [  ], 2017 (as amended, restated or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and between the Issuer and each of the Purchasers (as defined therein) from time to time party thereto, and Holder is entitled to the benefits thereof. All capitalized terms used but not defined herein shall have the meanings respectively ascribed to them in the Note Purchase Agreement.   Each Holder of this Note will be deemed, by its acceptance hereof, to have agreed to the provisions and to have made the representations and warranties set forth in Section 5 of the Note Purchase Agreement.

This Note is transferable only by surrender hereof at the principal office of the Issuer, duly endorsed, accompanied by a written instrument of transfer duly executed by the registered

Holder of this Note as shown in the register of the Issuer or as otherwise permitted under the Note Purchase Agreement.

This Note is also subject to mandatory and optional prepayment, in whole or from time to time in part, at the times and on the terms specified in the Note Purchase Agreement, but not otherwise.

Except as provided in Section 3.1 of the Note Purchase Agreement, all payments of amounts due under this Note shall be in such coin or currency of the United States of America as at the time of payment shall be legal tender for payment of public and private debts.

If an Event of Default (as such term is defined in the Note Purchase Agreement) occurs and is continuing, the unpaid principal of this Note may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Note Purchase Agreement.

This Note and the rights and obligations of the parties hereto shall be deemed to be contracts under the laws of the State of New York and for all purposes shall be governed by and construed and enforced in accordance with the laws of said State.

*[Signature page follows.]*

IN WITNESS WHEREOF, this Note is executed and delivered as of the date first set forth above.

POPLAR HEALTHCARE, PLLC

By: _____
    Name:
    Title: