*Execution Draft*

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT ("Agreement") is entered into this 25th day of April, 2017, to be effective immediately following the Closing on the Closing Date (as each such term is defined in the Purchase Agreement (defined below)) (the "Effective Date"), by and between Poplar Healthcare, PLLC, a Tennessee professional limited liability company ("Buyer"), and Bostwick Laboratories, Inc., a Delaware corporation ("Seller"). Buyer and Seller may be referred to herein individually as a "Party," and collectively as the "Parties."

### RECITALS

WHEREAS, pursuant to that certain Amended Stalking Horse Asset Purchase Agreement, dated March 20, 2017, by and between Buyer and Seller, as amended (the "Purchase Agreement"), Buyer has agreed to purchase or take assignment of certain assets and assume certain liabilities of Seller, and Seller has agreed to sell and assign the same to Buyer on the terms and conditions of the Purchase Agreement;

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement, each Party desires to provide to the other, and to receive from the other, certain transition services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

The following terms, when used in this Agreement, shall have the respective meanings set forth in this Article I.

Capitalized terms used but not defined herein shall have the respective meanings set forth in the Purchase Agreement.

Section 1.1.    "Action" means any action, cause of action, demand, audit, notice of violation, summons, subpoena, administrative enforcement, petition, complaint, claim, suit, litigation, arbitration, mediation, hearing, investigation, review or other proceeding commenced, brought or heard by or before any Governmental Authority.

Section 1.2.    "Affiliate" shall mean any Person that controls, is controlled by, or is under common control with, another Person.

Section 1.3.    "Agreement" shall have the meaning set forth in the Preamble.

Section 1.4.    "Buyer" shall have the meaning set forth in the Preamble.

Section 1.5.    "Buyer-Completed Legacy Tests" has the meaning set forth in Exhibit B.

Section 1.6.    "Buyer-Completed Legacy Test Results" has the meaning set forth in Exhibit B.

Section 1.7.    "Buyer Services" shall have the meaning set forth in Section 2.1(a).

Section 1.8.    "Clinical Laboratory Licenses" shall mean clinical laboratory licenses, permits, certifications and accreditations.

Section 1.9.    "Confidential Information" shall have the meaning set forth in Section 7.1.

Section 1.10.    "Effective Date" shall have the meaning set forth in the Preamble.

Section 1.11.    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended.

Section 1.12.    "Leased Assets" has the meaning set forth in Section 2.1(d).

Section 1.13.    "Leased Personnel" has the meaning set forth in Section 2.1(d).

Section 1.14.    "Legacy Samples" has the meaning set forth in Exhibit A.

Section 1.15.    "Legacy Tests" has the meaning set forth in Exhibit A.

Section 1.16.    "Loss" means any Action, loss, damage, tax, Liability, amount paid in settlement, penalty, fine, fee, cost or expense, including court costs and reasonable attorneys' fees, expenses and disbursements.

Section 1.17.    "Party" and "Parties" shall have the meanings set forth in the Preamble to this Agreement.

Section 1.18.    "Purchase Agreement" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.19.    "Retained Employees" shall mean employees of Seller that remain employed by Seller immediately following the Closing.

Section 1.20.    "Seller" shall have the meaning set forth in the Preamble.

Section 1.21.    "Seller-Completed Legacy Tests" has the meaning set forth in Exhibit A.

Section 1.22.    "Seller Fees" shall mean all fees, costs and other amounts incurred or paid by Seller in connection with the provision of the Seller Services, including without limitation, the following: (i) all fees, costs and other amounts arising after the Closing in connection with Seller's employment of the Retained Employees to the extent allocated to the provision of any Seller Services hereunder, including, but not limited to (a) the Retained Employees' compensation, employment taxes (including, but not limited to, social security,

#43604841 v5

unemployment and income tax), employee benefits (including, but not limited to, Seller 401(k) plan contributions, costs and fees, vacation and holiday pay), workers' compensation, and travel and business expense costs as well as any benefits, statutory or otherwise, earned, incurred or accrued during the Term in accordance with Seller's existing employee benefit plans, and (b) related administrative costs, including but not limited to those arising in connection with (Y) payroll processing and the payment or deduction from the compensation and benefits of the Retained Employees, and remittance to the appropriate governmental entities, of such sums, and (Z) compliance with employee-related reporting, filing and disclosure obligations; (ii) all fees, costs and other amounts associated with Seller, facility and Retained Employee licensure and provider registration; (iii) insurance premiums of Seller; (iv) costs (including but not limited to lease payments and payments on accrued financing) of inventory, supplies and equipment; (v) fees, costs and other amounts associated with information technology systems (including without limitation interfacing with those of the clients of the Business) and telephone systems of Seller or the Business; (vi) fees, costs and other amounts associated with the facilities of Seller or the Business, including without limitation, rent, real estate and similar taxes, utilities, facility maintenance, waste (including but not limited to hazardous waste) removal and other services related thereto; (vii) fees, costs and other amounts associated with vendors, third party service providers and independent contractors engaged by or on behalf of Seller; (viii) postage, shipping and handling and logistics services; and (ix) other overhead expenses of the Business or of Seller with respect to the Business. Seller Fees shall include legal fees and expenses incurred by the Seller in the Seller's pending bankruptcy case and in the operation of the Business in amounts agreed upon by the Parties from time to time.

Section 1.23.   "Seller Services" shall have the meaning set forth in Section 2.1(a).

Section 1.24.   "Services" shall mean the Buyer Services and the Seller Services, collectively.

Section 1.25.   "Term" shall have the meaning set forth in Section 5.1.

Section 1.26.   "Uniondale Laboratory" means that certain laboratory located in Uniondale, New York and utilized in the Business.

## ARTICLE II
## BUYER AND SELLER SERVICES

Section 2.1.   Services Provided.

(a)     Seller Services. Subject to the terms and conditions of this Agreement, Seller hereby agrees to provide to Buyer, or to procure the provision to Buyer, at Buyer's cost, each of the services described on Exhibit A attached hereto (each a "Seller Service," and collectively, the "Seller Services") during the Term for the applicable duration set forth on Exhibit A. THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY PROVISION TO THE CONTRARY IN THE PURCHASE AGREEMENT, THE SALE ORDER OR ANY OTHER DOCUMENT RELATING TO THE SALE OF THE PURCHASED ASSETS TO BUYER UNDER THE PURCHASE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT,

#43604841 v5

DURING THE TERM OF THIS AGREEMENT UNTIL THE TRANSITION OF THE BUSINESS AND THE LEGACY SAMPLES TO BUYER AS DESCRIBED ON <u>EXHIBIT B</u>, AS BETWEEN BUYER AND SELLER, SELLER SHALL BE IN SOLE, EXCLUSIVE AND ABSOLUTE CONTROL OF THE BUSINESS, INCLUDING WITHOUT LIMITATION, THE DIRECTION AND CONTROL OF ALL ASPECTS OF THE BUSINESS, INCLUDING THE UNIONDALE LABORATORY, PROCUREMENT AND MANAGEMENT OF INVENTORY, USE AND MAINTENANCE OF EQUIPMENT, PROCESSING OF SAMPLES AND NOTIFICATION OF TREATING OR AUTHORIZING PHYSICIANS (OR OTHER APPROPRIATE THIRD PARTIES) OF TEST RESULTS.  UNDER NO CIRCUMSTANCES DURING THE TERM OF THIS AGREEMENT SHALL BUYER BE ENTITLED TO DIRECT SELLER'S ACTIVITIES WITH RESPECT TO ANY ASPECT OF THE BUSINESS. In connection with the receipt of the Seller Services, Buyer shall comply with any written security policies, procedures and requirements of Seller that are provided in writing to Buyer and as agreed to by Buyer in advance.

(b)      <u>Buyer Services</u>. Subject to the terms and conditions of this Agreement, Buyer hereby agrees to provide to Seller, or to procure the provision to Seller, in each case at no cost to Seller: (i) use of Buyer's equipment, facilities, personnel (including, without limitation, Transferred Employees), intellectual property, telecommunications, computer systems and other assets that are part of the Purchased Assets as are reasonably necessary for Seller to provide the Seller Services hereunder, as further described in <u>Section 2.1(d)</u> below; and (ii) each of the services described on <u>Exhibit B</u> attached hereto (each of the services described in clauses (i) and (ii) a "<u>Buyer Service,</u>" and collectively, the "<u>Buyer Services</u>") during the Term for the applicable duration set forth on <u>Exhibit B</u>. In connection with the receipt of the Buyer Services, Seller shall comply with any written security policies, procedures and requirements of Buyer that are provided in writing to Seller and as agreed to by Seller in advance.

(c)      <u>No Violation of Law</u>.  Notwithstanding any provision of this Agreement to the contrary, neither Buyer nor Seller shall be required to provide any Services to the extent that the provision of such Services violates any applicable Law.

(d)      <u>Lease of Leased Assets and Leased Personnel</u>.  During the Term of this Agreement, Seller shall and hereby does lease from Buyer, and Buyer shall and hereby does lease to Seller, at no additional cost to Seller, all of Buyer's equipment, facilities, intellectual property, telecommunications, computer systems and other assets that are part of the Purchased Assets ("<u>Leased Assets</u>") and personnel (including, without limitation, Transferred Employees) ("<u>Leased Personnel</u>"), in each case that are reasonably necessary for Seller to provide the Seller Services hereunder.  The leases provided for in this subsection (d) shall automatically terminate with respect to any such Leased Assets and Leased Personnel, in each case without any further action by Buyer or Seller, upon the earlier of:  (i) the expiration or termination of all Seller Services with respect to which Seller utilizes such assets and personnel; or (ii) the expiration or termination of this Agreement (the term of such lease with respect to each Leased Asset and Leased Personnel is hereinafter referred to as the "<u>Lease Term</u>").  During each Lease Term applicable to Leased Assets, Seller shall be in sole control of such Leased Assets and make arrangement for, at the sole expense of Buyer, maintenance and repair of such Leased Assets as required from time to time.  During each Lease Term applicable to Leased Personnel:  (A) such Leased Personnel shall remain employees of Buyer and Seller shall not have the right or

-4-

authority to terminate any such Leased Personnel; and (B) Buyer shall be solely liable for, and shall pay when due, any and all Leased Personnel salary, wages, bonuses, benefits, accrued vacation, paid time off, and other amounts payable to such Leased Personnel as well as employee classification, employment tax withholding, workers' compensation coverage and other costs and expenses relating to the employment of such Leased Personnel, including without limitation any amounts owing to any such Leased Personnel arising out of or relating to any Actions brought by any Leased Personnel relating in any way to their employment by Buyer or utilization by Seller during the Lease Term. Seller shall not utilize the Leased Assets or Leased Personnel except in connection with the provision of Seller Services without the prior consent of Buyer. Upon the termination or expiration of each Lease Term, Seller shall immediately return control of the applicable Leased Assets to Buyer, each at no cost to Seller, and the applicable Leased Personnel shall cease to perform Seller Services under this Agreement.

(e)    <u>Licenses and Permits</u>.

(i)    <u>Clinical Laboratory Licenses</u>. During the Term, Seller and Buyer shall reasonably cooperate, at the sole cost and expense of Buyer, to complete and file with each applicable Governmental Authority any documents required to transfer or record the transfer of Seller's Clinical Laboratory Licenses to Buyer, in each case to the extent transferable, such transfer to be effective upon the expiration or termination of this Agreement. No such documents may be filed with any such Governmental Authority without Seller's prior written approval. Buyer shall be solely responsible for the cancellation, termination or forfeiture of all such Clinical Laboratory Licenses and all related costs, expenses and fees.

(ii)    <u>Other Licenses and Permits</u>. During the Term, Seller and Buyer shall reasonably cooperate, at the sole cost and expense of Buyer, to complete and file with each applicable Governmental Authority any documents required for Buyer to obtain any Clinical Laboratory Licenses or other licenses or permits of the types held by Seller in connection with its operation of the Business immediately prior to the Closing Date so that Buyer may operate the Business in the same manner. No such documents may be filed with any such Governmental Authority without prior written notification by Buyer to Seller of its intent to file such documents.

Section 2.2.    <u>Personnel</u>.

(a)    Notwithstanding any provision of the Purchase Agreement to the contrary, including without limitation, <u>Section 7.1</u> thereof, Buyer shall not hire at Closing, and Seller shall retain during the Term of this Agreement the employment of, the Medical Director and all other employees of Seller to the extent required by applicable Law to maintain Seller's Medicare enrollment and Clinical Laboratory Licenses. To the extent that it is determined during the Term that any Transferred Employees are required to be employed by Seller to maintain Seller's Medicare enrollment or Clinical Laboratory Licenses, the Parties shall reasonably cooperate in good faith, at the sole cost of Buyer, to take all actions necessary or advisable so that Seller may maintain its enrollment or Clinical Laboratory Licenses, as the case may be.

#43604841 v5

(b)      Buyer acknowledges and agrees that, for purposes of providing the Seller Services, personnel of Seller may include, at Seller's reasonable discretion: (i) Leased Personnel; (ii) employees of Seller or its Affiliates, or (iii) one or more contractors, subcontractors or other third parties hired or engaged by Seller or its Affiliates to provide any or all of the Seller Services.

## ARTICLE III
## STANDARD OF PERFORMANCE

Section 3.1.   Scope of Use.  Except upon prior written consent of Seller, Buyer's use of the Seller Services provided hereunder shall be for the sole and limited purpose of continuing to operate the Business in substantially the same manner as the Business was conducted by Seller prior to the Closing Date. Except with the prior written consent of Buyer, Seller's use of the Buyer Services provided hereunder shall be for the limited purposes described in Section 2.1(a) hereof.  Each Party shall provide the Services to, and for the benefit of, the other Party only.

Section 3.2.   Standard of Performance; Compliance with Applicable Laws. Each Party shall perform the Services in a diligent and timely manner, exercising the same degree of care as such Party exercises in performing the same or similar services for its own account or for the account of any of its Affiliates, but in all instances in a workman-like and professional manner and in accordance with the following, as applicable: (a) orders from the applicable treating or authorizing physicians (or other appropriate third parties); (b) applicable clinical laboratory and pathology standards; and (c) all applicable Laws; provided however, that in no event shall Seller be required to employ higher standards than those employed by Seller in performing any of the Seller Services for itself in accordance with past practice.  In the case of the Seller Services, the quantity of each of the Seller Services to be provided shall not exceed the level of use reasonably required in the day-to-day operations of the Business prior to the acquisition thereof by Buyer.  The Parties acknowledge and agree that in providing the Seller Services under this Agreement, Seller is continuing to function as a covered entity under HIPAA. To the extent required by applicable Law, the Parties shall execute and deliver a business associate agreement in form and substance reasonably acceptable to the Parties.

Section 3.3.   Relationship Among Seller and Buyer.  At all times during the Term of this Agreement, each Party shall be an independent contractor in providing the Services hereunder with the sole right, subject to terms and conditions of the Purchase Agreement, to supervise, manage, operate, control and direct the performance of the Services it is obligated to provide hereunder and with the sole obligation to employ, compensate and manage its employees and business affairs.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, or any employee/employer or principal/agent relationship.

-6-

#43604841 v5

# ARTICLE IV
## CONSIDERATION

Section 4.1.    <u>Seller Fees</u>.

(a)    Twice a month during the Term, Seller shall deliver to Buyer a good faith estimate of the bi-monthly (i.e., half-month) Seller Fees for each upcoming bi-monthly period ("<u>Estimated Bi-Monthly Seller Fees</u>"). No later than the last Business Day of each bi-monthly period during the Term, Buyer shall pay to Seller in immediately available funds the Estimated Bi-Monthly Seller Fees for the upcoming bi-monthly period. Seller's good faith estimate of the Estimated Bi-Monthly Seller Fees applicable for the first bi-monthly period of the Term (or first partial bi-monthly period) is $680,000, which Buyer shall pay to Seller in immediately available funds on the Effective Date. Following the Term, Seller shall invoice Buyer on a bi-monthly period for any Seller Fees not paid by Buyer during the Term.

(b)    Seller shall provide Buyer an accounting of the Seller Fees actually incurred or paid by Seller during each bi-monthly period ("<u>Actual Bi-Monthly Seller Fees</u>") promptly after Seller completes each such accounting and in event no later than fourteen (14) days after the applicable bi-monthly period. In the event the Actual Bi-Monthly Seller Fees for a bi-monthly period exceeds the Estimated Bi-Monthly Seller Fees for such bi-monthly period, Buyer shall pay the difference to Seller in immediately available funds within five (5) Business Days after receipt of such accounting. In the event the Estimated Bi-Monthly Seller Fees for a bi-monthly period exceeds the Actual Bi-Monthly Seller Fees for such bi-monthly period, then Buyer shall receive a credit against the next upcoming Estimated Bi-Monthly Seller Fees. In the event Buyer is entitled to a credit or Seller is entitled to payment at the end of the Term as a result of the foregoing provisions of this <u>Section 4.1</u>, the other Party shall remit such amount to Buyer or Seller (as appropriate) in immediately available funds within five (5) Business Days after the end of Term or receipt by Buyer of any invoices for Seller Fees following the Term.

(c)    The Parties acknowledge and agree that it is their intention that (i) Buyer be solely responsible for all Seller Fees; (ii) Buyer shall remit to Seller all estimated Seller Fees prior to Seller's payment of the same so that Seller need not pay Seller Fees out of pocket; and (iii) to the extent that Buyer does not remit any of such amounts prior to Seller's incurrence or payment of the same, Buyer shall be liable for and shall reimburse Seller for all such Seller Fees promptly following Seller's incurrence or payment of the same. Buyer acknowledges and agrees that any disputes hereunder, including without limitation any disputes relating to the calculation or payment of Seller Fees for any bi-monthly period, shall not give Buyer the right to delay, condition, withhold or offset payment of any Seller Fees prior to the final resolution of such dispute as provided herein.

Section 4.2.    <u>Buyer Services</u>.    Buyer shall provide the Buyer Services at no cost to Seller.

#43604841 v5

## ARTICLE V
## TERM AND TERMINATION

Section 5.1.    <u>Term</u>.  The term of this Agreement shall commence on the Effective Date and shall continue until the expiration of the last period for which any Service is required to be provided hereunder, as set forth on <u>Exhibit A</u> and <u>Exhibit B</u> (the "<u>Term</u>").  Each Party shall be obligated to provide each applicable Service for the applicable duration set forth on <u>Exhibit A</u> or <u>Exhibit B</u>.  Notwithstanding the foregoing sentence:  (a) Buyer's obligation to process and complete all Buyer-Completed Legacy Tests and notify Seller of Buyer-Completed Legacy Test Results, as further described on <u>Exhibit B</u> hereto, shall survive until the same have been completed in full; and (b) Buyer shall undertake reasonable best efforts to transition each Seller Service to its own internal organization or to obtain alternate third-party sources to provide such Seller Services as promptly as practicable following the execution of this Agreement.  In the event the Closing does not occur, this Agreement shall be void shall have no force or effect.

Section 5.2.    <u>Termination of Individual Services</u>.  During the Term, each Party may terminate any individual Service to be provided to such Party under this Agreement, on a Service-by-Service basis (and/or location-by-location basis if appropriate), upon prior written notice to the other Party.  Such notice shall identify the particular Service (or location) to be terminated and the desired date of termination, which date shall not be less than five (5) days after such other Party's receipt of such notice, unless such other Party otherwise agrees in writing.

Section 5.3.    <u>Termination for Breach</u>.

(a)    <u>Termination by Buyer</u>.  Buyer may terminate this Agreement upon written notice to Seller in the event of a material breach of this Agreement by Seller.  Such termination shall become effective fourteen (14) days from the date of Seller's receipt of such notice, unless Seller cures such breach within such fourteen (14) day period.

(b)    <u>Termination by Seller</u>.  Seller may terminate this Agreement upon written notice to Buyer in the event of a material breach of this Agreement by Buyer.  Such termination shall become effective fourteen (14) days from the date of Buyer's receipt of such notice, unless Buyer cures such breach within such fourteen (14) day period; provided, however, that if such breach relates to non-payment by Buyer of any of the amounts due under <u>Section 4.1</u> then Seller shall have the right to terminate one or more of the Seller Services effective five (5) Business Days from the date of the notice of such breach sent to Buyer, unless all unpaid fees or expenses are paid in full within such five (5) Business Day period.

Section 5.4.    <u>Provision for Processing of Outstanding Legacy Samples</u>.  Notwithstanding any provision of this Agreement to the contrary, upon the termination of this Agreement by either Party for any or no reason, Buyer shall be solely responsible, at Buyer's cost, for the processing of all Legacy Samples.  In such case, Buyer shall process all Legacy Samples in accordance with the standards set forth in <u>Section 3.2</u> and promptly provide to Seller written or electronic notice of such test results so that Seller may provide verbal, written or

#43604841 v5

electronic notice, as appropriate, of such test results to the treating or authorizing physician or other appropriate third party without undue delay and consistent with Seller's past practice.

Section 5.5.    Effect of Termination.  Except as described in Section 5.4 above, upon expiration or termination of this Agreement or of any Service, each Party shall have no further obligation to provide any terminated or expired Service, and Buyer shall have no obligation, other than as required by law, to pay any Seller Fees relating to any terminated Seller Services; provided, however, that Buyer shall remain liable for all Seller Fees owed to Seller with respect to the Seller Services provided prior to the effective date of termination or expiration thereof.  Any election by either Party to terminate any individual Service shall not relieve the other Party of its continuing duty to provide those Services that have not been terminated.

Section 5.6.    Survival.  The following provisions shall survive any expiration or termination of this Agreement:  Section 2.1(c), Section 4.1, Section 5.4, Section 5.5, this Section 5.6, Article VI, Article VII, Article VIII and Article IX.

## ARTICLE VI
## INDEMNITY AND LIABILITY

Section 6.1.    Indemnification.

(a)    Buyer shall defend, indemnify and hold harmless Seller and its Affiliates, and each of their respective shareholders, directors, partners, officers, employees and agents, against any Losses arising from or relating to: (i) Buyer's use of the Seller Services provided under this Agreement; (ii) Buyer's use of, or operation of business under, any of the Clinical Laboratory Licenses following any transfer or assignment thereof by Seller; (iii) any breach by Buyer of any of its representations, warranties, covenants or agreements under this Agreement; (iv) Buyer's recklessness or willful misconduct in the provision of Buyer Services hereunder; (v) any claim made by any governmental payor or private payor (whether such claim relates to the reimbursement of an overpayment or otherwise) arising out of, related to or in connection with (X) the Services except to the extent of Seller's recklessness or willful misconduct in the provision of Seller Services or (Y) Buyer's business following the expiration or termination of this Agreement, as the case may be; and (vi) any third party Actions arising out of or related to the provision of Seller Services by any Leased Personnel, including without limitation any Actions that directly or indirectly allege that Seller was an employer or a co-employer of any Leased Personnel during or following the Lease Term applicable to such Leased Personnel.

(b)    If Seller receives notice or actual knowledge of a claim as described in Section 6.1(a), Seller shall promptly notify Buyer in writing and undertake commercially reasonable efforts to provide Buyer all necessary information and reasonable assistance, and the exclusive authority to evaluate and settle such claim; provided, however, that (i) Buyer may not settle such claim in a manner that would have an adverse impact on the Seller, its Affiliates or their successors without receiving Seller's prior written consent, and (ii) Seller shall have the right to participate in the defense of any such claim that is a third party claim.

(c)       Seller shall defend, indemnify and hold harmless Buyer and its Affiliates, and their respective shareholders, directors, partners, officers, employees and agents, against any Losses arising from or relating to: (i) the recklessness or willful misconduct of Seller in providing the Seller Services, so long as such actions are not the result of a direct order by Buyer or any of its employees; and (ii) a breach by Seller of its representations, warranties, covenants or agreements under this Agreement.

(d)       If Buyer receives notice or knowledge of a claim as described in Section 6.1(c), it shall promptly notify Seller in writing and undertake commercially reasonable efforts to provide Seller all necessary information and reasonable assistance, and the exclusive authority to evaluate and settle such claim provided, however, that (i) Seller may not settle such claim in a manner that would have an adverse impact on the Buyer, its affiliates or successors without receiving Buyer's prior written consent; and (ii) Buyer shall have the right to participate in the defense of any such claim that is a third party claim.

Section 6.2.    Insurance.  At the cost and expense of Buyer: (a) Seller shall maintain insurance covering all risks for which insurance is currently maintained, including (to the extent applicable) but not limited to fiduciary and employment practices, medical malpractice, directors and officers insurance, general liability insurance and workers compensation insurance; and (b) Buyer shall maintain during the Term, at the sole cost and expense of the Buyer, a policy or policies of insurance at levels sufficient to support its business activities and indemnification obligations hereunder, including without limitation of the types referenced in subsection (a) above.

Section 6.3.    Disclaimer of Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE.  SELLER PROVIDES NO, AND HEREBY DISCLAIMS ANY AND ALL, REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE BUYER'S ABILITY TO OPERATE THE BUSINESS FOLLOWING CLOSING UNDER OR PURSUANT TO THE CLINICAL LABORATORY LICENSES.

Section 6.4.    Acknowledgment.  Each Party acknowledges that (a) the Services are being provided as an accommodation to the other Party, and (b) neither Party is in the business of providing the Services to third parties.

Section 6.5.    Dispute Resolution by Principals.  In the event any dispute arises between the parties under this Agreement other than with respect to the payment of Seller Fees under Section 4.1 hereof, each of the Parties shall appoint one senior level executive of such Party (each, a "Principal"), who shall undertake reasonable good faith efforts to resolve such dispute for no less than five (5) Business Days (the "Dispute Resolution Period") prior to commencing a law suit before the appropriate court of competent jurisdiction described in Section 9.9 hereof.  The Principals shall meet in person or attempt to resolve such dispute via telephone conference at least once during the Dispute Resolution Period.  In the event the

-10-

Principals do not resolve such dispute during the Dispute Resolution Period, the parties may seek any remedies available to them under this Agreement.

Section 6.6.    Exclusive Remedies; Buyer and Seller's Duty to Mitigate.  Subject to any equitable rights available to a Party in connection with a breach of Section 7.1 hereof, the Parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant or agreement set forth herein shall be pursuant to the indemnification provisions of this Article VI.  Buyer and Seller shall take, and shall cause each of its Affiliates to take, all reasonable steps to mitigate any Losses upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs and expenses only to the minimum extent necessary to remedy the breach that gives rise to such Losses.

## ARTICLE VII
## CONFIDENTIALITY

Section 7.1.    Confidential Information; Nondisclosure.  The Parties understand and agree that in the negotiation, execution and performance of this Agreement, each Party may have access to confidential or proprietary information of the other Party and its Affiliates, including trade secrets, product designs, marketing and business plans, and sales information (collectively, "Confidential Information").  Confidential Information shall not include any information to the extent it: (i) is or becomes a part of the public domain through no act or omission on the part of the receiving Party; (ii) is in the receiving Party's possession, without knowledge of an obligation of confidentiality with respect thereto, prior to the time of disclosure under or in connection with this Agreement; or (iii) is independently developed by the receiving Party without reference to the disclosing Party's Confidential Information.  The Party in receipt of the other Party's Confidential Information shall: (i) use such Confidential Information solely for purposes of this Agreement; and (ii) disclose such Confidential Information only to its officers, employees, consultants, and contractors whose duties relate to this Agreement, and who reasonably require familiarity with such information in order for such Party to perform its obligations hereunder and who agree to be bound by the confidentiality obligations contained herein.  Notwithstanding the foregoing, in the event that either Party is required by applicable law, regulation, or legal process to disclose any Confidential Information, then the Party required to make such disclosure shall undertake commercially reasonable efforts to give prior written notification to the other Party so that such other Party may attempt to obtain a protective order.

## ARTICLE VIII
## PROPRIETARY RIGHTS

Section 8.1.    Buyer Information.  Buyer shall retain exclusive ownership, together with all intellectual property rights therein, in any proprietary information, content or other materials that Buyer provides to Seller pursuant to this Agreement.

Section 8.2.    Seller Information.  Except for the Purchased Assets, Seller shall retain exclusive ownership, together with all intellectual property rights therein, in any proprietary information, content or other materials that Seller provides to Buyer pursuant to this Agreement.  Except as provided in the Purchase Agreement, Buyer shall not obtain any right,

-11-

title or interest in any asset owned by Seller after the Closing Date by virtue of the provision of the Services hereunder.

        Section 8.3.    <u>License to Use Seller Name</u>.  Buyer hereby grants to Seller a limited, irrevocable, royalty-free, non-exclusive, non-transferable license to use the name "Bostwick Laboratories" and any other name under which Seller operated the Business for the sole purpose of providing the Seller Services during the Term.

## ARTICLE IX
## MISCELLANEOUS

        Section 9.1.    <u>Notices</u>.

        (a)    All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by email, facsimile or reputable overnight delivery service and properly addressed as follows:

To Buyer:

> Poplar Healthcare, PLLC
> 3495 Hacks Cross Road
> Memphis, TN 38125
> Fax:  (901) 271-2684
> Attention:  James P. Sweeney

with a copy to (which shall not constitute notice):

> Baker Donelson
> 2000 First Tennessee Building
> 165 Madison Avenue
> Memphis, TN 38103
> Fax:  901-577-0845
> Attention:  E. Franklin Childress, Jr.

If to Seller following the Closing:

> Bostwick Laboratories, Inc.
> 100 Charles Lindbergh Boulevard
> Uniondale, NY 11553
> Fax:  (516) 512-5300
> Attention:  James Carroll, Chief Restructuring Officer

with a copy to (which shall not constitute notice):

> Pepper Hamilton LLP
> Hercules Plaza
> 1313 North Market Street, Suite 5100

-12-

Wilmington, DE  19899
Fax: (302) 656-8865
Attention:  David B. Stratton (strattod@pepperlaw.com) and Evelyn J.
Meltzer (meltzere@pepperlaw.com)

> (b)     Any party may, from time to time, change its address for the purpose of notices to that party by a similar notice specifying a new address.

Section 9.2.     Interpretation.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa; and (d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless otherwise specified or the context otherwise requires, references herein: (i) to Articles and Sections mean the Articles and Sections of this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

Section 9.3.     Headings.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 9.4.     Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 9.5.     Entire Agreement.  This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

Section 9.6.     Assignment.  Subject to Section 2.2, neither Party may assign, delegate or otherwise transfer this Agreement, or any of its rights or obligations hereunder, without the prior written consent of the other Party.

Section 9.7.     No Third Party Beneficiaries.  Except as otherwise expressly set forth in this Agreement, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.8.     Amendment and Modification; Waiver.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed and delivered by each

#43604841 v5

Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.

Section 9.9.    <u>GOVERNING LAW; WAIVER OF JURY TRIAL</u>.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLER EACH HEREBY CONSENT TO AND SUBMIT TO SUCH JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASE SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLE SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OR ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 9.1</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 9.1</u>.

(b)    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION

#43604841 v5

ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.9(b) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

      Section 9.10.   Force Majeure.  No failure or omission by either Party in the performance of any obligation under this Agreement shall be deemed a breach of this Agreement, nor shall it create any liability, if the same shall arise from any cause or causes beyond the reasonable control of such Party and not due to such Party's fault or negligence and was not reasonably foreseeable by such Party.

      Section 9.11.   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

      Section 9.12.   NO SPECIAL DAMAGES.  IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER PARTY HERETO FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING LOSS OF FUTURE REVENUE OR PROFITS, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY RELATING TO THE BREACH OR ALLEGED BREACH OF THIS AGREEMENT, OR DIMINUTION OF VALUE OR ANY DAMAGES BASED ON ANY TYPE OF MULTIPLE.

[Signatures appear on the following page.]

#43604841 v5

IN WITNESS WHEREOF, each of the Parties hereto has caused this Transition Services Agreement to be executed as of the Effective Date by its duly authorized representative.

**BUYER:**

**POPLAR HEALTHCARE, PLLC**

By: _____
Name: James P. Sweeney
Title:   Chief Executive Officer

**SELLER:**

**BOSTWICK LABORATORIES, INC.**

By: _____
Name: James Carroll
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Transition Services Agreement to be executed as of the Effective Date by its duly authorized representative.

**BUYER:**

**POPLAR HEALTHCARE, PLLC**

By: _____
Name: James P. Sweeney
Title:   Chief Executive Officer

**SELLER:**

**BOSTWICK LABORATORIES, INC.**

By: _____
Name: James Carroll
Title:   Chief Restructuring Officer

## EXHIBIT A

### Seller Services to be Provided to Buyer

| Seller Service | Description | Duration[1] |
|---|---|---|
| Operate and Supervise the Uniondale Laboratory | Seller shall operate and supervise the Uniondale Laboratory in substantially the same manner as Seller operated and managed it immediately prior to the Closing Date. | 3 months |
| Procurement and Management of Inventory and Supplies | Procurement, purchase and management of reagents and other inventory and supplies. | 3 months |
| Procurement and Management of Third Party Services | Procurement, purchase and management of services from third parties so that the Uniondale Laboratory is serviced in substantially the same manner as it was serviced immediately prior to the Closing Date. | 3 months |
| License Maintenance | Seller shall maintain in good standing Seller's Clinical Laboratory Licenses and Medicare provider registration. | 3 months |
| Interface Management | Providing maintenance to the software and hardware interfaces of the Business and the computing systems of its customers that existed as of the Closing Date in substantially the same manner as it was maintained immediately prior to the Closing Date. | 3 months |
| Provision of Client Supplies and Requisitions | Seller shall procure and provide to customers of the Business specimen collection kits in substantially the same manner as they were provided immediately prior to the Closing | 3 months |

---

[1] The Duration of each of the Seller Service is subject to termination or modification as set forth in Section 5.2.

| Seller Service | Description | Duration[1] |
|---|---|---|
| | Date. | |
| Testing of Legacy Samples | Seller shall undertake commercially reasonable efforts to process and complete all outstanding clinical laboratory and pathology laboratory tests on all samples in the possession of the Seller as of the Closing Date and submitted to Seller during the Term ("Legacy Samples").  All such clinical laboratory and pathology laboratory tests relating to Legacy Samples shall hereinafter be referred to as the "Legacy Tests".<br><br>Seller shall submit claims to all appropriate third-party payors, including Medicare and Medicaid and commercial payors, and collect reimbursements for the Legacy Tests completed by Seller during the Term ("Seller-Completed Legacy Tests").  Once  a month during the Term (and following the Term with respect to Seller-Completed Legacy Tests completed during the final month of the Term), Seller shall pay over to Buyer by wire transfer or by Seller check all revenues from such Seller-Completed Legacy Tests (net of recoupments sought by payors in the ordinary course of business) following actual receipt of the same. Notwithstanding the foregoing and any other provision of this Agreement to the contrary, Seller shall not be obligated to appeal or take any other actions related, or in response, to any claims that are denied in whole or in part unless otherwise agreed to by the Parties in writing.<br><br>Seller shall notify the appropriate treating or authorizing physicians (or | 3 months |

| Seller Service | Description | Duration[1] |
|---|---|---|
| | other appropriate third parties) of the results of Seller-Completed Legacy Tests without undue delay and consistent with Seller's past practice. | |
| Notification of Buyer-Completed Legacy Test Results | Promptly following receipt of Buyer-Completed Legacy Test Results from Buyer (as further described on Exhibit B), Seller shall provide verbal, written or electronic notice, as appropriate, of such Buyer-Completed Legacy Test Results to the treating or authorizing physician (or other appropriate third parties) without undue delay and consistent with Seller's past practice. | Until complete |
| Client Service | Seller shall provide customer service to clients of the Business in substantially the same manner as provided by Seller immediately prior to the Closing Date. | 3 months |
| Logistics Services | Seller shall provide logistics services to the Business in substantially the same manner provided by Seller immediately prior to the Closing Date. | 3 months |
| Field Diagnostics Services | Seller shall provide to the Business client office-based field technicians and related supplies and equipment, in substantially the same manner provided by Seller immediately prior to the Closing Date. | 3 months |

## EXHIBIT B

### Buyer Services to be Provided to Seller

| Buyer Service | Description | Duration |
|---|---|---|
| Testing/Notification of Legacy Samples | Buyer shall, at Buyer's cost, process and complete all Legacy Tests on all Legacy Samples that have not been fully processed by Seller during the Term ("Buyer-Completed Legacy Tests").<br><br>Promptly following the completion of Buyer-Completed Legacy Tests, Buyer shall, at Buyer's cost, provide to Seller written or electronic notice of such test results ("Buyer Completed-Legacy Test Results") so that Seller may provide verbal, written or electronic notice, as appropriate, of such Buyer-Completed Legacy Test Results to the treating or authorizing physician (or other appropriate third parties) without undue delay and consistent with Seller's past practice. | Until complete |